**IN THE COUNTY COURT, SEVENTH JUDICIAL CIRCUIT**
**IN AND FOR VOLUSIA COUNTY, FLORIDA**

CASE NO. ~~2025 30303 COOL~~

DIVISION ~~71~~

Michael Puckett

1601 n us R+1

Ormond beach Fl.

**Plaintiff (s),**

-vs-

Edgewater Animal Shelter
605 Mango Tree Drive
Edgewater, FL  32132

C/O Kayla Kaartz          **Defendant (s)**

2025 SEP 16 PM 4: 25
CLERK OF THE CIRCUIT
& CTY COURT VOLUSIA CTY, FL.
CC33

**REPLEVIN COMPLAINT**

**Plaintiff sues defendant and alleges:**

1. **This is an action to recover possession of personal property in** <u>Volusia County</u>,
   **Florida.**

2. **The description of the property is:**
   Dog # 1: American Bulldog named Goose, he is a Bindle/Bangle orange with black stripes around 80 pounds, intact male, he has a thin white stripe starts between his eyes that goes all the way to his nose.  Under his chin is some white.

   Dog # 2: Macho man, a mix of cane corso, staffordshore terrier, black lab, male intact, black with one white toe, white male intact, black and white chest about 40 pounds, he has a scar on his face, his back leg sometimes hangs.

   Due to my illness and trama from the Military these two dogs are my emotional support dogs.

   **(If more space is needed, attach additional sheet.)**

   **To the best of plaintiff's knowledge, information and belief, the value of the property is**
   <u>$200.00          </u>.

3. **Plaintiff is entitled to the possession of the property by reason of:**  **(if based on written**
   **instrument, attach a copy thereof.)**
   I was blessed with these 2 dogs, when they were around 7 weeks old and 3 1/2 years old.  I have had them in my pocession for 3 1/2 years.

CL-0216-1810                                (1)

**4. To plaintiff's best knowledge, information and belief, the property is located at:**

605 Mango Tree Edgewater, FL  32132

**5. The property is wrongfully detained by defendant.  Defendant came into possession of the property by (describe method of possession).**

I was arrested for tresspassing and left my dogs with a friend.  Upon being release I learned that the Police would not allow my friend to keep the dogs, they were seized without justification and turned over to the shelter. There was no reason for the seizer since they were left in good hands.. My rights were violated and my 2 dogs were taken from me and I have made every possible attempt to get my dogs back.  The shelter has my dogs and is continiuing to refuse to return them to me.  I was told I could get my dogs back within 3 days, but then they said they had to call the Police and would call me back, which they did not.  They avoided my calls and purposly increased the amount to get them out, they had my dogs fixed within the 3 days, put them up for adoption almost immeditaly.  I was denied due process. One of my dogs may have been put down.  My dogs are family and I truly love and miss them and take care of them at all times.

**To plaintiff's best knowledge, information and belief, defendant detains the property because (give reasons).**

An email stating that I could not have the dogs because the manager of where I live stated that it would not be a good enviorment for them.  The shelter never called the manager and used it as an excuse to deny me.  The manager is willing to testify.  They were well taken care of, not in distress, well fed & nurished, and very much  loved.  No evidence of negect or cruelty.  No justifiable cause.

**6. The property has not been taken for any tax, assessment or fine pursuant to law.**

**7. The property has not been taken under an execution or attachment against plaintiff's property.**

**Wherefore, plaintiff demands judgment for possession of the property and costs of this action.**

Micul Puckett

**Plaintiff or Attorney for Plaintiff (typed or printed)**

1608 N US RT 1 ormond Beach Fl.

**Address:**

**Tel. No.** 386 - 363 - 4558

**Fax No.**

**Attorney Bar No.**



I know this
is Goose   Mike Roberts
9-15-25

Dog





| PATIENT | CLIENT | RECORD # |
|---|---|---|
| Goose | Puckett, Mike | |

| DATE | MEDICAL RECORD | CODES |
|---|---|---|
| 12/30/22 | Rabies 1yr, Heartworm test, pass worms, ō unsure of vaccine history | O VV |
| | | RCI |
| 60# | ~ 6-7 month | OH&O |
| | BAH. Rec DP, HWP | WNF |
| | | 1/c |
| 1/3/23 | (P) ō saw worms in stool - emailed | Droncx4 |
| | image - tapeworm positive | Adv4x2 |
| | Rx Droncit 34mg #4 | 1/c bal |
| | ADVANTAGE 55↑ #2 doses | |
| | share with Chico | |
| 2/6/23 | (P) ō saw possible roundworms in stool was concerned since gave Droncit in Jan. ō traveling to FL with dogs and used rest stops. A/o to deworm and retest stool when back in area. ō to order HWP online. | |

Puckett, Mike
22
P



## CANINE TREATMENT RECORD

| | | RECORD # |
|---|---|---|

**PATIENT** Moncho Man

**BREED** Pit

**CLIENT** Puckett

**MOBILE #**

**HOME #**

**WORK #**

**SEX** MN

**BIRTHDATE** ~

**COLOR/MARKINGS** blk/whte

**SPECIAL DIET**

**BEHAVIOR ALERT**

**MEDICAL ALERT / ALLERGIES**

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RABIES | 12/22 | | | | | | | | | | | | | |
| DHPP | | | | | | | | | | | | | | |
| LEPTO | | | | | | | | | | | | | | |
| LYME | | | | | | | | | | | | | | |
| CORONA | | | | | | | | | | | | | | |
| BORDETELLA | | | | | | | | | | | | | | |
| INFLUENZA | | | | | | | | | | | | | | |
| 4DX HEARTWORM | 12/22 | | | | | | | | | | | | | |
| FECAL | | | | | | | | | | | | | | |
| DENTAL | | | | | | | | | | | | | | |

| DATE | MEDICAL PROBLEMS | DATE | PROCEDURES / DENTALS / SURGERIES |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | MEDICATIONS |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Puckett, Mike

22

# COURT FILING COVER SHEET

Case Type: Emergency Replevin (Return of Personal Property – Companion Animals)

Plaintiff: Michael Puckett
Address: 1608 US Highway 1, Ormond Beach, FL
Phone: 386-363-4558

Defendant: Edgewater Animal Shelter
Address: 605 Mango Tree Dr., Edgewater, FL

Documents Submitted:
1. Petition for Emergency Replevin
2. Motion for Writ of Emergency Replevin / Immediate Possession
3. Affidavit of Ownership
4. Witness Affidavit Template(s)

Relief Requested:
• Immediate issuance of a Writ of Replevin directing the Defendant to return the dogs (Goose and Macho Man) to Plaintiff.
• Any further relief the Court deems just and proper.

Instructions for Clerk:
Please file these documents under a new civil action in the Circuit Court of Volusia County. Plaintiff is requesting emergency handling due to the ongoing deprivation of property and potential harm to the animals.

| | | | |
|---|---|---|---|
| 3/16/2022 | about 1 month ago - was in driveway - got Ⓛ hind Ran over - | | EX |
| | went to Em. Clinic - xray said was broke than 2nd xray vet said wasn't broke - | | RIM100 x7 |
| 76# 8# | wanted $1400 ō declined tx - they declin'd to give pain meds - gave Abx | ½ 118.91 pd cash ✓ | |
| | ō states dog is up whinning all night - won't get comfortable | | |
| | No Vaccines, No HWP | | |
| | non-weight bearing Ⓛ hind prob Ⓛ hip lux. 'ō' to send old films Rec X-rays    can send RIM100 ½/BID/7d | | |
| 8/24/22 | ō request refill on 100mg Novox ½/bid/7d approved per JH | Rim100 x7 ½c 29.10 pd cash ✓ | |
| 9/2/22 | quote = $389 D/o for xrays $1700-2200+ SX | | |
| 9/6/22 | Phone: ō won't have funds for xrays x 2-3 weeks Requesting refill novox Per JH ok to Refill novox | RM100 x20 ½c 52.89 pd cash ✓ 5300 | |
| 10/17/22 | Rx - 100mg Carprophen ½/bid #20 | ½c (.71) | |
| 12/23/22 | No show | Rim100x20 ½c 72.00 pd CASH ✓ | |



12/30/22 | wants an xray done on his leg
left leg - ð gave loccipes at home | EX
wants OHW | RC'
50 | | OHW ⊖
2-3/5 time (2) rean | WDF
Rads show prob old pelvic fx | XR
ball of femur moth eaten + lytic | XRAD
Rec: excision or total hip replacement | WOF
Est ≈2,800 for FHO | VAIT - 1,25
⑩ | KET - 1,25
| HOSP
bal 786.47
RX - Carprofen 100mg #60 | pavipa
1/2 bid | RimlcD
1/c 52.29
| paviba

1/3/23 | Ⓟ õ saw worms in stool | DennyC x4.
tapeworm positive - emailed | AOVB
image | 1/c bal
RX DRONCIT 34mg #4
Advantage 21-55# 1month

MACHO

Puckett, Mike
22



| PATIENT | CLIENT | RECORD # |
|---|---|---|
| Chico | Puckett, Mike | |

**MEDICAL RECORD**

| DATE | | CODES |
|---|---|---|
| 12/30/22 | ā unsure of vaccine history - Rabies 1yr | |
| 55# | Heartworm test, possible worms | DVV |
| | BAR , NSR    Rx DP, NWP | RC1 |
| | | OHW ⊝ |
| | | WDF |
| | | 1/C |
| 1/3/23 | Ⓟ ō saw worms in stool - emailed | DRONCX4 |
| | image - tapeworm positive | bal |
| | Rx DRONCIT 34mg #4 | 1/C 23443 |
| | | pd VISA |



## ANIMAL CLINIC OF CAROLINE

| PATIENT | Aron | CLIENT | Pickett | RECORD # | |
|---|---|---|---|---|---|
| DATE | | MEDICAL RECORD | | | CODES |
| 1/7/23 | ō thinks ō has been hit by a car - limping on near Ⓛ leg ō has seen blood coming from the leg - ) open wound on left near leg | | | | EX |
| 14 2# | ō said vaccines are up to date | | | ⑩ | 0.3cc KA |
| | open wound / inside Ⓛ hock | | | | XR |
| | | | | | XRAD |
| | | | | | WDF |
| | | | | | HOSP |
| | | | | | SX-150 |
| | | | | | TR-95 |
| | | | | | ELIZ |
| | | | | | RA YTR 10.6 |
| | | | | | RAYt 2x7 |
| | | | | | RA |
| | | | | | ½c 609.52 |
| | | | | | pd visa |

22

Puckett, Mike

**IN THE COUNTY COURT OF THE SEVENTH JUDICIAL CIRCUIT
IN AND FOR VOLUSIA COUNTY, FLORIDA**

**MICHAEL PUCKETT**,

                Plaintiff,                              Case No.:  2025-25303-CODL

vs.

**EDGEWATER ANIMAL SHELTER, INC.,**
and **JANE DOE,**

                Defendants.

_____/

**<u>EDGEWATER ANIMAL SHELTER, INC'S MOTION TO DISMISS COUNTS II AND
III OF PLAINTIFF'S SECOND AMENDED COMPLAINT</u>**

        Edgewater Animal Shelter, Inc. ("Edgewater") by and through undersigned counsel, files

this Motion to Dismiss Counts II and III of Plaintiff's Second Amended Complaint. As grounds in

support thereof, Edgewater states as follows:

**<u>Factual History and Background</u>**

        1.      On September 16, 2025, Plaintiff filed a Complaint for Replevin against Edgewater,

seeking possession of two dogs that were delivered to Edgewater Animal Shelter by Ormond

Beach Police Department after the Plaintiff's arrest. Doc. 3.

        2.      A Show Cause Hearing was held on September 29, 2025.

        3.      On October 8, 2025, this Court entered an Order On Preliminary OTSC Hearing

and Granting Plaintiff's Motion to Amend Complaint (the "Order"). Doc. 14.  The Order dismissed

Plaintiff's first Complaint and deemed Plaintiff's Amended Petition for Writ of Replevin and

Complaint for Damages filed[1]. Order at ¶¶ 6, 9.

        4.      On October 21, 2025, Plaintiff – without a motion, without conferral with the

---

[1] Plaintiff filed a Motion for Reconsideration and Request for Leave to Amend on October 3, 2025 – prior
to entry of the Order. Dkt. 12

undersigned, and without leave of court –filed a Second Amended Complaint.

5.      The Second Amended Complaint includes three causes of action: I (Replevin against Jane Doe – i.e. Goose's adopter); II (Conversion against Edgewater); and III (Intentional Infliction of Emotional Distress against Edgewater).

6.      As set forth below, Counts II and III – the only claims brought against Edgewater - must be dismissed with prejudice.

## Legal Standard

The purpose of a motion to dismiss is to test the legal sufficiency of the complaint. *Pacific Ins. CO., Ltd. v. Botelho*, 891 So. 2d 587 (Fla. 3d DCA 2004); *citing Barbado v. Green & Murphy, P.A.,* 758 So. 2d 1173, 1174 (Fla. 4th DCA 2000). The function of a motion to dismiss is to raise as a matter of law the sufficiency of the facts alleged to state a cause of action. *Connolly v. Sebeco*, 89 So. 2d 482, 483 (Fla. 1956). "Whether a complaint is sufficient to state a cause of action is an issue of law." *Brewer v. Clerk of the Circuit Court, Gadsden County*, 720 So. 2d 602, 603 (Fla. 1st DCA 1998); s*ee also Siegle v. Progressive Consumers Ins. Co.*, 819 So. 2d 732, 734 (Fla. 2002). A petition or complaint that contains irrelevancies, certain evidentiary allegations, or improper conclusions will be subject to dismissal for failure to state a cause of action. *Balbontin v. Porias,* 215 So. 2d 732 (Fla. 1968).

In order to survive a motion to dismiss, a complaint must set forth sufficient ultimate facts to state a cause of action. Fla. R. Civ. P. 1.140(b)(6). "[M]ere statements of opinion or conclusions unsupported by specific facts will not suffice.  *Brandon v. County of Pinellas*, 141 So.2d 278 (Fla. 2d DCA 1962). A court "will not be bound by bare allegations which are unsupported or unsupportable. *Other Place of Miami, Inc. v. Hialleah Gardens*, 353 So. 2d 861, 862 (Fla. Dist. Ct. App. 1977).

<u>**Legal Argument**</u>

As discussed in detail below, each of Plaintiff's claims against Edgewater must be dismissed with prejudice, because a third amendment as to the Edgewater claims would be futile.

**A. Count II of the Second Amended Complaint (Conversion) Must be Dismissed**

Plaintiff alleges that Edgewater "intentionally exerted wrongful dominion over Macho Man and Goose", and interfered with Plaintiff's right of possession of the dogs by euthanizing Macho Man and transferring Goose to Jane Doe for adoption. *See* Plaintiff's Second Amended Complaint (the "2AC") at ¶¶ 53-55. Plaintiff demands unspecified damages for "suffering, mental anguish, loss of use of his property, loss of the intrinsic value of his property, and other compensatory damages". 2AC at ¶ 56. As discussed below, Count II must be dismissed because: a) Plaintiff failed to make the requisite demand for return of the property; b) at all times relevant to Plaintiff's claims, Edgewater (not Plaintiff) was the lawful owner of Goose and Macho Man; and c) Plaintiff's right to possession of Goose and Macho Man was terminated prior to the relevant time frame in the Second Amended Complaint.

**1. Count II Must be Dismissed For Plaintiff's Failure to Make a Demand for Return of the Property or to Allege that Such a Demand Would Have Been Futile**

As an initial matter, Count II must be dismissed due to Plaintiff's failure to demand return of Goose and Macho Man or, alternatively, to allege that such a demand would have been futile. Such demand is "an essential element in any claim for conversion and failure to make such a demand or allege the futility of doing so is fatal". *Shelby Mutual Insurance Co. of Shelby, Ohio v. Crain Press, Inc.*, 481 So.2d 501, 503 (Fla. 2d DCA 1985), *review denied*, 491 So.2d 278 (Fla. 1986). *See also Ginsberg v. Lennar Florida Holdings, Inc.*, 645 So.2d 490, 500 (Fla. 3d DCA 1994), *rev. denied*, 659 So.2d 272 (Fla. 1995).

**2. Count II Must Be Dismissed due to Plaintiff's Failure to State a Cause of Action**

Additionally, Count II must be dismissed for failure to state a cause of action. Conversion is "the exercise of wrongful dominion and control over property to the detriment of the rights of its actual owner. Where a person having a right to possession of property makes demand for its return and the property is not relinquished, a conversion has occurred". *Batista v. Rodriguez,* 388 So. 3d 1098, 1101 (Fla. 3d DCA 2024) (emphasis added)

<u>Edgewater was the Lawful Owner of Goose and Macho Man</u>

Plaintiff's conversion claim fails because, at all times relevant to his claims against Edgewater and Jane Doe, Plaintiff lacked the right to possession of Goose and Macho Man. To the contrary, *Edgewater* was the lawful owner of the dogs, and Edgewater's possession of and control over the dogs was authorized by law and not wrongful or improper in any way.

It is imperative to consider relevant Ormond Beach City, Edgewater City, and Volusia County ordinances when determining ownership of Goose and Macho Man. Edgewater's ownership, right to dominion, and control over Goose and Macho Man (as well as Plaintiff's termination of any previously-held possessory rights) is authorized and controlled by these laws.

A review of these laws confirms that Edgewater was the owner of Goose and Macho Man and did not wrongfully take either of them.  As alleged by Plaintiff, the dogs were delivered to Edgewater by the Ormond Beach Police Department ("OBPD") after a two-day hold. 2AC at ¶ 16. This process is consistent with Ormond Beach law, which provides:

> An animal control officer has the authority to impound any animal at large…The city shall establish and operate, either independently or in cooperation with a humane society or a veterinarian, a suitable place for the impounding, care and final disposal of all animals picked up under the terms of this chapter and said place shall be known as the animal shelter. Ormond Beach Ordinance § 5-70; and

> It shall be the duty of the animal control officer… to keep all animals impounded pursuant to this article for a period not to exceed two days. If, at the expiration of two days from the date of impoundment, such animal has not been reclaimed, it may be transferred to an animal shelter. Ormond Beach Ordinance § 5-73.

OBPD's transfer of the dogs to Edgewater is also consistent with Edgewater City law, which states:

> If the owner of an impounded animal is incarcerated… the impounding facility or shelter having custody of the animal will hold the animal up to three days. During this three-day period, all reasonable means will be utilized in an attempt to contact the owner to make arrangements for care of the animal impounded. If no arrangements are made, custody will then revert to the city's animal shelter for adoption or euthanasia if necessary. Edgewater City Ordinance §5-40(b); and

> If an animal is not claimed within three days after impoundment, the animal shall be deemed unowned or abandoned and shall be disposed of pursuant to the requirements of this chapter and the rules and regulations of the impounding facility. Edgewater City Ordinance §5-41(b); and

> Any unclaimed animal shall become the property of the impounding facility after the three-day hold period, and may be humanely destroyed, maintained or disposed of by gift, sale or adoption pursuant to the requirements of this chapter and the rules and regulations of the impounding facility. Edgewater City Ordinance §5-41(e);

OBPD's conduct is likewise consistent with Volusia County law:

> Any unclaimed animal shall become the property of the animal services division. The animal services division shall determine the appropriate disposition of the animal, which may include, but is not limited to, humanely destroyed, transferred to a humane society, or placed in the custody of some person deemed to be a responsible and suitable owner who will agree to comply with all of the provisions of this article. Volusia County Ordinances, §14-40(c).

As supported by the allegations in the Second Amended Complaint, and as authorized by these ordinances, *Edgewater – not Plaintiff - was at all times relevant to this action the legal owner of Macho Man and Goose.* Specifically, and as specifically provided in the Edgewater City Ordinances above, because Plaintiff was unable to pay the impoundment fee to reclaim Goose and Macho Man after three days, the dogs were deemed abandoned by law and became the property of Edgewater.

Edgewater gained ownership of the animals not through an improper taking, but through legal procedure followed by OBPD. Accordingly, Edgewater's possession of Goose and Macho Man was not wrongful, and was not inconsistent with Plaintiff's right of possession of the animals.

5

<u>Plaintiff had No Right of Possession of Goose and Macho Man</u>

Additionally, in Florida, a plaintiff must have a present or immediate right of possession of the property in question. *Allen v. Universal C. I. T. Credit Corp.,* 133 So. 2d 442, 445 (Fla. 1st DCA 1961); *Page v. Matthews*, 386 So. 2d 815, 816 (Fla. 5th DCA 1980). Plaintiff cannot allege any such right. Plaintiff admits in the Second Amended Complaint:

- OBPD transferred Goose and Macho Man to Edgewater on or about August 19, 2025, after holding them for two days after Plaintiff's arrest. 2AC at ¶ 9, 16

- Edgewater advised Plaintiff that he was required to pay $490.00 in order to retrieve his animals. 2AC at ¶ 25

- Plaintiff was unable to pay Edgewater the impoundment fee and that he informed Edgewater of this fact.

Plaintiff's right of possession of Goose and Macho Man was terminated when the dogs remained impounded with OBPD. *See* Edgewater City Ordinance §5-40(b) (if no arrangements are made by the owner for the care of the impounded animals within three days, "custody will then revert to the city's animal shelter for adoption or euthanasia"). It is clear that any right of possession that Plaintiff had was terminated when he failed to pay the impoundment fees imposed by Edgewater. *Id.*

Edgewater must point out that, while the Complaint attempts to depict Edgewater as a shelter that callously refused to work with Plaintiff to arrange for a payment plan for the fee, Plaintiff entirely overlooks the fact that Edgewater was *prohibited by law* from returning the dogs to Plaintiff without payment of the impoundment fee. Indeed, Plaintiff's payment of the "full cost of impoundment" was *required* before he could reclaim the animals. *See* Edgewater Florida Ordinance § 5-41(c), Ormond Beach Ordinance § 5-72, and Volusia County Ordinance §14-62(e)[2].

---

[2] For example, §14-62(e) provides, "**Any person seeking to redeem or reclaim an animal impounded** under the provisions of this Article **shall pay the impoundment fees, boarding fees, license fees, and all other fees** resulting from impounding and caring for the animal." (emphasis added). § 5-41(c) requires that an owner of an impounded

Edgewater waited 28 days before adopting Goose to Jane Doe – far longer than was required by law.

Finally, while the Second Amended Complaint entirely overlooks applicable city and county ordinances, Plaintiff attempts to support his claims by alleging Edgewater's supposed failure to comply with Fla. Stat. §828.073 (titled "Animals found in distress") and Part II of Chapter 767, Fla Stat. (titled "Dangerous Dogs). However, neither statute is at all relevant to the instant case, and Edgewater was not required to comply with them.

Fla. Stat. §828.073 is a *criminal* statute that sets forth the procedure a *law enforcement officer* must follow when removing a "neglected or mistreated animal" from its custody or when making such neglected or mistreated animal" the subject of an order to provide care. Edgewater is not a law enforcement agency, animal control agency, or an agent appointed under §828.03 to prosecute violators. Nor were Goose and Macho Man removed from Plaintiff's custody due to neglect or mistreatment – as evidenced by the fact that the Plaintiff was not arrested for or charged with animal cruelty. §828.073 is therefore not applicable to the situation that is the subject of this action, and neither Edgewater nor OBPD were required to follow the procedure for removal of neglected or mistreated animals set forth therein.

---

animal "pay impoundment fees before being entitled to resume possession".

§ 5-41(c) provides: Upon proof of ownership, **payment of any impoundment fees**, and the procurement of any required vaccinations and tags, the owner of an impounded animal is entitled to resume possession. (emphasis added)

§5-72 provides: "The owner of any animal impounded pursuant to city ordinance or Florida Statutes can reclaim such animal, **upon payment of a license fee and the charges hereinafter imposed, and of all costs and charges incurred by the city for impounding and maintenance of such animal**. No animal shall be reclaimed unless the owner furnishes the animal control officer a certificate showing that the animal has been vaccinated against rabies within the preceding 12 months. If the owner cannot furnish said certificate, the animal shall be transported to an animal shelter or veterinarian where the appropriate vaccination can be administered prior to its release. Any of the duties herein imposed upon the animal control officer may be delegated to an animal shelter by a service agreement approved by resolution of the city commission. **In all instances of impoundment, owners of animals are responsible for the full cost of impoundment as charged by the shelter."** (emphasis added)

Chapter 767 pertains to the classification and disposition of "dangerous dogs". Again, this statute is not relevant in the instant matter. No party attempted to declare Macho Man a "dangerous dog" and, more importantly, such designation is not necessary when an animal shelter determines that euthanizing a dog in its custody is appropriate. *See* Edgewater City Ordinance §5-41(e) and Volusia County Ordinance § 14-40(c).

In summary, Plaintiff's conversion claim must be dismissed. Plaintiff cannot allege ownership rights of Goose and Macho Man or that Edgewater exercised *wrongful* dominion or control over the dogs. To the contrary, the applicable law authorizes Edgewater's custody of the animals. Finally, Plaintiff failed to make the requisite demand for Goose and Macho Man prior to initiating the action.

### 3. Alternatively, Plaintiff's Demand for Damages as to Count II Must be Stricken.

Alternatively, if Count II is not dismissed, Plaintiff's demand for damages must be stricken. Plaintiff demands unspecified damages for "suffering, mental anguish, loss of use of his property, loss of the intrinsic value of his property, and other compensatory damages". 2AC at ¶ 56. However, it is well settled that damages for conversion are limited to the reasonable value of the property when converted. *Page*, 386 So. 2d at 816; *Foresight Enters., Inc. v. Leisure Time Props., Inc.,* 466 So. 2d 283, 286 (Fla. 5th DCA1985).

Plaintiff's damages (if any) would therefore be limited to the reasonable value of Goose and Macho Man in August of 2025. Plaintiff's demand for all other damages must be stricken.

### B. Count III (Intentional Infliction of Emotional Distress) Must Also be Dismissed

Like Count II, Plaintiff's claim for intentional infliction of emotional distress against Edgewater must be dismissed for failure to state a cause of action.

Plaintiff alleges that Edgewater acted with "deliberate indifference to Plaintiff's property rights in Goose and Macho Man and engaged in extreme and outrageous conduct by:

- Refusing to allow Plaintiff to reclaim Macho Man or Goose because he could not afford the fees unilaterally imposed by Edgewater;
- Refusing to allow Plaintiff to make payments for fees he owed to Edgewater for the impoundment of Goose and Macho Man
- Killing Macho Man
- Transferring possession of Goose to the adopter. (2AC at ¶ 58).

Put differently, Plaintiff alleges that Edgewater intentionally inflicted emotional distress upon him *simply by doing its job as authorized by law.* This argument is nonsensical and runs afoul of public policy and applicable law. Edgewater's conduct, even if it were extreme or outrageous, is simply not actionable. "A privilege exists as a matter of law to engage in reckless or even outrageous conduct if there is sufficient evidence that shows the defendant did no more than assert legal rights in a legally permissible way." *Canto v. J.B. Ivey and Company*, 595 So.2d 1025, 1028 (Fla. 1st DCA 1992), citing *Metropolitan Life Insurance Co. v. McCarson,* 467 So.2d 277, 279 (Fla. 1985). See also v. *Kowalski*, No. 2D2024-0382, 2025 WL 3019111, at *12 (Fla. 2d DCA Oct. 29, 2025) (To the extent the defendant took actions within its legal rights, "it cannot be liable for IIED").

Furthermore, as addressed in detail above, Edgewater's conduct was, at all times, authorized by law. Edgewater was *required* to collect the "full cost of impoundment" from Plaintiff before returning Goose and Macho Man. *See* Ormond Beach Ordinance § 5-72, Edgewater Florida Ordinance § 5-41(c), and Volusia County Ordinance §14-62(e) ("Any person seeking to redeem or reclaim an animal impounded under the provisions of this Article shall pay the impoundment fees, boarding fees, license fees, and all other fees resulting from impounding and caring for the

animal" and "In all instances of impoundment, owners of animals are responsible for the full cost of impoundment as charged by the shelter."). Unfair as it may feel to Plaintiff, his claim for intentional infliction of emotion distress is not supported by the application of law.

Edgewater was authorized by law to "humanely destroy" or "place in the custody of... a suitable owner". Volusia County Ordinance §14-40(c). Edgewater's authority to euthanize Macho Man and transfer possession of Goose to an adopter is also permissible under Fla. Stat. § 828.058(3)[3] and Edgewater Florida Ordinance §5-41(e) ("Any unclaimed animal shall become the property of the impounding facility after the three-day hold period, and may be humanely destroyed, maintained or disposed of by gift, sale or adoption pursuant to the requirements of this chapter and the rules and regulations of the impounding facility.").

Because Edgewater did nothing more than assert its legal rights in a legally permissible way, Count III must be dismissed.

## Conclusion

As set forth above, Counts II and III of the Second Amended Complaint against Edgewater must be dismissed. Moreover, Plaintiff's claims against Edgewater serve no purpose other than to harass Edgewater and force it to spend its time and limited financial resources to defend this frivolous lawsuit.

Plaintiff's counsel knew or should have known that the claims brought against Edgewater are: a) not supported by the material facts necessary to establish such claims; and b) not supported by the application of law to the material facts in this action. Therefore, Edgewater should be awarded its reasonable attorney's fees to be paid in equal amounts by Plaintiff and his attorney.

---

[3] The August 17, 2925 OBPD police report (Case No. OB250800224) indicates that Plaintiff informed law enforcement officers that Goose and Macho Man "must be kept separate from each other because one would likely 'kill' the other due to behavioral aggression"

**WHEREFORE**, Edgewater Animal Shelter, Inc. respectfully requests that Counts II and III of Michael Puckett's Second Amended Complaint be dismissed with prejudice, that it awarded attorney's fees under Fla. Stat. §57.105(1)(a) and (b), and for such other relief as this Court may deem appropriate.

## CERTIFICATE OF CONFERRAL

I hereby certify that conferral prior to filing is not required under Fla. R. Civ. P. 1.202(c)(6).

Respectfully submitted on November 6, 2025.

/s/ Stephanie M. Boomershine
Stephanie M. Boomershine
Florida Bar No.:  0046667
Bogin, Munns & Munns, P.A.
1000 Legion Place, Suite 1000
Orlando FL 32801
Tel: (407) 578-1334
Fax: (407) 578-2181
sboomershine@boginmunns.com
bmmservice@boginmunns.com
Attorneys for Defendant Edgewater Animal Shelter, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that on November 6, 2025 I electronically filed the foregoing by using the Florida Courts E-Filing Portal, which will send notice of this electronic filing to all counsel of record.

/s/ Stephanie M. Boomershine
Stephanie M. Boomershine

IN THE COUNTY COURT IN AND FOR
VOLUSIA COUNTY, FLORIDA

MICHAEL PUCKETT

     Plaintiff

vs.

EDGEWATER ANIMAL SHELTER

     Defendant

_____/

CASE NO: 2025 25303 CODL
Division 71
JUDGE Angela Dempsy

## <u>NOTICE OF APPEARANCE AND DESIGNATION OF EMAIL ADDRESS</u>

Please take notice that Marcy I. LaHart PA  hereby enters a notice as counsel for

Plaintiff Michael Puckett and pursuant to the Florida Rule of Judicial Administration 2.516

designates the following email addresses for service of all documents required to be served

in this proceeding.

Primary E-Mail Address:     marcy@floridaanimallawyer.com

Respectfully submitted this 24th day September, 2025.

BY:*/s/ Marcy LaHart*
Marcy I. LaHart, Esq.
Florida Bar No. 0967009
Marcy@floridaanimallawyer.com
861 SE 40th Street
Tacoma, WA 98418
(352) 545-7001

2025 25303 CODL

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 24th day of September, 2025 a true and correct copy of

the foregoing was furnished via electronic mail State Court E-Portal to all attorneys of record listed

in the Florida E-filing E-Portal.

BY:*/s/ Marcy LaHart*
Marcy I. LaHart, Esq.

IN THE COUNTY COURT, SEVENTH JUDICIAL CIRCUIT, IN AND FOR
VOLUSIA COUNTY, FLORIDA

| | | |
|---|---|---|
| MICHAEL PUCKETT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | CASE NO.: 2025-25303 CODL |
| EDGEWATER ANIMAL SHELTER | ) | Division: 71 |
| INC. | ) | |
| & | ) | |
| JANE DOE | ) | |
| | ) | |
| Defendants. | | |

_____

## NOTICE OF THE DEPOSITION OF DEFENDANT
## EDGEWATER ANIMAL SHELTER INC. DUCES TECUM

To:    Stephanie M. Boomershine, Esq.
       Bogin, Munns & Munns, P.A.
       1000 Legion Place
       Suite 1000 (10th Floor)
       Orlando, Florida 32801
       sboomershine@boginmunns.com

**PLEASE TAKE NOTICE** that pursuant to Florida Rule of Civil Procedure 1.310(b)(6) the

undersigned will take the deposition of:

Deponent:    Edgewater Animal Shelter through its corporate representative with knowledge

concerning the topics listed in the Attached Schedule A.

Date:   November 14, 2025

Time:  1:00 PM EST

Invite Link: https://us02web.zoom.us/j/6437902535?omn=85471525512

Meeting ID    643 790 2535

MARCY I. LAHART, P.A

**The witness should bring:**

1. An unredacted copy of the Animal Record Summary pertaining to Goose, ID EDGE-A-28149.

2. Edgewater Animal Shelter Inc.'s entire file pertaining to Goose, including any adoption contract or other document, electronic or otherwise reflecting the address where Goose is located and/or the name and address of the person or entity that was given possession of Goose by Edgewater Animal Shelter Inc.

3. Edgewater Animal Shelter Inc.'s entire file pertaining to Macho Man.

4. Any and all correspondence, emails, memos, notes, text, writings or media of any type between or among you and any employee, agent, or representative of Edgewater Animal Shelter Inc. and/or the City of Ormond Beach regarding Goose, Macho Man or Michael Puckett.

5. Any contract between Edgewater Animal Shelter Inc. and the City of Ormond Beach.

**At least 5 days prior to the deposition** all documents responsive to this notice shall be made available to undersigned counsel via electronic transmission. This deposition is being taken for purposes of discovery, for use at trial, or for any other purpose allowed under the Florida Rules of Civil Procedure,

Dated this 3rd day of November, 2025.

BY:/s/ Marcy LaHart
Marcy I. LaHart, Esq.
Florida Bar No. 0967009
Marcy@floridaanimallawyer.com

MARCY I. LAHART, P.A

861 SE 40th Street
Tacoma, WA 98418
(561) 358-5436

SCHEDULE A

1. The issues and facts raised by the pleadings in the attached Second Amended Complaint in this matter.
2. The identity and contact information for the person(s) to whom Edgewater Animal Shelter Inc. transferred possession of Goose.
3. The destruction of Macho Man.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 3rd day of November , 2025 a true and correct copy

of the foregoing was furnished via electronic mail State Court E-Portal to all attorneys of record

listed in the Florida E-filing E-Portal.

BY:*/s/ Marcy LaHart*
Marcy I. LaHart, Esq.

MARCY I. LAHART, P.A

IN THE COUNTY COURT IN AND FOR
VOLUSIA COUNTY, FLORIDA

MICHAEL PUCKETT

      Plaintiff

vs.

EDGEWATER ANIMAL SHELTER INC.

and

JANE DOE

      Defendants

_____/

CASE NO: 2025 25303 CODL
Division 71
JUDGE Angela Dempsy

## SECOND AMENDED COMPLAINT FOR WRIT OF REPLEVIN, DAMAGES AND DEMAND FOR JURY TRIAL

    Plaintiff, MICHAEL PUCKETT, sues Defendants EDGEWATER ANIMAL

SHELTER INC. for Conversion and Intentional Infliction of Emotional Distress and sues

JANE DOE to recover possession of personal property, and in support thereof states:

### JURISDICTION & VENUE

1.     This is an action for damages in excess of $8,000.00.

2.     Pursuant to § 47.011, Fla. Stat., venue is proper in Volusia County because the

incidents giving rise to this cause of action occurred in Volusia County.

### PARTIES

3.     Plaintiff MICHAEL PUCKETT (hereinafter "Plaintiff "or "PUCKETT") is an

adult individual that resides in Volusia County.

4.      Defendant EDGEWATER ANIMAL SHELTER INC. is a Florida not-for-profit corporation that owns and operates an animal shelter at 605 Mango Tree Drive, Edgewater, FL 32132. At all times relevant hereto, Defendant EDGEWATER ANIMAL SHELTER INC.  At all times relevant hereto, Defendant EDGEWATER ANIMAL SHELTER INC.  acquiesced in and ratified the decisions and actions made by its officers, directors, managers, supervisors, agents, and/or employees. All references in the instant complaint to Defendant EDGEWATER ANIMAL SHELTER INC.  includes its officers, directors, managers, supervisors, agents, and/or employees.

5.      Defendant JANE DOE is an adult individual that upon information and belief resides in Volusia County.

## FACTUAL BACKGROUND

6.      PUCKETT suffers from Post Traumatic Stress Disorder (PTSD).

7.      Like many individuals that struggle with mental health, PUCKETT has experienced intermittent periods of homelessness.

8.      PUCKETT is indigent.

9.      On August 17, 2025 PUCKETT was arrested at a homeless encampment for trespassing.

10.     Upon his arrest PUCKETT asked a friend also staying at the homeless encampment to care for PUCKETT's two dogs, Goose and Macho Man until he was released.

11.     Goose and Macho Man provided PUCKETT affection, companionship and emotional support that helped ameliorate the symptoms of his PTSD.

12.     The friend agreed to care for both dogs until PUCKETT was released from jail.

2

13.     After PUCKETT was arrested, two Ormond Beach police officers went to the homeless encampment and "took custody of both dogs."

14.     Goose and Macho Man were not at large or unattended when they were seized by the Ormond Beach Police Department.

15.     PUCKETT was not notified about his dogs being seized by the Ormond Beach Police Department, despite PUCKETT's location being known to the Ormond Beach Police Department.

16.     The Ormond Beach Police Department held Goose and Macho Man for two days before transferring the dogs to the Defendant EDGEWATER ANIMAL SHELTER INC.

17.     PUCKETT was not notified about his dogs being transferred to the Defendant EDGEWATER ANIMAL SHELTER INC. despite his location being known by the Ormond Beach Police Department.

18.      After being released from custody, PUCKETT contacted his friend, who informed him his dogs had been taken from him by the Ormond Beach Police Department.

19.     PUCKETT contacted the Ormond Beach Police Department and was told his dogs were at the Halifax Humane Society.

20.     PUCKETT contacted the Halifax Humane Society and was informed Goose and Macho Man were not at the animal shelter operated by the Halifax Humane Society.

21.     PUCKETT again contacted the Ormond Beach Police Department and was finally told that his dogs had been taken to the EDGEWATER ANIMAL SHELTER INC.

22.     Plaintiff contacted Defendant EDGEWATER ANIMAL SHELTER INC. and asked what he needed to do to be reunited with his dogs.

3

23.     Defendant EDGEWATER ANIMAL SHELTER INC. claimed it was necessary "to check with the Ormond Beach Police Department" to find out if his dogs could even be returned to him and promised to get back to him.

24.      After not hearing from Defendant EDGEWATER ANIMAL SHELTER INC. Plaintiff tried repeatedly to reach someone at the animal shelter without success.

25.     Plaintiff finally went to the animal shelter in person and was told he could not have his dogs unless he paid $490.00.

26.     PUCKETT did not have the money demanded by Defendant EDGEWATER ANIMAL SHELTER INC. and informed them of such.

27.     PUCKETT pleaded to be allowed to make payments towards the money Defendant EDGEWATER ANIMAL SHELTER INC. claimed he owed.

28.     Defendant EDGEWATER ANIMAL SHELTER INC. flatly refused to make any arrangements for PUCKETT to pay the demanded charges over time.

29.     Plaintiff requested to be allowed to adopt his dogs and was flatly denied because Defendant EDGEWATER ANIMAL SHELTER INC. deemed him unfit to care for his dogs.

30.     Section 828.073 Fla. Stat. provides a process by which ownership of neglected or mistreated animals may be awarded to an animal welfare organization.

31.     Defendant EDGEWATER ANIMAL SHELTER INC. did not avail itself of the process mandated by Section 828.073 Fla. Stat. to be legally awarded ownership of Goose or Macho Man.

32.     Although the timing is not entirely certain, notwithstanding Plaintiff's concerted efforts to be reunited with his dog, Defendant EDGEWATER ANIMAL SHELTER INC.,

4

though fully aware that Plaintiff wished to reclaim Macho Man, without any prior notice
to Plaintiff, killed Macho Man, claiming that the dog was "aggressive."

33.    EDGEWATER ANIMAL SHELTER INC. did not follow the statutory procedure
provided in Part II of Chapter 767, Fla. Stat. required for an animal control authority to
declare a dog dangerous or to confiscate an allegedly dangerous dog for purposes of
destruction, instead unilaterally terminating Macho Man's life and Plaintiff's property
rights in Macho Man.

34.    Defendant EDGEWATER ANIMAL SHELTER INC., though fully aware that
Plaintiff wished to reclaim Goose, nonetheless transferred possession of the dog to a third
party, referred to in the instant complaint as "JANE DOE."

35.    Macho Man was unique and irreplaceable; no other dog will have the same
personality and characteristics of Macho Man. Macho Man has special, intrinsic value to
Plaintiff.

36.    Goose is unique and irreplaceable; no other dog will have the same personality and
characteristics as Goose. Goose has special, intrinsic value to Plaintiff.

37.    JANE DOE has possession and control of Goose, property lawfully belonging to
Plaintiff.

38.    Plaintiff will seek leave of Court to amend his Second Amended Complaint to state
the true name of JANE DOE when it has been ascertained.

39.    Upon learning of Macho Man's death and Goose's transfer Plaintiff was overcome
with grief and so emotionally distraught that he became physically ill.

40.    Plaintiff still suffers extreme emotional distress because of Defendant
EDGEWATER ANIMAL SHELTER INC. heartless and intentional conduct in

deliberately depriving him of the possession, companionship, love and emotional support of Goose and Macho Man.

41.    At no point did Plaintiff release his legal ownership of Goose and Macho Man to the Defendant EDGEWATER ANIMAL SHELTER INC.

## COUNT I-REPLEVIN

42.    Plaintiff realleges and incorporates paragraphs 1-41 as though fully set forth herein.

43.    This is a replevin action to recover possession of personal property to which the Plaintiff MICHAEL PUCKETT is lawfully entitled.

44.    The property to be replevied is a male Bully Mixed Breed dog named "Goose."

45.    The economic value of Goose is approximately $ 200.00.

46.    Goose was neither taken on an order or judgment of a court against Plaintiff, nor under an execution or judgment against Plaintiff or against the property.

47.    Goose was not taken for a tax, assessment or fine pursuant to law.

48.    PUCKETT is the owner of Goose, never relinquished ownership of Goose, and is entitled to possession of Goose.

49.    Plaintiff seeks entry of an order to show cause directed to Defendant JANE DOE pursuant to F.S. 78.067, and an immediate hearing on Plaintiff's right to possession of Goose.

50.    Plaintiff also requests expedited discovery regarding JANE DOE's identity and address.

## COUNT II-CONVERSION

51.    Plaintiff realleges and incorporates paragraphs 1-41 as though fully set forth herein.

6

52.     Defendant EDGEWATER ANIMAL SHELTER INC. was fully aware that Goose and Macho Man were Plaintiff's property.

53.     Defendant EDGEWATER ANIMAL SHELTER INC. intentionally exerted wrongful dominion over Plaintiff's personal property, Macho Man.

54.     Defendant EDGEWATER ANIMAL SHELTER INC. intentionally exerted wrongful dominion over Plaintiff's personal property, Goose.

55.     Defendant EDGEWATER ANIMAL SHELTER INC. killed Macho Man and transferred Goose to JANE DOE without disclosing to her/him PUCKETT's actual ownership interest in Goose, thereby interfering with PUCKETT's right of possession.

56.     As a direct and proximate result of the intentional actions, as alleged in this Count, Defendant EDGEWATER ANIMAL SHELTER INC. is civilly liable to PUCKETT for suffering, mental anguish, loss of use of his property, loss of the intrinsic value of his property and other compensatory damages.

**COUNT III- INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

57.     Plaintiff realleges and incorporates paragraphs 1- 41 as though fully set forth herein.

58.     Defendant EDGEWATER ANIMAL SHELTER INC. acted with deliberate indifference to Plaintiff's property rights in Goose and Macho Man and engaged in extreme and outrageous conduct through the following acts and omissions:

    a)   Refusing to allow Plaintiff to reclaim Macho Man or Goose because he could not afford the fees it unilaterally imposed;

    b)   Refusing to allow Plaintiff to make payments for fees he allegedly owned to Defendant EDGEWATER ANIMAL SHELTER INC. for Macho Man and Goose;

7

c)  Killing Plaintiff's dog Macho Man knowing that Plaintiff had not
abandoned Macho Man or relinquished his ownership interest in Macho
Man and desperately desired to be reunited with Macho Man;

d)   Transferring possession of Goose to JANE DOE knowing that Plaintiff had
not abandoned Goose or relinquished his ownership interest in Goose and
desperately desired to be reunited with Goose.

59.    Defendant EDGEWATER ANIMAL SHELTER INC. intended to cause emotional
distress to PUCKETT or had a reckless disregard for the risk their actions posed for causing
emotional distress to PUCKETT.

60.    Defendant EDGEWATER ANIMAL SHELTER INC.'s conduct in killing one of
his dogs and intentionally depriving him of possession, love, companionship and emotional
support of the other was outrageous and beyond all bounds of decency to be regarded as
odious and utterly intolerable in a civilized community.

61.    As a direct and proximate result of the extreme and outrageous conduct and
intentional infliction of emotional distress by Defendant EDGEWATER ANIMAL
SHELTER INC. Plaintiff PUCKETT suffered severe emotional distress.

**JURY DEMAND**

62.    Plaintiff requests a jury trial as to damages and all other issues so triable.


**WHEREFORE,** Plaintiff demands a judgment for damages against Defendant
EDGEWATER ANIMAL SHELTER INC. and a judgment for replevin against Defendant
JANE DOE, together with the costs of this action, and whatever other relief the court deems
just and appropriate.

8

Respectfully submitted this 21st day of October, 2025.

By: s/ *Marcy LaHart*
Marcy I. LaHart, Esq.
Florida Bar No. 0967009
Marcy@floridaanimallawyer.com
861 SE 40th Street
Tacoma, WA 98418
(352) 545-7001

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 21st day of October, 2025 a true and correct copy of the foregoing was furnished via electronic mail State Court E-Portal to all attorneys of record listed in the Florida E-filing E-Portal.

By: s/ *Marcy LaHart*
Marcy I. LaHart, Esq.

9

IN THE COUNTY COURT, SEVENTH JUDICIAL CIRCUIT, IN AND FOR
VOLUSIA COUNTY, FLORIDA

| | | |
|---|---|---|
| MICHAEL PUCKETT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | CASE NO.: 2025-25303 CODL |
| EDGEWATER ANIMAL SHELTER | ) | Division: 71 |
| INC. | ) | |
| & | ) | |
| JANE DOE | ) | |
| | ) | |
| Defendants. | | |

_____

## **NOTICE OF REMOTE DEPOSITION DUCES TECUM**

To:     Christopher W. Wickersham, Sr., Esquire
        Wickersham & Bowers
        Post Office Drawe 2250
        Daytona Beach, FL 32115
        lbowers@wickershamandbowers.com
        Randi@wickershamandbowers.com
        cwickersham@wickershamandbowers.com

PLEASE TAKE NOTICE that pursuant to Florida Rule of Civil Procedure 1.310 the undersigned

will take the deposition of **Roxanne Hicks** upon oral examination before an official court

reporter or other officer authorized by law to take depositions via zoom **on October, 23 2025 at**

**1:00 PM** (EST).

Invite Link: https://us02web.zoom.us/j/6437902535?omn=85471525512

Meeting ID     643 790 2535

**The witness should bring:**

Marcy I. LaHart, P.A

1. An unredacted copy of the Animal Record Summary pertaining to Goose, ID EDGE-A-28149.

2. Edgewater Animal Shelter Inc.'s entire file pertaining to Goose, including any adoption contract or other document, electronic or otherwise reflecting the address where Goose is located and/or the name and address of the person or entity that was given possession of Goose by Edgewater Animal Shelter Inc.

3. Edgewater Animal Shelter Inc.'s entire file pertaining to Macho Man.

4. Any and all correspondence, emails, memos, notes, text, writings or media of any type between or among you and any employee, agent, or representative of Edgewater Animal Shelter Inc. and/or the City of Ormond Beach regarding Goose, Macho Man or Michael Puckett.

5. Any contract between Edgewater Animal Shelter Inc. and the City of Ormond Beach.

**At least 5 days prior to the deposition** all documents responsive to this notice shall be made available to undersigned counsel via electronic transmission. This deposition is being taken for purposes of discovery, for use at trial, or for any other purpose allowed under the Florida Rules of Civil Procedure,

Dated this 10th day of October, 2025.

BY: /s/ Marcy LaHart
Marcy I. LaHart, Esq.
Florida Bar No. 0967009
Marcy@floridaanimallawyer.com
861 SE 40th Street
Tacoma, WA 98418
(561) 358-5436

MARCY I. LAHART, P.A

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 10th day of October, 2025 a true and correct copy of

the foregoing was furnished via electronic mail State Court E-Portal to all attorneys of record

listed in the Florida E-filing E-Portal.

BY:/s/ Marcy LaHart
Marcy I. LaHart, Esq.

MARCY I. LAHART, P.A

IN THE COUNTY COURT, SEVENTH JUDICIAL CIRCUIT, IN AND FOR
VOLUSIA COUNTY, FLORIDA

MICHAEL PUCKETT,                          )
                                          )
        Plaintiff,                        )
                                          )
vs.                                       )
                                          )        CASE NO.: 2025-25303 CODL
EDGEWATER ANIMAL SHELTER                  )        Division: 71
INC.                                      )
&                                         )
JANE DOE                                  )
                                          )
        Defendants.                       )
_____

## NOTICE OF CANCELLATION OF DEPOSITION

PLEASE TAKE NOTICE that the deposition of Edgewater Animal Shelter through its

Corporate Representative scheduled to take place via zoom on **November 14, 2025 at 1:00 PM**

**(EST)** has been cancelled.

**I HEREBY CERTIFY** that on this 13th day of November, 2025 a true and correct copy

of the foregoing was electronically filed with the Clerk of Court using the Florida Courts E-Portal which

will send a notice of electronic filing to all attorneys of record listed in the Florida E-filing E-Portal.

BY:/s/ Marcy LaHart
Marcy I. LaHart, Esq.
Florida Bar No. 0967009
Marcy@floridaanimallawyer.com
861 SE 40th Street
Tacoma, WA 98418
(561) 358-5436

MARCY I. LAHART, P.A

IN THE COUNTY COURT, SEVENTH JUDICIAL CIRCUIT, IN AND FOR
VOLUSIA COUNTY, FLORIDA

| | | |
|---|---|---|
| MICHAEL PUCKETT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | CASE NO.: 2025-25303 CODL |
| EDGEWATER ANIMAL SHELTER | ) | Division: 71 |
| INC. | ) | |
| & | ) | |
| JANE DOE | ) | |
| | ) | |
| Defendants. | | |

_____

## NOTICE OF CANCELLATION OF DEPOSITION

PLEASE TAKE NOTICE that the deposition of **Roxanne Hicks** scheduled to take place

via zoom on **October, 23 2025 at 1:00 PM** (EST) has been cancelled.

**I HEREBY CERTIFY** that on this 22nd day of October, 2025 a true and correct copy

of the foregoing was electronically filed with the Clerk of Court using the Florida Courts E-Portal which

will send a notice of electronic filing to all attorneys of record listed in the Florida E-filing E-Portal.

BY:/s/ Marcy LaHart
Marcy I. LaHart, Esq.
Florida Bar No. 0967009
Marcy@floridaanimallawyer.com
861 SE 40th Street
Tacoma, WA 98418
(561) 358-5436

MARCY I. LAHART, P.A

## IN THE COUNTY COURT OF THE SEVENTH JUDICIAL CIRCUIT
## IN AND FOR VOLUSIA COUNTY, FLORIDA

**MICHAEL PUCKETT**,

           Plaintiff,                      Case No.:  2025-25303-CODL

                                         Division:  71

vs.

**EDGEWATER ANIMAL SHELTER, INC.,**
and **JANE DOE,**

           Defendants.

_____/

## ORDER GRANTING EDGEWATER ANIMAL SHELTER'S MOTION TO DISMISS COUNTS II AND III OF THE SECOND AMENDED COMPLAINT

    **THIS CAUSE** came before the Court for a hearing on Defendant Edgewater Animal Sheltter, Inc.'s Motion to Dismiss Counts II and III of Plaintiff Michael Puckett's Second Amended Complaint (Doc. # 22) on December 10, 2025 at 2:30 p.m.

    The Court, having heard and considered legal arguments from counsel for Plaintiff and Defendant, and having reviewed the Motion to Dismiss and Plaintiff's Response to the Motion to Dismiss (Doc. # 29), the relevant legal standard, and pertinent case law and statutes, and being otherwise advised in the premises, finds as follows.

1. Edgewater's Motion to Dismiss Counts II and III of the Second Amended Complaint is GRANTED.

2. Counts II and III of the Second Amended Complaint, filed on October 21, 2025, are DISMISSED WITHOUT PREJUDICE.

3.     Plaintiff is granted leave to file a Third Amended Complaint.

**DONE AND ORDERED** at Deland, Volusia County, Florida.

e-Signed 12/16/2025 1:16 PM 2025 25303 CODL

**ANGELA A. DEMPSEY**
**COUNTY JUDGE**

Copies of foregoing is being served to all attorneys/interested parties identified on the E-Portal Electronic Service List via transmission of Notices of Electronic Filing generated by the E-Portal System.

2

IN THE COUNTY COURT, SEVENTH
JUDICIAL CIRCUIT, IN AND FOR
VOLUSIA COUNTY, FLORIDA

CASE NO.:     2025 25303 CODL
DIVISION:     71

MICHAEL PUCKETT
Plaintiff(s)

v.

EDGEWATER ANIMAL SHELTER
Defendant(s)

_____/

### ORDER ON PRELIMINARY OTSC HEARING AND GRANTING
### PLAINTIFF'S MOTION TO AMEND COMPLAINT

THIS CAUSE has come before the Court for hearing on the Replevin Order to Show Cause, held

September 29, 2025, and Plaintiff's subsequent Motion to Amend Complaint. The Court being fully

advised in the premises, finds as follows:

1. Plaintiff via his original complaint for replevin seeks return of his two dogs, which were left

   in the care of a friend, to his knowledge, upon being arrested for trespass on August 18,

   2025, but thereafter seized by the Ormond Beach Police Department and turned over to the

   Edgewater Animal Shelter.

2. Defendant was released from jail on Thursday, August 21, 2025, and immediately started

   searching for his friend he believed had his dogs.  He found out they were seized by law

   enforcement that night, and went to Halifax Humane Society on Friday morning, mistakenly

   believing they were there.  Upon their opening at noon, he discovered they were not at

   Halifax, and he was directed to the Ormond Beach Police Department.  He found out his

dogs were at the Edgewater Animal Shelter on Friday at approximately 2:00 pm. Upon calling, he was advised him had until 4 pm to get to the Edgewater Aimal Shelter and pay over $368.00 for Goose, and he was told he would not be getting Macho Man back and he was fostered out. Defendant did not have the money to pay for the dog's release, but attempted to make it there anyway by 4pm unsuccessfully. He returned on Monday, August 25, 2025, and offered to make payments, but was denied. The owner hold had been released at that point, so he, and later his boss tried to adopt his dogs back, however they were both denied.

3. Despite desperately trying to obtain the return of both dogs to no avail, Macho Man, was euthanized by the Edgewater Animal Shelter on Tuesday, August 26, 2025, within two business days of the release of the owner-hold, and with the knowledge Plaintiff desperately wanted them back.

4. The other dog, Goose, was adopted out approximately one week later to an unknown party.

5. At the time of the OTSC hearing, the evidence showed that the Edgewater Animal Shelter had possession of neither dog, as they had destroyed one, and adopted out the other.

6. At the time of the hearing, no further action could be taken by the Court, other than to deny a preliminary writ and indicate the case would be dismissed as there were no further matters pending that could be addressed.

7. On October 3, 2025, prior to the Court entering a written Order, Plaintiff filed his Motion for Leave to Amend to include a demand for damages, and the addition of the unknown party adopter.

8. The Court, having reviewed the Motion and Amended pleading hereby GRANTS the motion for leave to amend.

9.  The Amended Petition for Writ of Replevin, Complaint for Damages, and Demand for Jury Trial, shall be deemed filed and is the operative Complaint in this matter.

10. The parties may conduct discovery pursuant to the Rules of Civil Procedure.

11. No other action is taken pursuant to the OTSC hearing, and no further OTSC hearing will be scheduled unless requested by motion.

DONE AND ORDERED in chambers, in Volusia County, Florida, on 08 day of October, 2025.

10/8/2025 10:52 AM 2025 25303
CODL

e-Signed 10/8/2025 10:52 AM 2025 25303 CODL

ANGELA A. DEMPSEY
COUNTY JUDGE

Copies to:  All parties of record                    CASE NO.:  2025 25303 CODL

MICHAEL PUCKETT
EDGEWATER ANIMAL SHELTER

IN THE COUNTY COURT, SEVENTH
JUDICIAL CIRCUIT, IN AND FOR
VOLUSIA COUNTY, FLORIDA

CASE NO.:    2025 25303 CODL
DIVISION:    71

MICHAEL PUCKETT
Plaintiff(s)

v.

EDGEWATER ANIMAL SHELTER INC and JANE DOE
Defendant(s)

_____/

## ORDER PARTIALLY AND TEMPORARILY GRANTING
## DEFENDANTS' MOTION FOR PROTECTIVE ORDER PENDING  A HEARING ON
## DEFENDANT'S MOTION TO DISMISS

THIS CAUSE has come before the Court upon Defendants' Motion for Protective Order. The Court

being fully advised in the premises, finds as follows:

Defendant's Motion to Dismiss shall be set for hearing.  Plaintiff's deposition of Defendant's

representative may occur, however, Defendant may withhold only the identifying information (name,

address, phone number) of Goose's adopter pending the outcome of the Defendant's Motion to Dismiss.

The Deposition may otherwise proceed.  Defendant shall coordinate hearing time with opposing counsel

and the undersigned's office.

DONE AND ORDERED in chambers, in Volusia County, Florida, on 13 day of November, 2025.

11/13/2025 1:11 PM 2025 25303
CODL

e-Signed 11/13/2025 1:11 PM 2025 25303 CODL

ANGELA A. DEMPSEY
COUNTY JUDGE

Order-Civil – 3/11/2016

**11/13/2025 01:11:26 PM Clerk of the Circuit Court, Volusia County, Florida**

Copies to:  All parties of record                    CASE NO.:  2025 25303 CODL

MICHAEL PUCKETT
EDGEWATER ANIMAL SHELTER INC
JANE DOE

IN THE COUNTY COURT IN AND FOR
VOLUSIA COUNTY, FLORIDA

MICHAEL PUCKETT

      Plaintiff

vs.

EDGEWATER ANIMAL SHELTER

      Defendant

                               /

CASE NO: 2025 25303 CODL
Division 71
JUDGE Angela Dempsy

**PLAINTIFF'S AMENDED[1] MOTION FOR RECONSIDERATION AND REQUEST FOR LEAVE TO AMEND**

    Plaintiff Michael Puckett ("Plaintiff" and/or "Puckett"), by and through undersigned counsel, respectfully moves for reconsideration of this Honorable Court's September 29, 2025 ruling that his Petition for Writ of Replevin should be dismissed and for leave to file an Amended Petition for Writ of Replevin and in support states:

*Introduction*

    1.    Petitioner Michael Puckett filed a Petition for Writ of Replevin on September 16, 2025 seeking to be reunited with his two dogs, Goose and Macho Man, who were transferred to the Defendant Edgewater Animal Shelter Inc. after Plaintiff was arrested for trespassing at a homeless encampment.

    2.    An Order to Show Cause was issued on September 18, 2025 setting a hearing for September 29, 2025.

    3.    At the September 29, 2025 hearing Roxanne Hicks testified that although she was aware that the dogs belonged to Plaintiff and that Plaintiff desired that his dogs be returned,

---

[1] Amended to add paragraph 17 noting that this motion is opposed.

because Plaintiff was unable to immediately pay the $490.00 Defendant claimed Plaintiff

owed in one lump sum, Macho Man had been destroyed due to alleged "aggression" and

Goose had been adopted to a third party.

*The Adoption Agreement is Void*

4.      Plaintiff's counsel made a public records request for the adoption contract

pertaining to Goose, and was provided a redacted copy of an "Animal Record Summary"

which is attached hereto as Exhibit A.

5.      Although the Defendant did not cite an exemption authorizing the redaction as

required by §119.07(e) Fla. Stat. (2025)[2], presumably the adopter's identifying was withheld

based upon § 823.15 (7) Fla. Stat., an exemption enacted in 2024. Section 823.15(7), Fla.

Stat. exempts "[p]ersonal identifying information of a person who fosters, adopts, or

otherwise receives legal custody of an animal from an animal shelter or animal control

agency . . . ."

6.      Ignoring for now the warrantless seizure of Plaintiff's dogs and the questionable

constitutionality of Defendant's unilateral termination of Plaintiff's property rights in his

dogs, Goose was adopted to an undisclosed third party in violation of § 823.15(3) Fla. Stat.

which requires that all dogs adopted from a public or private animal shelter that have reached

sexual maturity be spayed or neutered <u>before</u> custody of the animal is relinquished.

7.      Goose is an adult dog that has reached sexual maturity; apparently in its great

haste to ensure Plaintiff would never see his dog again, Defendant transferred Goose to a

third party in clear violation of Florida law.

---

[2] Section 119.07 (1)(e) Fla. Stat. provides: "If the person who has custody of a public record
contends that all or part of the record is exempt from inspection and copying, he or she shall state
the basis of the exemption that he or she contends is applicable to the record, including the
statutory citation to an exemption created or afforded by statute."

8.      Notwithstanding its clear legal obligation under § 823.15(3) Fla. Stat., Defendant purportedly released Goose to a third party who has six months in which to have him sterilized. It is axiomatic that a contract entered in violation of a statute is void. *See Loc. No. 234, United Ass'n of Journeymen & Apprentices v. Henley & Beckwith, Inc.*, 66 So. 2d 818, 821 (Fla. 1953)(an agreement that is violative of a provision of a constitution or a valid statute, or an agreement which cannot be performed without violating such a constitutional or statutory provision, is illegal and void)

*Ormond Beach was without authority to seize Plaintiff's Dogs*

9.      Plaintiff's dogs were his private property, and he was entitled to due process before being permanently deprived of his property by the government or any entity acting on the government's behalf. *Cty. of Pasco v. Riehl Cty. of Pasco v. Riehl*, 620 So. 2d 229 (Fla. 2d DCA 1993)

10.     Goose and Macho Man were not seized pursuant to Part II of Chapter 767, Fla. Stat. for a dangerous dog investigation nor were they made the subject of a petition for custody filed pursuant to § 828.073, Fla. Stat.

11.     Section 5-70 of the "Ormond Beach, Florida, Code of Ordinances" (hereinafter City Code) provides that "[a]n animal control officer has the authority to impound any animal <u>at large</u>, pursuant to the enforcement or violation of any ordinance of this chapter or as provided by Florida Statutes." (emphasis added)

12.     Goose and Macho Man were not impounded by an animal control officer. Plaintiff testified that he had left his dogs in the care of a friend when he was arrested. Nonetheless, according to Defendant's Exhibit B, police officers went to the location where Plaintiff had been arrested and "took custody of both dogs." No exigent circumstances were

noted.

13.     Section 5-71 of the City Code requires that "immediately after impounding any

animal under the provisions of section 5-70, it shall be the duty of the impounding officer to

make every reasonable effort to identify and notify the owner of the animal." Plaintiff was

not notified that his dogs had been "taken into custody" by the Ormond Beach Police

Department even though he was presumably easy to find as he was being held in the Volusia

County Jail.

14.     It is a well settled rule that statutes authorizing seizure and confiscation of

personal property must be strictly construed. *L. Maxcy, Inc. v. Mayo*, 142 Fla. 707, 714

(1940). Ormond Beach's authority to seize Plaintiff's dogs is questionable and the fact that it

did not follow its City Code indisputable. Unequivocally Plaintiff never transferred

ownership of Goose and Macho Man to Ormond Beach, and while Ormond Beach may have

had possession of the dogs it did not take any legal steps to acquire ownership of them.

15.     Defendant was subsequently given possession of the dogs by Ormond Beach.

Defendant knew Plaintiff had not surrendered the dogs or otherwise transferred ownership of

them, and that Plaintiff wanted both of his dogs returned. Defendant's possession of Goose

and Macho Man did not confer upon it a right to permanently deprive Plaintiff of his personal

property merely because Plaintiff was too poor to immediately pay all charges exacted by

Defendant.

16.     While the violations of Plaintiff's constitutional rights cannot be addressed in a

replevin action, his right of possession of Goose can and should be. Based upon the above,

Plaintiff requests permission to file the Amended Petition for Writ of Replevin attached

hereto as Exhibit B and to conduct discovery regarding the identity of the person in

possession of Goose so that his right to possession of Goose may be adjudicated.

17.    Undersigned counsel consulted counsel for the Defendant Edgewater Animal

Shelter Inc. and was informed that this motion is opposed.

Respectfully submitted this 3rd day October, 2025.

BY: */s/ Marcy LaHart*
Marcy I. LaHart, Esq.
Florida Bar No. 0967009
Marcy@floridaanimallawyer.com
861 SE 40th Street
Tacoma, WA 98418
(561) 358-5436

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 3rd day of October, 2025 a true and correct copy of the foregoing was furnished via electronic mail State Court E-Portal to all attorneys of record listed in the Florida E-filing E-Portal.

<u>BY:</u>*/s/ Marcy LaHart*
Marcy I. LaHart, Esq.

Exhibit A

Animal Record Summary



**Edgewater Animal Shelter**
605 Mango Tree Dr
Edgewater, FL 32132
(386) 402-7476



## 🐾 Animal Record Summary

### Goose

| | |
|---|---|
| **ID** | EDGE-A-28149 |
| **Species** | Dog |
| **Breed** | Terrier, Pit Bull |
| **Color** | Brindle |
| **Pattern** | None |
| **Sex** | Male |
| **Altered** | Yes |
| **DOB** | 02/16/2021 |
| **Age (Y/M/D)** | 4Y/7M/12D |
| **Microchip #** | |



## 🗐 Memos

### Disclaimer
08/19/2025 by Megan Sb

The Adopted Pet has not been sterilized prior to this adoption, the Adopter SHALL have 6 months to bring Adopted Pet back to EAS to be sterilized, unless other written instructions are provided and signed by EAS veterinary staff. Should an Adopted Pet not be returned for sterilization in the required time frame the Adopter forfeits the spay/neuter included in the adoption fee and all sterilization fees default to the Adopter's expense. If the Adopter chooses to use another service to complete this procedure it will be at the Adopter's expense. EAS makes every effort to ensure that it does not let an unaltered Adopted Pet leave the shelter; however, EAS will allow an unaltered animal leave its possession when WAS determines, at its sole discretion, that it is in the best interest of the Adopted Pet to be adopted in an unaltered condition. In the instance that the Adopted Pet is unaltered, Adopter hereby warrants, represents, and agrees that the Adopted Pet will not be bred, whether accidental or intentional, prior to being sterilized.

### Kennel Card / Website Memo
09/02/2025 by Dynah Jackson

Hello! I'm Goose! I came into the shelter after my owner faced hard times and could no longer care for me. I am a big hunk who loves all the love! I am great with other dogs but I am not a big fan of kitty cats, they

scare me a lot! I would love to find my forever family! I love playing outside, but I also would love to be a couch potato and snuggle all day!

## 🏥 Complete Medical History

### ID Numbers

| Microchip Number | Issued Date | Microchip Issuer |
|---|---|---|
| ██████████ | 08/22/2025 | Petlink / Datamars |

| Rabies Tag Number |
|---|
| 26270 |

### Weight

| Weight | Date |
|---|---|
| 77 lbs | 08/21/2025 |

### Vaccinations Next Due

**Bordetella (Kennel Cough)**
08/22/2026

**DHPP**
08/22/2026

**Rabies**
08/21/2026

### Vaccination History

**DHPP**
RECOMBITEK C4 (Merial) (Merial)
08/22/2025 – Completed

| Lot # | 45853B | Route | SQ (subcutaneous) |
|---|---|---|---|
| Exp. Date | 02/15/2026 | Site | Left front leg |
| Vaccinated By | Jewely Throm | | |
| Notes | None | | |

**Bordetella (Kennel Cough)**
RECOMBITEK Oral Bordetella (Merial) (Merial)
08/22/2025 – Completed

| Lot # | 33141B | Route | PO (oral) |
|---|---|---|---|
| Exp. Date | 11/19/2027 | Site | Mouth |
| Vaccinated By | Jewely Throm | | |

**Notes**                     None

---

**Rabies**
IMRAB 1 TF (Merial) (Merial)
08/21/2025 – Completed

| Lot # | 22144 | Route | SQ (subcutaneous) |
| Exp. Date | 01/16/2027 | Site | Right front leg |
| Vaccinated By | Dr. Kayla Kurtz | Clinic | Edgewater Animal Shelter |
| Veterinarian | Dr. Kayla Kurtz | Rabies Tag Number | 26270 |
| Notes | None | | |

## Treatments Next Due

**NexGard PLUS Chew for Dogs, 66.1-132 lbs.**
150 mg Afoxolaner chewable tablet, 720 mg Moxidectin chewable tablet, 300 mg Pyrantel chewable tablet
1 tablet(s) PO (by mouth) every 30 days (Q30D)
10/22/2025 – Scheduled

## Treatment History

**NexGard PLUS Chew for Dogs, 66.1-132 lbs.**
150 mg Afoxolaner chewable tablet, 720 mg Moxidectin chewable tablet, 300 mg Pyrantel chewable tablet
1 tablet(s) PO (by mouth) every 30 days (Q30D) until further notice
09/22/2025 - – In Progress

## Active Diagnoses

**Apparently Healthy**
08/21/2025 – Active

**Diagnosed by**          Dr. Kayla Kurtz

## Scheduled Diagnostic Tests

**Heartworm test**
VetScan Canine Heartworm Rapid Test (Abaxis)
08/22/2026 - Scheduled

## Diagnostic Tests History

**Fecal Float**
Fecal Analysis (Generic)
08/25/2025 – Completed

| Results | Fecal-Float: Positive |
| Test By | Jewely Throm |
| Notes | Cocc |
| | Treating with Marquis |

**Heartworm test**

VetScan Canine Heartworm Rapid Test (Abaxis)

**08/22/2025** – Completed

| | |
|---|---|
| **Results** | Heartworm: Negative, Microfilaria : Negative |
| **Test By** | Jewely Throm |

### Fecal Float
Fecal Analysis (Generic)

**09/12/2025** – Completed

| | |
|---|---|
| **Results** | Fecal-Float: Negative |
| **Test By** | Lilian Yerke |

## Physical Exam History

### Vet Exam: Complete vet exam
**08/21/2025 | 1:05 pm** – Completed

| | | | |
|---|---|---|---|
| **Examination By** | Dr. Kayla Kurtz | **Clinic** | Edgewater Animal Shelter |
| **Exam Reason** | New Intake | | |
| **Reason Notes** | Ormond Beach ACO on 08/19 - Needs vet check and RV | | |

#### Subjective
stray intake, has not completed 72 hr stray hold

#### Objective
BAR- friendly

| | | | |
|---|---|---|---|
| **Weight** | 77 lbs | **Body Condition Score** | 7 - Overweight |
| **Temperature** | 100.7°F | **Heart rate** | 96 bpm |
| **Respiratory rate** | 42 bpm | **Mm color** | Pink |
| **Mm touch** | Moist | **Crt** | 2 |
| **Hydration** | Normal | **Attitude** | BAR |
| **Pain** | None | | |
| **Eyes** | No ocular abnormalities detected | | |
| **Ears** | No aural discharge or abnormalities detected | | |
| **Nose/Mouth/Dental** | No nasal discharge. No obvious dental or oral abnormalities | | |
| **Lymph nodes** | No peripheral lymphadenopathy | | |
| **Cardiovascular** | Normal sinus rhythm, no murmurs ausculted | | |
| **Respiratory** | Normal lung sounds. Normal respiratory rate and effort | | |
| **Abdomen** | Soft and non-painful, no abnormalities detected | | |
| **Urogenital** | No external abnormalities. Rectal examination not performed. Testicles palp wnl | | |
| **Musculoskeletal** | No evidence of lameness. Full orthopedic examination not performed | | |
| **Neurological** | Normal gait and mentation. Full neurologic examination not performed | | |
| **Integument** | No evidence of parasites, masses, or other lesions | | |

| Diagnosis Type | Diagnosis Notes | Status |
|---|---|---|
| Apparently Healthy | | Active |

#### Plan
Admin RV. Complete stray hold then process/neuter then MTA

## Procedures/Surgeries History

### Canine Neuter
**08/26/2025 | 2:33 pm** – Completed

| | | | |
|---|---|---|---|
| **Surgeon** | Dr. Kayla Kurtz | **Clinic** | Edgewater Animal Shelter |

| Memo | Weight: 77.0#  Ketamine: 1.8ml IV  Midazolam: 1.8ml IV  Torb: 0.77ml SQ  Carprofen: 75mg :Give 1 tab PO BID X 3 days | | |
|---|---|---|---|
| Suture Size | 3-0 | Suture Type | PDS II |
| Spermatocord Ligation | Miller's | Incision Closure | 3-Layer |
| Skin Glue | Yes | Castration Type | Closed Castration |
| Is Routine | Routine | Scrotal Castration | Pre-scrotal Castration |

## ➕ Behavioral Plans

> **Disclaimer**
> Shelters are unusual and unnatural environments; we can't guarantee that these results are 100% predictive of the way and animal will behave in the home.

## ➕ Behavior Assessments

> **Disclaimer**
> Shelters are unusual and unnatural environments; we can't guarantee that these results are 100% predictive of the way and animal will behave in the home.

## ➕ History

### Intakes/Outcomes

| Date | Visit # | Event | Person/Partner | Jurisdiction | User |
|---|---|---|---|---|---|
| 08/19/2025 | 1 | Stray In | Ormond Beach Animal Control | City of Ormond Beach | Megan Sb |

| | | | |
|---|---|---|---|
| **Found Date & Time:** | 08/17/2025 07:45 pm | **Found Address:** | |
| **Found by:** | Ormond Beach Animal Control | 170 W Granada Blvd  Cross Street: U.S Rte 1 | |
| **Found Condition:** | - | FL 32174 | |
| **Found Notes:** | - | Volusia | |

| 09/15/2025 | 1 | Adoption | ███████ | Unknown | Jewely Throm |
|---|---|---|---|---|---|

### Statuses

Days Adoptable: 0 | Days Onsite: 28 | Days in Custody: 28

| Status Name | User | Start Date | End Date | # of Days |
|---|---|---|---|---|
| Healthy In Home | Jewely Throm | 09/15/2025 12:42 pm | N/A | 16 |

| Status Name | User | Start Date | End Date | # of Days |
|---|---|---|---|---|
| Stray Hold | Megan Sb | 08/19/2025 07:45 pm | 09/15/2025 12:42 pm | 27 |

## Locations

| Visit # | Parent Site | Site | Start Date | User | End Date |
|---|---|---|---|---|---|
| 1 | Dog Intake Kennel 1 | Dog Intake Kennel 1 | 08/19/2025 07:45 pm | Megan Sb | 09/15/2025 12:42 pm |
| 1 | ███████████ | █████ | 09/15/2025 12:42 pm | Jewely Throm | Current |

## Categories

| Date | Category Type | Previous Value | New Value | User |
|---|---|---|---|---|
| No category history available | | | | |

# 🧰 Files

## Photos

 

## Documents

2 pits ormond aco.pdf                                             08/19/2025

## SHELTER**LUV**

Exhibit B

Proposed Amended Complaint

IN THE COUNTY COURT IN AND FOR
VOLUSIA COUNTY, FLORIDA

MICHAEL PUCKETT

     Plaintiff

vs.

EDGEWATER ANIMAL SHELTER INC.

and

JANE DOE

     Defendants

_____/

CASE NO: 2025 25303 CODL
Division 71
JUDGE Angela Dempsy

**<u>AMENDED PETITION FOR WRIT OF REPLEVIN, COMPLAINT FOR DAMAGES
AND DEMAND FOR JURY TRIAL</u>**

Plaintiff, MICHAEL PUCKETT, pursuant to §78.01, et. Seq. Fla. Stat. and Rules

1.100(a) and 1.110, Fla. R. Civ. Pro. sues the Defendants EDGEWATER ANIMAL SHELTER

INC. for damages and JANE DOE to recover possession of personal property, and in support

thereof states:

**JURISDICTION & VENUE**

1.     This is a replevin action to recover possession of personal property to which the Plaintiff

MICHAEL PUCKETT is lawfully entitled.

2.     The property to be replevied is a male Bully Mixed Breed dog named "Goose."

3.     The economic value of Bear is $ 200.00.

4.      Pursuant to § 47.011, Fla. Stat., venue is proper in Volusia County because the incidents

giving rise to this cause of action occurred in Volusia County.

## PARTIES

5.      Plaintiff MICHAEL PUCKETT (hereinafter "Plaintiff "or "PUCKETT") is an adult

individual that resides in Volusia County.

6.      Defendant EDGEWATER ANIMAL SHELTER INC. is a Florida not-for-profit

corporation that owns and operates an animal shelter at 605 Mango Tree Drive, Edgewater, FL

32132.

7.      Defendant Jane Doe is an adult individual that upon information and belief resides in

Volusia County.

## FACTUAL BACKGROUND

8.      On August 17, 2025 PUCKETT was arrested at a homeless encampment for trespassing.

9.      Upon his arrest PUCKETT asked a friend also staying at the homeless encampment where

he was arrested if he would care for PUCKETT's two dogs, Goose and Macho Man until he was

released.

10.     The friend agreed to care for the dogs until PUCKETT was released from jail.

11.     After PUCKETT was arrested, two Ormand Beach police officers went to the homeless

encampment and "took custody of both dogs."

12.     PUCKETT was not notified about his dogs being taken by the Ormond Beach Police

Department, despite his location being known.

13.     The Ormond Beach Police Department held Goose and Macho Man for two days before

transferring them to the Defendant EDGEWATER ANIMAL SHELTER INC.

14.    PUCKETT was not notified about his dogs being transferred to the Defendant EDGEWATER ANIMAL SHELTER INC. despite his location being known.

15.    After being released from custody, PUCKETT learned that his dogs had been taken to the EDGEWATER ANIMAL SHELTER INC.

16.    Plaintiff contacted Defendant EDGEWATER ANIMAL SHELTER INC. and asked what he needed to do to be reunited with his dogs. Defendant EDGEWATER ANIMAL SHELTER INC. claimed it needed to check with the Ormond Beach Police Department to find out if his dogs could be returned to him and promised to get back to him.

17.    After not hearing from Defendant EDGEWATER ANIMAL SHELTER INC. Plaintiff tried repeatedly to reach someone at the animal shelter without success.

18.    Plaintiff finally went to the animal shelter in person and was told he could not have his dogs unless he paid $490.00. Plaintiff did not have the money demanded by Defendant EDGEWATER ANIMAL SHELTER INC., and his pleas to be allowed to make payments fell on deaf ears.

19.    Plaintiff requested to be allowed to adopt his dogs and was flatly denied because Defendant EDGEWATER ANIMAL SHELTER INC. deemed him unfit to care for his dogs.

20.    Although the timing is not entirely certain, notwithstanding Plaintiff's concerted efforts to be reunited with his dog, Defendant EDGEWATER ANIMAL SHELTER INC. destroyed Macho Man without any prior notice to Plaintiff, claiming that the dog was aggressive.

21.    Defendant EDGEWATER ANIMAL SHELTER INC., though fully aware that Plaintiff wished to reclaim Goose, nonetheless adopted the dog out to a third party, referred to in the instant complaint as "Jane Doe."

22.    Goose's adoption violates Florida law, which requires that any sexually mature dog or cat be sterilized before the animal shelter relinquishes custody of the animal.

23.    Goose was neither taken on an order or judgment of a court against Plaintiff, nor under an execution or judgment against Plaintiff or against the property.

24.    Goose was not taken for a tax, assessment or fine pursuant to law.

25.    PUCKETT is the owner of Goose, never relinquished ownership of Goose, and is entitled to possession of Goose.

## COUNT I-REPLEVIN

26.    Plaintiff realleges and incorporates paragraphs 1- 25 as though fully set forth herein.

27.    Plaintiff seeks entry of an order to show cause directed to Defendant Jane Doe pursuant to F.S. 78.067, and an immediate hearing on Plaintiff's right to possession of Goose.

28.    Plaintiff also requests expedited discovery regarding Jane Doe's identity and address.

## COUNT II-DAMAGES

29.    Defendant EDGEWATER ANIMAL SHELTER INC. wrongfully refused to return Plaintiff's dogs to him, and leveraged its superior financial resources to deprive him of his property.

30.    Plaintiff seeks damages from Defendant EDGEWATER ANIMAL SHELTER INC. pursuant to §78.01 Fla. Stat. for injury he sustained based upon the Defendant EDGEWATER ANIMAL SHELTER INC.'s wrongful detention of his dogs.

## JURY TRIAL

31.    Plaintiff requests a jury trial as to damages and all other issues so triable.

**WHEREFORE,** Plaintiff demands a judgment for damages against Defendant EDGEWATER ANIMAL SHELTER INC. and a judgment for replevin against Defendant JANE DOE, together with the costs of this action, and whatever other relief the court deems just and appropriate.

Respectfully submitted this _____ day of October, 2025.

By_____
Marcy I. LaHart, Esq.
Florida Bar No. 0967009
Marcy@floridaanimallawyer.com
861 SE 40th Street
Tacoma, WA 98418
(352) 545-7001

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this  day of October, 2025 a true and correct copy of the foregoing was furnished via electronic mail State Court E-Portal to all attorneys of record listed in the Florida E-filing E-Portal.

_____
Marcy I. LaHart, Esq.

## IN THE CIRCUIT/COUNTY COURT IN AND FOR VOLUSIA COUNTY, FLORIDA

CASE NO. 2025 25303 CODL
JUDGE Angela A. Dempsey
DIVISION 71

MICHAEL PUCKETT v.                     EDGEWATER ANIMAL SHELTER

Plaintiff(s)                                                    Defendant(s)

### REPLEVIN ORDER TO SHOW CAUSE

THE STATE OF FLORIDA
To Each Sheriff of This State:
        YOU ARE COMMANDED to serve this order on defendant(s):
EDGEWATER ANIMAL SHELTER
C/O KAYLA KURTZ

by personal service as provided by law, if possible, or if you are unable to personally serve defendant within the time specified, by placing a copy of this order with a copy of the Summons on the claimed property located at:

605 MANGO TREE
EDGEWATER, FL 32132
at least Five (5) days before the hearing scheduled below, excluding the day of service and intermediate Saturdays, Sundays and legal holidays.  Non personal service as provided in this order shall be effective to afford notice to defendant of this order, but for no other purpose.

        Defendant shall show cause before a judge of this Court on the following date, time and location:

Date: MONDAY, SEPTEMBER 29, 2025, at 10:30 a.m.
DeLand Courthouse             VIA ZOOM  https://zoom.us/j/7298437446
101 N. Alabama Avenue
Deland, FL 32721-6043

why the property claimed by plaintiff in the complaint filed in this action should not be taken from the possession of defendant and delivered to plaintiff.

        If the defendant fails to appear as ordered, defendant shall be deemed to have waived the right to a hearing.  The Court may thereupon order the Clerk to issue a Writ of Replevin.

        ORDERED at   DeLand, Volusia County, Florida on  Sept. 17, 2025

                                        Circuit/County Court Judge

### SEE REVERSE SIDE FOR VERY IMPORTANT INFORMATION.

CL-0094-1709

Defendant may file affidavits, appear personally or with an attorney and present testimony at the time of the hearing, or, on a finding by the Court pursuant to Section 78.067(2), Florida Statutes (1979), that the plaintiff is entitled to possession of the property described in the complaint pending final adjudication of the claim of the parties, file with the court a written undertaking executed by a surety approved by the Court in an amount equal to the value of the property to stay in order authorizing the delivery of the property to the plaintiff.

A copy of the above was mailed to the plaintiff/plaintiff/s attorney by U.S. Mail this date.
Dated: September 19, 2025

LAURA E ROTH
CLERK OF THE CIRCUIT COURT
BY: _____ /s/ Kate Nash _____
DEPUTY CLERK

Orig. fwd to:
  VSO for SOP

**If English is not your native language and you need assistance understanding the court's proceedings, you will need to bring someone to interpret for you as this service is not provided by the court.**

**Si el inglés no es su lengua materna y va a necesitar ayuda para entender el proceso judicial, tendrá que traer a alguien para que le interprete ya que el tribunal no ofrece este servicio.**

## SEE NEXT PAGE FOR VERY IMPORTANT INFORMATION.

CL-0094-1709



**REQUESTS FOR ACCOMMODATIONS BY PERSONS WITH DISABILITIES** If you are a person with a disability who needs an accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Court Administration, 125 E. Orange Ave., Ste. 300, Daytona Beach, FL 32114, (386) 257-6096, at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the appearance is less than 7 days; if you are hearing or voice impaired, call 711.

**THESE ARE NOT COURT INFORMATION NUMBERS**



**SOLICITUD DE ADAPTACIONES PARA PERSONAS CON DISCAPACIDADES**

Si usted es una persona con discapacidad que necesita una adaptación para poder participar en este procedimiento, usted tiene el derecho a que se le proporcione cierta asistencia, sin incurrir en gastos. Comuníquese con la Oficina de Administración Judicial (Court Administration), 125 E. Orange Ave., Ste. 300, Daytona Beach, FL 32114, (386) 257-6096, con no menos de 7 días de antelación de su cita de comparecencia ante el juez, o de inmediato al recibir esta notificación si la cita de comparecencia está dentro de un plazo menos de 7 días; si usted tiene una discapacidad del habla o del oído, llame al 711.

**ESTOS NUMEROS TELEFONICOS NO SON PARA OBTENER INFORMACION JUDICIAL**

CL-0094-1709

**IN THE CIRCUIT/COUNTY COURT IN AND FOR VOLUSIA COUNTY, FLORIDA**

CASE NO.  2025 25303 CODL
JUDGE  Angela A. Dempsey
DIVISION  71

MICHAEL PUCKETT v.                      EDGEWATER ANIMAL SHELTER

Plaintiff(s)                                        Defendant(s)

**REPLEVIN ORDER TO SHOW CAUSE**

THE STATE OF FLORIDA
To Each Sheriff of This State:
        YOU ARE COMMANDED to serve this order on defendant(s):
EDGEWATER ANIMAL SHELTER
C/O KAYLA KURTZ

by personal service as provided by law, if possible, or if you are unable to personally serve
defendant within the time specified, by placing a copy of this order with a copy of the Summons
on the claimed property located at:

605 MANGO TREE
EDGEWATER, FL 32132
at least Five (5) days before the hearing scheduled below, excluding the day of service and
intermediate Saturdays, Sundays and legal holidays.  Non personal service as provided in this order
shall be effective to afford notice to defendant of this order, but for no other purpose.

        Defendant shall show cause before a judge of this Court on the following date, time and
location:

Date:  MONDAY, SEPTEMBER 29, 2025, at 10:30 a.m.
DeLand Courthouse                        VIA ZOOM  https://zoom.us/j/7298437446
101 N. Alabama Avenue
Deland, FL 32721-6043

why the property claimed by plaintiff in the complaint filed in this action should not be taken from
the possession of defendant and delivered to plaintiff.

        If the defendant fails to appear as ordered, defendant shall be deemed to have waived the
right to a hearing.  The Court may thereupon order the Clerk to issue a Writ of Replevin.

        ORDERED at   DeLand, Volusia County, Florida on ___Sept. 17, 2025___

_____
Circuit/County Court Judge

**SEE REVERSE SIDE FOR VERY IMPORTANT INFORMATION.**

CL-0094-1709

Defendant may file affidavits, appear personally or with an attorney and present testimony at the time of the hearing, or, on a finding by the Court pursuant to Section 78.067(2), Florida Statutes (1979), that the plaintiff is entitled to possession of the property described in the complaint pending final adjudication of the claim of the parties, file with the court a written undertaking executed by a surety approved by the Court in an amount equal to the value of the property to stay in order authorizing the delivery of the property to the plaintiff.

A copy of the above was mailed to the plaintiff/plaintiff's attorney by U.S. Mail this date. Dated: _____

K. Johnson
Deputy Clerk

Orig. fwd to:

**If English is not your native language and you need assistance understanding the court's proceedings, you will need to bring someone to interpret for you as this service is not provided by the court.**

**Si el inglés no es su lengua materna y va a necesitar ayuda para entender el proceso judicial, tendrá que traer a alguien para que le interprete ya que el tribunal no ofrece este servicio.**

## SEE NEXT PAGE FOR VERY IMPORTANT INFORMATION.

CL-0094-1709



## REQUESTS FOR ACCOMMODATIONS BY PERSONS WITH DISABILITIES  If you are a person with a disability who needs an accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Court Administration, 125 E. Orange Ave., Ste. 300, Daytona Beach, FL 32114, (386) 257-6096, at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the appearance is less than 7 days; if you are hearing or voice impaired, call 711.

**THESE ARE NOT COURT INFORMATION NUMBERS**



## SOLICITUD DE ADAPTACIONES PARA PERSONAS CON DISCAPACIDADES
Si usted es una persona con discapacidad que necesita una adaptación para poder participar en este procedimiento, usted tiene el derecho a que se le proporcione cierta asistencia, sin incurrir en gastos.  Comuníquese con la Oficina de Administración Judicial (Court Administration), 125 E. Orange Ave., Ste. 300, Daytona Beach, FL 32114, (386) 257-6096,  con no menos de 7 días de antelación de su cita de comparecencia ante el juez, o de inmediato al recibir esta notificación si la cita de comparecencia está dentro de un plazo menos de 7 días; si usted tiene una discapacidad del habla o del oído, llame al 711.

**ESTOS NUMEROS TELEFONICOS NO SON PARA OBTENER INFORMACION JUDICIAL**

CL-0094-1709

IN THE COUNTY COURT IN AND FOR
VOLUSIA COUNTY, FLORIDA

MICHAEL PUCKETT

      Plaintiff

vs.

EDGEWATER ANIMAL SHELTER INC.

and

JANE DOE

      Defendants

_____/

CASE NO: 2025 25303 CODL
Division 71
JUDGE Angela Dempsy

## PLAINTIFF MICHAEL PUCKETT's RESPONSE TO EDGEWATER ANIMAL HOSPITAL'S MOTION TO DISMISS

Plaintiff, Michael Puckett responds to Defendant Edgewater Animal Shelter's "Motion to Dismiss Counts II and III of Plaintiff's Second Amended Complaint" and in opposition states:

### I.    Procedural History

On September 16, 2025 Plaintiff Michael Puckett ("Plaintiff" or "Puckett") filed a pro se Replevin Complaint seeking possession of his two dogs, Goose and Macho Man, believing his dogs were at the Edgewater Animal Shelter. An Order to Show Cause was entered the following day setting a hearing on September 29, 2025 at which the Defendant Edgewater Animal Shelter Inc. ("Defendant" or "EAS") was required to show cause "why the property claimed by plaintiff in the complaint filed in this action should not be taken from the possession of the defendant and delivered to plaintiff."

On September 24, 2025 undersigned counsel filed a Notice of Appearance; two days later on September 26, 2025 Attorney Christopher W. Wickersham entered a Notice of Appearance on behalf of Defendant EAS.

At the September 29, 2025 hearing EAS presented the testimony of its Director, Roxanne Hicks, who testified under oath that although EAS was fully aware that Puckett wanted his dogs back, because Puckett could not afford the fees demanded by EAS, Macho Man had been destroyed because the dog was allegedly aggressive, and Goose had been adopted out to an undisclosed third party.

After the September 29, 2025 hearing Plaintiff's counsel received, pursuant to a public records request, an "Animal Record Summary" regarding Goose that stated on the very first page "The Adopted pet has not been sterilized prior to adoption," and filed a Motion for Reconsideration and Request for Leave to Amend on October 2, 2025. October 8, 2025 an Order was entered deeming the Amended Petition for Writ of Replevin, Complaint for Damages, and Demand for Jury Trial filed and "the operative Complaint in this matter."

Upon the pronouncement of Attorney Stephanie Boomershine, who entered an appearance on behalf of EAS on October 17, 2025, that notwithstanding the disclaimer on page 1 of EAS's "Animal Record Summary" Goose was in fact altered prior to his adoption, a Second Amended Complaint was filed on behalf of Plaintiff on October 21, 2025.[1] Three weeks later EAS filed its Motion to Dismiss Counts II and III of the Second Amended Complaint.

---

[1] EAS is apparently salty about the filing of a Second Amended Complaint, complaining that such filing was "without a motion, without conferral with the undersigned, and without leave of court." EAS has yet to file a responsive pleading in this matter and fails

2

## II.  Legal Standard

The primary purpose of a motion to dismiss is to request the trial court to determine whether the complaint properly states a cause of action upon which relief can be granted and, if it does not, to enter an order of dismissal. *See*, *Sobi v. Fairfield Resorts, Inc*., 846 So. 2d 1204, 1206 (Fla. 5th DCA 2003). The function of a motion to dismiss is to raise as a question of law the sufficiency of the facts alleged to state a cause of action. *See, Varnes v. Dawkins,* 624 So.2d 349, 350 (Fla. 1st DCA 1993). It is axiomatic that in ruling on a motion to dismiss a court is confined to the four corners of the complaint and must consider all well-pled allegations as true. *Music Royalty Consulting, Inc. v. Am. Soc'y of Composers, Authors & Publishers (ASCAP)*, 314 So. 3d 377, 379 (Fla. 3d DCA 2020).

## III.    Plaintiff has pled a cause of action for conversion.

EAS asserts that Plaintiff's conversion claim "must be dismissed due to Plaintiff's failure to demand return of Goose and Macho Man or, alternatively, to allege that such a demand would be futile." EAS is wrong; proof of demand is not required to prevail on a conversion claim. *Rosenthal v. Equus Prop. Homeowners Hoa*, 369 So. 3d 719, 722 (Fla. 4th DCA 2023) (Nevertheless, proof of "demand" is not required to prevail on a conversion claim.) *accord Batista v. Rodriguez*, 388 So. 3d 1098, 1101 (Fla. 3d DCA 2024) ("To state a claim for conversion, one must allege facts sufficient to show ownership of the subject property and facts that the other party wrongfully asserted dominion over that property.") See also *Hannah v. Malk Holdings*, 368 So. 3d 1087, 1091(Fla. 6th DCA 2023) (To state a claim for conversion, one must allege facts

---

to cite any authority for its insinuation that the filing of a Second Amended Complaint was improper.

sufficient to show ownership of the subject property and facts that the other party

wrongfully asserted dominion over that property. Proof of a plaintiff's demand and a

defendant's refusal is unnecessary when a plaintiff can demonstrate that the unauthorized

act constituted a conversion regardless of a demand.) *citing Goodrich v. Malowne*y, 157

So. 2d 829, 832 (Fla. 2d DCA 1963) (The generally accepted rule is that demand and

refusal are unnecessary where the act complained of amounts to a conversion regardless

of whether a demand is made.) *citing Louisville & N.R. Co. v. Citizens' & Peoples' Nat'l

Bank of Pensacola*, 74 Fla. 385, 77 So. 104, 105 (Fla. 1917).

    Furthermore, even if Puckett was required to allege he made a demand for return

of his dogs to state a cause of action for conversion, the Second Amended Complaint

alleges:

1) Plaintiff contacted Defendant EDGEWATER ANIMAL SHELTER INC. and
   asked what he needed to do to be reunited with his dogs. ¶ 22
2) PUCKETT pleaded to be allowed to make payments towards the money
   Defendant EDGEWATER ANIMAL SHELTER INC. claimed he owed. ¶ 27
3) Plaintiff requested to be allowed to adopt his dogs and was flatly denied because
   Defendant EDGEWATER ANIMAL SHELTER INC. deemed him unfit to care
   for his dogs. ¶ 29

    EAS's unsupported argument raises "form over substance" to new heights. The

factual allegations of the complaint establish that Plaintiff communicated to EAS that he

wanted Goose and Macho Man to be returned, and those allegations are apparently

undisputed. Plaintiff was not required to utter the magic word "demand" nor is he

required to allege that he spouted that magic word to state a cause of action for

conversion. *Edwards v. Landsman*, 51 So. 3d 1208, 1213 (Fla. 4th DCA 2011) ([T]o state

a claim for conversion, one must allege facts sufficient to show ownership of the subject

property and facts that the other party wrongfully asserted dominion over that property.)

4

The Second Amended Complaint more than adequately states a cause of action for

conversion by asserting that Plaintiff owned Goose and Macho Man, and that EAS was

aware Plaintiff wanted his dogs to be returned but killed Macho Man and disappeared

Goose nonetheless.

### A. Goose and Macho Man were Never Property of EAS

According to EAS "it is imperative to consider relevant Ormond Beach City,

Edgewater City, and Volusia County ordinances," and supposedly based upon a

combination of provisions contained in those ordinances, EAS had extinguished

Puckett's property rights in Goose and Macho Man.

It is equally imperative that this court construe "relevant Ormond Beach City,

Edgewater City, and Volusia County ordinances" to affect a constitutional outcome

whenever possible. *DeSisto College Inc. v. Town of Howey-In-The-Hills*, 706 F. Supp.

1479 (M.D. Fla.), affirmed, 888 F.2d 766 (11th Cir. 1989). (Rules of construction require

that the ordinance be interpreted, if possible, as constitutional.) An ordinance that allows

a not-for-profit corporation to obtain ownership of personal property simply because the

owner of the property is unable to pay fees leveraged by that corporation is

unconstitutional. *See Barrow v. Holland*, 125 So.2d 749, 751 (Fla.1960) (Once any

animal has been legitimately reduced to private control, confinement, and possession, it

becomes private property. When that occurs, the owner thereof cannot be deprived of the

use thereof, except in accord with all of the elements of due process.) The purpose of

ordinances imposing time limits on claiming an animal at an animal shelter is to allow

stray animals or abandoned animals to be rehomed without unduly burdening the facility

caring for the animals. Hold periods are not intended to effectuate a forfeiture when the

5

owner of an animal is known simply because the owner is poor.

**B. Ormond Beach Code of Ordinances does not compel forfeiture of Goose and Macho Man**

Defendant claims the delivery of Goose and Macho Man to the clutches of EAS was "consistent with Ormond Beach law," specifically citing Ormond Beach Ordinance § 5-70, which provides that *"[a]n animal control officer has the authority to impound any animal at large, pursuant to the enforcement or violation of any ordinance of this chapter or as provided by Florida Statutes."* However, §5-72 of the Ormond Beach Code states that *"[t]he owner of any animal impounded pursuant to city ordinance or Florida Statutes can reclaim such animal, upon payment of a license fee and the charges hereinafter imposed, and of all costs and charges incurred <u>by the city</u> for impounding and maintenance of such animal*." (emphasis added) Section 5-72 further provides that "*the duties herein imposed upon the animal control officer may be delegated to <u>an animal shelter by a service agreement approved by resolution of the city commission</u>. In all instances of impoundment, owners of animals are responsible for the full cost of impoundment as charged by the shelter*." (emphasis added)

First, at the time Goose and Macho Man were transferred to the Edgewater Animal Shelter the only service agreement approved by resolution of the city commission was with the Halifax Humane Society, there is no such resolution regarding EAS. The Ormond Beach Code provided EAS <u>zero authority</u> to condition the return of Puckett's dogs on payment of a fee unilaterally imposed by EAS that EAS knew Puckett could not afford. Even if EAS had such authority, nothing in the Ormond Beach Code requires a dog owner to pay the full amount of the "impoundment fee" in one lump payment.

Second, the agreement between Ormond Beach and the Halifax Humane Society,

6

attached hereto as Exhibit 1, states on page 6 of 13 that "the Humane Society may release an animal to its owner without payment in the event the animal's owner completes a financial affidavit indicating that the owner qualifies as indigent." The minutes of the September 18, 2024 Ormond Beach City Commission meeting, which on page 7 reflects the city commission's approval of Resolution No. 2024-157 authorizing execution of the agreement is attached hereto as Exhibit 2. Presumably the city commission would not have approved the agreement by resolution if reuniting dogs with owners of limited financial means violated the city code.

The assertion that EAS was legally unable to return Puckett's dog unless he coughed up $490.00 is absurd. EAS has not identified any authority to charge Puckett at all, let alone any provision of the Ormond Beach Code stating that impoundment fees may not be waived for indigent dog owners or paid in installments.

### C. The Animal Services Ordinance of the City of Edgewater, Florida does not apply to dogs that were not impounded in Edgewater

EAS asserts in its motion to dismiss that "as specifically provided in the Edgewater City Ordinances above, because Plaintiff was unable to pay the impoundment fee to reclaim Goose and Macho Man after three days, the dogs were deemed abandoned by law and became the property of Edgewater."

Section 5-40 of the City of Edgewater's Code of Ordinances authorizes animal control officers to, under specified conditions, "*pick up, capture, catch, procure and impound in a holding facility*" animals within the City of Edgewater. Section 5-41 of the Code, entitled, **Disposition of Impounded Animals**, regulates what happens to animals after those animals within the Edgewater city limits are impounded by animal control

7

officers. Impounding facility is defined in the Code as "*any holding or impounding facility owned or under contract with the City of Edgewater for services or one that is designated from time to time by the city.*" Presumably EAS does not have a contract with the City of Edgewater to hold animals brought to the private shelter from other jurisdictions.

The Edgewater ordinance on its face does not apply to animals that have been transferred to a private animal shelter that simply happens to be located in the City of Edgewater, and provides EAS no authority to terminate ownership of an animal that was not impounded by an animal control officer within the City's jurisdiction.

Even if the Edgewater Code did apply to Goose and Macho Man, Section 5-41(e) states that "[a]ny unclaimed animal shall become the property of the impounding facility after the three-day hold period, and may be humanely destroyed, maintained or disposed of by gift, sale or adoption pursuant to the requirements of this chapter and the rules and regulations of the impounding facility." EAS is not "the impounding facility" as that term is defined, and Goose and Macho Man were not unclaimed, Puckett attempted to claim his dogs, but EAS would not allow him to do so. This provision is clearly intended to apply to animals whose owner is unknown and does not look for their lost pet, not to dog owners known to be desperate to be reunited with their pets but unable to afford the fees demanded by a non-profit corporation.

None of the many ordinances cited by EAS compelled the forfeiture of Goose and Macho Man to EAS. The obligation to construe the various provisions of Volusia County, Edgewater and Ormond Beach consistent with constitutional constraints forbids any such tortured interpretation. Puckett has stated a claim for conversion.

8

IV.    *Puckett's Claims for Damages is Valid*

EAS asserts that Puckett's damages for conversion are limited to the "reasonable value of Goose and Macho Man" and all other damage claims must be stricken. EAS fails to enlighten the Court as to how it should determine the reasonable value of Goose and Macho Man. Goose and Macho Man were Puckett's emotional support animals. As alleged in the Second Amended Complaint, Goose and Macho Man provided Puckett affection, companionship and emotional support that helped ameliorate the symptoms of his PTSD. Restricting the owner of irreplaceable companion animals to recovering only their pets' fair market value fails to fully compensate the injured party. This is especially true of animals that provide therapeutic support to an individual that struggles with mental health issues.

Florida Courts have held that in some cases damages in a conversion case can include compensation for the loss of use of the property. See for example, *R&B Holding Co. v. Christopher Advert. Grp., Inc*., 994 So. 2d 329, 331-32 (Fla. 3d DCA 2008), pointing out that damages for conversion can include an award for loss of use of property not otherwise compensated by an award for the conversion of chattel.

In Florida, when a wrong is shown, it becomes the duty of court and jury to apply a test that will reasonably compensate the person wronged rather than one that makes it impossible to do so. *Fla. Pub. Utils. Co. v. Wester*, 150 Fla. 378, 382 (Fla. 1942). More than fifty years ago the Florida Supreme Court concluded that in the case of intentional injury to or destruction of a pet, damages are not capped by the animal's market value. *LaPorte v. Associated Independents, Inc*., 163 So. 2d 267, 269 (Fla. 1964) ("The restriction of the loss of a pet to its intrinsic value in circumstances such as the ones

9

before us is a principle we cannot accept. Without indulging in a discussion of the affinity

between 'sentimental value' and 'mental suffering', we feel that the affection of a master

for his dog is a very real thing and that the malicious destruction of the pet provides an

element of damage for which the owner should recover, irrespective of the value of the

animal because of its special training such as a Seeing Eye dog or sheep dog.")


### V.    Plaintiff has pled a cause of action for Intentional Infliction of Emotional Distress.

EAS asserts that it was just doing its job when it refused to return Goose and

Macho Man to Puckett. According to EAS:

> Edgewater was *required* to collect the "full cost of
> impoundment" from Plaintiff before returning Goose and
> Macho Man. *See* Ormond Beach Ordinance § 5-72,
> Edgewater Florida Ordinance § 5-41(c), and Volusia
> County Ordinance §14-62(e) ("Any person seeking to
> redeem or reclaim an animal impounded under the
> provisions of this Article shall pay the impoundment fees,
> boarding fees, license fees, and all other fees resulting
> from impounding and caring for the animal" and "In all
> instances of impoundment, owners of animals are
> responsible for the full cost of impoundment as charged by
> the shelter.") (emphasis in the original)


Volusia County's Ordinance applies only in unincorporated areas of the County

and in incorporated areas of municipalities that contract with the County to provide

animal control services, which does not include the City of Edgewater. § 14-35, Volusia

County Code of Ordinances. Even if the County ordinance  did apply, the ordinance does

not indicate that the full cost of impoundment may not be paid in installments, or that

such fees may not be waived. The form Halifax Humane Society asks indigent pet

owners to complete when releasing an animal to its owner without payment is a Volusia

10

County Form[2], suggesting that Volusia County, like Halifax Humane Society works with low-income pet owners rather than unilaterally terminating their ownership of a beloved pet based upon an inability to pay. The inapplicability of Edgewater's ordinance to an animal not impounded in Edgewater was addressed above, as was the fact that EAS has no service agreement with Ormond Beach approved by resolution of the city commission, and nothing in Ormond Beach's code compelled the forfeiture of Goose and Macho Man to EAS based solely on Puckett's inability to pay fees as demanded by EAS.

Simply put, rather than extend Puckett some much needed grace, which was well within its power, EAS destroyed one of his dogs and deprived him of the other because Puckett did not have $490. EAS did so knowing that Puckett had not abandoned his dogs and to the contrary desperately wanted them back, after Puckett had offered to make payments towards the fees demanded and even attempted to adopt them and when rebuffed attempted to have a friend adopt them. EAS's mantra of inability to return Puckett's dogs to him based upon various provisions in an inapplicable county ordinance and two city ordinances fails; none of the cited authorities allowed much less required EAS to effectuate a forfeiture of Puckett's property based upon his inability to immediately pay the fees EAS unilaterally imposed.

To prove intentional infliction of emotional distress, Puckett must show: (1) The wrongdoer's conduct was intentional or reckless, that is, he intended his behavior when he knew or should have known that emotional distress would likely result; (2) the conduct was outrageous, that is, as to go beyond all bounds of decency, and to be regarded as odious and utterly intolerable in a civilized community; (3) the conduct

---

[2] The form is the last page of Exhibit 1.

caused emotional distress; and (4) the emotional distress was severe." *Deauville Hotel*

*Mgmt., LLC v. Ward*, 219 So. 3d 949, 954-55 (Fla. 3d DCA 2017).

The Second Amended Complaint properly alleges facts that if true establish a

valid claim for intentional infliction of emotional distress. The EAS oft repeated albeit

baseless mantra that it was "simply doing its job as authorized by law" does not change

the fact that it deprived Puckett of the love and companionship of his beloved dogs

because Puckett did not have $490. Puckett's factual allegations are sufficient to support

a claim for outrageous conduct as required for an intentional infliction of emotional

distress claim.

### VI.    Conclusion

The arguments asserted in the Defendant's Motion to Dismiss all fail as a matter

of law. The motion should be denied, and the Defendant should be ordered to promptly

file an answer to the complaint.


By: s/ *Marcy LaHart*
Marcy I. LaHart, Esq.
Florida Bar No. 0967009
Marcy@floridaanimallawyer.com
861 SE 40th Street
Tacoma, WA 98418
(352) 545-7001


**CERTIFICATE OF SERVICE**

I hereby certify that on December 3, 2025 I electronically filed the foregoing by using the

Florida Courts E-Filing Portal, which will send notice of this electronic filing to all counsel of record.

By: s/ *Marcy LaHart*
Marcy I. LaHart, Esq.

EXHIBIT ONE

**AGREEMENT FOR SERVICES BETWEEN**
**Halifax Humane Society, Inc.**
**AND**
**The Impounding agency**

**This Services Agreement** ("Agreement") is hereby entered into by and between the **Halifax Humane Society, Inc.**, a Florida non-profit corporation, with its principal address at 2364 West LPGA Boulevard, Daytona Beach, Florida 32124 ("Humane Society"), and the **Impounding agency**, a municipal corporation, with its primary address at ("Impounding agency address").

**WHEREAS,** in order to enforce the ordinances of the Impounding agency and the laws of the State of Florida with respect to stray animals, the Impounding agency desires to deliver stray animals to the Humane Society for the humane impoundment and humane disposition of said animals; and

**WHEREAS,** the Humane Society is organized for the purpose, among others, of preventing cruelty to animals and is interested in assuring that impounded animals are sheltered in a humane manner and those which must be destroyed, be so destroyed humanely.

**NOW, THEREFORE,** for and in consideration of the mutual covenants, conditions and provisions herein contained, it is expressly agreed and understood as follows:

1.    **TERM**:  This Agreement will take effect on the 1st day of October 2024, and will remain in full force and effect for an initial twelve (12) month period ending on midnight between September 30, 2025. The parties shall have the option to extend the contract or enter into contract negotiations if they so desire. This contract may be renewed by the Impounding agency for up to three (3) twelve (12) month periods, with a 10% increase of fees per renewal.

2.    **ANIMAL SHELTER, RETURN TO FIELD, AND TRAP, NEUTER, AND RETURN**:

(a)  The Humane Society will maintain and operate an animal shelter ("Shelter") in a manner adequate for the confinement, remedial treatment, and, if necessary, disposal of stray dogs, cats, or other animals, which may be delivered to the Humane Society from all areas within the jurisdiction of the Impounding Agency, and the Humane Society will furnish, at its sole expense, all supervision, labor, animal food, tools, supplies and other things necessary for the satisfactory performance of the services herein agreed to be provided.  Remedial care will be provided for injured animals during operating hours when there is a staff veterinarian available, at the Humane Society's sole expense.  The Shelter will be operated at 2364 West LPGA Blvd., Daytona Beach, Florida.

(b)  The Humane Society will provide means to accept all stray dogs and other stray or seized domesticated animals delivered to the Shelter by the Impounding agency's law enforcement personnel, Animal Control Officers, or other designated officers appointed by the Impounding agency for this purpose.  The Humane Society will

provide Return to Field (RTF) for unsterilized cats following national animal welfare organization recommendations for the most humane practices with addressing cat overpopulation. The Humane Society will accept wild animals and livestock only if it has the ability and facilities to impound and control these animals, and the decision to accept or reject such animals will be solely within the discretion of the Humane Society. The Humane Society will require all persons who drop off or report injured or stray animals to the Shelter during the Shelter's normal operating hours to give their names, phone number, and current home and post office addresses and identify the place where the animals involved were located or picked up.

(c)   If the Impounding agency delivers an animal to the Shelter for impoundment discovers such animal bears information indicating ownership of the animal, the impounding agency representative shall take reasonable steps to identify the owner of the animal and contact said owner prior to delivering the animal to the Shelter. The impounding representative shall also provide all contact information gathered and documented attempts of contact for the owner/guardian to Halifax.   Regardless of the foregoing, any animal suspected of being infected with rabies or which has bitten or otherwise exposed any person to rabies, shall not be released to its owner until after such animal has been impounded for a period of ten (10) days and the Volusia Health Department, through its authorized representatives, has expressly approved, in writing, any such release.

(d)  When a stray domestic animal is delivered to the Shelter and is not suspected of having rabies or has not bitten or otherwise exposed any person to rabies, the Humane Society will impound the animal at the Impounding agency's expense for a period of not to exceed three (3) calendar days (unless otherwise provided in this Agreement).   If the owner has not retrieved the animal within the designated holding period, the Humane Society will thereafter, at its own expense, provide for the adoption or humane disposal of the animal in accordance with its routine methods and procedures**.**

(e)  When a stray cat is delivered to the Shelter and is not suspected of having rabies or has not bitten or otherwise exposed any person to rabies, the Humane Society will determine the eligibility of the animal for the RTF Program. After consultation with the Impounding agency, Humane Society will decide whether the cat will be referred for impoundment or RTF and notify the impounding agency. The Impounding agency representative will expressly inform the Humane Society if a cat is brought in as part of the Trap, Neuter and Return Program (TNR). The Humane Society will only perform feline sterilization services for cats brought to the Humane Society by an Animal Control Officer (ACO) or other Impounding agency person designated by the Police Department. Cats brought to the Humane Society by any other person will not be eligible for reimbursement by the Impounding agency. Fees for this service are listed in 3.b. under RTF/TNR Cats. The Impounding agency will only be responsible

for services or procedures that are requested and expressly included in this agreement. The Impounding agency will not pay for any other service or procedure. The RTF/TNR Program requires the following:

i.      The Humane Society and the Impounding agency shall mutually agree on the day(s) of the week that the Impounding agency will bring cats to the designated Humane Society facility. Said schedule shall be subject to change by mutual agreement of the parties. The Impounding agency shall at a minimum have one day reserved each week at a designated Humane Society facility to bring in cats for sterilization.

ii.     Surgeries may be completed at either:
Halifax Humane Society 2364 West LPGA Boulevard Daytona Beach, FL 32124
         -Or-
HHS Redinger Clinic 600 Mason Ave #150 Daytona Beach, FL 32117

Hereafter, Humane Society shall refer to both the location on LPGA Blvd. and Mason Ave.

iii.    All regular sterilizations are the same price for neuters and spays (males and females).  Each surgery includes complimentary ear tipping, FVRCP and rabies vaccines, and anesthesia.  Ear tipping must be completed according to Alley Cat Allies recommendations by removing at least 3/8 of an inch from the top of the left ear.

iv.     If the Impounding agency presents a cat for sterilization and the Humane Society finds the cat has already been sterilized, the Humane Society will provide anesthesia, ear tipping, FVRCP and rabies vaccine at the normal sterilization surgery cost.

v.      Upon presentation of a cat, the Humane Society, at its sole discretion, will determine if the cat is healthy enough to survive surgery and whether or not it should be euthanized.  The Humane Society recognizes that the Impounding agency does not have a licensed veterinarian on staff and does not have the ability to determine whether an animal should be euthanized.

vi.     All cats being returned to the Impounding agency staff from the Humane Society will have their ear tipped as described above.  No exceptions.  If a cat is returned to the Impounding agency staff without an ear tip, or with an ear tip of less than 3/8 of an inch from the top of the left ear, the Impounding agency cat will be returned to the Humane Society for the procedure without any additional charge to the Impounding agency.

vii.    No procedures other than those listed in this document will be paid for by the

Impounding agency.  The Impounding agency will only reimburse for procedures that have been documented and provided to the Impounding agency.  The Humane Society must provide at least the following information in order to receive reimbursement for each cat:

- Invoice number
- Visit Date
- Billing Date
- Animal Name and/or Number
- Impounding agency services provided
- Name of Impounding Agency Rep authorizing service(s)
- Cost for each service provided
- Total cost

**viii.** The Humane Society will combine and send all invoices to the Impounding agency monthly.

**ix.** ACO's will notify the Humane Society staff at the LPGA location whether a feline brought there is part of the TNR program, if it is for RTF, is wild, stray, confiscated, or seized.

**x.** The Humane Society will only release RTF cats to the Impounding agency Animal Control Officer unless Impounding agency provided permission for a 3rd party release in writing from the agency's authority.

3. **BILLING & PAYMENT**:

(a) The Humane Society shall bill the Impounding agency pursuant to Paragraph 3(b), as applicable, for:

(i) each dog, cat, domesticated animal, injured animal, deceased animal, livestock animal, wild animal, or quarantined/confiscated animal delivered to the Shelter by either the Impounding agency's designated personnel, Police or Animal Control Officers;

(ii) each stray dog, cat, domesticated animal, injured animal, deceased animal, livestock animal or wild animal emanating from within Impounding agency the jurisdictional limits of the impounding agency and delivered to the Shelter by a private citizen who has provided their full name and contact information. Owner surrendered animals will only be accepted via impounding agency with Supervisor approval from Halifax Humane Society.  Owner requested surrenders in the field should be referred to Halifax Humane Society directly; and

(iii) each dog, cat, domesticated animal, injured animal or deceased animal picked up at the request of the Impounding agency by the Humane Society within

Impounding agency jurisdictional limits of the impounding agency.

(b) In consideration of the agreements and undertakings to be performed by the Humane Society, the Impounding agency agrees to pay the following applicable fee(s) per animal to the Humane Society on a monthly basis, in arrears:

| Type of Animal | Fee |
| --- | --- |
| **Dog or cat** (if the cat is not eligible for RTF/TNR program) Impoundment | $156.00 |
| **Other domesticated animal** | $130.00 |
| **Livestock animal** | $195.00 |
| **Wild animal (Euthanasia)** | $ 71.50 |
| **Deceased on arrival (Disposal)** | $32.50 |
| **Quarantined animal (*e.g.*, Rabies)** | $390, $39 per day Quarantine period determined by Florida State Statute |
| **Confiscated animal** | $130 for the 1st day of impoundment plus $45.50 for each additional day of impoundment |
| **Fees for RTF/TNR cats** **Sterilization Surgery** Complimentary ear tipping, FVRCP, Rabies Vaccines | $58.50 |
| **Anesthesia Fee** No surgery performed, ear tipping, FVRCP vaccine, rabies vaccine | $58.50 |
| **Euthanasia** Veterinarian determined that patient cannot undergo surgery due to illness/disease | $58.50 |
| **Forensic calls and staff assistance upon request** | Staff Support:            $32.50 per hr. Veterinarian Support:  $162.50 per hr. |

Page **5** of **13**

(c)    Payment must be made to the Humane Society within forty-five (45) days of the date of a proper invoice, as required by the Florida Local Government Prompt Payment Act (Part VII, Chapter 218, Florida Statutes) (the "Prompt Payment Act"). As provided by the Prompt Payment Act, any payment that is not made by the Impounding agency within such time period shall bear interest from thirty (30) days after the due date at a rate of one percent (1%) per month on the unpaid balance until paid in full.  If the Impounding agency has a dispute about a charge on its invoice, it must contact the Humane Society's Director of Administrative Services at 386-274-4703, extension 315, within fifteen (15) days of the date of the invoice.

(d)    The Humane Society will submit to the Impounding agency, with its monthly invoice, a list of all pick up addresses of stray animals charged to the Impounding agency account for animals that were not impounded by a an impounding agency's designated personnel, the names and addresses of all persons claiming any stray animals that are dropped off at the Shelter during normal operating hours, and, if known, the names and addresses of all persons claiming stray animals that are dropped off at the Shelter after-hours.

(e)    The Humane Society will make a good faith effort to collect the costs incurred for the care of any animal that is served by the Humane Society and later reclaimed by the animal's owner. Collections received by the Humane Society by an animal owner shall be credited against the fees charged to the Impounding Agency. The animal's owner is financially responsible for any services rendered to the animal by the Humane Society and the Humane Society, without indicating that payment is optional, will seek full payment for said services prior to releasing the animal. The Humane Society may release an animal to its owner without payment in the event the animal's owner completes a financial affidavit indicating that the owner qualifies as indigent. The financial affidavit to be used by Humane Society is attached hereto marked as **Exhibit A**.  If the attached financial affidavit is completed by the animal owner, the Humane Society may release the animal to the owner without collecting any fees and the Impounding Agency shall be responsible for the charges associated with the released animal as outlined herein.  A copy of the animal owner's financial affidavit shall be included in the corresponding invoice to the Impounding Agency.  If the  Humane  Society does  not  have  the  animal  owner  complete  a  financial  affidavit but releases the animal to the owner, the Impounding Agency shall not be charged for any of the fees associated with the animal released.

4.    **RABIES QUARANTINE**:  The Humane Society will provide space for the confinement, observation and care of any stray animal suspected of rabies, or any stray animal which has bitten or otherwise exposed any person to rabies for a period of the state determined time for quarantine and will accept, care for and dispose of any such animal delivered to the Shelter. The Humane Society will notify the Volusia County Health Department of any rabies specimen

animal that dies during the quarantine period, and will allow the Volusia Impounding agency Health Department the opportunity to take custody of the remains of any such animal that becomes ill or dies while under confinement for such reasons.   The Impounding agency impounding agency shall pay the applicable charges for quarantine service pursuant to Section 3(b) of this Agreement.

5.    **CONFISCATED ANIMALS – 828.073, F.S.**:   The Humane Society will agree to accept confiscated animals as strays or accept said animals as "confiscated" only when the provisions of Section 828.073, Florida Statutes are satisfied (*i.e.*, pursuant to a Court order after petition and hearing).   The Impounding agency shall be responsible for all charges and expenses incurred in confiscating an animal pursuant to § 828.073, Fla. Stat.  Upon request, a copy of the petition must be submitted by the seizing agent to the Humane Society within ten (10) business days of the request.  Failure to comply with this requirement will result in "confiscated" animals being deemed "stray" animals, at which point care of the animal will be charged to the Impounding agency at the default "stray" rates provided in Section 3(b) of this Agreement. The Impounding agency agrees to indemnify the Humane Society for any and all claims that may arise as a result of the Impounding agency decision to submit the animal as a stray, except that the cap on the amount and liability of the Impounding agency for indemnification or damages under this contract, regardless of the number or nature of claims in tort, equity, or contract, shall not exceed the dollar amount expended by the Impounding agency for Humane Society services in the contract year in which the claim arises.

6.    **DANGEROUS DOG LAW**:   Pursuant to Sections 767.12 and 767.13, Florida Statutes, it will be the sole responsibility of the Impounding agency's animal control authority to determine whether a dog is dangerous and to submit to the Humane Society the necessary paperwork as required by the applicable statutes.  If quarantine is necessary, a dog quarantined pursuant to Sections 767.12 and 767.13, Florida Statutes, may be quarantined for ten (10) business days at a bona fide boarding kennel or veterinarian's office of the seizing agent's or owner's choice. Otherwise, the Humane Society will quarantine all dogs that the Impounding agency animal control authority determines to be dangerous for a maximum of ten (10) business days.   The Impounding agency shall pay the applicable charges for such service pursuant to Section 3(b) of this Agreement.  If the owner of the dog is unknown by the end of the quarantine period, the Impounding agency may request that euthanasia be performed by the Humane Society when it is the Impounding agency's belief that the dog poses a threat to public safety. The Impounding agency agrees to indemnify the Humane Society for any and all claims that may arise as a result of the Impounding agency decision to submit the animal under the Dangerous Dog Law, except that the cap on the amount and liability of the Impounding agency for indemnification or damages under this contract, regardless of the number or nature of claims in tort, equity, or contract, shall not exceed the dollar amount expended by the Impounding agency for Humane Society services in the contract year in which the claim arises.

7.    **CONFISCATED ANIMALS - OWNER OF ANIMAL IS IN CUSTODY / DECEASED / HOSPITALIZED**:  All animals whose owners are in police custody, deceased or hospitalized may

be placed in a bona fide boarding kennel or veterinary clinic at the owner's expense. The Humane Society will accept any such animals that are seized or taken by the Impounding agency. The Impounding agency will pay the applicable charges for such service (*i.e.*, "Confiscated Animal") pursuant to Section 3(b) of this Agreement. The Impounding agency agrees to indemnify the Humane Society for any and all claims that may arise as a result of the Impounding agency's decision to submit the animal as Confiscated/Owner of Animal in Custody/Deceased/Hospitalized, except that the cap on the amount and liability of the Impounding agency for indemnification or damages under this contract, regardless of the number or nature of claims in tort, equity, or contract, shall not exceed the dollar amount expended by the Impounding agency for Humane Society services in the contract year in which the claim arises. The impounding agency agrees to provide next of kin, emergency contact or any other guardian information to Halifax within 3 days of impoundment. Failure to do so by the impounding agency will forfeit any hold on the animal other than the mandatory 3 day holding period for stray animals.

8.      **CONFISCATED ANIMALS DUE TO OWNER EVICTION**:  Animals seized by the Impounding agency as a result of an owner eviction will be held by the Humane Society for 5 days.  The impounding agency agrees to leave notice of impoundment at the eviction location listing the whereabouts and descriptions of animal confiscated.  Impounding agency's representative will provide proof of such notice, agency report or photograph of notice on the dwelling with address or writ of possession displayed.   If not reclaimed by the owner, all charges accruing pursuant to Section 3(b) will be paid by the Impounding agency.

As the impounding agency, if the Impounding agency chooses not to have the Humane Society hold the animal for the entire reclamation period referenced above, the Impounding agency may submit the animal to the Humane Society as a "stray," in which case the animal will be held for three (3) days prior to disposition.  The Impounding agency agrees to indemnify the Humane Society for any and all claims that may arise as a result of the Impounding agency's decision to submit the animal as a "stray", except that the cap on the amount and liability of the Impounding agency for indemnification or damages under this contract, regardless of the number or nature of claims in tort, equity, or contract, shall not exceed the dollar amount expended by the Impounding agency for Humane Society services in the contract year in which the claim arises  The Impounding agency shall pay the applicable charges for such service pursuant to Section 3(b) of this Agreement.

9.      **REMEDY IN THE EVENT OF BREACH**:  In the event that the Impounding agency fails to make timely payment to the Humane Society for services rendered pursuant to this Agreement, the Humane Society, in its sole discretion, may elect to terminate this Agreement and cease providing services to the Impounding agency.  If the Humane Society exercises this option, it will provide the Impounding agency with thirty (30) days written notice of its decision to terminate the Agreement.  The Impounding agency will remain responsible for payment for all services rendered by the Humane Society prior to and during the thirty (30) day notice period.  Upon expiration of the thirty (30) day notice period, the Humane Society will no longer provide

any services to the Impounding agency.

10.      **WAIVER OF BREACH**:  The waiver by the Humane Society or the Impounding agency of any breach or violation of this Agreement will not operate as or be construed to be a waiver of any subsequent breach of this Agreement.

**11.  INSURANCE**: Humane Society shall maintain insurance of sufficient amounts during the life of this Agreement. Humane Society shall provide to the Impounding Agency with a certificate of insurance endorsing the Impounding Agency as an additional named insured, upon request. All insurance coverages of the Humane Society shall be primary and noncontributory. All insurance coverages of the Humane Society shall not seek contribution from any other insurance or self-insurance available to the Impounding Agency.

Policies shall be issued by insurers licensed and/or duly authorized under Florida Law to do business in the State of Florida and all insuring companies are required to have a minimum rating of "A-" in the "Best Key Rating Guide" published by A.M. Best & Company, Inc. Insurer shall provide the Impounding Agency written notice of cancellation, nonrenewal or any other changes in coverage no later than thirty (30) days prior to the effective date of the change and shall provide notice to the Impounding Agency no later than 10 days after non-payment.

Minimum insurance coverages that must remain in place for the life of the Agreement are as follows:

| | |
|---|---|
| Commercial General Liability: | Aggregate $2,000,000.00/ Each Occurrence $1,000,000.00 |
| Automobile Liability: | $1,000,000.00 |
| Umbrella Liability: | $1,000,000.00 |

Should at any time the Humane Society not maintain the insurance coverages required herein, the Impounding Agency may terminate the Agreement or at its sole discretion shall be authorized to purchase such coverages and charge the Humane Society for such coverages purchased. The Impounding Agency shall be under no obligation to purchase such insurance, nor shall it be responsible for the coverages purchased or the insurance company or companies used. The decision of the Impounding Agency to purchase such insurance coverages shall in no way be construed to be a waiver of any of its rights under the Agreement.

11.      **SOVEREIGN IMMUNITY:**  The Impounding agency expressly retains all rights, benefits, and immunities of sovereign immunity in accordance with §768.28, Florida Statutes. Notwithstanding anything set forth in any section of the Agreement to the contrary, nothing in the Agreement shall be deemed as a waiver of immunity of limits of liability of the Impounding agency beyond any statutory limited waiver of immunity or limits of liability which may have been adopted by the Florida Legislature or may be adopted by the Florida Legislature, and the cap on the amount and liability of the Impounding agency for damages, regardless of the number or nature of claims in tort, equity, or contract, shall not exceed the dollar amount set

by the legislature for tort. Nothing in this Agreement shall inure to the benefit of any third party for the purpose of allowing any claim against the Impounding agency, which would otherwise be barred under the Doctrine of Sovereign Immunity or by operation of law.

**12.    PUBLIC RECORDS**:  Pursuant to section 119.0701 (2)(a), Florida Statutes, the Impounding agency is required to provide the Humane Society with this statement and establish the following requirements as contractual obligations pursuant to the Agreement:

**IF THE HUMANE SOCIETY HAS QUESTIONS REGARDING THE APPLICATION OF CHAPTER 119, FLORIDA STATUTES, TO THE HUMANE SOCIETY'S DUTY TO PROVIDE PUBLIC RECORDS RELATING TO THIS AGREEMENT, CONTACT THE CUSTODIAN OF PUBLIC RECORDS AT 386-736-5935, email for Impounding Agency, by mail, Purchasing and Contracts Division, Attn: Public Records Custodian, 123 W. Indiana Ave. RM 302 DeLand, FL 32720.**

By entering into this Agreement, the Humane Society acknowledges and agrees that some records maintained, generated, received, or kept in connection with, or related to the performance of services provided under, this Agreement are public records subject to the public records disclosure requirements of section 119.07(1), Florida Statutes, and Article I, section 24 of the Florida Constitution. Pursuant to section 119.0701, Florida Statutes, any contractor entering into a contract for services with the Impounding agency, including the Humane Society, is required to comply with the following with respect to the applicable public records:

   a)  Keep and maintain public records required by the Impounding agency to perform the services and work provided pursuant to this Agreement.

   b)  Upon request from the Impounding agency's custodian of public records, provide the Impounding agency with a copy of the requested records or allow the records to be inspected or copied within a reasonable time at a cost that does not exceed the cost provided in Chapter 119, Florida Statutes, or as otherwise provided by law.

   c)  Ensure that public records that are exempt or confidential and exempt from public records disclosure requirements are not disclosed except as authorized by law for the duration of the contract term and following completion of the contract if the contractor does not transfer the records to the Impounding agency.

   d)  Upon completion of the contract, transfer, at no cost, to the Impounding agency all public records in the possession of the contractor or keep and maintain public records required by the Impounding agency to perform the service.  If the contractor transfers all public records to the Impounding agency upon completion of the contract, the contractor shall destroy any duplicate public records that are exempt or confidential and exempt from public records disclosure requirements.  If the contractor keeps and maintains public records upon completion of the contract, the contractor shall meet all applicable requirements for retaining public records.  All records stored electronically must be provided to the Impounding agency, upon request from the Impounding

agency's custodian of public records, in a format that is compatible with the information technology systems of the Impounding agency.

e) Requests to inspect or copy public records relating to the Impounding agency's contract for services must be made directly to the Impounding agency.  If contractor receives any such request, contractor shall instruct the requestor to contact the Impounding agency.  If the Impounding agency does not possess the records requested, the Impounding agency shall immediately notify the contractor of such request, and the contractor must provide the records to the Impounding agency or otherwise allow the records to be inspected or copied within a reasonable time.

The Humane Society acknowledges that failure to provide the applicable public records to the Impounding agency within a reasonable time may be subject to penalties under section 119.10, Florida Statutes.  The Humane Society further agrees not to release any records that are statutorily confidential or otherwise exempt from disclosure without first receiving prior written authorization from the Impounding agency.  Humane Society shall indemnify, defend, and hold the Impounding agency harmless for and against any and all claims, damage awards, and causes of action arising from Humane Society's failure to comply with the applicable public records disclosure requirements of section 119.07(1), Florida Statutes, or by Humane Society's failure to maintain any applicable public records that are exempt or confidential and exempt from the public records disclosure requirements, including, but not limited to, any third party claims or awards for attorney's fees and costs arising therefrom.  Humane Society authorizes Impounding agency to seek declaratory, injunctive, or other appropriate relief against Humane Society from a Circuit Court in Volusia Impounding agency on an expedited basis to enforce the requirements of this section.

13.    **E-VERIFY**:  Humane Society shall utilize the U.S. Department of Homeland Security's E-Verify system to verify the employment eligibility of all new employees hired by the Humane Society during the term of this Agreement and shall expressly require any sub-contractors performing services pursuant to this Agreement to likewise utilize the U.S. Department of Homeland Security's E-Verify system to verify the employment eligibility of all new employees hired by the sub-contractor during the term of this Agreement.

13.    **MEDIATION**:  Any dispute arising from this Agreement, including, but not limited to, disputes over fees for services, will be mediated prior to a lawsuit being filed.  Mediation will occur within sixty (60) days of written request by either party to mediate unless agreed to otherwise.  The written request must be delivered in accordance with the provisions of Paragraph 19, below, of this Agreement.  The cost of the mediator's fee will be borne equally by the parties.

14.    **ATTORNEY'S FEES**:  Both parties agree to bear the cost of their own attorneys' fees with respect to any disputes, lawsuits, or claims arising under this Agreement, except unless otherwise specifically allowed elsewhere in this Agreement or in the event of an action to recover amounts due under Part VII, Chapter 218, Florida Statutes, in which case, the court

shall award court costs and reasonable attorney's fees, including fees incurred through appeal, to the prevailing party.

15.    **GOVERNING LAW AND VENUE:**  The parties further agree that this Agreement will be governed by the laws of the State of Florida and that venue for any and all suits arising out of or otherwise attributable to this Agreement will lie exclusively in the courts of Volusia Impounding agency, Florida, unless the matter at issue is solely cognizable in federal court, in which case, venue shall be in the Middle District of Florida, Orlando Division.

16.    **SEVERABILITY**:  If any provision of this Agreement or any part of any provision of this Agreement is found to be invalid by a court of competent jurisdiction, such will not affect the validity of any other provision, or part thereof, of this Agreement.

17.    **ENTIRE AGREEMENT**:  This Agreement constitutes the entire and final understanding and agreement with respect to the subject matter hereof and supersedes all prior or contemporaneous negotiations, promises, covenants, agreements, or representations concerning all matters directly or indirectly, collaterally related to the subject matter of this Agreement.

18.    **AMENDMENTS**:  This Agreement cannot be amended or modified except by a writing executed by both of the parties hereto or their respective administrators, trustees, personal representatives and successors.

19.    **NOTICES**:  Any written notice required to be given under this Agreement is to be mailed by registered or certified mail, postage prepaid, to the party's business address or any other address designated for that purpose by written notice and sent to the attention of the Impounding agency Manager with respect to the Impounding agency and to the attention of the CEO with respect to the Humane Society.

IN WITNESS WHEREOF, the Humane Society and the Impounding agency have executed this Agreement for Services between Halifax Humane Society Inc. and the Impounding agency of Volusia, effective on the date and year as set forth above.

**HALIFAX HUMANE SOCIETY, INC.**      **IMPOUNDING AGENCY OF VOLUSIA**

By: _Sean Hawkins_             By: _____

Name: _Sean Hawkins_     Name:

Title:  Chief Executive Officer     Title: _____

Date: _Aug. 23, 2024_        Date: _____

ATTEST:                  ATTEST:

By: _____     By: _____

Name: Christina Sutherin     Name: _____

Title:  Chief Operating Officer     Title: _____

Date: _____     Date: _____



**COUNTY OF VOLUSIA**
**ANIMAL SERVICES**
**RETURN TO CUSTODY**

**DECLARATION OF NO OR LOW INCOME**

This form should be completed <u>by an adult household member</u> if the household is claiming no or low income within the last 30 days.

_____        _____        _____

**Last Name**        **First Name**        **Phone Number**

_____        _____        _____

**Address**        **City**        **Zip**

**1A. I hereby certify that I do not individually receive income from any of the following sources:**

- Wages from employment (including commissions, tips, bonuses, fees, etc.)
- Income from operation of a business
- Rental income from real or personal property
- Interest or dividends from assets
- Social Security, annuities, insurance policies, retirement funds, pensions, or death benefits
- Unemployment or disability payments
- Public assistance payments (AFCD, SSI, TANF)
- Alimony, child support, or gifts received from persons not living in my household
- Sales from self-employed resources (Avon, Mary Kay, etc.)
- Any other source not named above

       **OR**

**1B. I hereby certify that I am low-income, as defined by Florida law, as a family or individual earning 80% or less of the area median income ($63,075)**

2. ☐ I have resources to pay for the daily care of the animal being returned to my custody.

   ☐ I need access to resources to supplement my source of funds to adequately care for the animal being returned to my custody.

**By my signature below, I certify and acknowledge the following:**

- That the forgoing is true, complete, and correct.
- Inquiries may be made to verify statements and a request for documentation to verify low or no-income status maybe requested by Volusia County Animal Services.
- That false statements or omissions are grounds for an at large citation if the animal was impounded and the fees not paid upon return to the owner.

_____        _____

**Signature**        **Date**

EXHIBIT TWO

**MINUTES**
**ORMOND BEACH CITY COMMISSION**
**HELD AT CITY HALL COMMISSION CHAMBERS**

| September 18, 2024 | 7:00 p.m. | Commission Chambers |
|---|---|---|

Present: Mayor Bill Partington, Commissioners Lori Tolland, Travis Sargent, Susan Persis, and Harold Briley, City Manager Joyce Shanahan, City Attorney Randy Hayes, Assistant City Manager Shawn Finley, Assistant City Manager Claire Whitley, and City Clerk Susan Carroll Dauderis.

*A G E N D A*

1. **CALL TO ORDER**

2. **INVOCATION**

3. **PLEDGE OF ALLEGIANCE**

4. **PRESENTATIONS AND PROCLAMATIONS**
   A.  Recognition of Florida Legislators
   B.  Evelyn Rebostini

5. **ADOPTION OF FISCAL YEAR 2024-2025 MILLAGE RATES AND BUDGET**

   A.  **RESOLUTION NO. 2024-146**: A RESOLUTION ADOPTING FINAL MILLAGE RATES TO BE LEVIED FOR FISCAL YEAR 2024-2025; DIRECTING CERTIFICATION; EXPRESSING LEGISLATIVE INTENT; AND SETTING FORTH AN EFFECTIVE DATE.
       *Staff Contact:*    *Kelly McGuire, Finance Director, (386) 676-3226*

   B.  **ORDINANCE NO. 2024-25:** AN ORDINANCE ADOPTING THE ANNUAL BUDGET FOR THE 2024-2025 FISCAL YEAR BEGINNING OCTOBER 1, 2024 AND ENDING SEPTEMBER 30, 2025; REPEALING ALL INCONSISTENT ORDINANCES OR PARTS THEREOF; AND SETTING FORTH AN EFFECTIVE DATE. **(SECOND READING)**
       *Staff Contact:*    *Kelly McGuire, Finance Director, (386) 676-3226*

6. **AUDIENCE REMARKS - REGARDING ITEMS NOT ON THE AGENDA**

7. **APPROVAL OF MINUTES**
   A.  Minutes from City Commission meeting - September 4, 2024

8. **CONSENT AGENDA**
   The action proposed is stated for each item on the Consent Agenda. Unless a City Commissioner removes an item from the Consent Agenda, no discussion on individual items will occur and a single motion will approve all items.

   A.  **RESOLUTION NO. 2024-147**: A RESOLUTION AUTHORIZING THE EXECUTION OF A NON-EXCLUSIVE FRANCHISE AGREEMENT BETWEEN THE CITY AND FENCE SERVICE, INC. D/B/A AAA DUMPSTER RENTAL AND D/B/A F.S.I. ROLL OFF CONTAINER SERVICE REGARDING THE COLLECTION OF CONSTRUCTION AND DEMOLITION DEBRIS; AND SETTING FORTH AN EFFECTIVE DATE.
       *Staff Contact:*    *Kevin Gray, Deputy Public Works Director, (386) 676-3325*

   B.  **RESOLUTION NO. 2024-148**: A RESOLUTION RATIFYING, AFFIRMING AND AUTHORIZING EXPENDITURES FOR

SERVICES FROM EMPIRE COMPUTING AND CONSULTING, INC. FOR BARRACUDA BACKUP PROTECTION; AND SETTING FORTH AN EFFECTIVE DATE.
> **Staff Contact:**    Chuck Osteen, Information Technology Manager, (386) 615-7031

C.  **RESOLUTION NO. 2024-149:**  A RESOLUTION ACCEPTING A BID FROM SGS CONTRACTING SERVICES, INC. FOR CONSTRUCTION SERVICES REGARDING THE WATER RECLAMATION FACILITY ULTRAVIOLET DISINFECTION CONVERSION PROJECT, UNDER BID NO. 2024-24; AUTHORIZING THE EXECUTION OF A CONTRACT AND PAYMENT THEREFOR; REJECTING ALL OTHER BIDS; AND SETTING FORTH AN EFFECTIVE DATE.
> **Staff Contact:**    Bob Preis, Utilities Manager, (386) 676-3305

D.  **RESOLUTION NO. 2024-151:**  A RESOLUTION ACCEPTING A PROPOSAL FROM MCKIM & CREED, INC. TO PROVIDE CONSTRUCTION ADMINISTRATION SERVICES REGARDING THE FLEMING AVENUE DRAINAGE IMPROVEMENTS PROJECT; AUTHORIZING THE EXECUTION OF A WORK AUTHORIZATION THERETO; AND SETTING FORTH AN EFFECTIVE DATE.
> **Staff Contact:**    Alex Schumann, City Engineer, (386) 676-3302

E.  **RESOLUTION NO. 2024-152:**  A RESOLUTION AUTHORIZING AN EMERGENCY PROCUREMENT OF A HIPOWER PORTABLE GENERATOR FROM ALTERNATIVE POWER SOLUTIONS, INC. FOR USE AT THE HUDSON WELL FIELD IN THE HUNTERS RIDGE SUBDIVISION; AUTHORIZING THE EXECUTION OF A PURCHASE AUTHORIZATION; AND SETTING FORTH AN EFFECTIVE DATE.
> **Staff Contact:**    Bob Preis, Utilities Manager, (386) 676-3305

F.  **RESOLUTION NO. 2024-153:**  A RESOLUTION APPROVING AND AUTHORIZING REVISIONS TO THE CITY'S FEE SCHEDULE FOR CULTURAL AND RECREATIONAL PROGRAMS AND FACILITIES OPERATED BY THE LEISURE SERVICES DEPARTMENT; AND SETTING FORTH AN EFFECTIVE DATE.
> **Staff Contact:**    Robert Carolin, Leisure Services Director, (386) 676-3279

G.  **RESOLUTION NO. 2024-156:**  A RESOLUTION AUTHORIZING THE EXECUTION OF AN INTERLOCAL AGREEMENT BETWEEN THE CITY AND THE STATE ATTORNEY OF THE SEVENTH JUDICIAL CIRCUIT FOR PROSECUTION OF VIOLATIONS OF CITY ORDINANCES PUNISHABLE BY INCARCERATION; AND SETTING FORTH AN EFFECTIVE DATE.
> **Staff Contact:**    Randy Hayes, City Attorney, (386) 676-3217

H.  **RESOLUTION NO. 2024-157:**  A RESOLUTION AUTHORIZING THE EXECUTION OF AN AGREEMENT FOR SERVICES BETWEEN THE CITY AND HALIFAX HUMANE SOCIETY, INC.; AND SETTING FORTH AN EFFECTIVE DATE.
> **Staff Contact:**    Jesse Godfrey, Police Chief, (386) 676-3500

I.  **RESOLUTION NO. 2024-158:**  A RESOLUTION APPROVING A SETTLEMENT PROPOSAL REGARDING THE WORKERS' COMPENSATION CLAIM OF MICHAEL BAKAYSA; AUTHORIZING THE EXECUTION OF ANY AND ALL DOCUMENTS INCIDENTAL THERETO; AUTHORIZING PAYMENT RELATIVE THERETO; AND SETTING FORTH AN EFFECTIVE DATE.
> **Staff Contact:**    Randy Hayes, City Attorney, (386) 676-3217

J.    **RFP - Cross Connection Control Program Management Services**

    **Staff Contact:**    *Bob Preis, Utilities Manager, (386) 676-3305*

    **Disposition:**    Approve as recommended in the City Manager staff report dated September 18, 2024.

K.    **City Manager's Monthly Report, September 2024**

    **Staff Contact:**    *Joyce Shanahan, City Manager, (386) 676-3200*

    **Disposition:**    Accept as information as recommended in the City Manager staff report dated September 18, 2024.

9.    **PUBLIC HEARINGS**

A.    **ORDINANCE NO. 2024-26:** AN ORDINANCE AMENDING CHAPTER 2, DISTRICT AND GENERAL REGULATIONS, ARTICLE IV, CONDITIONAL AND SPECIAL EXCEPTION REGULATIONS, SECTION 2-57, CRITERIA FOR REVIEW OF SPECIFIC CONDITIONAL AND SPECIAL EXCEPTION, SUBSECTION (37), HOUSES OF WORSHIP, OF THE CITY OF ORMOND BEACH LAND DEVELOPMENT CODE, BY AMENDING THE CONDITIONS FOR HOUSES OF WORSHIP; REPEALING ALL INCONSISTENT ORDINANCES OR PARTS THEREOF; PROVIDING FOR SEVERABILITY; AND SETTING FORTH AN EFFECTIVE DATE.

    **Staff Contact:**    *Steven Spraker, Planning Director, (386) 676-3341*

B.    **ORDINANCE NO. 2024-27:** AN ORDINANCE APPROVING THE FINAL PLAT FOR THE "BRADFORD LAKES" SUBDIVISION, SHOWN WITHIN PHASE 4 OF THE PLANTATION OAKS PLANNED RESIDENTIAL DEVELOPMENT; ESTABLISHING CONDITIONS AND EXPIRATION DATE OF APPROVAL; AND SETTING FORTH AN EFFECTIVE DATE.

    **Staff Contact:**    *Steven Spraker, Planning Director, (386) 676-3341*

C.    **ORDINANCE NO. 2024-28:** AN ORDINANCE APPROVING THE FINAL PLAT FOR THE "BRADFORD PARK" SUBDIVISION; ESTABLISHING CONDITIONS AND EXPIRATION DATE OF APPROVAL; AND SETTING FORTH AN EFFECTIVE DATE.

    **Staff Contact:**    *Steven Spraker, Planning Director, (386) 676-3341*

D.    **ORDINANCE NO. 2024-29:** AN ORDINANCE CHANGING THE NAME OF "HALIFAX STREET" TO "CLIFFHAVEN COURT", AND "MATANZAS STREET" TO "RIDGEHAVEN AVENUE", SAID STREETS BEING LOCATED IN THE RIDGEHAVEN SUBDIVISION AREA; REPEALING ALL INCONSISTENT ORDINANCES OR PARTS THEREOF; PROVIDING FOR TRANSMITTAL AND RECORDING IN THE PUBLIC RECORDS OF VOLUSIA COUNTY; AND SETTING FORTH AN EFFECTIVE DATE.

    **Staff Contact:**    *Steven Spraker, Planning Director, (386) 676-3341*

E.    **RESOLUTION NO. 2024-133:** A RESOLUTION AUTHORIZING THE EXECUTION AND ISSUANCE OF A DEVELOPMENT ORDER FOR A SPECIAL EXCEPTION TO ALLOW OUTDOOR ACTIVITY TO INCLUDE THE PERMANENT OUTDOOR STORAGE, DISPLAY, AND SALES OF MERCHANDISE AT THE LOWES HOME IMPROVEMENT STORE LOCATED AT 1340 WEST GRANADA BOULEVARD; ESTABLISHING CONDITIONS AND EXPIRATION DATE OF APPROVAL; AND SETTING FORTH AN EFFECTIVE

DATE.

    ***Staff Contact:***     *Steven Spraker, Planning Director, (386) 676-3341*

**10.**    **RESOLUTIONS**

    A.   **RESOLUTION NO. 2024-154**: A RESOLUTION ESTABLISHING FUEL FLOWAGE FEES, LANDING FEES, AND AIRCRAFT TIE DOWN FEES AT THE ORMOND BEACH MUNICIPAL AIRPORT; AND SETTING FORTH AN EFFECTIVE DATE.

       ***Staff Contact:***     *Steven Lichliter, Airport Manager, (386) 615-7019*

    B.   **RESOLUTION NO. 2024-155**: A RESOLUTION AUTHORIZING THE EXECUTION OF AN AGREEMENT BETWEEN THE CITY AND VECTOR AIRPORT SYSTEMS, LLC, FOR THE PROVISION OF PLANEPASS AIRCRAFT OPERATING FEE BILLING AND COLLECTION SERVICES AT THE ORMOND BEACH MUNICIPAL AIRPORT; AND SETTING FORTH AN EFFECTIVE DATE.

       ***Staff Contact:***     *Steven Lichliter, Airport Manager, (386) 615-7019*

    C.   **RESOLUTION NO. 2024-159**: A RESOLUTION APPOINTING A MEMBER AND AN ALTERNATE MEMBER TO SERVE ON THE OPIOID ABATEMENT FUNDING ADVISORY BOARD; ESTABLISHING TERM AND CONDITIONS OF SERVICE; AND SETTING FORTH AN EFFECTIVE DATE.

       ***Staff Contact:***     *Susan Dauderis, City Clerk, (386) 676-3340*

    D.   **RESOLUTION NO. 2024-160**: A RESOLUTION ACCEPTING A PROPOSAL FROM BROWN & BROWN INSURANCE SERVICES, INC., FOR THE PROVISION OF PROPERTY, LIABILITY AND WORKERS' COMPENSATION INSURANCE FOR VARIOUS LINES OF INSURANCE COVERAGE THROUGH VARIOUS INSURANCE CARRIERS, INCLUDING PROPERTY, INLAND MARINE, AUTO PHYSICAL DAMAGE, EXCESS WORKERS' COMPENSATION, CRIME, ACCIDENTAL DEATH AND DISMEMBERMENT (POLICE OFFICERS AND FIREFIGHTERS), NATIONAL FLOOD INSURANCE PROGRAM (NFIP) FLOOD, POLLUTION, PROFESSIONAL LIABILITY (EMT'S AND PARAMEDICS), GENERAL LIABILITY (INCLUDING LAW ENFORCEMENT LIABILITY), TENANT AND USERS LIABILITY (TULIP) (SPECIAL EVENTS), CYBER LIABILITY, AND ACTIVE SHOOTER LIABILITY INSURANCE; AUTHORIZING THE EXECUTION OF DOCUMENTS RELATIVE THERETO; AUTHORIZING PAYMENT THEREFOR; AND SETTING FORTH AN EFFECTIVE DATE.

       ***Staff Contact:***     *Kelly McGuire, Finance Director, (386) 676-3226*

**11.**    **REPORTS, SUGGESTIONS, REQUESTS**

**12.**    **ADJOURNMENT**

*M I N U T E S*

<u>Item #1 – Meeting Call to Order</u>

Mayor Partington called the meeting to order at 7:01 p.m.

<u>Item #2 – Invocation</u>

Father Roy Allison, St. James Episcopal Church, provided the invocation.

Item #3 – Pledge of Allegiance

Mayor Partington led the Pledge of Allegiance.

Item #4 – Presentations and Proclamations

Item #4A – Recognition of Florida Legislators

Mayor Partington presented a plaque of appreciation and Key to the City to Representative Tom Leek for his work and dedication to the community. He recognized Representative Webster Barnaby, Representative Chase Tramont, and Florida Senator Tom Wright with a plaque of appreciation.

Item #4B – Evelyn Rebostini

Mayor Partington presented a proclamation and Key to the City to Ms. Evelyn Rebostini, honoring her work as the Ormond Beach Police Department's Victim Advocate and congratulating her on her retirement.

Ms. Rebostini thanked the Commission, city staff, and co-workers for their support and friendship over the years and discussed her career with the city.

Item #5 – Adoption of Fiscal Year 2024-2025 Millage Rates and Budget

Mayor Partington opened the Public Hearings.

Item #5A –Millage Rates for 2024-2025 Fiscal Year

City Clerk Susan C. Dauderis read by title only:

RESOLUTION NO. 2024-146
A RESOLUTION ADOPTING FINAL MILLAGE RATES TO BE LEVIED FOR FISCAL YEAR 2024-2025; DIRECTING CERTIFICATION; EXPRESSING LEGISLATIVE INTENT; AND SETTING FORTH AN EFFECTIVE DATE.

Mayor Partington stated per Florida Statute, he was required to state the millage rate for the City of Ormond Beach necessary to fund the Fiscal Year (FY) 2024-2025 budget was 4.0960 mills, noting the rate was 12.82 percent above the rolled back rate of 3.6305 mills and the debt service millage rate was 0.065 for the 2010 General Obligation Bond Sinking Fund.

Mayor Partington stated it was a public hearing and inquired if there were any members of the public who wished to speak or ask questions prior to adoption of the millage rate and budget.

Mr. Sean Daly, 1106 Northside Drive, expressed concerns regarding the tax increase and the Ormond Beach Municipal Airport's budget. He discussed the funds owed by the airport and not using taxpayer dollars to support it.

**Commissioner Briley moved, seconded by Commissioner Tolland, for approval of Resolution No. 2024-146, as read by title only.**

Mayor Partington stated the operating millage of 4.0960 mills was 12.82 percent above the rolled back millage rate and the resolution included adoption of the debt service millage rate of 0.065 for the 2010 General Obligation Bond Sinking Fund.

| Call Vote: | | |
|---|---|---|
| | Commissioner Tolland | Yes |
| | Commissioner Sargent | Yes |
| | Commissioner Persis | Yes |
| | Commissioner Briley | Yes |
| Carried. | Mayor Partington | Yes |

Mayor Partington announced the operating millage rate was set at 4.0960 mills, which was 12.82 percent above the rolled back millage rate of 3.6305 mills.

Item #5B – Adoption of Annual Budget for the 2024-2025 Fiscal Year

City Clerk Susan C. Dauderis read by title only:

ORDINANCE NO. 2024-25
AN ORDINANCE ADOPTING THE ANNUAL BUDGET FOR THE 2024-2025 FISCAL YEAR BEGINNING OCTOBER 1, 2024 AND ENDING SEPTEMBER 30, 2025; REPEALING ALL INCONSISTENT ORDINANCES OR PARTS THEREOF; AND SETTING FORTH AN EFFECTIVE DATE. **(SECOND READING)**

**Commissioner Persis moved, seconded by Commissioner Briley, for approval of Ordinance No. 2024-25, on second reading, as read by title only.**

Mayor Partington requested for the City Clerk to call the vote to adopt the budget of $131,976,868.

| Call Vote: | | |
|---|---|---|
| | Commissioner Sargent | Yes |
| | Commissioner Persis | Yes |
| | Commissioner Briley | Yes |
| | Commissioner Tolland | Yes |
| Carried. | Mayor Partington | Yes |

Mayor Partington closed the Public Hearings.

Item #6 – Audience Remarks

Ms. Cindy Costa, 6 Walden Lane, voiced concerns regarding North Beach Street and the state of the roadway. She requested the city look into repairs to make the street safer for drivers.

Ms. Alicya Simmons, 705 North Peninsula Avenue, requested for the city to look into a grant from the Daytona Beach Racing and Recreation Center Fund for the Ormond Beach Tennis Center. She discussed the needs of the tennis center, personal funds the current operator put into the programs at the facility, and the growth since the current operator started.

Ms. Connie Colby, 108 Roble Lane, discussed the rules regarding parks within the city and their regulation. She expressed concerns surrounding the use of the parks, specifically motorbikes and drones. She voiced concerns regarding code enforcement and the way citizens report concerns.

Item #7 – Approval of Minutes

Mayor Partington advised the minutes from the September 4, 2024, meeting had been sent to the Commission for review and posted on the city's website for public viewing. He asked for any corrections, additions, or omissions. He stated, hearing no corrections, the minutes would stand approved as presented.

**Commissioner Sargent moved, seconded by Commissioner Tolland, for approval of the September 4, 2024, City Commission meeting minutes.**

**The motion passed by voice vote.**

Item #8 – Consent Agenda

Mayor Partington advised the actions proposed for the items on the Consent Agenda were so stated on the agenda. He asked if any member of the Commission had questions or wished to discuss any items separately.

Commissioner Briley requested Item 8H be pulled from the Consent Agenda.

**Commissioner Persis moved, seconded by Commissioner Sargent, for approval of the Consent Agenda, absent Item 8H.**

| Call Vote: | | |
|---|---|---|
| | Commissioner Persis | Yes |
| | Commissioner Briley | Yes |
| | Commissioner Tolland | Yes |
| | Commissioner Sargent | Yes |
| Carried. | Mayor Partington | Yes |

Item #8H – Humane Society Contract FY 2024-2025

City Clerk Susan C. Dauderis read by title only:

RESOLUTION NO. 2024-157
A RESOLUTION AUTHORIZING THE EXECUTION OF AN AGREEMENT
FOR SERVICES BETWEEN THE CITY AND HALIFAX HUMANE
SOCIETY, INC.; AND SETTING FORTH AN EFFECTIVE DATE.

Ms. Colby expressed concerns regarding the stray cats in her neighborhood and the
return of the stray cats once they were neutered by the Humane Society. She requested
the city renegotiate the contract for the Humane Society to not return the cats.

Commissioner Briley deferred to staff for information for Ms. Colby; whereby, Ms. Joyce
Shanahan, City Manager, stated the contract called for just Trap, Neuter, and Release
(TNR).

Captain Chris Roos, Ormond Beach Police Department, discussed the Humane
Society's TNR program and the life span of wild cats. He noted if there were better
plans, staff would be happy to review. He explained there were no cat colonies in the
area Ms. Colby expressed concerns with.

Commissioner Tolland expressed support of revisiting the contract to see what further
could be done to prevent the return of the stray cats.

Ms. Claire Whitley, Assistant City Manager, stated staff would discuss the request with
the Humane Society before the next contract; whereby, Mayor Partington noted if a
resolution to the request could happen sooner than the next contract to bring it back to
the Commission before then.

Commissioner Persis requested the Humane Society go look at Ms. Colby's areas of
concern.

Commissioner Tolland suggested having data of how many cats were in the area to
determine if there were needs for a revised program.

**Commissioner Briley moved, seconded by Commissioner Sargent, for approval of
Resolution No. 2024-157, as read by title only.**

| Call Vote: | Commissioner Briley | Yes |
|---|---|---|
| | Commissioner Tolland | Yes |
| | Commissioner Sargent | Yes |
| | Commissioner Persis | Yes |
| Carried. | Mayor Partington | Yes |

Comments on the Consent Agenda

Commissioner Sargent expressed support for Item 8I regarding the Settlement of
Workers' Compensation Claim for Michael Bakaysa.

Mayor Partington voiced support of Item 8C regarding the Bid Award for the Water
Reclamation Facility Ultra-Violet Disinfection Conversion and the state money that
helped fund the project, and Item 8D regarding the Work Authorization for the
Construction Administrative Services for the Fleming Avenue Drainage project.

Item #9 – Public Hearings

Mayor Partington opened the Public Hearings.

Item #9A – Land Development Code Amendment, Houses of Worship Conditions

City Clerk Susan C. Dauderis read by title only:

ORDINANCE NO. 2024-26
AN ORDINANCE AMENDING CHAPTER 2, DISTRICT AND GENERAL
REGULATIONS, ARTICLE IV, CONDITIONAL AND SPECIAL EXCEPTION
REGULATIONS, SECTION 2-57, CRITERIA FOR REVIEW OF SPECIFIC

CONDITIONAL AND SPECIAL EXCEPTION, SUBSECTION (37),
HOUSES OF WORSHIP, OF THE CITY OF ORMOND BEACH LAND
DEVELOPMENT CODE, BY AMENDING THE CONDITIONS FOR
HOUSES OF WORSHIP; REPEALING ALL INCONSISTENT
ORDINANCES OR PARTS THEREOF; PROVIDING FOR SEVERABILITY;
AND SETTING FORTH AN EFFECTIVE DATE.

Mr. Steven Spraker, Planning Director, explained the item was for reduced setback and
stated the Planning Board recommended approval.

Mayor Partington noted it was a unanimous approval by the Planning Board and
explained there were no projects being proposed, the item was the starting point for any
future projects.

**Commissioner Sargent moved, seconded by Commissioner Briley, to approve
Ordinance No. 2024-26, on first reading, as read by title only.**

| Call Vote: | | |
|---|---|---|
| | Commissioner Tolland | Yes |
| | Commissioner Sargent | Yes |
| | Commissioner Persis | Yes |
| | Commissioner Briley | Yes |
| Carried. | Mayor Partington | Yes |

Item #9B – Bradford Lakes, Final Plat

City Clerk Susan C. Dauderis read by title only:

ORDINANCE NO. 2024-27
AN ORDINANCE APPROVING THE FINAL PLAT FOR THE "BRADFORD
LAKES" SUBDIVISION, SHOWN WITHIN PHASE 4 OF THE PLANTATION
OAKS PLANNED RESIDENTIAL DEVELOPMENT; ESTABLISHING
CONDITIONS AND EXPIRATION DATE OF APPROVAL; AND SETTING
FORTH AN EFFECTIVE DATE.

Mr. Spraker explained the item was for the final plat for the Bradford Lakes subdivision
located within the Plantation Oaks Planned Residential Development and stated the
Planning Board unanimously recommended approval.

**Commissioner Sargent moved, seconded by Commissioner Persis, to approve
Ordinance No. 2024-27, on first reading, as read by title only.**

| Call Vote: | | |
|---|---|---|
| | Commissioner Sargent | Yes |
| | Commissioner Persis | Yes |
| | Commissioner Briley | Yes |
| | Commissioner Tolland | Yes |
| Carried. | Mayor Partington | Yes |

Item #9C – Bradford Park, Final Plat

City Clerk Susan C. Dauderis read by title only:

ORDINANCE NO. 2024-28
AN ORDINANCE APPROVING THE FINAL PLAT FOR THE "BRADFORD
PARK" SUBDIVISION; ESTABLISHING CONDITIONS AND EXPIRATION
DATE OF APPROVAL; AND SETTING FORTH AN EFFECTIVE DATE.

**Commissioner Briley moved, seconded by Commissioner Sargent, to approve
Ordinance No. 2024-28, on first reading, as read by title only.**

| Call Vote: | | |
|---|---|---|
| | Commissioner Persis | Yes |
| | Commissioner Briley | Yes |
| | Commissioner Tolland | Yes |
| | Commissioner Sargent | Yes |
| Carried. | Mayor Partington | Yes |

Item #9D – RidgeHaven Subdivision, Street Name Changes

City Clerk Susan C. Dauderis read by title only:

ORDINANCE NO. 2024-29

AN ORDINANCE CHANGING THE NAME OF "HALIFAX STREET" TO "CLIFFHAVEN COURT", AND "MATANZAS STREET" TO "RIDGEHAVEN AVENUE", SAID STREETS BEING LOCATED IN THE RIDGEHAVEN SUBDIVISION AREA; REPEALING ALL INCONSISTENT ORDINANCES OR PARTS THEREOF; PROVIDING FOR TRANSMITTAL AND RECORDING IN THE PUBLIC RECORDS OF VOLUSIA COUNTY; AND SETTING FORTH AN EFFECTIVE DATE.

**Commissioner Sargent moved, seconded by Commissioner Persis, to approve Ordinance No. 2024-29, on first reading, as read by title only.**

| Call Vote: | | |
|---|---|---|
| | Commissioner Briley | Yes |
| | Commissioner Tolland | Yes |
| | Commissioner Sargent | Yes |
| | Commissioner Persis | Yes |
| Carried. | Mayor Partington | Yes |

Item #9E – 1340 West Granada Blvd, Lowe's Special Exception for Outdoor Activity

City Clerk Susan C. Dauderis read by title only:

RESOLUTION NO. 2024-133

A RESOLUTION AUTHORIZING THE EXECUTION AND ISSUANCE OF A DEVELOPMENT ORDER FOR A SPECIAL EXCEPTION TO ALLOW OUTDOOR ACTIVITY TO INCLUDE THE PERMANENT OUTDOOR STORAGE, DISPLAY, AND SALES OF MERCHANDISE AT THE LOWES HOME IMPROVEMENT STORE LOCATED AT 1340 WEST GRANADA BOULEVARD; ESTABLISHING CONDITIONS AND EXPIRATION DATE OF APPROVAL; AND SETTING FORTH AN EFFECTIVE DATE.

Mr. Spraker explained the Special Exception for Lowe's for their outdoor activity and displays. He reviewed the history of the Special Exception, and the updated proposal since the last time it was brought before the City Commission.

Mr. Joey Posey, 420 South Nova Road, noted he was the attorney for the applicant and reviewed the updated plan and updated landscaping. He stated Lowes was very responsive to the City Commissions requests and understood their concerns.

Commissioner Tolland stated she spoke with Mr. Posey regarding the proposed plans and appreciated the updated landscaping. She inquired if there were concerns regarding pedestrian safety; whereby, Mr. Roger Strcula, Upham Engineering, explained there were minimal parking spaces along the building, therefore pedestrian safety was not a concern.

Commissioner Persis indicated she spoke with Mr. Posey and thanked him for the updates to the plan.

Commissioner Sargent discussed his concerns regarding future change of management and noted his hope of better communication between the store managers regarding the special exception.

Commissioner Briley expressed concerns regarding the grills, lawnmowers, and plants for sale outside of the store, noting the continued violations.

Mr. Posey stated it was a delicate balance for the store to promote the sale of their products and put all the product behind the fencing.

Commissioner Sargent stated he was supportive of items in front of the store to promote sales. He thanked Lowe's for working with the city to become compliant with the Special Exception.

Commissioner Briley voiced concerns with the Special Exception, noting it was a Special Exception and Lowe's had violated the development order.

Mr. Posey expressed understanding of the concerns, noting he would pass them along.

Commissioner Tolland inquired if all product was contained within the painted squares in front of Lowe's would Commissioner Briley approve; whereby, Commissioner Briley stated yes, if the products were contained in the squares, and expressed concerns due to prior actions. Commissioner Tolland emphasized compliance, noting other smaller stores had the same special exception.

**Commissioner Sargent moved, seconded by Commissioner Persis, to approve Resolution No. 2024-133, as read by title only.**

| Call Vote: | Commissioner Tolland | Yes |
| | Commissioner Sargent | Yes |
| | Commissioner Persis | Yes |
| | Commissioner Briley | Yes |
| Carried. | Mayor Partington | Yes |

Mayor Partington closed the Public Hearings.

Item #10 – Resolutions

Item #10A – Airport Rates and Fees

City Clerk Susan C. Dauderis read by title only:

RESOLUTION NO. 2024-154
A RESOLUTION ESTABLISHING FUEL FLOWAGE FEES, LANDING FEES, AND AIRCRAFT TIE DOWN FEES AT THE ORMOND BEACH MUNICIPAL AIRPORT; AND SETTING FORTH AN EFFECTIVE DATE.

Mr. Brian Rademacher, Economic Development Director, reviewed the Ormond Beach Municipal Airport's budget deficit, the advantage of the proposed landing fees, and proposed agreement with Vector Airport Systems, LLC, noting the agreement was Item 10B. He reviewed the proposed landing fees and where the fees would be applied. He reviewed the purchasing process utilized for the agreement with Vector Airport Systems, LLC.

Mr. Douglas Shinn, 2806 South Peninsula Drive, Daytona Beach, 32118, discussed unintended consequences, including the potential for grants provided to the airport to be taken away due to a decrease in number of operations as a result of the landing fees. He noted the number of pilots who would utilize other airports without landing fees, which could affect other local non-airport related businesses.

Mr. Daryl Hickman, 323 River Vale Lane, stated there was a call for a boycott of any airport that imposes the fees. He stated he owned a business at the airport and would be directly impacted, and the fee would also affect the local business economy. He inquired if the fees would stop when the airport debt was paid off or if the fees were indefinite.

Mr. Patrick Murphy, 678 Swan Range Road, Orange City, 32763, stated he was speaking as Vice President of Sunrise Aviation and stated he had a neutral position on it as his company was exempt from the landing fees. He noted he understood the city's need for the landing fees, that pilot aviation was already expensive, and worried about the added fees. He explained the concern as the airport's fueler, there may be a decrease in fuel purchases due to a decrease in landings.

Mr. Terence Perkins, 108 Heritage Circle, expressed concerns regarding safety and potential pull of grants for funding due to lack of landings caused by the fees.

Mr. Richard Isherwood, 1531 Poplar Drive, reviewed the airport funding grants and discussed other funding options for the airport.

Mr. Gordon Arbeitman, 3107 Inishmore Drive, discussed Vector Airport Systems, LLC and noted there were companies that could present to staff the pros and cons of the landing fees before a decision was made.

Ms. Samantha Bowyer, 68 Seacrest Drive, voiced concerns regarding the data collection process for the landing fee calculation and potential safety concerns. She discussed the Federal Aviation Administration's Reauthorization Act of 2024 and potential violations of the act with the landing fees. She noted the fees would discourage student pilots as the fees would be passed onto their training cost. She suggested the city focus on attracting

businesses to fill the empty space of the vacant golf course next to the airport, and promote events such as air and car shows.

Mr. Tony Arnaoutis, 17 Tiffany Circle, discussed the aviation fees internationally and locally, and requested the Commission reconsider adding the landing fees.

Mr. Daly voiced concerns with the Daytona flight schools, and noted the majority of the flights out of the airport were from the flight schools. He noted the landing fees would be put onto the student's flight training costs. He believed the fees would help the debt without costing the tax payers money.

Mr. Ron Serra, 1761 Mitchell Court, Port Orange, 32128, stated he disagreed with the implementation of the landing fees. He discussed the local economy growth due to the aviation field. He discussed other states who were competing for the Florida aviation business. He stated he was a flight instructor and students were discussing landing fees being add to their tuition costs, noting they discussed looking elsewhere for training.

Mr. Bob Brown, 918 Lake Lindley Drive South, DeLand, 32724, expressed concerns of the landing fees being in the same ordinance as the fuel and tiedown fees. He discussed concerns regarding the exemptions and the collection of the fees.

Mr. Matthew Serra, 1761 Mitchell Court, Port Orange, 32128, discussed his history with aviation. He stated the fees would cause changes in the trainings, as pilots would lessen the number of landings in training sessions. He discussed fees pilots currently face and expressed concerns regarding pilot shortages. He requested an exemption for all aircrafts under 6,000 pounds, noting the precedence from other airports.

Ms. Sharon Serra, 1761 Mitchell Court, Port Orange, 32128, requested the landing fees be removed from the ordinance for further review. She explained her belief was Vector Airport Systems, LLC used standard pricing for all airports instead of customizing the fees to each individual airport based on needs, and felt that was not the correct way to go about it. She discussed the rulings around landing fees.

Mr. David Gall, unlisted address, Port Orange, 32128, reviewed his aviation background and expressed concerns regarding landing fees specifically for flight trainings.

Mr. Terence Anderson, 101 Ray Lake Drive, discussed the importance of flight schools practicing landings for safety reasons.

Mr. Michael Galluzzi, 1008 Flying M Court, Edgewater, 32132, indicated he worked for the NASA Research Institute, specializing in advanced air mobility. He shared some research from surrounding airports and across Central Florida. He expressed concerns regarding the landing fees, including unwarranted surveillance. He stated he would like to share a proposal for a public/private partnership and would provide further details.

Mr. Andre Maye, 2002 Yellowfin Drive, Port Orange, 32128, stated the United States of America was number one in aviation trainings and noted comparison to international fees. He expressed concerns regarding how the fees would impact flight schools.

Mr. Robert Jex, 55 Front Street, Palm Coast, 32137, stated the proposal would not improve safety, pilot production, or long-term funds. He stated there were other positive ways to generate funds, including attracting new aviation businesses.

Mayor Partington stated he received a letter from Ms. Stacy Heaton, the Southern Regional Manager for Aircraft Owners and Pilots Association (AOPA), opposing the landing fees.

**Commissioner Sargent moved, seconded by Commissioner Briley, to approve Resolution No. 2024-154, as read by title only, for discussion purposes.**

Commissioner Sargent discussed the airport's debt and inquired if the landing fees were presented to the Aviation Advisory Board; whereby, Mr. Rademacher stated it was not brought to the Aviation Advisory Board but would be discussed with them at their next scheduled meeting. Commissioner Sargent stated the advisory board should make a recommendation before the item was brought before the Commission.

Commissioner Sargent and Commissioner Briley withdrew their motion and second respectively for Resolution No. 2024-154.

**Commissioner Sargent moved, seconded by Commissioner Persis, to table Items 10A and 10B until they were brought before the Aviation Advisory Board for review.**

Commissioner Persis stated she had many questions and would like more time to learn about the issues.

Commissioner Tolland indicated she learned information during the comments and would need answers to questions she had.

Commissioner Sargent and Commissioner Tolland promoted citizens to apply online for the city's advisory boards.

Commissioner Briley agreed the Aviation Advisory Board needed to review the item and with Mr. Daly's comments regarding tax payer dollars not supporting the airport.

| Call Vote: | | |
|---|---|---|
| | Commissioner Persis | Yes |
| | Commissioner Briley | Yes |
| | Commissioner Tolland | Yes |
| | Commissioner Sargent | Yes |
| Carried. | Mayor Partington | Yes |

Item #10C – Opioid Abatement Advisory Board Appointments

City Clerk Susan C. Dauderis read by title only:

RESOLUTION NO. 2024-159
A RESOLUTION APPOINTING A MEMBER AND AN ALTERNATE MEMBER TO SERVE ON THE OPIOID ABATEMENT FUNDING ADVISORY BOARD; ESTABLISHING TERM AND CONDITIONS OF SERVICE; AND SETTING FORTH AN EFFECTIVE DATE.

Mayor Partington explained he would like to continue his service through the end of his mayoral obligations.

Commissioner Briley nominated Commissioner Tolland for the alternate role; whereby, Commissioner Persis agreed.

Commissioner Tolland expressed support of serving as the alternate.

**Commissioner Briley moved, seconded by Commissioner Persis, to approve Resolution No. 2024-159, as read by title only, with Mayor Partington as the primary member and Commissioner Tolland as the alternate member.**

Ms. Susan Dauderis, City Clerk, explained Volusia County indicated Mayor Partington could serve through October, a new primary member could be named to replace him when he leaves, and an alternate member could be named.

Mayor Partington stated he believed he could fill the role as primary member until his mayoral duties were completed, then the item could be brought back to the Commission to fill the vacancy of the primary member.

| Call Vote: | | |
|---|---|---|
| | Commissioner Briley | Yes |
| | Commissioner Tolland | Yes |
| | Commissioner Sargent | Yes |
| | Commissioner Persis | Yes |
| Carried. | Mayor Partington | Yes |

Item #10D – Intent to Award RFP 2024-29 Property, Liability and Workers' Compensation Insurance

City Clerk Susan C. Dauderis read by title only:

RESOLUTION NO. 2024-160
A RESOLUTION ACCEPTING A PROPOSAL FROM FOUNDATION RISK PARTNERS PUBLIC ENTITY SERVICES, FOR THE PROVISION OF PROPERTY, LIABILITY AND WORKERS' COMPENSATION INSURANCE

FOR VARIOUS LINES OF INSURANCE COVERAGE THROUGH
VARIOUS INSURANCE CARRIERS; AUTHORIZING THE EXECUTION
OF DOCUMENTS RELATIVE THERETO; AUTHORIZING PAYMENT
THEREFOR; AND SETTING FORTH AN EFFECTIVE DATE.

Mr. Kelly McGuire, Finance Director, explained the item was regarding the two proposals
received during the city's Request for Proposal (RFP), one from Brown & Brown
Insurance Services, Inc. (Brown & Brown) and one from Foundation Risk Partners Public
Entity Services (Foundation Risk Partners). She stated the prices from each proposal,
noting neither included flood insurance information due to rates not being available at
the time of the proposal openings. She stated there were four coverages that Foundation
Risk Partners did not provide in their proposal and indicated they could assume existing
coverages. She discussed the qualifications of the firms and underlying insurance trusts;
all were highly qualified, noting both companies were considered equal in qualifications.
She stated staff recommended Brown & Brown due to the lower price.

Commissioner Tolland and Commissioner Sargent abstained from the vote due to
potential conflicts of interest.

Representative Leek explained he was speaking in his capacity as Chief Legal Officer of
Foundation Risk Partners and discussed the company. He expressed concerns
regarding the proposal from Brown & Brown not including the affidavit required by
Section 287.138 of Florida Statutes. He stated by Statute the Brown & Brown proposal
should be deemed unresponsive. He introduced other members of his team, including
Ms. Jo Thacker, Mr. David Lodwick, and Mr. Alan Florez of Foundation Risk Partners.

Ms. Jo Thacker, 780 West Granada Boulevard, stated there was a whereas clause in the
resolution stating a second alternative was neither authorized nor consistent with the
RFP, and expressed concerns with the RFP conflicting the Code of Ordinances
referenced within the resolution. She stated concerns with the Code of Ordinances not
referencing if forms and affidavits could be submitted after the proposal was opened.

Mr. David Lodwick, 780 West Granada Boulevard, reviewed proposal "Option 2" that
was provided to the Commission and reviewed the option in detail.

Mr. Alan Florez, 780 West Granada Boulevard, reiterated Representative Leeks
statement regarding the affidavit and bid fairness. He reviewed the handout provided to
the Commission and discussed the risk factors related to hurricanes.

Commissioner Briley expressed concerns regarding compliance; whereby, Mayor
Partington believed everything complied now if accepted.

Ms. McGuire indicated everything was in compliance, noting the affidavit was included in
the agenda packet.

Mayor Partington noticed the notary stamp and signature dates of expiration did not
match in the packet and commented that could be a clerical error.

Commissioner Sargent inquired when the bids were due; whereby, Ms. McGuire stated
June 9, 2024, but was extended a week due to additional questions. Commissioner
Sargent inquired if policy documents were up to date within the packet, as there was a
policy provided that had expired dates; whereby, Ms. McGuire assured the Commission
the policy was within date and would renew in 2025. He expressed concerns regarding
the storm policy limits.

Commissioner Tolland expressed support of the competitive bidding process, noting
Brown & Brown's proposal was $300,000 less than the prior year.

Commissioner Briley expressed concerns regarding the shared policy limits.

Commissioner Persis inquired if Mr. Randy Hayes, City Attorney, had anything to add;
whereby, Mr. Hayes stated what was presented was the recommendation from the
Insurance Program Committee. He indicated historically and customarily during the
presentation of the bids, it was allowed for the vendor to provide clarification or affidavits
if needed. He noted the item was the Committee's best recommendation based on the
RFP. He discussed what would need to happen if the Commission wished to proceed
with Brown & Brown or if they chose to proceed with Foundation Risk Partners.

Mr. Steve Farmer, Brown & Brown Executive Vice President, reviewed his history with the city and Brown & Brown. He discussed the proposed insurance trusts and the shared policies. He discussed the proposal and improvement in the insurance market, his connections which helped to lower the rate, and noted the Insurance Program Committee recommended their proposal.

Commissioner Sargent reviewed prior prices of the city's insurance policies, increasing through the years.

Mayor Partington inquired about the compliance of the affidavit; whereby, Ms. McGuire stated the purchasing department addressed the issue of the affidavit to bring the bid into compliance. He asked what the Committee's thought was on the shared limit versus named storm limit; whereby, Ms. McGuire stated the city's RFP solicited proposals for the same coverage levels, and the Foundation Risk Partners alternate proposal was not consistent with the current insurance program, therefore the Committee only considered the primary Foundation Risk Partners proposal.

Mayor Partington stated the city only wanted the best for the residents. He reviewed other municipalities utilizing Foundation Risk Partners and questioned why the city would not consider proposals outside of the scope of service; whereby, Ms. McGuire stated the RFP called for a specific scope of service, which Foundation Risk Partners' alternate proposal did not match.

Commissioner Persis expressed concerns regarding the storm policy.

Commissioner Tolland stated needs change and inquired if the city could accept proposals outside of scope of service.

Ms. Shanahan stated the RFP was approved by the Commission before getting sent out to bid with the scope of service to maintain the same coverages.

Mayor Partington stated Foundation Risk Partners had the lowest cost with the alternate proposal.

Commissioner Tolland inquired about the affidavit being submitted late; whereby, Mr. Hayes stated it was a matter of interpretation, noting the Statutes required an affidavit and one was provided, noting past bids were accepted with the late submission of the affidavit. He explained it was up to the Commission to agree or disagree with the recommendation of the Insurance Program Committee. He reviewed the process of the Committee and what was needed from the Commission if they agreed or disagreed with the recommendation.

Mayor Partington inquired about the shared limit versus named storm limit; whereby, Mr. Lodwick stated it depended on the circumstances. Mr. Lodwick discussed issues with shared limit coverages and reviewed the named storm coverage with the dedicated limit.

Mr. Farmer stated the shared limit program was very transparent, noting it was reviewed every year and was never close to being exceeded.

Commissioner Tolland inquired how the shared limit versus dedicated limit effect the level of service during an event; whereby, Mr. Farmer indicated each insurance company handles events differently, noting during any event he was always there to assist the city.

Mr. Lodwick discussed the requirements and process of the dedicated limit coverage and assessments during events.

Mr. Farmer inquired if there were any issues with the current providers; whereby, Mr. Hayes stated there were no issues in coverage or level of service of the existing provider.

Commissioner Sargent inquired when the city last sent insurance out to bid; whereby, Mr. Farmer stated he participated in many bids for insurance with the city.

Ms. McGuire stated 2017 was the last time the Agent of Record for insurance went out to bid.

Commissioner Tolland inquired if there were only two bids every time; whereby, Ms. McGuire stated Brown & Brown was always responsive to the RFP's.

Mayor Partington expressed support of both companies, noting he's worked with both through the city and through the Florida League of Cities. He stated as the agreement was for a year he was comfortable going with the cheaper proposal from Foundation Risk Partners.

Commissioner Briley inquired if the proposal was cheaper by $40,000; whereby, Ms. McGuire stated that was correct but the four coverages not quoted would need to be assumed.

Commissioner Persis expressed support of the lower proposal.

**Commissioner Briley moved, seconded by Commissioner Persis, to approve Resolution No. 2024-160, as read by title only, for discussion purposes.**

Mr. Hayes inquired on the Commissions stance of the affidavit; whereby, Mayor Partington stated he believed the bid to be deemed non-compliant due to the missing affidavit upon bid opening.

Mayor Partington stated the third whereas clause should be amended as well, since both companies were qualified and able, noting the disagreement was the shared limit versus the named storm limit. He discussed the Florida League of Cities insurance program.

Mr. Hayes requested a recess to amend the resolution in favor of Foundation Risk Partners and include the requested amendments.

Mayor Partington recessed the City Commission meeting at 10:11 p.m.

Mayor Partington reconvened the City Commission meeting at 10:38 p.m.

Mr. Hayes explained there was a revised resolution, noting the incorporated findings discussed.

Mr. Hayes read the change in the resolution title:

> A RESOLUTION ACCEPTING A PROPOSAL FROM FOUNDATION RISK PARTNERS PUBLIC ENTITY SERVICES, FOR THE PROVISION OF PROPERTY, LIABILITY AND WORKERS' COMPENSATION INSURANCE FOR VARIOUS LINES OF INSURANCE COVERAGE…

Mr. Hayes reviewed the revised whereas clauses that changed from Resolution 2024-160.

Commissioner Briley and Commissioner Persis withdrew their motion and second, respectively.

Mr. Hayes requested a new Resolution number for the updated resolution; whereby, Ms. Dauderis stated Resolution number 2024-161 would be assigned.

**Commissioner Briley moved, seconded by Commissioner Persis, to approve Resolution No. 2024-161, as amended to award the bid to Foundation Risk Partners.**

Commissioner Sargent inquired if there was anything needed by the Commission regarding the policies that would be assumed by Foundation Risk Partners; whereby, Ms. McGuire stated the policies were included in the updated Resolution.

Commissioner Briley, Commissioner Persis, and Mayor Partington expressed support of both agencies.

| Call Vote: | | |
|---|---|---|
| | Commissioner Sargent | Abstained |
| | Commissioner Persis | Yes |
| | Commissioner Briley | Yes |
| | Commissioner Tolland | Abstained |
| Carried. | Mayor Partington | Yes |

# FORM 8B  MEMORANDUM OF VOTING CONFLICT FOR COUNTY, MUNICIPAL, AND OTHER LOCAL PUBLIC OFFICERS

LAST NAME—FIRST NAME—MIDDLE NAME
Tolland, Loretta (Lori) Riehl

MAILING ADDRESS
5 Broadriver Rd

CITY                          COUNTY
Ormond Beach , FL  32174

DATE ON WHICH VOTE OCCURRED
Sept 18, 2024

NAME OF BOARD, COUNCIL, COMMISSION, AUTHORITY, OR COMMITTEE
City of Ormond Beach Commission

THE BOARD, COUNCIL, COMMISSION, AUTHORITY OR COMMITTEE ON WHICH I SERVE IS A UNIT OF:
☑ CITY    ☐ COUNTY    ☐ OTHER LOCAL AGENCY

NAME OF POLITICAL SUBDIVISION:
Commissioner zone one

MY POSITION IS:
☑ ELECTIVE    ☐ APPOINTIVE

## WHO MUST FILE FORM 8B

This form is for use by any person serving at the county, city, or other local level of government on an appointed or elected board, council, commission, authority, or committee. It applies to members of advisory and non-advisory bodies who are presented with a voting conflict of interest under Section 112.3143, Florida Statutes.

Your responsibilities under the law when faced with voting on a measure in which you have a conflict of interest will vary greatly depending on whether you hold an elective or appointive position. For this reason, please pay close attention to the instructions on this form before completing and filing the form.

## INSTRUCTIONS FOR COMPLIANCE WITH SECTION 112.3143, FLORIDA STATUTES

A person holding elective or appointive county, municipal, or other local public office MUST ABSTAIN from voting on a measure which would inure to his or her special private gain or loss. Each elected or appointed local officer also MUST ABSTAIN from knowingly voting on a measure which would inure to the special gain or loss of a principal (other than a government agency) by whom he or she is retained (including the parent, subsidiary, or sibling organization of a principal by which he or she is retained); to the special private gain or loss of a relative; or to the special private gain or loss of a business associate. Commissioners of community redevelopment agencies (CRAs) under Sec. 163.356 or 163.357, F.S., and officers of independent special tax districts elected on a one-acre, one-vote basis are not prohibited from voting in that capacity.

For purposes of this law, a "relative" includes only the officer's father, mother, son, daughter, husband, wife, brother, sister, father-in-law, mother-in-law, son-in-law, and daughter-in-law. A "business associate" means any person or entity engaged in or carrying on a business enterprise with the officer as a partner, joint venturer, coowner of property, or corporate shareholder (where the shares of the corporation are not listed on any national or regional stock exchange).

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## ELECTED OFFICERS:

In addition to abstaining from voting in the situations described above, you must disclose the conflict:

PRIOR TO THE VOTE BEING TAKEN by publicly stating to the assembly the nature of your interest in the measure on which you are abstaining from voting; *and*

WITHIN 15 DAYS AFTER THE VOTE OCCURS by completing and filing this form with the person responsible for recording the minutes of the meeting, who should incorporate the form in the minutes.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## APPOINTED OFFICERS:

Although you must abstain from voting in the situations described above, you are not prohibited by Section 112.3143 from otherwise participating in these matters. However, you must disclose the nature of the conflict before making any attempt to influence the decision, whether orally or in writing and whether made by you or at your direction.

IF YOU INTEND TO MAKE ANY ATTEMPT TO INFLUENCE THE DECISION PRIOR TO THE MEETING AT WHICH THE VOTE WILL BE TAKEN:

• You must complete and file this form (before making any attempt to influence the decision) with the person responsible for recording the minutes of the meeting, who will incorporate the form in the minutes. (Continued on page 2)

**APPOINTED OFFICERS (continued)**

- A copy of the form must be provided immediately to the other members of the agency.

- The form must be read publicly at the next meeting after the form is filed.

IF YOU MAKE NO ATTEMPT TO INFLUENCE THE DECISION EXCEPT BY DISCUSSION AT THE MEETING:

- You must disclose orally the nature of your conflict in the measure before participating.

- You must complete the form and file it within 15 days after the vote occurs with the person responsible for recording the minutes of the meeting, who must incorporate the form in the minutes. A copy of the form must be provided immediately to the other members of the agency, and the form must be read publicly at the next meeting after the form is filed.

---

## DISCLOSURE OF LOCAL OFFICER'S INTEREST

I, _Loretta (Lori) Tolland_ , hereby disclose that on _Sept 18_ , 20 _24_ :

(a) A measure came or will come before my agency which (check one or more)

___ inured to my special private gain or loss;

___ inured to the special gain or loss of my business associate, _____ ;

✓ inured to the special gain or loss of my relative, _Christopher Tolland_ ;

___ inured to the special gain or loss of _____ , by whom I am retained; or

___ inured to the special gain or loss of _____ , which is the parent subsidiary, or sibling organization or subsidiary of a principal which has retained me.

(b) The measure before my agency and the nature of my conflicting interest in the measure is as follows:

_Resolution NO 2024-160 - Accepting a proposal from Brown & Brown Insurance Services -_

_My son works for a competing insurance broker._

If disclosure of specific information would violate confidentiality or privilege pursuant to law or rules governing attorneys, a public officer, who is also an attorney, may comply with the disclosure requirements of this section by disclosing the nature of the interest in such a way as to provide the public with notice of the conflict.

_Sept 18, 2024_
Date Filed

Signature

---

NOTICE: UNDER PROVISIONS OF FLORIDA STATUTES §112.317, A FAILURE TO MAKE ANY REQUIRED DISCLOSURE CONSTITUTES GROUNDS FOR AND MAY BE PUNISHED BY ONE OR MORE OF THE FOLLOWING: IMPEACHMENT, REMOVAL OR SUSPENSION FROM OFFICE OR EMPLOYMENT, DEMOTION, REDUCTION IN SALARY, REPRIMAND, OR A CIVIL PENALTY NOT TO EXCEED $10,000.

CE FORM 8B – EFF. 11/2013
Adopted by reference in Rule 34-7.010(1)(f), F.A.C.

# FORM 8B   MEMORANDUM OF VOTING CONFLICT FOR COUNTY, MUNICIPAL, AND OTHER LOCAL PUBLIC OFFICERS

| LAST NAME—FIRST NAME—MIDDLE NAME | NAME OF BOARD, COUNCIL, COMMISSION, AUTHORITY, OR COMMITTEE |
|---|---|
| Sargent - Travis - Craig | Commission |

| MAILING ADDRESS | THE BOARD, COUNCIL, COMMISSION, AUTHORITY OR COMMITTEE ON WHICH I SERVE IS A UNIT OF: |
|---|---|
| 406 N. Beach St. | ☑ CITY    ☐ COUNTY    ☐ OTHER LOCAL AGENCY |

| CITY | COUNTY | NAME OF POLITICAL SUBDIVISION: |
|---|---|---|
| Ormond Beach | Volusia | |

| DATE ON WHICH VOTE OCCURRED | MY POSITION IS: |
|---|---|
| 09-18-24 | ☑ ELECTIVE    ☐ APPOINTIVE |

## WHO MUST FILE FORM 8B

This form is for use by any person serving at the county, city, or other local level of government on an appointed or elected board, council, commission, authority, or committee. It applies to members of advisory and non-advisory bodies who are presented with a voting conflict of interest under Section 112.3143, Florida Statutes.

Your responsibilities under the law when faced with voting on a measure in which you have a conflict of interest will vary greatly depending on whether you hold an elective or appointive position. For this reason, please pay close attention to the instructions on this form before completing and filing the form.

## INSTRUCTIONS FOR COMPLIANCE WITH SECTION 112.3143, FLORIDA STATUTES

A person holding elective or appointive county, municipal, or other local public office MUST ABSTAIN from voting on a measure which would inure to his or her special private gain or loss. Each elected or appointed local officer also MUST ABSTAIN from knowingly voting on a measure which would inure to the special gain or loss of a principal (other than a government agency) by whom he or she is retained (including the parent, subsidiary, or sibling organization of a principal by which he or she is retained); to the special private gain or loss of a relative; or to the special private gain or loss of a business associate. Commissioners of community redevelopment agencies (CRAs) under Sec. 163.356 or 163.357, F.S., and officers of independent special tax districts elected on a one-acre, one-vote basis are not prohibited from voting in that capacity.

For purposes of this law, a "relative" includes only the officer's father, mother, son, daughter, husband, wife, brother, sister, father-in-law, mother-in-law, son-in-law, and daughter-in-law. A "business associate" means any person or entity engaged in or carrying on a business enterprise with the officer as a partner, joint venturer, coowner of property, or corporate shareholder (where the shares of the corporation are not listed on any national or regional stock exchange).

\*        \*        \*        \*        \*        \*        \*        \*        \*        \*        \*        \*        \*        \*        \*        \*

## ELECTED OFFICERS:

In addition to abstaining from voting in the situations described above, you must disclose the conflict:

PRIOR TO THE VOTE BEING TAKEN by publicly stating to the assembly the nature of your interest in the measure on which you are abstaining from voting; and

WITHIN 15 DAYS AFTER THE VOTE OCCURS by completing and filing this form with the person responsible for recording the minutes of the meeting, who should incorporate the form in the minutes.

\*        \*        \*        \*        \*        \*        \*        \*        \*        \*        \*        \*        \*        \*        \*        \*

## APPOINTED OFFICERS:

Although you must abstain from voting in the situations described above, you are not prohibited by Section 112.3143 from otherwise participating in these matters. However, you must disclose the nature of the conflict before making any attempt to influence the decision, whether orally or in writing and whether made by you or at your direction.

IF YOU INTEND TO MAKE ANY ATTEMPT TO INFLUENCE THE DECISION PRIOR TO THE MEETING AT WHICH THE VOTE WILL BE TAKEN:

• You must complete and file this form (before making any attempt to influence the decision) with the person responsible for recording the minutes of the meeting, who will incorporate the form in the minutes. (Continued on page 2)

CE FORM 8B - EFF. 11/2013
Adopted by reference in Rule 34-7.010(1)(f), F.A.C.

PAGE 1

## APPOINTED OFFICERS (continued)

- A copy of the form must be provided immediately to the other members of the agency.
- The form must be read publicly at the next meeting after the form is filed.

IF YOU MAKE NO ATTEMPT TO INFLUENCE THE DECISION EXCEPT BY DISCUSSION AT THE MEETING:

- You must disclose orally the nature of your conflict in the measure before participating.
- You must complete the form and file it within 15 days after the vote occurs with the person responsible for recording the minutes of the meeting, who must incorporate the form in the minutes. A copy of the form must be provided immediately to the other members of the agency, and the form must be read publicly at the next meeting after the form is filed.

---

## DISCLOSURE OF LOCAL OFFICER'S INTEREST

I, _Travis Sargent_, hereby disclose that on _Sept. 18_, 20 _24_:

(a) A measure came or will come before my agency which (check one or more)

___ inured to my special private gain or loss;

✓ inured to the special gain or loss of my business associate, _Foundation Risk Partners_;

___ inured to the special gain or loss of my relative,_____;

___ inured to the special gain or loss of _____, by whom I am retained; or

___ inured to the special gain or loss of _____, which is the parent subsidiary, or sibling organization or subsidiary of a principal which has retained me.

(b) The measure before my agency and the nature of my conflicting interest in the measure is as follows:

If disclosure of specific information would violate confidentiality or privilege pursuant to law or rules governing attorneys, a public officer, who is also an attorney, may comply with the disclosure requirements of this section by disclosing the nature of the interest in such a way as to provide the public with notice of the conflict.

_9/18/24_
Date Filed

Signature

---

NOTICE: UNDER PROVISIONS OF FLORIDA STATUTES §112.317, A FAILURE TO MAKE ANY REQUIRED DISCLOSURE CONSTITUTES GROUNDS FOR AND MAY BE PUNISHED BY ONE OR MORE OF THE FOLLOWING: IMPEACHMENT, REMOVAL OR SUSPENSION FROM OFFICE OR EMPLOYMENT, DEMOTION, REDUCTION IN SALARY, REPRIMAND, OR A CIVIL PENALTY NOT TO EXCEED $10,000.

CE FORM 8B - EFF. 11/2013
Adopted by reference in Rule 34-7.010(1)(f), F.A.C.

<u>Item #11 – Reports, Suggestions, Requests</u>

<u>Events, Updates, Congratulations, and Requests</u>
Ms. Shanahan noted upcoming meetings and events.

Commissioner Sargent reviewed upcoming events and events he attended, including the 9/11 and Crime Stoppers events.

Commissioner Persis discussed upcoming events, events she attended, and thanked staff for their work with an issue that occurred.

Commissioner Briley reviewed events he attended.

Commissioner Tolland congratulated Ms. Rebostini and Representative Leek for their service. She discussed events she attended, upcoming events, and provided updates from Ormond Beach MainStreet. She requested an education push on social media regarding code enforcement regulations. She suggested a thin black trim to be used in the city landscaping with mulch to help contain it and prevent runoff into the streets.

Mayor Partington discussed the budget, highlighting the public safety items, and noted the city was the second lowest tax rate in Volusia County. He thanked those who participated in the 9/11 event.

<u>Tomoka State Park</u>
Commissioner Briley inquired if there was any interest by the Commission to write a letter from the Commission as a whole to the State regarding the proposed paving of Tomoka State Park; whereby, Mayor Partington and Commissioner Sargent stated they had no interest in sending a letter.

Commissioner Tolland stated she would support a letter requesting a more permanent permeable product due to flooding concerns.

<u>Item #12 – Adjournment</u>

The meeting was adjourned at 11:02 p.m.

APPROVED:    October 2, 2024

BY:    _____
Bill Partington, Mayor

ATTEST:

_____
Susan Carroll Dauderis,
City Clerk

IN THE COUNTY COURT IN AND FOR
VOLUSIA COUNTY, FLORIDA

MICHAEL PUCKETT

     Plaintiff

vs.

EDGEWATER ANIMAL SHELTER INC.

and

JANE DOE

     Defendants

_____/

CASE NO: 2025 25303 CODL
Division 71
JUDGE Angela Dempsy

## SECOND AMENDED COMPLAINT FOR WRIT OF REPLEVIN, DAMAGES AND DEMAND FOR JURY TRIAL

Plaintiff, MICHAEL PUCKETT, sues Defendants EDGEWATER ANIMAL SHELTER INC. for Conversion and Intentional Infliction of Emotional Distress and sues JANE DOE to recover possession of personal property, and in support thereof states:

### JURISDICTION & VENUE

1.    This is an action for damages in excess of $8,000.00.

2.    Pursuant to § 47.011, Fla. Stat., venue is proper in Volusia County because the incidents giving rise to this cause of action occurred in Volusia County.

### PARTIES

3.    Plaintiff MICHAEL PUCKETT (hereinafter "Plaintiff "or "PUCKETT") is an adult individual that resides in Volusia County.

4.      Defendant EDGEWATER ANIMAL SHELTER INC. is a Florida not-for-profit corporation that owns and operates an animal shelter at 605 Mango Tree Drive, Edgewater, FL 32132. At all times relevant hereto, Defendant EDGEWATER ANIMAL SHELTER INC.  At all times relevant hereto, Defendant EDGEWATER ANIMAL SHELTER INC.  acquiesced in and ratified the decisions and actions made by its officers, directors, managers, supervisors, agents, and/or employees. All references in the instant complaint to Defendant EDGEWATER ANIMAL SHELTER INC.  includes its officers, directors, managers, supervisors, agents, and/or employees.

5.      Defendant JANE DOE is an adult individual that upon information and belief resides in Volusia County.

## FACTUAL BACKGROUND

6.      PUCKETT suffers from Post Traumatic Stress Disorder (PTSD).

7.      Like many individuals that struggle with mental health, PUCKETT has experienced intermittent periods of homelessness.

8.      PUCKETT is indigent.

9.      On August 17, 2025 PUCKETT was arrested at a homeless encampment for trespassing.

10.     Upon his arrest PUCKETT asked a friend also staying at the homeless encampment to care for PUCKETT's two dogs, Goose and Macho Man until he was released.

11.     Goose and Macho Man provided PUCKETT affection, companionship and emotional support that helped ameliorate the symptoms of his PTSD.

12.     The friend agreed to care for both dogs until PUCKETT was released from jail.

2

13.    After PUCKETT was arrested, two Ormond Beach police officers went to the homeless encampment and "took custody of both dogs."

14.    Goose and Macho Man were not at large or unattended when they were seized by the Ormond Beach Police Department.

15.    PUCKETT was not notified about his dogs being seized by the Ormond Beach Police Department, despite PUCKETT's location being known to the Ormond Beach Police Department.

16.    The Ormond Beach Police Department held Goose and Macho Man for two days before transferring the dogs to the Defendant EDGEWATER ANIMAL SHELTER INC.

17.    PUCKETT was not notified about his dogs being transferred to the Defendant EDGEWATER ANIMAL SHELTER INC. despite his location being known by the Ormond Beach Police Department.

18.    After being released from custody, PUCKETT contacted his friend, who informed him his dogs had been taken from him by the Ormond Beach Police Department.

19.    PUCKETT contacted the Ormond Beach Police Department and was told his dogs were at the Halifax Humane Society.

20.    PUCKETT contacted the Halifax Humane Society and was informed Goose and Macho Man were not at the animal shelter operated by the Halifax Humane Society.

21.    PUCKETT again contacted the Ormond Beach Police Department and was finally told that his dogs had been taken to the EDGEWATER ANIMAL SHELTER INC.

22.    Plaintiff contacted Defendant EDGEWATER ANIMAL SHELTER INC. and asked what he needed to do to be reunited with his dogs.

3

23.    Defendant EDGEWATER ANIMAL SHELTER INC. claimed it was necessary "to check with the Ormond Beach Police Department" to find out if his dogs could even be returned to him and promised to get back to him.

24.     After not hearing from Defendant EDGEWATER ANIMAL SHELTER INC. Plaintiff tried repeatedly to reach someone at the animal shelter without success.

25.    Plaintiff finally went to the animal shelter in person and was told he could not have his dogs unless he paid $490.00.

26.    PUCKETT did not have the money demanded by Defendant EDGEWATER ANIMAL SHELTER INC. and informed them of such.

27.    PUCKETT pleaded to be allowed to make payments towards the money Defendant EDGEWATER ANIMAL SHELTER INC. claimed he owed.

28.    Defendant EDGEWATER ANIMAL SHELTER INC. flatly refused to make any arrangements for PUCKETT to pay the demanded charges over time.

29.    Plaintiff requested to be allowed to adopt his dogs and was flatly denied because Defendant EDGEWATER ANIMAL SHELTER INC. deemed him unfit to care for his dogs.

30.    Section 828.073 Fla. Stat. provides a process by which ownership of neglected or mistreated animals may be awarded to an animal welfare organization.

31.    Defendant EDGEWATER ANIMAL SHELTER INC. did not avail itself of the process mandated by Section 828.073 Fla. Stat. to be legally awarded ownership of Goose or Macho Man.

32.    Although the timing is not entirely certain, notwithstanding Plaintiff's concerted efforts to be reunited with his dog, Defendant EDGEWATER ANIMAL SHELTER INC.,

4

though fully aware that Plaintiff wished to reclaim Macho Man, without any prior notice to Plaintiff, killed Macho Man, claiming that the dog was "aggressive."

33. EDGEWATER ANIMAL SHELTER INC. did not follow the statutory procedure provided in Part II of Chapter 767, Fla. Stat. required for an animal control authority to declare a dog dangerous or to confiscate an allegedly dangerous dog for purposes of destruction, instead unilaterally terminating Macho Man's life and Plaintiff's property rights in Macho Man.

34. Defendant EDGEWATER ANIMAL SHELTER INC., though fully aware that Plaintiff wished to reclaim Goose, nonetheless transferred possession of the dog to a third party, referred to in the instant complaint as "JANE DOE."

35. Macho Man was unique and irreplaceable; no other dog will have the same personality and characteristics of Macho Man. Macho Man has special, intrinsic value to Plaintiff.

36. Goose is unique and irreplaceable; no other dog will have the same personality and characteristics as Goose. Goose has special, intrinsic value to Plaintiff.

37. JANE DOE has possession and control of Goose, property lawfully belonging to Plaintiff.

38. Plaintiff will seek leave of Court to amend his Second Amended Complaint to state the true name of JANE DOE when it has been ascertained.

39. Upon learning of Macho Man's death and Goose's transfer Plaintiff was overcome with grief and so emotionally distraught that he became physically ill.

40. Plaintiff still suffers extreme emotional distress because of Defendant EDGEWATER ANIMAL SHELTER INC. heartless and intentional conduct in

deliberately depriving him of the possession, companionship, love and emotional support of Goose and Macho Man.

41.     At no point did Plaintiff release his legal ownership of Goose and Macho Man to the Defendant EDGEWATER ANIMAL SHELTER INC.

### COUNT I-REPLEVIN

42.     Plaintiff realleges and incorporates paragraphs 1-41 as though fully set forth herein.

43.     This is a replevin action to recover possession of personal property to which the Plaintiff MICHAEL PUCKETT is lawfully entitled.

44.     The property to be replevied is a male Bully Mixed Breed dog named "Goose."

45.     The economic value of Goose is approximately $ 200.00.

46.     Goose was neither taken on an order or judgment of a court against Plaintiff, nor under an execution or judgment against Plaintiff or against the property.

47.     Goose was not taken for a tax, assessment or fine pursuant to law.

48.     PUCKETT is the owner of Goose, never relinquished ownership of Goose, and is entitled to possession of Goose.

49.     Plaintiff seeks entry of an order to show cause directed to Defendant JANE DOE pursuant to F.S. 78.067, and an immediate hearing on Plaintiff's right to possession of Goose.

50.     Plaintiff also requests expedited discovery regarding JANE DOE's identity and address.

### COUNT II-CONVERSION

51.     Plaintiff realleges and incorporates paragraphs 1-41 as though fully set forth herein.

6

52.    Defendant EDGEWATER ANIMAL SHELTER INC. was fully aware that Goose and Macho Man were Plaintiff's property.

53.    Defendant EDGEWATER ANIMAL SHELTER INC. intentionally exerted wrongful dominion over Plaintiff's personal property, Macho Man.

54.    Defendant EDGEWATER ANIMAL SHELTER INC. intentionally exerted wrongful dominion over Plaintiff's personal property, Goose.

55.    Defendant EDGEWATER ANIMAL SHELTER INC. killed Macho Man and transferred Goose to JANE DOE without disclosing to her/him PUCKETT's actual ownership interest in Goose, thereby interfering with PUCKETT's right of possession.

56.    As a direct and proximate result of the intentional actions, as alleged in this Count, Defendant EDGEWATER ANIMAL SHELTER INC. is civilly liable to PUCKETT for suffering, mental anguish, loss of use of his property, loss of the intrinsic value of his property and other compensatory damages.

**COUNT III- INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

57.    Plaintiff realleges and incorporates paragraphs 1- 41 as though fully set forth herein.

58.    Defendant EDGEWATER ANIMAL SHELTER INC. acted with deliberate indifference to Plaintiff's property rights in Goose and Macho Man and engaged in extreme and outrageous conduct through the following acts and omissions:

    a)    Refusing to allow Plaintiff to reclaim Macho Man or Goose because he could not afford the fees it unilaterally imposed;

    b)    Refusing to allow Plaintiff to make payments for fees he allegedly owned to Defendant EDGEWATER ANIMAL SHELTER INC. for Macho Man and Goose;

7

c) Killing Plaintiff's dog Macho Man knowing that Plaintiff had not abandoned Macho Man or relinquished his ownership interest in Macho Man and desperately desired to be reunited with Macho Man;

d) Transferring possession of Goose to JANE DOE knowing that Plaintiff had not abandoned Goose or relinquished his ownership interest in Goose and desperately desired to be reunited with Goose.

59. Defendant EDGEWATER ANIMAL SHELTER INC. intended to cause emotional distress to PUCKETT or had a reckless disregard for the risk their actions posed for causing emotional distress to PUCKETT.

60. Defendant EDGEWATER ANIMAL SHELTER INC.'s conduct in killing one of his dogs and intentionally depriving him of possession, love, companionship and emotional support of the other was outrageous and beyond all bounds of decency to be regarded as odious and utterly intolerable in a civilized community.

61. As a direct and proximate result of the extreme and outrageous conduct and intentional infliction of emotional distress by Defendant EDGEWATER ANIMAL SHELTER INC. Plaintiff PUCKETT suffered severe emotional distress.

**JURY DEMAND**

62. Plaintiff requests a jury trial as to damages and all other issues so triable.

**WHEREFORE,** Plaintiff demands a judgment for damages against Defendant EDGEWATER ANIMAL SHELTER INC. and a judgment for replevin against Defendant JANE DOE, together with the costs of this action, and whatever other relief the court deems just and appropriate.

Respectfully submitted this 21st day of October, 2025.

By: s/ *Marcy LaHart*
Marcy I. LaHart, Esq.
Florida Bar No. 0967009
Marcy@floridaanimallawyer.com
861 SE 40th Street
Tacoma, WA 98418
(352) 545-7001

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 21st day of October, 2025 a true and correct copy of the foregoing was furnished via electronic mail State Court E-Portal to all attorneys of record listed in the Florida E-filing E-Portal.

By: s/ *Marcy LaHart*
Marcy I. LaHart, Esq.

9

IN THE COUNTY COURT IN AND FOR
VOLUSIA COUNTY, FLORIDA

MICHAEL PUCKETT

     Plaintiff

vs.

EDGEWATER ANIMAL SHELTER INC.

and

JANE DOE

     Defendants

_____/

CASE NO: 2025 25303 CODL
Division 71
JUDGE Angela Dempsy

## **THIRD AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND RELIEF, WRIT OF REPLEVIN, DAMAGES AND DEMAND FOR JURY TRIAL**

Plaintiff, MICHAEL PUCKETT, sues Defendants EDGEWATER ANIMAL SHELTER INC., and in support thereof states:

### **JURISDICTION & VENUE**

1.     This is an action for replevin, declaratory relief and damages of $50,000.00.

2.     Pursuant to § 47.011, Fla. Stat., venue is proper in Volusia County because the incidents giving rise to this cause of action occurred in Volusia County.

### **PARTIES**

3.     Plaintiff MICHAEL PUCKETT (hereinafter "Plaintiff "or "PUCKETT") is an adult individual that resides in Volusia County.

4.      Defendant EDGEWATER ANIMAL SHELTER INC. is a Florida not-for-profit

corporation that owns and operates an animal shelter at 605 Mango Tree Drive,

Edgewater, FL 32132.

5.      Defendant JANE DOE is an adult individual that upon information and belief

resides in Volusia County.

## FACTS COMMON TO ALL COUNTS

6.      PUCKETT suffers from Post Traumatic Stress Disorder (PTSD).

7.      Like many individuals that struggle with mental health, PUCKETT has

experienced intermittent periods of homelessness.

8.      PUCKETT is indigent.

9.      At all times relevant to this complaint PUCKETT was the owner of two dogs,

Goose and Macho Man. Goose is a large brindle cane Corso mix, Macho Man was a

smaller lab/pit mix.

10.     Goose and Macho Man provided PUCKETT affection, companionship and

emotional support that helped ameliorate the symptoms of his PTSD.

11.     On August 17, 2025, PUCKETT was arrested for allegedly trespassing at a

homeless encampment located at 1700 North US Highway 1 in Ormond Beach.

12.     Upon his arrest PUCKETT asked Timothy Boring, a friend also staying at the

homeless encampment, to care for PUCKETT's two dogs, Goose and Macho Man until he

was released.

13.     Timothy Boring agreed to care for both dogs until PUCKETT was released from

jail.

2

14.    After PUCKETT was arrested, two Ormond Beach community service officers went to the homeless encampment and took PUCKETT's two dogs.

15.    Goose and Macho Man were not at large or unattended when they were seized by the Ormond Beach Police Department; they were being looked after and cared for by Timothy Boring.

16.    Ormond Beach did not seize Goose and Macho Man because the animals were being abused or neglected or because the dogs were a threat to public safety; Goose and Macho Man were seized upon the mistaken belief that if something happened to the dogs while PUCKETT was incarcerated Ormond Beach would be liable.

17.    The Community Service officers that indicated they "took custody" of Goose and Macho Man described both dogs as having a "nice disposition." The Ormond Beach Police Department Incident Report is marked, attached hereto and incorporated by reference as Exhibit 1.

18.    Ormond Beach Police Department did not notify PUCKETT that it had seized his dogs, despite PUCKETT's location being known to the Ormond Beach Police Department.

19.    On August 19, less than 48 hours after the Ormond Beach Police Department seized Goose and Macho Man both dogs were transferred to the Defendant EDGEWATER ANIMAL SHELTER INC.

20.    The Ormond Beach Police Department did not notify PUCKETT about his dogs being transferred to the Defendant EDGEWATER ANIMAL SHELTER INC. despite PUCKETT's location being known by the Ormond Beach Police Department.

21.    PUCKETT was released from custody on August 21, 2025 at approximately 6:30 pm after being sentenced to time served.

3

22.    After being released from custody, PUCKETT was driven by friends to the homeless encampment at 1700 North US Highway 1 in Ormond Beach so he could be reunited with his dogs.

23.    Mr. Boring informed PUCKETT that Goose and Macho Man had been seized by the Ormond Beach Police Department.

24.    PUCKETT called the Ormond Beach Police Department, who informed him that Macho Man and Goose had been taken to the Halifax Humane Society.

25.    Halifax Humane Society did not open until noon on the following day, Friday, August 22, 2025.

26.    As soon as the Halifax Humane Society opened on Friday August 22, 2025, PUCKETT called and was informed Goose and Macho Man were not at the animal shelter operated by the Halifax Humane Society. It was suggested PUCKETT call the Volusia County Sheriff's Office.

27.    The Volusia County Sheriff's Office transferred PUCKETT to Volusia County Animal Control.

28.    After multiple phone calls, PUCKETT eventually learned that his dogs had been taken to the EDGEWATER ANIMAL SHELTER INC.

29.    Plaintiff contacted Defendant EDGEWATER ANIMAL SHELTER INC. at 1:17 pm on Friday, August 22, 2025. No one answered the phone and he left a message.

30.    PUCKETT was finally able to speak with an employee of EDGEWATER ANIMAL SHELTER INC. at 2:29 pm.

4

31.    PUCKETT claimed his dogs on August 22, 2025 by calling and informing
EDGEWATER ANIMAL SHELTER INC.  that Macho Man and Goose were his dogs and
he wanted them back.

32.    PUCKETT informed EDGEWATER ANIMAL SHELTER INC. asked what he
needed to do to get Goose and Macho Man released.

33.    PUCKETT was immediately told "You are not going to get the black dog back, he
has been 'fostered out,'[1] and your bill for the other dog is $368 and he is scheduled to be
neutered and you'll be responsible for that also."

34.    PUCKETT questioned how Macho Man could have been fostered out and why
Goose was scheduled to be neutered given that the three-day stray hold had not expired.

35.    PUCKETT was transferred to another employee and then to the Director of
EDGEWATER ANIMAL SHELTER INC., Ms. Roxanne Hicks.

36.    PUCKETT asked Ms. Hicks how one of his dogs could be fostered out given that
it had not been three days since the dogs were brought to the animal shelter. Ms. Hicks
stated that what was counted is the number of nights the dogs had been at the shelter, and
that the time the dogs were held by the Ormond Beach Police Department also counted
toward the three-day stray hold.

37.    PUCKETT argued that the time the dogs were in the custody of Ormond Beach
could not be counted and Ms. Hicks replied: "I am the animal shelter, I can do whatever I
want."

---

[1] It makes no sense that EDGEWATER ANIMAL SHELTER INC. would "foster out" a
dog that was allegedly so aggressive it had to be destroyed. On information and belief
Macho Man was already dead by Friday, August 22, 2025.

38.    Ms. Hicks told PUCKETT that he could not have his dogs back because Ormond Beach would not allow it.

39.    PUCKETT informed Ms. Hicks that Ormond Beach had told him exactly the opposite, and that he would call Ormond Beach again for further clarification, but Ms. Hicks insisted that she would call Ormond Beach to inquire as to whether PUCKETT could have his dogs back, promising she would call PUCKETT back after speaking with Ormond Beach.

40.    After hearing nothing from Ms. Hicks for more than an hour, PUCKETT called the animal shelter again at 2:29 pm, but his call was not answered.

41.    PUCKETT, who does not have a working vehicle, anxiously waited for the promised return call from Ms. Hicks until 3:40 pm.  When it was obvious his calls were being intentionally ignored, PUCKETT was given a ride to EDGEWATER ANIMAL SHELTER INC., which closed at 4:00 pm.

42.    PUCKETT called multiple times while enroute to the animal shelter to inform EDGEWATER ANIMAL SHELTER INC. he was on his way. When his calls were again ignored, he left messages.

43.    PUCKETT arrived at the shelter shortly after 4 pm on Friday, August 22, 2025; although the shelter was closed, he could see people inside.

44.    PUCKETT continued to call EDGEWATER ANIMAL SHELTER INC. from the parking lot but his calls were not answered, and he could not gain access to the shelter because of a closed gate.

45.    All together PUCKETT called EDGEWATER ANIMAL SHELTER INC. sixteen times on Friday, August 22, 2025 attempting to be reunited with his dogs.

6

46.    PUCKETT returned to the animal shelter on Monday, August 25th and demanded
that his dogs be returned to him.

47.    PUCKETT was told he could not have Goose and Macho Man back unless he paid
$490.00.

48.    PUCKETT did not have all the money demanded by Defendant EDGEWATER
ANIMAL SHELTER INC. and informed them of such.

49.    PUCKETT offered to pay every penny he had immediately and pleaded to be
allowed to make payments towards the money Defendant EDGEWATER ANIMAL
SHELTER INC. claimed he owed.

50.    Defendant EDGEWATER ANIMAL SHELTER INC. flatly refused to make any
arrangements for PUCKETT to pay the demanded charges over time and called the
Edgewater Police Department to have PUCKETT trespassed from the premises.

51.    PUCKETT later requested to be allowed to adopt his dogs and was flatly denied
because Defendant EDGEWATER ANIMAL SHELTER INC. deemed him unfit to care
for his dogs.

52.    PUCKETT's employer went to the shelter and requested to adopt Goose and Macho
Man but was also refused by EDGEWATER ANIMAL SHELTER INC.

53.    Although the timing is not entirely certain, notwithstanding Plaintiff's concerted
efforts to be reunited with his dog, Defendant EDGEWATER ANIMAL SHELTER INC.,
though fully aware that Plaintiff wished to reclaim Macho Man, without any prior notice
to PUCKETT killed Macho Man, claiming that the dog was "aggressive."

7

54.     Defendant EDGEWATER ANIMAL SHELTER INC., though fully aware that Plaintiff wished to reclaim Goose, nonetheless transferred possession of the dog to a third party, referred to in the instant complaint as "JANE DOE."

55.     Macho Man was unique and irreplaceable; no other dog will have the same personality and characteristics of Macho Man. Macho Man had special, intrinsic value to PUCKETT.

56.     Goose is unique and irreplaceable; no other dog will have the same personality and characteristics as Goose. Goose has special, intrinsic value to PUCKETT.

57.     JANE DOE has possession and control of Goose, property lawfully belonging to Plaintiff.

58.     Plaintiff will seek leave of Court to amend his Third Amended Complaint to state the true name of JANE DOE when it has been ascertained.

59.     Upon learning of Macho Man's death and Goose's transfer Plaintiff was overcome with grief and so emotionally distraught that he became physically ill.

60.     Plaintiff still suffers extreme emotional distress because of Defendant EDGEWATER ANIMAL SHELTER INC. heartless and intentional conduct in deliberately depriving him of the possession, companionship, love and emotional support of Goose and Macho Man.

61.     At no point did Plaintiff release his legal ownership of Goose and Macho Man to the Defendant EDGEWATER ANIMAL SHELTER INC.

62.     EDGEWATER ANIMAL SHELTER INC. is apparently unclear what authority effectuated PUCKETT's alleged forfeiture of his dogs as it has argued that "it is imperative

8

to consider relevant Ormond Beach City, Edgewater City, and Volusia County ordinances.
. . ."

63.     EDGEWATER ANIMAL SHELTER INC. asserts based upon language cherry
picked from three different code of ordinances that it was authorized if not downright
required to permanently deprive PUCKETT of the love and companionship of Goose and
Macho Man.

64.     Volusia County's Animal Control Ordinance does not apply within Ormond Beach
or the City of Edgewater. Volusia County's Animal Control Ordinance applies only in the
unincorporated areas of the county and in the incorporated areas of any municipality that
contracts with the county. Furthermore, Volusia County's Animal Control Ordinance does
not and could not grant a non-profit organization ownership of an animal seized in a
municipality where Volusia County is not contracted to perform animal control functions.
*See* Section 14-35 Volusia County Code of Ordinances.

65.     EDGEWATER ANIMAL SHELTER INC. refers to itself as "Edgewater" in
documents filed with this Court, but the animal shelter is not owned or operated by the City
of Edgewater.

66.     EDGEWATER ANIMAL SHELTER INC. is not a municipality with authority to
perform municipal services or exercise municipal powers; it is a private non-profit
organization.

67.     The provisions contained in the "Animal Services Ordinance of the City of
Edgewater, Florida" regarding "impounded animals" apply only to animals impounded
within the City of Edgewater.

68.    The Edgewater Animal Services Ordinance does not and cannot grant a private, non-profit organization ownership of an animal seized in another jurisdiction.

69.    Section 5-72 of the Ormond Beach Code states that "[t]he owner of any animal impounded pursuant to city ordinance or Florida Statutes can reclaim such animal, upon payment of a license fee and the charges hereinafter imposed, and of all costs and charges incurred *by the city* for impounding and maintenance of such animal."(emphasis added)

70.    Section 5-72 further provides that "the duties herein imposed upon the animal control officer may be delegated to an animal shelter *by a service agreement approved by resolution of the city commission*." (emphasis added)

71.    On September 18, 2024 the Ormond Beach City Commission approved Resolution No. 2024-157 authorizing execution of an "Agreement for Services" with the Halifax Humane Society, Inc. which became effective on October 1, 2024.  The minutes of the September 18, 2024 meeting of the Ormond Beach City Commission meeting are marked, attached hereto and incorporated by reference as Exhibit 2.

72.    The Agreement for Services between Ormond Beach and the Halifax Humane Society, Inc. marked, attached hereto and incorporated by reference as Exhibit 3, states on page 6 of 13 that "the Humane Society may release an animal to its owner without payment in the event the animal's owner completes a financial affidavit indicating that the owner qualifies as indigent." The financial affidavit, a Volusia County form, is attached to the "Agreement for Services."

73.    On July 23, 2025 Ormond Beach City Manager Joyce Shanahan executed an agreement with Defendant EDGEWATER ANIMAL SHELTER INC. However, the agreement was not approved by resolution of the Ormond Beach city commission before

10

it was signed by the City Manager, nor has it been approved by resolution of the Ormond

Beach city commission in the many months since its unauthorized execution. The

unauthorized agreement is  marked, attached hereto and incorporated by reference as

Exhibit 4.

74.     EDGEWATER ANIMAL SHELTER INC. has not been delegated animal control

functions by Ormond Beach because such delegation requires a services agreement

approved by the Ormond Beach city commission.

75.     There is not a legally valid agreement between Defendant EDGEWATER

ANIMAL SHELTER INC. and Ormond Beach authorizing EDGEWATER ANIMAL

SHELTER INC. to charge dog owners or to withhold dog owners' pets if the owner cannot

afford fees unilaterally imposed by EDGEWATER ANIMAL SHELTER INC.

76.     EDGEWATER ANIMAL SHELTER INC. was not acting pursuant to authority

delegated by Ormond Beach when it demanded $490.00 from PUCKETT as a condition

precedent to the return of his personal property.

77.     EDGEWATER ANIMAL SHELTER INC. was not acting pursuant to authority

delegated by Ormond Beach when it refused to return Goose to PUCKETT.

78.     EDGEWATER ANIMAL SHELTER INC. was not acting pursuant to authority

delegated by Ormond Beach when it destroyed Macho Man.

**PROCEDURAL HISTORY**

79.     On September 16, 2025 PUCKETT filed a *pro se* Replevin Complaint seeking

possession of his two dogs, Goose and Macho Man, believing his dogs were at the

Edgewater Animal Shelter.

11

80.     An Order to Show Cause was entered the following day setting a hearing on September 29, 2025 at which EDGEWATER ANIMAL SHELTER INC. was required to show cause "why the property claimed by plaintiff in the complaint filed in this action should not be taken from the possession of the defendant and delivered to plaintiff."

81.     On September 24, 2025 undersigned counsel filed a Notice of Appearance; two days later on September 26, 2025 Attorney Christopher W. Wickersham entered a Notice of Appearance on behalf of Defendant EDGEWATER ANIMAL SHELTER INC.

82.     EDGEWATER ANIMAL SHELTER INC. had destroyed Macho Man and disappeared Goose approximately a month before the hearing but did not inform PUCKETT or his attorney that it no longer had possession of the dogs, necessitating a hearing that wasted the resources of the Court and the parties.

83.     At the September 29, 2025 hearing EDGEWATER ANIMAL SHELTER INC. presented the testimony of its Director, Roxanne Hicks, who testified under oath that although EDGEWATER ANIMAL SHELTER INC. was fully aware that PUCKETT wanted his dogs back, because PUCKETT could not afford the fees demanded by EDGEWATER ANIMAL SHELTER INC., Macho Man had been destroyed because the dog was allegedly aggressive, and Goose had been adopted out to an undisclosed third party.

84.     Ms. Hicks also testified under oath that even though the 3 day stray hold had been up on Friday August 22, 2025, had PUCKETT been able to pay the $490.00 demanded on Monday, August 25, 2025 she would have allowed him to have his dogs, testimony which contradicts EDGEWATER ANIMAL SHELTER INC.'s more recent assertions that it had no flexibility regarding the stray hold period.

12

85.     Upon the testimony of Roxanne Hicks that Goose and Macho Man were no longer in the possession of EDGEWATER ANIMAL SHELTER INC. the court ruled that the replevin complaint should be dismissed.

86.     After the September 29, 2025 hearing Plaintiff's counsel received, pursuant to a public records request, an "Animal Record Summary" regarding Goose that stated on the very first page "The Adopted pet has not been sterilized prior to adoption."

87.     Because it is illegal for an animal shelter to release an unaltered animal to an adopter except under narrow circumstances inapplicable to Goose, PUCKETT filed a Motion for Reconsideration and Request for Leave to Amend on October 2, 2025.

88.     October 8, 2025 an Order was entered deeming the Amended Petition for Writ of Replevin, Complaint for Damages, and Demand for Jury Trial filed and "the operative Complaint in this matter."

89.     Upon the pronouncement of Attorney Stephanie Boomershine, who entered an appearance on behalf of EDGEWATER ANIMAL SHELTER INC. on October 17, 2025, that notwithstanding the disclaimer the first page of EDGEWATER ANIMAL SHELTER INC.'s "Animal Record Summary" Goose was in fact altered prior to his adoption, a Second Amended Complaint was filed on behalf of Plaintiff on October 21, 2025.

90.     Three weeks later filed EDGEWATER ANIMAL SHELTER INC. its Motion to Dismiss Counts II and III of the Second Amended Complaint, asserting that PUCKETT had not stated a cause of action of action for conversion or intentional infliction of emotional distress, and that depriving PUCKETT of his dogs was not only authorized but mandated by "relevant Ormond Beach City, Edgewater City, and Volusia County ordinances."

13

91.    A hearing was held on December 10, 2025 at which EDGEWATER ANIMAL SHELTER INC.'s motion to dismiss was granted without prejudice to allow PUCKETT to file the instant Third Amended Complaint.

## COUNT I-REPLEVIN

92.    Plaintiff realleges and incorporates paragraphs 1- 78 and 83-84 as though fully set forth herein.

93.    This is a replevin action to recover possession of personal property to which the Plaintiff MICHAEL PUCKETT is lawfully entitled.

94.    The property to be replevied is a male Cane Corso mixed breed dog named "Goose."

95.    The economic value of Goose is approximately $ 200.00.

96.    Goose's value to PUCKETT is not economic; until wrongfully converted by EDGEWATER ANIMAL SHELTER INC., Goose was an emotional support animal that provided therapeutic support to PUCKETT and has emotional and intrinsic value to PUCKETT.

97.    Goose was neither taken on an order or judgment of a court against Plaintiff, nor under an execution or judgment against Plaintiff or against the property.

98.    Goose was not taken for a tax, assessment or fine pursuant to law.

99.    PUCKETT is the owner of Goose, never relinquished ownership of Goose, and is entitled to possession of Goose.

100.    Plaintiff seeks entry of an order to show cause directed to Defendant JANE DOE pursuant to F.S. 78.067, and an immediate hearing on Plaintiff's right to possession of Goose.

14

101.    Plaintiff also requests expedited discovery regarding JANE DOE's identity and

address.

**WHEREFORE,** Plaintiff demands a judgment for replevin against Defendant JANE DOE.


## COUNT II-CONVERSION

102.    Plaintiff realleges and incorporates paragraphs 1-78 and 83-84 as though fully set

forth herein.

103.    Defendant EDGEWATER ANIMAL SHELTER INC. was fully aware that Goose

and Macho Man were Plaintiff's property.

104.    PUCKETT demanded that EDGEWATER ANIMAL SHELTER INC. return

Goose and Macho Man to him.

105.    Defendant EDGEWATER ANIMAL SHELTER INC. intentionally exerted

wrongful dominion over Plaintiff's personal property, Goose and Macho Man.

106.    Defendant EDGEWATER ANIMAL SHELTER INC. killed Macho Man and

transferred Goose to JANE DOE without disclosing to her/him PUCKETT's actual

ownership interest in Goose, thereby interfering with PUCKETT's right of possession.

107.    As a direct and proximate result of the intentional actions, as alleged in this Count,

Defendant EDGEWATER ANIMAL SHELTER INC. is civilly liable to PUCKETT for

loss of use of his property, loss of the intrinsic value of his property and other compensatory

damages.

**WHEREFORE,** Plaintiff demands a judgment for damages against Defendant

EDGEWATER ANIMAL SHELTER INC. in an amount not in excess of the jurisdictional

limits of this court.

## COUNT III- INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

108.    Plaintiff realleges and incorporates paragraphs 1-78 and 83-84 as though fully set forth herein.

109.    Defendant EDGEWATER ANIMAL SHELTER INC. acted with deliberate indifference to PUCKETT's property rights in Goose and Macho Man and engaged in extreme and outrageous conduct by killing Macho Man and transferring Goose to Jane Doe merely because PUCKETT could not immediately pay in full the sum EDGEWATER ANIMAL SHELTER INC. illegally attempted to extract from PUCKETT.

110.    Defendant EDGEWATER ANIMAL SHELTER INC. intended to cause emotional distress to PUCKETT or had a reckless disregard for the risk its actions posed for causing emotional distress to PUCKETT.

111.    Defendant EDGEWATER ANIMAL SHELTER INC.'s conduct in killing one of his dogs and intentionally depriving him of possession, love, companionship and emotional support of the other because he is indigent was outrageous and beyond all bounds of decency to be regarded as odious and utterly intolerable in a civilized community.

112.    PUCKETT did not have to be physically present and observe Macho Man's death to suffer foreseeable emotional distress as a direct and proximate result of the extreme and outrageous conduct by Defendant EDGEWATER ANIMAL SHELTER INC.

113.    PUCKETT did not have to be physically present at the animal shelter and watch Jane Doe load Goose into a vehicle and depart with his dog to suffer emotional distress as a direct and proximate result of the extreme and outrageous conduct by Defendant EDGEWATER ANIMAL SHELTER INC.

114.    As a direct and proximate result of the extreme and outrageous conduct by
Defendant EDGEWATER ANIMAL SHELTER INC., PUCKETT suffered severe
emotional distress.

**WHEREFORE,** Plaintiff demands a judgment for damages against Defendant
EDGEWATER ANIMAL SHELTER INC. in an amount not in excess of the jurisdictional
limits of this court.


## COUNT IV

**Declaratory Relief Regarding Validity of the July 24, 2025 Agreement Between
Ormond Beach and Edgewater Animal Shelter Inc.**

115.    Plaintiff realleges and incorporates paragraphs 1-78 and 83-84 as though fully set
forth herein.

116.    Plaintiff seeks a declaration that the services agreement with Edgewater Animal
Shelter Inc. signed by the City Manager of Ormond Beach, Exhibit 4 to this complaint,  is
invalid because it was not approved by a resolution of the Ormand Beach city commission
as required by Section 5-72 of the Ormond Beach Code.

117.    In Florida, the case law is clear that "[i]n order for a contract with a city to be valid,
it must comply with the city charter or ordinances." *City of Hollywood v. Witt*, 789 So.2d
1130, 1131-32 (4th DCA 2001), accord *Town of Indian River Shores v. Coll*, 378 So. 2d
53 (Fla. 4th DCA 1979)(refusing to enforce an alleged employment contract executed by
the mayor of a municipality, where an ordinance required that contracts had to be
authorized by the city council), *see also Ramsey v. City of Kissimmee*, 139 Fla. 107, 190
So. 474 (Fla. 1939), in which the Florida Supreme Court held that even though a contract

for engineering services was presented to the city commission, because there was no evidence of any motion, resolution or ordinance adopted approving the contract, the contract was not valid, notwithstanding execution of the contract by the Mayor.

118.    The purpose of a declaratory judgment is to afford relief for a person's insecurity and uncertainty with respect to their rights, status, or other equitable or legal relations.

119.    There is a bona fide, actual, present need for a declaratory judgment to determine this matter.

120.    The parties have an actual, present, adverse interest in the subject matter.

121.    There is a bona fide, present dispute amongst the parties regarding their rights and obligations.

122.    The requested declaration deals with a presently ascertainable set of facts.

123.    The rights of the Plaintiff are dependent upon the facts set forth herein or law applicable to these facts.

124.    The parties to this action have an actual, present, adverse and antagonistic interest in the subject matter, either in fact or in law.

125.    The antagonistic and adverse interests are all before the Court by proper process.

126.    The relief sought is not merely the giving of legal advice by the Court, or the answer to questions propounded out of curiosity.

127.    No vote was ever taken by the Ormond Beach city commission at a publicly noticed meeting which authorized the City Manager to execute an agreement with the Defendant EDGEWATER ANIMAL SHELTER INC. on behalf of Ormond Beach.

128.    Before a service agreement may be legally instituted, a public vote by the city commission was required both by Ormond Beach city ordinance and the Government in

18

the Sunshine Law. See *Broward County v. Conner*, 660 So. 2d 288, 290 (Fla. 4th DCA 1995) (interpreting Sunshine Law) (If the county could not have entered into a contract without action taken at a properly noticed public meeting, the actions of the county's attorneys could not bind the county in the absence of proper commission approval.)

129.    Defendant EDGEWATER ANIMAL SHELTER INC. through email from counsel, has asserted that Ormond Beach Ordinance 2-300(c)(2)(e), "authorized the city manager to approve the Edgewater Animal Shelter contract without the involvement of the city commission." The email is marked, attached hereto and incorporated by reference as Exhibit 5.

130.    The ordinance cited by Defendant's counsel applies exclusively to contracts "for professional services required for any project which is *within the scope of a continuing contract between the city and a service provider*, which services are included within the scope of the professional services within the scope of the [Consultants' Competitive Negotiations] Act[2]." (emphasis added) The ordinance is marked, attached hereto and incorporated by reference as Exhibit 6.

131.    Section 2-300(c)(2)(e) of the Ormond Beach Code allows the City Manager, upon the recommendation of a department head, to sign off on services of specified professionals who already have existing contracts with the City, provided the proposal is for $75,000.00 or less.

132.    The Consultants' Competitive Negotiations Act in § 287.055(2)(a) Fla. Stat. defines "professional services" as:

> services within the scope of the practice of architecture, professional engineering, landscape architecture, or registered surveying and mapping, as defined by the laws of

---

[2] See §287.055 Fla. Stat.

> the state, or those performed by any architect, professional
> engineer, landscape architect, or registered surveyor and
> mapper in connection with his or her professional
> employment or practice.

133.    Notably absent from the definition of professional services for which the Ormond

Beach City Manager may contract "without involvement of the city commission" are 1) the

duties of an animal control officer or 2) temporarily sheltering domestic animals.

134.    Section 2-300(c)(2)(e) of the Ormond Beach Code provided the City Manager no

authority to enter an agreement with EDGEWATER ANIMALS SHELTER INC.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court declare that the

services agreement executed by the Ormond Beach City Manager is not legally valid

because it was not approved by a resolution of the Ormond Beach city commission during

a duly noticed public meeting.

## COUNT V

### Declaratory Relief Regarding Edgewater Animal Shelter Inc.'s Authority to Refuse to Return Goose and Macho Man

135.    Plaintiff realleges and incorporates paragraphs 1-78 and 83-84 as though fully set

forth herein.

136.    Plaintiff seeks a declaration that EDGEWATER ANIMAL SHELTER INC. was

without authority to deprive him of his personal property, specifically his dogs Goose and

Macho Man, and that the adoption agreement between EDGEWATER ANIMAL

SHELTER INC. and Jane Doe purporting to transfer ownership of Goose to Jane Doe is

void.

137.    One who contracts with a municipality is bound to know the limitations of the City's

contracting authority. *Indian River Shores v. Coll*, 378 So. 2d 53, 55 (Fla. 4th DCA 1979)

20

138.    The unauthorized services agreement signed by the City Manager of Ormond Beach

is invalid because it did not delegate the duties or authorities of Ormond Beach animal

control officers to EDGEWATER ANIMAL SHELTER INC.

139.    EDGEWATER ANIMAL SHELTER INC. did not acquire ownership of Goose and

Macho Man by the agreement or by operation of any applicable law.

140.    EDGEWATER ANIMAL SHELTER INC. had no authority to destroy Macho

Man.

141.    EDGEWATER ANIMAL SHELTER INC. had no authority to transfer Goose to

Jane Doe.

142.    PUCKETT did not bring his dogs to the City of Edgewater nor deliver them to the

Edgewater Animal Shelter Inc.

143.    PUCKETT did not surrender his dogs or abandon them; PUCKETT claimed his

dogs and EDGEWATER ANIMAL SHELTER INC. refused to return them to PUCKETT.

144.    EDGEWATER ANIMAL SHELTER INC. had no authority to condition returning

PUCKETT's personal property on his payment of a unilaterally imposed fee.

145.    EDGEWATER ANIMAL SHELTER INC. had no authority to refuse to return

Goose and Macho Man when PUCKETT requested his dogs be returned.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court declare that

Defendant EDGEWATER ANIMAL SHELTER INC. had no authority to withhold Goose

and Macho Man, to destroy Macho Man or to sell, transfer or otherwise convey Goose to

Jane Doe and that any agreement transferring Goose to Jane Doe is void.

### COUNT VI
### (Plead in the Alternative)
### Declaratory Relief Regarding Constitutionally Interpreting Stray Hold Periods

21

146.    Plaintiff realleges and incorporates paragraphs 1-78 and 83-84 as though fully set forth herein.

147.    Plaintiff seeks a declaration that any stray hold period that arguably applied to EDGEWATER ANIMAL SHELTER INC.'s possession of Goose and Macho did not extinguish his rights as the dogs' known owner.

148.    Assuming that any one of the multiple codes that EDGEWATER ANIMAL SHELTER INC. has deemed "imperative for consideration" actually applied to Goose and Macho Man, nothing in any of the codes cited required or allowed forfeiture of PUCKETT's dogs to EDGEWATER ANIMAL SHELTER INC.

149.    Stray hold periods provided by all three codes apply to animals that were "impounded," not animals that were seized whose owners are known. For example, Section 5-70 of the Ormond Beach Code states that "[a]n animal control officer has the authority to impound *any animal at large*, pursuant to the enforcement or violation of any ordinance of this chapter or as provided by Florida Statutes." (emphasis added)

150.    Goose and Macho man were not "at large" when seized by Ormond Beach. Even the community service officers that took PUCKETT's dogs from Tim Boring indicated that the dogs were "taken into custody," not impounded. See Exhibit 1.

151.    Section 5-72 of the Ormond Beach Code states that "[i]n all instances of impoundment, owners of animals are responsible for the full cost of impoundment as charged by the shelter." It does NOT state that the owners of animals must pay the full cost of impoundment BEFORE the animal is returned to its owner, or that the inability to immediately pay the costs of impoundment as charged by the shelter allows the shelter to permanently deprive animal owners of their pets.

152.    To the contrary, the services agreement between Ormand Beach and Halifax
Humane Society, the only valid agreement between Ormond Beach and any entity that
operates an animal shelter, specifically authorizes waiver of impoundment fees for pet
owners like PUCKETT that are indigent.

153.    Time limits for pet owners to claim their animals are imposed to allow stray animals
or abandoned animals to be rehomed after an unknown owner has had a sufficient
opportunity to look for their lost pet.

154.    The public policy considerations that are the basis for hold periods for stray animals
are to avoid imposing undue financial burdens upon animal shelters of caring for animals
for extended periods of time by allowing municipalities and animal welfare organizations
that operate animal shelters to make  appropriate disposition of an animal whose owner is
unknown or unwilling to reclaim their animal after a certain period of impoundment has
expired. Finite hold periods also prevent animals from being subject to long-term
confinement that is detrimental to their welfare.

155.    Hold periods are not intended to effectuate a forfeiture when an animal's owner is
known simply because the owner is indigent.

156.    An ordinance that results in forfeiture of personal property, including animals,
without due process simply because the owner of the property is indigent is
unconstitutional. See *Barrow v. Holland*, 125 So.2d 749, 751 (Fla.1960) (Once any animal
has been legitimately reduced to private control, confinement, and possession, it becomes
private property. When that occurs, the owner thereof cannot be deprived of the use thereof,
except in accord with all of the elements of due process.)

23

157.    Assuming arguendo that any of the "relevant Ormond Beach City, Edgewater City, and Volusia County ordinances" identified imperative by EDGEWATER ANIMAL SHELTER INC. allowed EDGEWATER ANIMAL SHELTER INC. to act as the agent of any of the three governments, it is imperative that the relevant ordinance must be given a constitutional interpretation if possible. *DeSisto College Inc. v. Town of Howey-In-The-Hills*, 706 F. Supp. 1479 (M.D. Fla.), *affirmed*, 888 F.2d 766 (11th Cir. 1989). (Rules of construction require that the ordinance be interpreted, if possible, as constitutional.)

158.    Forfeitures are considered "harsh extractions" not favored by the legal system and accordingly forfeiture provisions are strictly construed. In doubtful cases the courts will construe ambiguous statutes, or even clear forfeiture provisions resting on uncertain authority, against any loss and in favor of an owner's retention of property. *Mulligan v. City of Hollywood*, 871 So. 2d 249, 253 (Fla. 4th DCA 2003), *quashed,* 934 So. 2d 1238 (Fla. 2006).

159.    Interpreting a stray hold period to require or allow forfeiture of an indigent dog owner's private property interest in his beloved pets when the owner is known and diligently attempted to reclaim his property cannot be reconciled with the requirements of the Florida and Federal Constitution that property owners must be provided with due process before their property can be taken by the government or any agent acting on the government's behalf.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court declare that the ordinances cited by EDGEWATER ANIMAL SHELTER INC.  did not authorize or require forfeiture of Goose and Macho Man to EDGEWATER ANIMAL SHELTER INC.

24

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all issues so triable.

Respectfully submitted this 16th day of December, 2025.

By: s/ *Marcy LaHart*
Marcy I. LaHart, Esq.
Florida Bar No. 0967009
Marcy@floridaanimallawyer.com
861 SE 40th Street
Tacoma, WA 98418
(352) 545-7001

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this a true and correct copy of the foregoing was

furnished via electronic mail State Court E-Portal to all attorneys of record listed in the

Florida E-filing E-Portal.

By: s/ *Marcy LaHart*
Marcy I. LaHart, Esq.

25

EXHIBIT ONE

EXHIBIT B

# Ormond Beach Police Department

## - Incident Report -

### CASE No.: OB250800224

| Agency ORI Number: FL0640400 | Reporting Agency: Ormond Beach Police Department | | ☐ Domestic Violence | ☐ Juvenile | Nature of Call Trespassers | |
|---|---|---|---|---|---|---|

**EVENT**

| Reported Date/Time 08/17/2025 08:56:00 | Dispatch Date/Time 08/17/2025 08:56:00 | Arrival Date/Time 08/17/2025 08:56:00 | Completed Date/Time 08/17/2025 11:04:00 | Incident From Date/Time 08/17/2025 08:56:00 | | Incident To Date/Time | |
|---|---|---|---|---|---|---|---|
| Commonplace Name ORMOND CROSSING WEST, LLC | Incident Location 1700 N US HWY 1 | | City Ormond Beach | | State FLORIDA | Zip Code 32174 | County VOLUSIA | Zone OB8 |

**OFFENSES**

**Offense No. 1**

| Felony/Misdemeanor Misdemeanor | UCR/NIBRS Code 810.09 2a | Description 810.09 2a TRESPASSING-TRESPASS FAIL TO LEAVE PROP ON ORDER OF OWNER | | | Attempted/Completed Completed |
|---|---|---|---|---|---|
| Location Type Field/Woods | # Prem. Entered | Method of Entry | Offender Suspected of Using Not Applicable (Mutually Exclusive) | Criminal Activity/Gang | |
| Weapon Types | | | Bias Motivation None (no bias) | Cargo Theft | Activity Type |

**SUBJECT**

**Subject No. 1**                                                          Attorney:

| Last Name WHITE | First Name SAUNDRA | Middle Name DEE | Suffix | Maiden Name | Nickname | Sex F | Race White | | Ethnicity Non-Hispanic |
|---|---|---|---|---|---|---|---|---|---|
| Date of Birth 11/18/1971 | Place Of Birth | Age 53 | To Age | Height | Weight | Eye Color | Hair Color | Hair Length | Hair Style | Facial Hair | Build |

| Complexion | Glasses | Teeth | | Speech/Voice | | Physical Feature Code | | Special Identifiers | |

| Clothing Descrption | | | Resident Status Non-Resident | Immigration Status United States Citizen | Education Level | | Social Security Number 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 |

| Driver's License Number RQ765610 | State OH | Misc ID Number / Type / State – / – / – |

- Contact Information -

| Last Known Address GENERAL DELIVERY, Apt ORMOND BEACH | City Ormond Beach | State FL | Zip Code 32174 | County Volusia | | Country USA |
|---|---|---|---|---|---|---|
| Employer/School Name | Employer/School Phone | Employer/School Address | City | County | State | Zip Code | Country |

| Cell Phone (386) 278-5625 | Home Phone | Work Phone | Email UNKNOWN | Social Media Information | |
|---|---|---|---|---|---|

| Heroin/Opioid? No   – / – | Narcan Administered? / patient respond? | Narcan Dosage | Date/Time Administered | Who Administered | Narcotic Involved | Transported to Hospital |

- Related Offenses -

| 1 | Code 810.09 2a | Description TRESPASSING-TRESPASS FAIL TO LEAVE PROP ON ORDER OF OWNER | | UCR Code 90J |
|---|---|---|---|---|

**Subject No. 2**                                                          Attorney:

| Last Name PUCKETT | First Name MICHAEL | Middle Name KELLY | Suffix | Maiden Name | Nickname | Sex M | Race White | | Ethnicity Non-Hispanic |
|---|---|---|---|---|---|---|---|---|---|
| Date of Birth 12/12/1968 | Place Of Birth | Age 56 | To Age | Height | Weight | Eye Color | Hair Color | Hair Length | Hair Style | Facial Hair | Build |

| Complexion | Glasses | Teeth | | Speech/Voice | | Physical Feature Code | | Special Identifiers | |

| Clothing Descrption | | | Resident Status Resident | Immigration Status United States Citizen | Education Level | | Social Security Number 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 |

| Driver's License Number T62708075 | State VA | Misc ID Number / Type / State – / – / – |

- Contact information -

| Last Known Address GENERAL DELIVERY, Apt ORMOND BEACH | City Ormond Beach | State FL | Zip Code 32174 | County Volusia | | Country USA |
|---|---|---|---|---|---|---|
| Employer/School Name | Employer/School Phone | Employer/School Address | City | County | State | Zip Code | Country |

| Cell Phone | Home Phone | Work Phone | Email UNKNOWN | Social Media Information | |

| Heroin/Opioid? No   – / – | Narcan Administered? / patient respond? | Narcan Dosage | Date/Time Administered | Who Administered | Narcotic Involved | Transported to Hospital |

- Related Offenses -

| 1 | Code 810.09 2a | Description TRESPASSING-TRESPASS FAIL TO LEAVE PROP ON ORDER OF OWNER | | UCR Code 90J |
|---|---|---|---|---|

**BUS/STATE/GOV**

**Business/State/Gov No. 1 - VICTIM OF INCIDENT**

| Organization Name ORMOND CROSSING WEST, LLC | | Organization Phone (301) 448-9425 | | Victim Type Business | |
|---|---|---|---|---|---|
| Address 1700 N US HWY 1 | Apt | City Ormond Beach | State FLORIDA | Zip Code 32174 | County VOLUSIA | Country USA |

- Related Offenses -

| 1 | Code 810.09 2a | Description TRESPASSING-TRESPASS FAIL TO LEAVE PROP ON ORDER OF OWNER | | UCR Code 90J |
|---|---|---|---|---|

The Ormond Beach Police Department has received a significant uptick in transient related complaints from citizens and business owners along the North US Highway 1 / Interstate 95 corridor. Many of the transient related complaints have been associated with criminal conduct, to include: public intoxication, brawling, loitering, burglary, theft, illicit narcotics use (and overdoses), trespassing, aggressive panhandling, littering, etcetera.

The Ormond Beach Police Department recently identified a large homeless encampment situated upon a vacant parcel of land located at 1700 North US Highway 1. The property is owned by Ormond Crossing West, LLC and is a designated trespass enforcement site. Ormond Crossing West, LLC has entered into a Trespass Enforcement Agreement with the Ormond Beach Police Department authorizing its officers to issue trespass warnings, remove and arrest undesired person(s) from the property at law enforcement's discretion. The Ormond Beach Police Department retains a copy of the Trespass Enforcement Affidavit.

On today's date, August 17, 2025, at approximately 9:03am, Officer Garcia encountered Saundra White within the homeless encampment located at 1700 North US Highway 1. Officer Garcia previously issued White a formal trespass warning from this very same location on May 6, 2025 during a prior domestic violence related investigation (OB250500076). During that previous trespassing investigation Officer Garcia explained to White that she would be subject to arrest if she was found on the property again.

On today's date, August 17, 2025, at approximately 9:10am, Officer Garcia encountered Michael Puckett within the homeless encampment located at 1700 North US Highway 1. Officer Garcia previously issued Puckett a formal trespass warning from this very same location on June 12, 2025 during a prior trespassing investigation (CAD #P251630768). During that previous trespassing investigation Officer Garcia explained to Puckett that he would be subject to arrest if he was found on the property again.

Officer Garcia determined that probable cause existed to place both White and Puckett under arrest for Trespass After Warning for returning the property again today, August 17, 2025, after having been previously warned. White and Puckett were subsequently placed under arrest and transported to the Volusia County Branch Jail where they were turned over to Corrections officials.

It should be noted that Puckett's two large mixed breed (pit-bull) dogs were present within the transient camp at the time of Puckett's arrest. Puckett was unable to provide a name or contact information for anyone capable of providing appropriate care and shelter for either dog. Puckett disclosed that the two dogs must be kept separate from each other because one would likely "kill" the other due to behavioral aggression. CSO Stephens and CSO Davis responded to the transient camp and took custody of both dogs. See supplement by CSO Stephens for details pertaining to the placement and final disposition of each dog.

| ADMIN INFO | ☐ Victim Advocate  ☐ Triad  ☐ SA Referral | | ☐ DCF Hotline  ☐ CAC | Spoke With | | Date/Time Spoke With |
|---|---|---|---|---|---|---|
| | | Date | By | Connecting Report Number | | Agency |
| | ☐ FCIC/NCIC Entry  ☐ FCIC/NCIC Cancel  ☐ T.T. BOLO | | | | | |
| | Copies To | Additional Forms Attached | | If Other Attachment Selected, Describe | | |

| OFFICER | Officer No. 1 | | | | | |
|---|---|---|---|---|---|---|
| | Officer Name | | Involvement Type | Unit | Signature Date | |
| | Garcia, Thomas OB344 | | Reporting | 10A58 | 08/17/2025 09:19:00 | |
| | Officer Signature | *Thomas* | | | | |
| | Officer No. 2 | | | | | |
| | Officer Name | | Involvement Type | Unit | Signature Date | |
| | Llanes, Ray OB426 | | Approving | | 08/17/2025 18:00:40 | |
| | Officer Signature | | | | | |

# Ormond Beach Police Department

## - Incident Supplement -

### CASE No.: OB250800224

| Agency ORI Number:<br>FL0640400 | Reporting Agency:<br>Ormond Beach Police Department | | Supplement Reported Date<br>8/20/2025 |
|---|---|---|---|

**NARRATIVE**

Two dogs were removed from the camp when it was evacuated:

1 – Adult intact male pit, brown brindle in color, collar with no tags, no chip, nice disposition.

2 – Adult intact male pit mix, black in color, collar with no tags, no chip, nice disposition.

Both dogs were held at the PD dog pens until Tuesday afternoon, in case we were contacted by the owner(s) so that the dogs could be turned over to them instead of going to the shelter. Having heard from no one, the dogs were taken to Edgewater Animal Shelter Tuesday afternoon.

**ADMIN INFO**

☐ Victim Advocate  ☐ Triad  ☐ SA Referral     ☐ DCF Hotline  ☐ CAC     Spoke With     Date/Time Spoke With

☐ FCIC/NCIC Entry  ☐ FCIC/NCIC Cancel  ☐ T.T. BOLO     Date     By     Connecting Report Number     Agency

Copies To     Additional Forms Attached     If Other Attachment Selected, Describe

**OFFICER**

| Officer No. 1 | | | |
|---|---|---|---|
| Officer Name<br>Stephens, Cris OB105 | Involvement Type<br>Reporting | Unit | Signature Date<br>08/20/2025 08:58:00 |

Officer Signature

# EXHIBIT TWO

**MINUTES**
**ORMOND BEACH CITY COMMISSION**
**HELD AT CITY HALL COMMISSION CHAMBERS**

| September 18, 2024 | 7:00 p.m. | Commission Chambers |
|---|---|---|

Present: Mayor Bill Partington, Commissioners Lori Tolland, Travis Sargent, Susan Persis, and Harold Briley, City Manager Joyce Shanahan, City Attorney Randy Hayes, Assistant City Manager Shawn Finley, Assistant City Manager Claire Whitley, and City Clerk Susan Carroll Dauderis.

*A G E N D A*

1. **CALL TO ORDER**

2. **INVOCATION**

3. **PLEDGE OF ALLEGIANCE**

4. **PRESENTATIONS AND PROCLAMATIONS**
   A. Recognition of Florida Legislators
   B. Evelyn Rebostini

5. **ADOPTION OF FISCAL YEAR 2024-2025 MILLAGE RATES AND BUDGET**

   A. **RESOLUTION NO. 2024-146**: A RESOLUTION ADOPTING FINAL MILLAGE RATES TO BE LEVIED FOR FISCAL YEAR 2024-2025; DIRECTING CERTIFICATION; EXPRESSING LEGISLATIVE INTENT; AND SETTING FORTH AN EFFECTIVE DATE.
      *Staff Contact:*    *Kelly McGuire, Finance Director, (386) 676-3226*

   B. **ORDINANCE NO. 2024-25:** AN ORDINANCE ADOPTING THE ANNUAL BUDGET FOR THE 2024-2025 FISCAL YEAR BEGINNING OCTOBER 1, 2024 AND ENDING SEPTEMBER 30, 2025; REPEALING ALL INCONSISTENT ORDINANCES OR PARTS THEREOF; AND SETTING FORTH AN EFFECTIVE DATE. **(SECOND READING)**
      *Staff Contact:*    *Kelly McGuire, Finance Director, (386) 676-3226*

6. **AUDIENCE REMARKS - REGARDING ITEMS NOT ON THE AGENDA**

7. **APPROVAL OF MINUTES**
   A. Minutes from City Commission meeting - September 4, 2024

8. **CONSENT AGENDA**
   The action proposed is stated for each item on the Consent Agenda. Unless a City Commissioner removes an item from the Consent Agenda, no discussion on individual items will occur and a single motion will approve all items.

   A. **RESOLUTION NO. 2024-147**: A RESOLUTION AUTHORIZING THE EXECUTION OF A NON-EXCLUSIVE FRANCHISE AGREEMENT BETWEEN THE CITY AND FENCE SERVICE, INC. D/B/A AAA DUMPSTER RENTAL AND D/B/A F.S.I. ROLL OFF CONTAINER SERVICE REGARDING THE COLLECTION OF CONSTRUCTION AND DEMOLITION DEBRIS; AND SETTING FORTH AN EFFECTIVE DATE.
      *Staff Contact:*    *Kevin Gray, Deputy Public Works Director, (386) 676-3325*

   B. **RESOLUTION NO. 2024-148**: A RESOLUTION RATIFYING, AFFIRMING AND AUTHORIZING EXPENDITURES FOR

SERVICES FROM EMPIRE COMPUTING AND CONSULTING, INC. FOR BARRACUDA BACKUP PROTECTION; AND SETTING FORTH AN EFFECTIVE DATE.

    ***Staff Contact:***    *Chuck Osteen, Information Technology Manager, (386) 615-7031*

C.  **RESOLUTION NO. 2024-149**: A RESOLUTION ACCEPTING A BID FROM SGS CONTRACTING SERVICES, INC. FOR CONSTRUCTION SERVICES REGARDING THE WATER RECLAMATION FACILITY ULTRAVIOLET DISINFECTION CONVERSION PROJECT, UNDER BID NO. 2024-24; AUTHORIZING THE EXECUTION OF A CONTRACT AND PAYMENT THEREFOR; REJECTING ALL OTHER BIDS; AND SETTING FORTH AN EFFECTIVE DATE.

    ***Staff Contact:***    *Bob Preis, Utilities Manager, (386) 676-3305*

D.  **RESOLUTION NO. 2024-151**: A RESOLUTION ACCEPTING A PROPOSAL FROM MCKIM & CREED, INC. TO PROVIDE CONSTRUCTION ADMINISTRATION SERVICES REGARDING THE FLEMING AVENUE DRAINAGE IMPROVEMENTS PROJECT; AUTHORIZING THE EXECUTION OF A WORK AUTHORIZATION THERETO; AND SETTING FORTH AN EFFECTIVE DATE.

    ***Staff Contact:***    *Alex Schumann, City Engineer, (386) 676-3302*

E.  **RESOLUTION NO. 2024-152**: A RESOLUTION AUTHORIZING AN EMERGENCY PROCUREMENT OF A HIPOWER PORTABLE GENERATOR FROM ALTERNATIVE POWER SOLUTIONS, INC. FOR USE AT THE HUDSON WELL FIELD IN THE HUNTERS RIDGE SUBDIVISION; AUTHORIZING THE EXECUTION OF A PURCHASE AUTHORIZATION; AND SETTING FORTH AN EFFECTIVE DATE.

    ***Staff Contact:***    *Bob Preis, Utilities Manager, (386) 676-3305*

F.  **RESOLUTION NO. 2024-153**: A RESOLUTION APPROVING AND AUTHORIZING REVISIONS TO THE CITY'S FEE SCHEDULE FOR CULTURAL AND RECREATIONAL PROGRAMS AND FACILITIES OPERATED BY THE LEISURE SERVICES DEPARTMENT; AND SETTING FORTH AN EFFECTIVE DATE.

    ***Staff Contact:***    *Robert Carolin, Leisure Services Director, (386) 676-3279*

G.  **RESOLUTION NO. 2024-156**: A RESOLUTION AUTHORIZING THE EXECUTION OF AN INTERLOCAL AGREEMENT BETWEEN THE CITY AND THE STATE ATTORNEY OF THE SEVENTH JUDICIAL CIRCUIT FOR PROSECUTION OF VIOLATIONS OF CITY ORDINANCES PUNISHABLE BY INCARCERATION; AND SETTING FORTH AN EFFECTIVE DATE.

    ***Staff Contact:***    *Randy Hayes, City Attorney, (386) 676-3217*

H.  **RESOLUTION NO. 2024-157**: A RESOLUTION AUTHORIZING THE EXECUTION OF AN AGREEMENT FOR SERVICES BETWEEN THE CITY AND HALIFAX HUMANE SOCIETY, INC.; AND SETTING FORTH AN EFFECTIVE DATE.

    ***Staff Contact:***    *Jesse Godfrey, Police Chief, (386) 676-3500*

I.  **RESOLUTION NO. 2024-158**: A RESOLUTION APPROVING A SETTLEMENT PROPOSAL REGARDING THE WORKERS' COMPENSATION CLAIM OF MICHAEL BAKAYSA; AUTHORIZING THE EXECUTION OF ANY AND ALL DOCUMENTS INCIDENTAL THERETO; AUTHORIZING PAYMENT RELATIVE THERETO; AND SETTING FORTH AN EFFECTIVE DATE.

    ***Staff Contact:***    *Randy Hayes, City Attorney, (386) 676-3217*

J.   **RFP - Cross Connection Control Program Management Services**

   *Staff Contact:*   *Bob Preis, Utilities Manager, (386) 676-3305*

   *Disposition:*   Approve as recommended in the City Manager staff report dated September 18, 2024.

K.   **City Manager's Monthly Report, September 2024**

   *Staff Contact:*   *Joyce Shanahan, City Manager, (386) 676-3200*

   *Disposition:*   Accept as information as recommended in the City Manager staff report dated September 18, 2024.

**9.     PUBLIC HEARINGS**

A.   **ORDINANCE NO. 2024-26:** AN ORDINANCE AMENDING CHAPTER 2, DISTRICT AND GENERAL REGULATIONS, ARTICLE IV, CONDITIONAL AND SPECIAL EXCEPTION REGULATIONS, SECTION 2-57, CRITERIA FOR REVIEW OF SPECIFIC CONDITIONAL AND SPECIAL EXCEPTION, SUBSECTION (37), HOUSES OF WORSHIP, OF THE CITY OF ORMOND BEACH LAND DEVELOPMENT CODE, BY AMENDING THE CONDITIONS FOR HOUSES OF WORSHIP; REPEALING ALL INCONSISTENT ORDINANCES OR PARTS THEREOF; PROVIDING FOR SEVERABILITY; AND SETTING FORTH AN EFFECTIVE DATE.

   *Staff Contact:*   *Steven Spraker, Planning Director, (386) 676-3341*

B.   **ORDINANCE NO. 2024-27:** AN ORDINANCE APPROVING THE FINAL PLAT FOR THE "BRADFORD LAKES" SUBDIVISION, SHOWN WITHIN PHASE 4 OF THE PLANTATION OAKS PLANNED RESIDENTIAL DEVELOPMENT; ESTABLISHING CONDITIONS AND EXPIRATION DATE OF APPROVAL; AND SETTING FORTH AN EFFECTIVE DATE.

   *Staff Contact:*   *Steven Spraker, Planning Director, (386) 676-3341*

C.   **ORDINANCE NO. 2024-28:** AN ORDINANCE APPROVING THE FINAL PLAT FOR THE "BRADFORD PARK" SUBDIVISION; ESTABLISHING CONDITIONS AND EXPIRATION DATE OF APPROVAL; AND SETTING FORTH AN EFFECTIVE DATE.

   *Staff Contact:*   *Steven Spraker, Planning Director, (386) 676-3341*

D.   **ORDINANCE NO. 2024-29:** AN ORDINANCE CHANGING THE NAME OF "HALIFAX STREET" TO "CLIFFHAVEN COURT", AND "MATANZAS STREET" TO "RIDGEHAVEN AVENUE", SAID STREETS BEING LOCATED IN THE RIDGEHAVEN SUBDIVISION AREA; REPEALING ALL INCONSISTENT ORDINANCES OR PARTS THEREOF; PROVIDING FOR TRANSMITTAL AND RECORDING IN THE PUBLIC RECORDS OF VOLUSIA COUNTY; AND SETTING FORTH AN EFFECTIVE DATE.

   *Staff Contact:*   *Steven Spraker, Planning Director, (386) 676-3341*

E.   **RESOLUTION NO. 2024-133:** A RESOLUTION AUTHORIZING THE EXECUTION AND ISSUANCE OF A DEVELOPMENT ORDER FOR A SPECIAL EXCEPTION TO ALLOW OUTDOOR ACTIVITY TO INCLUDE THE PERMANENT OUTDOOR STORAGE, DISPLAY, AND SALES OF MERCHANDISE AT THE LOWES HOME IMPROVEMENT STORE LOCATED AT 1340 WEST GRANADA BOULEVARD; ESTABLISHING CONDITIONS AND EXPIRATION DATE OF APPROVAL; AND SETTING FORTH AN EFFECTIVE

DATE.

**Staff Contact:**     *Steven Spraker, Planning Director, (386) 676-3341*

## 10.    RESOLUTIONS

A.    **RESOLUTION NO. 2024-154**: A RESOLUTION ESTABLISHING FUEL FLOWAGE FEES, LANDING FEES, AND AIRCRAFT TIE DOWN FEES AT THE ORMOND BEACH MUNICIPAL AIRPORT; AND SETTING FORTH AN EFFECTIVE DATE.

**Staff Contact:**     *Steven Lichliter, Airport Manager, (386) 615-7019*

B.    **RESOLUTION NO. 2024-155**: A RESOLUTION AUTHORIZING THE EXECUTION OF AN AGREEMENT BETWEEN THE CITY AND VECTOR AIRPORT SYSTEMS, LLC, FOR THE PROVISION OF PLANEPASS AIRCRAFT OPERATING FEE BILLING AND COLLECTION SERVICES AT THE ORMOND BEACH MUNICIPAL AIRPORT; AND SETTING FORTH AN EFFECTIVE DATE.

**Staff Contact:**     *Steven Lichliter, Airport Manager, (386) 615-7019*

C.    **RESOLUTION NO. 2024-159**: A RESOLUTION APPOINTING A MEMBER AND AN ALTERNATE MEMBER TO SERVE ON THE OPIOID ABATEMENT FUNDING ADVISORY BOARD; ESTABLISHING TERM AND CONDITIONS OF SERVICE; AND SETTING FORTH AN EFFECTIVE DATE.

**Staff Contact:**     *Susan Dauderis, City Clerk, (386) 676-3340*

D.    **RESOLUTION NO. 2024-160**: A RESOLUTION ACCEPTING A PROPOSAL FROM BROWN & BROWN INSURANCE SERVICES, INC., FOR THE PROVISION OF PROPERTY, LIABILITY AND WORKERS' COMPENSATION INSURANCE FOR VARIOUS LINES OF INSURANCE COVERAGE THROUGH VARIOUS INSURANCE CARRIERS, INCLUDING PROPERTY, INLAND MARINE, AUTO PHYSICAL DAMAGE, EXCESS WORKERS' COMPENSATION, CRIME, ACCIDENTAL DEATH AND DISMEMBERMENT (POLICE OFFICERS AND FIREFIGHTERS), NATIONAL FLOOD INSURANCE PROGRAM (NFIP) FLOOD, POLLUTION, PROFESSIONAL LIABILITY (EMT'S AND PARAMEDICS), GENERAL LIABILITY (INCLUDING LAW ENFORCEMENT LIABILITY), TENANT AND USERS LIABILITY (TULIP) (SPECIAL EVENTS), CYBER LIABILITY, AND ACTIVE SHOOTER LIABILITY INSURANCE; AUTHORIZING THE EXECUTION OF DOCUMENTS RELATIVE THERETO; AUTHORIZING PAYMENT THEREFOR; AND SETTING FORTH AN EFFECTIVE DATE.

**Staff Contact:**     *Kelly McGuire, Finance Director, (386) 676-3226*

## 11.    REPORTS, SUGGESTIONS, REQUESTS

## 12.    ADJOURNMENT

### *M I N U T E S*

Item #1 – Meeting Call to Order

Mayor Partington called the meeting to order at 7:01 p.m.

Item #2 – Invocation

Father Roy Allison, St. James Episcopal Church, provided the invocation.

Item #3 – Pledge of Allegiance

Mayor Partington led the Pledge of Allegiance.

Item #4 – Presentations and Proclamations

Item #4A – Recognition of Florida Legislators

Mayor Partington presented a plaque of appreciation and Key to the City to Representative Tom Leek for his work and dedication to the community. He recognized Representative Webster Barnaby, Representative Chase Tramont, and Florida Senator Tom Wright with a plaque of appreciation.

Item #4B – Evelyn Rebostini

Mayor Partington presented a proclamation and Key to the City to Ms. Evelyn Rebostini, honoring her work as the Ormond Beach Police Department's Victim Advocate and congratulating her on her retirement.

Ms. Rebostini thanked the Commission, city staff, and co-workers for their support and friendship over the years and discussed her career with the city.

Item #5 – Adoption of Fiscal Year 2024-2025 Millage Rates and Budget

Mayor Partington opened the Public Hearings.

Item #5A –Millage Rates for 2024-2025 Fiscal Year

City Clerk Susan C. Dauderis read by title only:

> RESOLUTION NO. 2024-146
> A RESOLUTION ADOPTING FINAL MILLAGE RATES TO BE LEVIED FOR FISCAL YEAR 2024-2025; DIRECTING CERTIFICATION; EXPRESSING LEGISLATIVE INTENT; AND SETTING FORTH AN EFFECTIVE DATE.

Mayor Partington stated per Florida Statute, he was required to state the millage rate for the City of Ormond Beach necessary to fund the Fiscal Year (FY) 2024-2025 budget was 4.0960 mills, noting the rate was 12.82 percent above the rolled back rate of 3.6305 mills and the debt service millage rate was 0.065 for the 2010 General Obligation Bond Sinking Fund.

Mayor Partington stated it was a public hearing and inquired if there were any members of the public who wished to speak or ask questions prior to adoption of the millage rate and budget.

Mr. Sean Daly, 1106 Northside Drive, expressed concerns regarding the tax increase and the Ormond Beach Municipal Airport's budget. He discussed the funds owed by the airport and not using taxpayer dollars to support it.

**Commissioner Briley moved, seconded by Commissioner Tolland, for approval of Resolution No. 2024-146, as read by title only.**

Mayor Partington stated the operating millage of 4.0960 mills was 12.82 percent above the rolled back millage rate and the resolution included adoption of the debt service millage rate of 0.065 for the 2010 General Obligation Bond Sinking Fund.

| Call Vote: | | |
|---|---|---|
| | Commissioner Tolland | Yes |
| | Commissioner Sargent | Yes |
| | Commissioner Persis | Yes |
| | Commissioner Briley | Yes |
| Carried. | Mayor Partington | Yes |

Mayor Partington announced the operating millage rate was set at 4.0960 mills, which was 12.82 percent above the rolled back millage rate of 3.6305 mills.

Item #5B – Adoption of Annual Budget for the 2024-2025 Fiscal Year

City Clerk Susan C. Dauderis read by title only:

ORDINANCE NO. 2024-25
AN ORDINANCE ADOPTING THE ANNUAL BUDGET FOR THE 2024-2025 FISCAL YEAR BEGINNING OCTOBER 1, 2024 AND ENDING SEPTEMBER 30, 2025; REPEALING ALL INCONSISTENT ORDINANCES OR PARTS THEREOF; AND SETTING FORTH AN EFFECTIVE DATE. **(SECOND READING)**

**Commissioner Persis moved, seconded by Commissioner Briley, for approval of Ordinance No. 2024-25, on second reading, as read by title only.**

Mayor Partington requested for the City Clerk to call the vote to adopt the budget of $131,976,868.

| Call Vote: | | |
|---|---|---|
| | Commissioner Sargent | Yes |
| | Commissioner Persis | Yes |
| | Commissioner Briley | Yes |
| | Commissioner Tolland | Yes |
| Carried. | Mayor Partington | Yes |

Mayor Partington closed the Public Hearings.

Item #6 – Audience Remarks

Ms. Cindy Costa, 6 Walden Lane, voiced concerns regarding North Beach Street and the state of the roadway. She requested the city look into repairs to make the street safer for drivers.

Ms. Alicya Simmons, 705 North Peninsula Avenue, requested for the city to look into a grant from the Daytona Beach Racing and Recreation Center Fund for the Ormond Beach Tennis Center. She discussed the needs of the tennis center, personal funds the current operator put into the programs at the facility, and the growth since the current operator started.

Ms. Connie Colby, 108 Roble Lane, discussed the rules regarding parks within the city and their regulation. She expressed concerns surrounding the use of the parks, specifically motorbikes and drones. She voiced concerns regarding code enforcement and the way citizens report concerns.

Item #7 – Approval of Minutes

Mayor Partington advised the minutes from the September 4, 2024, meeting had been sent to the Commission for review and posted on the city's website for public viewing. He asked for any corrections, additions, or omissions. He stated, hearing no corrections, the minutes would stand approved as presented.

**Commissioner Sargent moved, seconded by Commissioner Tolland, for approval of the September 4, 2024, City Commission meeting minutes.**

**The motion passed by voice vote.**

Item #8 – Consent Agenda

Mayor Partington advised the actions proposed for the items on the Consent Agenda were so stated on the agenda. He asked if any member of the Commission had questions or wished to discuss any items separately.

Commissioner Briley requested Item 8H be pulled from the Consent Agenda.

**Commissioner Persis moved, seconded by Commissioner Sargent, for approval of the Consent Agenda, absent Item 8H.**

| Call Vote: | | |
|---|---|---|
| | Commissioner Persis | Yes |
| | Commissioner Briley | Yes |
| | Commissioner Tolland | Yes |
| | Commissioner Sargent | Yes |
| Carried. | Mayor Partington | Yes |

Item #8H – Humane Society Contract FY 2024-2025

City Clerk Susan C. Dauderis read by title only:

RESOLUTION NO. 2024-157
A RESOLUTION AUTHORIZING THE EXECUTION OF AN AGREEMENT
FOR SERVICES BETWEEN THE CITY AND HALIFAX HUMANE
SOCIETY, INC.; AND SETTING FORTH AN EFFECTIVE DATE.

Ms. Colby expressed concerns regarding the stray cats in her neighborhood and the
return of the stray cats once they were neutered by the Humane Society. She requested
the city renegotiate the contract for the Humane Society to not return the cats.

Commissioner Briley deferred to staff for information for Ms. Colby; whereby, Ms. Joyce
Shanahan, City Manager, stated the contract called for just Trap, Neuter, and Release
(TNR).

Captain Chris Roos, Ormond Beach Police Department, discussed the Humane
Society's TNR program and the life span of wild cats. He noted if there were better
plans, staff would be happy to review. He explained there were no cat colonies in the
area Ms. Colby expressed concerns with.

Commissioner Tolland expressed support of revisiting the contract to see what further
could be done to prevent the return of the stray cats.

Ms. Claire Whitley, Assistant City Manager, stated staff would discuss the request with
the Humane Society before the next contract; whereby, Mayor Partington noted if a
resolution to the request could happen sooner than the next contract to bring it back to
the Commission before then.

Commissioner Persis requested the Humane Society go look at Ms. Colby's areas of
concern.

Commissioner Tolland suggested having data of how many cats were in the area to
determine if there were needs for a revised program.

**Commissioner Briley moved, seconded by Commissioner Sargent, for approval of
Resolution No. 2024-157, as read by title only.**

| Call Vote: | Commissioner Briley | Yes |
|---|---|---|
| | Commissioner Tolland | Yes |
| | Commissioner Sargent | Yes |
| | Commissioner Persis | Yes |
| Carried. | Mayor Partington | Yes |

Comments on the Consent Agenda

Commissioner Sargent expressed support for Item 8I regarding the Settlement of
Workers' Compensation Claim for Michael Bakaysa.

Mayor Partington voiced support of Item 8C regarding the Bid Award for the Water
Reclamation Facility Ultra-Violet Disinfection Conversion and the state money that
helped fund the project, and Item 8D regarding the Work Authorization for the
Construction Administrative Services for the Fleming Avenue Drainage project.

Item #9 – Public Hearings

Mayor Partington opened the Public Hearings.

Item #9A – Land Development Code Amendment, Houses of Worship Conditions

City Clerk Susan C. Dauderis read by title only:

ORDINANCE NO. 2024-26
AN ORDINANCE AMENDING CHAPTER 2, DISTRICT AND GENERAL
REGULATIONS, ARTICLE IV, CONDITIONAL AND SPECIAL EXCEPTION
REGULATIONS, SECTION 2-57, CRITERIA FOR REVIEW OF SPECIFIC

CONDITIONAL AND SPECIAL EXCEPTION, SUBSECTION (37), HOUSES OF WORSHIP, OF THE CITY OF ORMOND BEACH LAND DEVELOPMENT CODE, BY AMENDING THE CONDITIONS FOR HOUSES OF WORSHIP; REPEALING ALL INCONSISTENT ORDINANCES OR PARTS THEREOF; PROVIDING FOR SEVERABILITY; AND SETTING FORTH AN EFFECTIVE DATE.

Mr. Steven Spraker, Planning Director, explained the item was for reduced setback and stated the Planning Board recommended approval.

Mayor Partington noted it was a unanimous approval by the Planning Board and explained there were no projects being proposed, the item was the starting point for any future projects.

**Commissioner Sargent moved, seconded by Commissioner Briley, to approve Ordinance No. 2024-26, on first reading, as read by title only.**

| Call Vote: | | |
|---|---|---|
| | Commissioner Tolland | Yes |
| | Commissioner Sargent | Yes |
| | Commissioner Persis | Yes |
| | Commissioner Briley | Yes |
| Carried. | Mayor Partington | Yes |

<u>Item #9B – Bradford Lakes, Final Plat</u>

City Clerk Susan C. Dauderis read by title only:

ORDINANCE NO. 2024-27
AN ORDINANCE APPROVING THE FINAL PLAT FOR THE "BRADFORD LAKES" SUBDIVISION, SHOWN WITHIN PHASE 4 OF THE PLANTATION OAKS PLANNED RESIDENTIAL DEVELOPMENT; ESTABLISHING CONDITIONS AND EXPIRATION DATE OF APPROVAL; AND SETTING FORTH AN EFFECTIVE DATE.

Mr. Spraker explained the item was for the final plat for the Bradford Lakes subdivision located within the Plantation Oaks Planned Residential Development and stated the Planning Board unanimously recommended approval.

**Commissioner Sargent moved, seconded by Commissioner Persis, to approve Ordinance No. 2024-27, on first reading, as read by title only.**

| Call Vote: | | |
|---|---|---|
| | Commissioner Sargent | Yes |
| | Commissioner Persis | Yes |
| | Commissioner Briley | Yes |
| | Commissioner Tolland | Yes |
| Carried. | Mayor Partington | Yes |

<u>Item #9C – Bradford Park, Final Plat</u>

City Clerk Susan C. Dauderis read by title only:

ORDINANCE NO. 2024-28
AN ORDINANCE APPROVING THE FINAL PLAT FOR THE "BRADFORD PARK" SUBDIVISION; ESTABLISHING CONDITIONS AND EXPIRATION DATE OF APPROVAL; AND SETTING FORTH AN EFFECTIVE DATE.

**Commissioner Briley moved, seconded by Commissioner Sargent, to approve Ordinance No. 2024-28, on first reading, as read by title only.**

| Call Vote: | | |
|---|---|---|
| | Commissioner Persis | Yes |
| | Commissioner Briley | Yes |
| | Commissioner Tolland | Yes |
| | Commissioner Sargent | Yes |
| Carried. | Mayor Partington | Yes |

<u>Item #9D – RidgeHaven Subdivision, Street Name Changes</u>

City Clerk Susan C. Dauderis read by title only:

ORDINANCE NO. 2024-29
AN ORDINANCE CHANGING THE NAME OF "HALIFAX STREET" TO
"CLIFFHAVEN COURT", AND "MATANZAS STREET" TO "RIDGEHAVEN
AVENUE", SAID STREETS BEING LOCATED IN THE RIDGEHAVEN
SUBDIVISION AREA; REPEALING ALL INCONSISTENT ORDINANCES
OR PARTS THEREOF; PROVIDING FOR TRANSMITTAL AND
RECORDING IN THE PUBLIC RECORDS OF VOLUSIA COUNTY; AND
SETTING FORTH AN EFFECTIVE DATE.

**Commissioner Sargent moved, seconded by Commissioner Persis, to approve
Ordinance No. 2024-29, on first reading, as read by title only.**

| Call Vote: | Commissioner Briley | Yes |
|---|---|---|
| | Commissioner Tolland | Yes |
| | Commissioner Sargent | Yes |
| | Commissioner Persis | Yes |
| Carried. | Mayor Partington | Yes |

Item #9E – 1340 West Granada Blvd, Lowe's Special Exception for Outdoor Activity

City Clerk Susan C. Dauderis read by title only:

RESOLUTION NO. 2024-133
A RESOLUTION AUTHORIZING THE EXECUTION AND ISSUANCE OF A
DEVELOPMENT ORDER FOR A SPECIAL EXCEPTION TO ALLOW
OUTDOOR ACTIVITY TO INCLUDE THE PERMANENT OUTDOOR
STORAGE, DISPLAY, AND SALES OF MERCHANDISE AT THE LOWES
HOME IMPROVEMENT STORE LOCATED AT 1340 WEST GRANADA
BOULEVARD; ESTABLISHING CONDITIONS AND EXPIRATION DATE
OF APPROVAL; AND SETTING FORTH AN EFFECTIVE DATE.

Mr. Spraker explained the Special Exception for Lowe's for their outdoor activity and
displays. He reviewed the history of the Special Exception, and the updated proposal
since the last time it was brought before the City Commission.

Mr. Joey Posey, 420 South Nova Road, noted he was the attorney for the applicant and
reviewed the updated plan and updated landscaping. He stated Lowes was very
responsive to the City Commissions requests and understood their concerns.

Commissioner Tolland stated she spoke with Mr. Posey regarding the proposed plans
and appreciated the updated landscaping. She inquired if there were concerns regarding
pedestrian safety; whereby, Mr. Roger Strcula, Upham Engineering, explained there
were minimal parking spaces along the building, therefore pedestrian safety was not a
concern.

Commissioner Persis indicated she spoke with Mr. Posey and thanked him for the
updates to the plan.

Commissioner Sargent discussed his concerns regarding future change of management
and noted his hope of better communication between the store managers regarding the
special exception.

Commissioner Briley expressed concerns regarding the grills, lawnmowers, and plants
for sale outside of the store, noting the continued violations.

Mr. Posey stated it was a delicate balance for the store to promote the sale of their
products and put all the product behind the fencing.

Commissioner Sargent stated he was supportive of items in front of the store to promote
sales. He thanked Lowe's for working with the city to become compliant with the Special
Exception.

Commissioner Briley voiced concerns with the Special Exception, noting it was a Special
Exception and Lowe's had violated the development order.

Mr. Posey expressed understanding of the concerns, noting he would pass them along.

Commissioner Tolland inquired if all product was contained within the painted squares in front of Lowe's would Commissioner Briley approve; whereby, Commissioner Briley stated yes, if the products were contained in the squares, and expressed concerns due to prior actions. Commissioner Tolland emphasized compliance, noting other smaller stores had the same special exception.

**Commissioner Sargent moved, seconded by Commissioner Persis, to approve Resolution No. 2024-133, as read by title only.**

| Call Vote: | | |
|---|---|---|
| | Commissioner Tolland | Yes |
| | Commissioner Sargent | Yes |
| | Commissioner Persis | Yes |
| | Commissioner Briley | Yes |
| Carried. | Mayor Partington | Yes |

Mayor Partington closed the Public Hearings.

Item #10 – Resolutions

Item #10A – Airport Rates and Fees

City Clerk Susan C. Dauderis read by title only:

RESOLUTION NO. 2024-154
A RESOLUTION ESTABLISHING FUEL FLOWAGE FEES, LANDING FEES, AND AIRCRAFT TIE DOWN FEES AT THE ORMOND BEACH MUNICIPAL AIRPORT; AND SETTING FORTH AN EFFECTIVE DATE.

Mr. Brian Rademacher, Economic Development Director, reviewed the Ormond Beach Municipal Airport's budget deficit, the advantage of the proposed landing fees, and proposed agreement with Vector Airport Systems, LLC, noting the agreement was Item 10B. He reviewed the proposed landing fees and where the fees would be applied. He reviewed the purchasing process utilized for the agreement with Vector Airport Systems, LLC.

Mr. Douglas Shinn, 2806 South Peninsula Drive, Daytona Beach, 32118, discussed unintended consequences, including the potential for grants provided to the airport to be taken away due to a decrease in number of operations as a result of the landing fees. He noted the number of pilots who would utilize other airports without landing fees, which could affect other local non-airport related businesses.

Mr. Daryl Hickman, 323 River Vale Lane, stated there was a call for a boycott of any airport that imposes the fees. He stated he owned a business at the airport and would be directly impacted, and the fee would also affect the local business economy. He inquired if the fees would stop when the airport debt was paid off or if the fees were indefinite.

Mr. Patrick Murphy, 678 Swan Range Road, Orange City, 32763, stated he was speaking as Vice President of Sunrise Aviation and stated he had a neutral position on it as his company was exempt from the landing fees. He noted he understood the city's need for the landing fees, that pilot aviation was already expensive, and worried about the added fees. He explained the concern as the airport's fueler, there may be a decrease in fuel purchases due to a decrease in landings.

Mr. Terence Perkins, 108 Heritage Circle, expressed concerns regarding safety and potential pull of grants for funding due to lack of landings caused by the fees.

Mr. Richard Isherwood, 1531 Poplar Drive, reviewed the airport funding grants and discussed other funding options for the airport.

Mr. Gordon Arbeitman, 3107 Inishmore Drive, discussed Vector Airport Systems, LLC and noted there were companies that could present to staff the pros and cons of the landing fees before a decision was made.

Ms. Samantha Bowyer, 68 Seacrest Drive, voiced concerns regarding the data collection process for the landing fee calculation and potential safety concerns. She discussed the Federal Aviation Administration's Reauthorization Act of 2024 and potential violations of the act with the landing fees. She noted the fees would discourage student pilots as the fees would be passed onto their training cost. She suggested the city focus on attracting

businesses to fill the empty space of the vacant golf course next to the airport, and promote events such as air and car shows.

Mr. Tony Arnaoutis, 17 Tiffany Circle, discussed the aviation fees internationally and locally, and requested the Commission reconsider adding the landing fees.

Mr. Daly voiced concerns with the Daytona flight schools, and noted the majority of the flights out of the airport were from the flight schools. He noted the landing fees would be put onto the student's flight training costs. He believed the fees would help the debt without costing the tax payers money.

Mr. Ron Serra, 1761 Mitchell Court, Port Orange, 32128, stated he disagreed with the implementation of the landing fees. He discussed the local economy growth due to the aviation field. He discussed other states who were competing for the Florida aviation business. He stated he was a flight instructor and students were discussing landing fees being add to their tuition costs, noting they discussed looking elsewhere for training.

Mr. Bob Brown, 918 Lake Lindley Drive South, DeLand, 32724, expressed concerns of the landing fees being in the same ordinance as the fuel and tiedown fees. He discussed concerns regarding the exemptions and the collection of the fees.

Mr. Matthew Serra, 1761 Mitchell Court, Port Orange, 32128, discussed his history with aviation. He stated the fees would cause changes in the trainings, as pilots would lessen the number of landings in training sessions. He discussed fees pilots currently face and expressed concerns regarding pilot shortages. He requested an exemption for all aircrafts under 6,000 pounds, noting the precedence from other airports.

Ms. Sharon Serra, 1761 Mitchell Court, Port Orange, 32128, requested the landing fees be removed from the ordinance for further review. She explained her belief was Vector Airport Systems, LLC used standard pricing for all airports instead of customizing the fees to each individual airport based on needs, and felt that was not the correct way to go about it. She discussed the rulings around landing fees.

Mr. David Gall, unlisted address, Port Orange, 32128, reviewed his aviation background and expressed concerns regarding landing fees specifically for flight trainings.

Mr. Terence Anderson, 101 Ray Lake Drive, discussed the importance of flight schools practicing landings for safety reasons.

Mr. Michael Galluzzi, 1008 Flying M Court, Edgewater, 32132, indicated he worked for the NASA Research Institute, specializing in advanced air mobility. He shared some research from surrounding airports and across Central Florida. He expressed concerns regarding the landing fees, including unwarranted surveillance. He stated he would like to share a proposal for a public/private partnership and would provide further details.

Mr. Andre Maye, 2002 Yellowfin Drive, Port Orange, 32128, stated the United States of America was number one in aviation trainings and noted comparison to international fees. He expressed concerns regarding how the fees would impact flight schools.

Mr. Robert Jex, 55 Front Street, Palm Coast, 32137, stated the proposal would not improve safety, pilot production, or long-term funds. He stated there were other positive ways to generate funds, including attracting new aviation businesses.

Mayor Partington stated he received a letter from Ms. Stacy Heaton, the Southern Regional Manager for Aircraft Owners and Pilots Association (AOPA), opposing the landing fees.

**Commissioner Sargent moved, seconded by Commissioner Briley, to approve Resolution No. 2024-154, as read by title only, for discussion purposes.**

Commissioner Sargent discussed the airport's debt and inquired if the landing fees were presented to the Aviation Advisory Board; whereby, Mr. Rademacher stated it was not brought to the Aviation Advisory Board but would be discussed with them at their next scheduled meeting. Commissioner Sargent stated the advisory board should make a recommendation before the item was brought before the Commission.

Commissioner Sargent and Commissioner Briley withdrew their motion and second respectively for Resolution No. 2024-154.

**Commissioner Sargent moved, seconded by Commissioner Persis, to table Items 10A and 10B until they were brought before the Aviation Advisory Board for review.**

Commissioner Persis stated she had many questions and would like more time to learn about the issues.

Commissioner Tolland indicated she learned information during the comments and would need answers to questions she had.

Commissioner Sargent and Commissioner Tolland promoted citizens to apply online for the city's advisory boards.

Commissioner Briley agreed the Aviation Advisory Board needed to review the item and with Mr. Daly's comments regarding tax payer dollars not supporting the airport.

| Call Vote: | | |
|---|---|---|
| | Commissioner Persis | Yes |
| | Commissioner Briley | Yes |
| | Commissioner Tolland | Yes |
| | Commissioner Sargent | Yes |
| Carried. | Mayor Partington | Yes |

Item #10C – Opioid Abatement Advisory Board Appointments

City Clerk Susan C. Dauderis read by title only:

RESOLUTION NO. 2024-159
A RESOLUTION APPOINTING A MEMBER AND AN ALTERNATE MEMBER TO SERVE ON THE OPIOID ABATEMENT FUNDING ADVISORY BOARD; ESTABLISHING TERM AND CONDITIONS OF SERVICE; AND SETTING FORTH AN EFFECTIVE DATE.

Mayor Partington explained he would like to continue his service through the end of his mayoral obligations.

Commissioner Briley nominated Commissioner Tolland for the alternate role; whereby, Commissioner Persis agreed.

Commissioner Tolland expressed support of serving as the alternate.

**Commissioner Briley moved, seconded by Commissioner Persis, to approve Resolution No. 2024-159, as read by title only, with Mayor Partington as the primary member and Commissioner Tolland as the alternate member.**

Ms. Susan Dauderis, City Clerk, explained Volusia County indicated Mayor Partington could serve through October, a new primary member could be named to replace him when he leaves, and an alternate member could be named.

Mayor Partington stated he believed he could fill the role as primary member until his mayoral duties were completed, then the item could be brought back to the Commission to fill the vacancy of the primary member.

| Call Vote: | | |
|---|---|---|
| | Commissioner Briley | Yes |
| | Commissioner Tolland | Yes |
| | Commissioner Sargent | Yes |
| | Commissioner Persis | Yes |
| Carried. | Mayor Partington | Yes |

Item #10D – Intent to Award RFP 2024-29 Property, Liability and Workers' Compensation Insurance

City Clerk Susan C. Dauderis read by title only:

RESOLUTION NO. 2024-160
A RESOLUTION ACCEPTING A PROPOSAL FROM FOUNDATION RISK PARTNERS PUBLIC ENTITY SERVICES, FOR THE PROVISION OF PROPERTY, LIABILITY AND WORKERS' COMPENSATION INSURANCE

FOR VARIOUS LINES OF INSURANCE COVERAGE THROUGH
VARIOUS INSURANCE CARRIERS; AUTHORIZING THE EXECUTION
OF DOCUMENTS RELATIVE THERETO; AUTHORIZING PAYMENT
THEREFOR; AND SETTING FORTH AN EFFECTIVE DATE.

Mr. Kelly McGuire, Finance Director, explained the item was regarding the two proposals
received during the city's Request for Proposal (RFP), one from Brown & Brown
Insurance Services, Inc. (Brown & Brown) and one from Foundation Risk Partners Public
Entity Services (Foundation Risk Partners). She stated the prices from each proposal,
noting neither included flood insurance information due to rates not being available at
the time of the proposal openings. She stated there were four coverages that Foundation
Risk Partners did not provide in their proposal and indicated they could assume existing
coverages. She discussed the qualifications of the firms and underlying insurance trusts;
all were highly qualified, noting both companies were considered equal in qualifications.
She stated staff recommended Brown & Brown due to the lower price.

Commissioner Tolland and Commissioner Sargent abstained from the vote due to
potential conflicts of interest.

Representative Leek explained he was speaking in his capacity as Chief Legal Officer of
Foundation Risk Partners and discussed the company. He expressed concerns
regarding the proposal from Brown & Brown not including the affidavit required by
Section 287.138 of Florida Statutes. He stated by Statute the Brown & Brown proposal
should be deemed unresponsive. He introduced other members of his team, including
Ms. Jo Thacker, Mr. David Lodwick, and Mr. Alan Florez of Foundation Risk Partners.

Ms. Jo Thacker, 780 West Granada Boulevard, stated there was a whereas clause in the
resolution stating a second alternative was neither authorized nor consistent with the
RFP, and expressed concerns with the RFP conflicting the Code of Ordinances
referenced within the resolution. She stated concerns with the Code of Ordinances not
referencing if forms and affidavits could be submitted after the proposal was opened.

Mr. David Lodwick, 780 West Granada Boulevard, reviewed proposal "Option 2" that
was provided to the Commission and reviewed the option in detail.

Mr. Alan Florez, 780 West Granada Boulevard, reiterated Representative Leeks
statement regarding the affidavit and bid fairness. He reviewed the handout provided to
the Commission and discussed the risk factors related to hurricanes.

Commissioner Briley expressed concerns regarding compliance; whereby, Mayor
Partington believed everything complied now if accepted.

Ms. McGuire indicated everything was in compliance, noting the affidavit was included in
the agenda packet.

Mayor Partington noticed the notary stamp and signature dates of expiration did not
match in the packet and commented that could be a clerical error.

Commissioner Sargent inquired when the bids were due; whereby, Ms. McGuire stated
June 9, 2024, but was extended a week due to additional questions. Commissioner
Sargent inquired if policy documents were up to date within the packet, as there was a
policy provided that had expired dates; whereby, Ms. McGuire assured the Commission
the policy was within date and would renew in 2025. He expressed concerns regarding
the storm policy limits.

Commissioner Tolland expressed support of the competitive bidding process, noting
Brown & Brown's proposal was $300,000 less than the prior year.

Commissioner Briley expressed concerns regarding the shared policy limits.

Commissioner Persis inquired if Mr. Randy Hayes, City Attorney, had anything to add;
whereby, Mr. Hayes stated what was presented was the recommendation from the
Insurance Program Committee. He indicated historically and customarily during the
presentation of the bids, it was allowed for the vendor to provide clarification or affidavits
if needed. He noted the item was the Committee's best recommendation based on the
RFP. He discussed what would need to happen if the Commission wished to proceed
with Brown & Brown or if they chose to proceed with Foundation Risk Partners.

Mr. Steve Farmer, Brown & Brown Executive Vice President, reviewed his history with the city and Brown & Brown. He discussed the proposed insurance trusts and the shared policies. He discussed the proposal and improvement in the insurance market, his connections which helped to lower the rate, and noted the Insurance Program Committee recommended their proposal.

Commissioner Sargent reviewed prior prices of the city's insurance policies, increasing through the years.

Mayor Partington inquired about the compliance of the affidavit; whereby, Ms. McGuire stated the purchasing department addressed the issue of the affidavit to bring the bid into compliance. He asked what the Committee's thought was on the shared limit versus named storm limit; whereby, Ms. McGuire stated the city's RFP solicited proposals for the same coverage levels, and the Foundation Risk Partners alternate proposal was not consistent with the current insurance program, therefore the Committee only considered the primary Foundation Risk Partners proposal.

Mayor Partington stated the city only wanted the best for the residents. He reviewed other municipalities utilizing Foundation Risk Partners and questioned why the city would not consider proposals outside of the scope of service; whereby, Ms. McGuire stated the RFP called for a specific scope of service, which Foundation Risk Partners' alternate proposal did not match.

Commissioner Persis expressed concerns regarding the storm policy.

Commissioner Tolland stated needs change and inquired if the city could accept proposals outside of scope of service.

Ms. Shanahan stated the RFP was approved by the Commission before getting sent out to bid with the scope of service to maintain the same coverages.

Mayor Partington stated Foundation Risk Partners had the lowest cost with the alternate proposal.

Commissioner Tolland inquired about the affidavit being submitted late; whereby, Mr. Hayes stated it was a matter of interpretation, noting the Statutes required an affidavit and one was provided, noting past bids were accepted with the late submission of the affidavit. He explained it was up to the Commission to agree or disagree with the recommendation of the Insurance Program Committee. He reviewed the process of the Committee and what was needed from the Commission if they agreed or disagreed with the recommendation.

Mayor Partington inquired about the shared limit versus named storm limit; whereby, Mr. Lodwick stated it depended on the circumstances. Mr. Lodwick discussed issues with shared limit coverages and reviewed the named storm coverage with the dedicated limit.

Mr. Farmer stated the shared limit program was very transparent, noting it was reviewed every year and was never close to being exceeded.

Commissioner Tolland inquired how the shared limit versus dedicated limit effect the level of service during an event; whereby, Mr. Farmer indicated each insurance company handles events differently, noting during any event he was always there to assist the city.

Mr. Lodwick discussed the requirements and process of the dedicated limit coverage and assessments during events.

Mr. Farmer inquired if there were any issues with the current providers; whereby, Mr. Hayes stated there were no issues in coverage or level of service of the existing provider.

Commissioner Sargent inquired when the city last sent insurance out to bid; whereby, Mr. Farmer stated he participated in many bids for insurance with the city.

Ms. McGuire stated 2017 was the last time the Agent of Record for insurance went out to bid.

Commissioner Tolland inquired if there were only two bids every time; whereby, Ms. McGuire stated Brown & Brown was always responsive to the RFP's.

Mayor Partington expressed support of both companies, noting he's worked with both through the city and through the Florida League of Cities. He stated as the agreement was for a year he was comfortable going with the cheaper proposal from Foundation Risk Partners.

Commissioner Briley inquired if the proposal was cheaper by $40,000; whereby, Ms. McGuire stated that was correct but the four coverages not quoted would need to be assumed.

Commissioner Persis expressed support of the lower proposal.

**Commissioner Briley moved, seconded by Commissioner Persis, to approve Resolution No. 2024-160, as read by title only, for discussion purposes.**

Mr. Hayes inquired on the Commissions stance of the affidavit; whereby, Mayor Partington stated he believed the bid to be deemed non-compliant due to the missing affidavit upon bid opening.

Mayor Partington stated the third whereas clause should be amended as well, since both companies were qualified and able, noting the disagreement was the shared limit versus the named storm limit. He discussed the Florida League of Cities insurance program.

Mr. Hayes requested a recess to amend the resolution in favor of Foundation Risk Partners and include the requested amendments.

Mayor Partington recessed the City Commission meeting at 10:11 p.m.

Mayor Partington reconvened the City Commission meeting at 10:38 p.m.

Mr. Hayes explained there was a revised resolution, noting the incorporated findings discussed.

Mr. Hayes read the change in the resolution title:

> A RESOLUTION ACCEPTING A PROPOSAL FROM FOUNDATION RISK PARTNERS PUBLIC ENTITY SERVICES, FOR THE PROVISION OF PROPERTY, LIABILITY AND WORKERS' COMPENSATION INSURANCE FOR VARIOUS LINES OF INSURANCE COVERAGE…

Mr. Hayes reviewed the revised whereas clauses that changed from Resolution 2024-160.

Commissioner Briley and Commissioner Persis withdrew their motion and second, respectively.

Mr. Hayes requested a new Resolution number for the updated resolution; whereby, Ms. Dauderis stated Resolution number 2024-161 would be assigned.

**Commissioner Briley moved, seconded by Commissioner Persis, to approve Resolution No. 2024-161, as amended to award the bid to Foundation Risk Partners.**

Commissioner Sargent inquired if there was anything needed by the Commission regarding the policies that would be assumed by Foundation Risk Partners; whereby, Ms. McGuire stated the policies were included in the updated Resolution.

Commissioner Briley, Commissioner Persis, and Mayor Partington expressed support of both agencies.

Call Vote:

| | |
|---|---|
| Commissioner Sargent | Abstained |
| Commissioner Persis | Yes |
| Commissioner Briley | Yes |
| Commissioner Tolland | Abstained |
| Mayor Partington | Yes |

Carried.

# FORM 8B   MEMORANDUM OF VOTING CONFLICT FOR COUNTY, MUNICIPAL, AND OTHER LOCAL PUBLIC OFFICERS

| LAST NAME—FIRST NAME—MIDDLE NAME | NAME OF BOARD, COUNCIL, COMMISSION, AUTHORITY, OR COMMITTEE |
|---|---|
| Tolland, Loretta (Lori) RiehL | City of Ormond Beach Commission |

MAILING ADDRESS
5 Broadriver Rd

THE BOARD, COUNCIL, COMMISSION, AUTHORITY OR COMMITTEE ON WHICH I SERVE IS A UNIT OF:

☑ CITY   ☐ COUNTY   ☐ OTHER LOCAL AGENCY

CITY
Ormond Beach , FL 32174   COUNTY

NAME OF POLITICAL SUBDIVISION:
Commissioner zone one

DATE ON WHICH VOTE OCCURRED
Sept 18, 2024

MY POSITION IS:
☑ ELECTIVE   ☐ APPOINTIVE

## WHO MUST FILE FORM 8B

This form is for use by any person serving at the county, city, or other local level of government on an appointed or elected board, council, commission, authority, or committee. It applies to members of advisory and non-advisory bodies who are presented with a voting conflict of interest under Section 112.3143, Florida Statutes.

Your responsibilities under the law when faced with voting on a measure in which you have a conflict of interest will vary greatly depending on whether you hold an elective or appointive position. For this reason, please pay close attention to the instructions on this form before completing and filing the form.

## INSTRUCTIONS FOR COMPLIANCE WITH SECTION 112.3143, FLORIDA STATUTES

A person holding elective or appointive county, municipal, or other local public office MUST ABSTAIN from voting on a measure which would inure to his or her special private gain or loss. Each elected or appointed local officer also MUST ABSTAIN from knowingly voting on a measure which would inure to the special gain or loss of a principal (other than a government agency) by whom he or she is retained (including the parent, subsidiary, or sibling organization of a principal by which he or she is retained); to the special private gain or loss of a relative; or to the special private gain or loss of a business associate. Commissioners of community redevelopment agencies (CRAs) under Sec. 163.356 or 163.357, F.S., and officers of independent special tax districts elected on a one-acre, one-vote basis are not prohibited from voting in that capacity.

For purposes of this law, a "relative" includes only the officer's father, mother, son, daughter, husband, wife, brother, sister, father-in-law, mother-in-law, son-in-law, and daughter-in-law. A "business associate" means any person or entity engaged in or carrying on a business enterprise with the officer as a partner, joint venturer, coowner of property, or corporate shareholder (where the shares of the corporation are not listed on any national or regional stock exchange).

\*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*

## ELECTED OFFICERS:

In addition to abstaining from voting in the situations described above, you must disclose the conflict:

PRIOR TO THE VOTE BEING TAKEN by publicly stating to the assembly the nature of your interest in the measure on which you are abstaining from voting; *and*

WITHIN 15 DAYS AFTER THE VOTE OCCURS by completing and filing this form with the person responsible for recording the minutes of the meeting, who should incorporate the form in the minutes.

\*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*

## APPOINTED OFFICERS:

Although you must abstain from voting in the situations described above, you are not prohibited by Section 112.3143 from otherwise participating in these matters. However, you must disclose the nature of the conflict before making any attempt to influence the decision, whether orally or in writing and whether made by you or at your direction.

IF YOU INTEND TO MAKE ANY ATTEMPT TO INFLUENCE THE DECISION PRIOR TO THE MEETING AT WHICH THE VOTE WILL BE TAKEN:

• You must complete and file this form (before making any attempt to influence the decision) with the person responsible for recording the minutes of the meeting, who will incorporate the form in the minutes. (Continued on page 2)

**APPOINTED OFFICERS (continued)**

- A copy of the form must be provided immediately to the other members of the agency.

- The form must be read publicly at the next meeting after the form is filed.

IF YOU MAKE NO ATTEMPT TO INFLUENCE THE DECISION EXCEPT BY DISCUSSION AT THE MEETING:

- You must disclose orally the nature of your conflict in the measure before participating.

- You must complete the form and file it within 15 days after the vote occurs with the person responsible for recording the minutes of the meeting, who must incorporate the form in the minutes. A copy of the form must be provided immediately to the other members of the agency, and the form must be read publicly at the next meeting after the form is filed.

## DISCLOSURE OF LOCAL OFFICER'S INTEREST

I, Loretta (Lori) Tolland , hereby disclose that on Sept 18 , 20 24 :

(a) A measure came or will come before my agency which (check one or more)

___ inured to my special private gain or loss;

___ inured to the special gain or loss of my business associate, _____ ;

✓ inured to the special gain or loss of my relative, Christopher Tolland ;

___ inured to the special gain or loss of _____ , by

whom I am retained; or

___ inured to the special gain or loss of _____ , which

is the parent subsidiary, or sibling organization or subsidiary of a principal which has retained me.

(b) The measure before my agency and the nature of my conflicting interest in the measure is as follows:

Resolution NO 2024-160 - Accepting a proposal from Brown & Brown Insurance Services -

My son works for a competing insurance broker.

If disclosure of specific information would violate confidentiality or privilege pursuant to law or rules governing attorneys, a public officer, who is also an attorney, may comply with the disclosure requirements of this section by disclosing the nature of the interest in such a way as to provide the public with notice of the conflict.

Date Filed Sept 18, 2024

Signature _Loretta R Tolland_

NOTICE: UNDER PROVISIONS OF FLORIDA STATUTES §112.317, A FAILURE TO MAKE ANY REQUIRED DISCLOSURE CONSTITUTES GROUNDS FOR AND MAY BE PUNISHED BY ONE OR MORE OF THE FOLLOWING: IMPEACHMENT, REMOVAL OR SUSPENSION FROM OFFICE OR EMPLOYMENT, DEMOTION, REDUCTION IN SALARY, REPRIMAND, OR A CIVIL PENALTY NOT TO EXCEED $10,000.

CE FORM 8B – EFF. 11/2013
Adopted by reference in Rule 34-7.010(1)(f), F.A.C.

PAGE 2

# FORM 8B   MEMORANDUM OF VOTING CONFLICT FOR COUNTY, MUNICIPAL, AND OTHER LOCAL PUBLIC OFFICERS

| | |
|---|---|
| LAST NAME—FIRST NAME—MIDDLE NAME<br>*Sargent- Travis - Craig* | NAME OF BOARD, COUNCIL, COMMISSION, AUTHORITY, OR COMMITTEE<br>*Commission* |
| MAILING ADDRESS<br>*406 N. Beach St.* | THE BOARD, COUNCIL, COMMISSION, AUTHORITY OR COMMITTEE ON WHICH I SERVE IS A UNIT OF:<br>☑ CITY      ☐ COUNTY      ☐ OTHER LOCAL AGENCY |
| CITY<br>*Ormond Beach*  COUNTY<br>*Volusia* | NAME OF POLITICAL SUBDIVISION: |
| DATE ON WHICH VOTE OCCURRED<br>*09-18-24* | MY POSITION IS:<br>☑ ELECTIVE      ☐ APPOINTIVE |

## WHO MUST FILE FORM 8B

This form is for use by any person serving at the county, city, or other local level of government on an appointed or elected board, council, commission, authority, or committee. It applies to members of advisory and non-advisory bodies who are presented with a voting conflict of interest under Section 112.3143, Florida Statutes.

Your responsibilities under the law when faced with voting on a measure in which you have a conflict of interest will vary greatly depending on whether you hold an elective or appointive position. For this reason, please pay close attention to the instructions on this form before completing and filing the form.

## INSTRUCTIONS FOR COMPLIANCE WITH SECTION 112.3143, FLORIDA STATUTES

A person holding elective or appointive county, municipal, or other local public office MUST ABSTAIN from voting on a measure which would inure to his or her special private gain or loss. Each elected or appointed local officer also MUST ABSTAIN from knowingly voting on a measure which would inure to the special gain or loss of a principal (other than a government agency) by whom he or she is retained (including the parent, subsidiary, or sibling organization of a principal by which he or she is retained); to the special private gain or loss of a relative; or to the special private gain or loss of a business associate. Commissioners of community redevelopment agencies (CRAs) under Sec. 163.356 or 163.357, F.S., and officers of independent special tax districts elected on a one-acre, one-vote basis are not prohibited from voting in that capacity.

For purposes of this law, a "relative" includes only the officer's father, mother, son, daughter, husband, wife, brother, sister, father-in-law, mother-in-law, son-in-law, and daughter-in-law. A "business associate" means any person or entity engaged in or carrying on a business enterprise with the officer as a partner, joint venturer, coowner of property, or corporate shareholder (where the shares of the corporation are not listed on any national or regional stock exchange).

\*         \*         \*         \*         \*         \*         \*         \*         \*         \*         \*         \*         \*         \*         \*         \*

## ELECTED OFFICERS:

In addition to abstaining from voting in the situations described above, you must disclose the conflict:

PRIOR TO THE VOTE BEING TAKEN by publicly stating to the assembly the nature of your interest in the measure on which you are abstaining from voting; *and*

WITHIN 15 DAYS AFTER THE VOTE OCCURS by completing and filing this form with the person responsible for recording the minutes of the meeting, who should incorporate the form in the minutes.

\*         \*         \*         \*         \*         \*         \*         \*         \*         \*         \*         \*         \*         \*         \*         \*

## APPOINTED OFFICERS:

Although you must abstain from voting in the situations described above, you are not prohibited by Section 112.3143 from otherwise participating in these matters. However, you must disclose the nature of the conflict before making any attempt to influence the decision, whether orally or in writing and whether made by you or at your direction.

IF YOU INTEND TO MAKE ANY ATTEMPT TO INFLUENCE THE DECISION PRIOR TO THE MEETING AT WHICH THE VOTE WILL BE TAKEN:

• You must complete and file this form (before making any attempt to influence the decision) with the person responsible for recording the minutes of the meeting, who will incorporate the form in the minutes.  (Continued on page 2)

**APPOINTED OFFICERS (continued)**

- A copy of the form must be provided immediately to the other members of the agency.

- The form must be read publicly at the next meeting after the form is filed.

IF YOU MAKE NO ATTEMPT TO INFLUENCE THE DECISION EXCEPT BY DISCUSSION AT THE MEETING:

- You must disclose orally the nature of your conflict in the measure before participating.

- You must complete the form and file it within 15 days after the vote occurs with the person responsible for recording the minutes of the meeting, who must incorporate the form in the minutes. A copy of the form must be provided immediately to the other members of the agency, and the form must be read publicly at the next meeting after the form is filed.

---

## DISCLOSURE OF LOCAL OFFICER'S INTEREST

I, _Travis Sargent_____, hereby disclose that on ___Sept. 18_____, 20 _24_ :

(a) A measure came or will come before my agency which (check one or more)

___ inured to my special private gain or loss;

_✓_ inured to the special gain or loss of my business associate, _Foundation Risk Partners_____;

___ inured to the special gain or loss of my relative,_____ ;

___ inured to the special gain or loss of _____ , by

whom I am retained; or

___ inured to the special gain or loss of _____ , which

is the parent subsidiary, or sibling organization or subsidiary of a principal which has retained me.

(b) The measure before my agency and the nature of my conflicting interest in the measure is as follows:

If disclosure of specific information would violate confidentiality or privilege pursuant to law or rules governing attorneys, a public officer, who is also an attorney, may comply with the disclosure requirements of this section by disclosing the nature of the interest in such a way as to provide the public with notice of the conflict.

_9/18/24_____

Date Filed                                          Signature

---

NOTICE: UNDER PROVISIONS OF FLORIDA STATUTES §112.317, A FAILURE TO MAKE ANY REQUIRED DISCLOSURE CONSTITUTES GROUNDS FOR AND MAY BE PUNISHED BY ONE OR MORE OF THE FOLLOWING: IMPEACHMENT, REMOVAL OR SUSPENSION FROM OFFICE OR EMPLOYMENT, DEMOTION, REDUCTION IN SALARY, REPRIMAND, OR A CIVIL PENALTY NOT TO EXCEED $10,000.

CE FORM 8B - EFF. 11/2013
Adopted by reference in Rule 34-7.010(1)(f), F.A.C.

PAGE 2

<u>Item #11 – Reports, Suggestions, Requests</u>

<u>Events, Updates, Congratulations, and Requests</u>
Ms. Shanahan noted upcoming meetings and events.

Commissioner Sargent reviewed upcoming events and events he attended, including the 9/11 and Crime Stoppers events.

Commissioner Persis discussed upcoming events, events she attended, and thanked staff for their work with an issue that occurred.

Commissioner Briley reviewed events he attended.

Commissioner Tolland congratulated Ms. Rebostini and Representative Leek for their service. She discussed events she attended, upcoming events, and provided updates from Ormond Beach MainStreet. She requested an education push on social media regarding code enforcement regulations. She suggested a thin black trim to be used in the city landscaping with mulch to help contain it and prevent runoff into the streets.

Mayor Partington discussed the budget, highlighting the public safety items, and noted the city was the second lowest tax rate in Volusia County. He thanked those who participated in the 9/11 event.

<u>Tomoka State Park</u>
Commissioner Briley inquired if there was any interest by the Commission to write a letter from the Commission as a whole to the State regarding the proposed paving of Tomoka State Park; whereby, Mayor Partington and Commissioner Sargent stated they had no interest in sending a letter.

Commissioner Tolland stated she would support a letter requesting a more permanent permeable product due to flooding concerns.

<u>Item #12 – Adjournment</u>

The meeting was adjourned at 11:02 p.m.

APPROVED:    October 2, 2024


BY:    _____
                          Bill Partington, Mayor

ATTEST:


_____
Susan Carroll Dauderis,
City Clerk

# EXHIBIT THREE

**AGREEMENT FOR SERVICES BETWEEN**
**Halifax Humane Society, Inc.**
**AND**
**The Impounding agency**

**This Services Agreement** ("Agreement") is hereby entered into by and between the **Halifax Humane Society, Inc.**, a Florida non-profit corporation, with its principal address at 2364 West LPGA Boulevard, Daytona Beach, Florida 32124 ("Humane Society"), and the **Impounding agency**, a municipal corporation, with its primary address at ("Impounding agency address").

**WHEREAS,** in order to enforce the ordinances of the Impounding agency and the laws of the State of Florida with respect to stray animals, the Impounding agency desires to deliver stray animals to the Humane Society for the humane impoundment and humane disposition of said animals; and

**WHEREAS,** the Humane Society is organized for the purpose, among others, of preventing cruelty to animals and is interested in assuring that impounded animals are sheltered in a humane manner and those which must be destroyed, be so destroyed humanely.

**NOW, THEREFORE,** for and in consideration of the mutual covenants, conditions and provisions herein contained, it is expressly agreed and understood as follows:

1.    **TERM**:  This Agreement will take effect on the 1st day of October 2024, and will remain in full force and effect for an initial twelve (12) month period ending on midnight between September 30, 2025. The parties shall have the option to extend the contract or enter into contract negotiations if they so desire. This contract may be renewed by the Impounding agency for up to three (3) twelve (12) month periods, with a 10% increase of fees per renewal.

2.    **ANIMAL SHELTER, RETURN TO FIELD, AND TRAP, NEUTER, AND RETURN**:

   (a)  The Humane Society will maintain and operate an animal shelter ("Shelter") in a manner adequate for the confinement, remedial treatment, and, if necessary, disposal of stray dogs, cats, or other animals, which may be delivered to the Humane Society from all areas within the jurisdiction of the Impounding Agency, and the Humane Society will furnish, at its sole expense, all supervision, labor, animal food, tools, supplies and other things necessary for the satisfactory performance of the services herein agreed to be provided.  Remedial care will be provided for injured animals during operating hours when there is a staff veterinarian available, at the Humane Society's sole expense.  The Shelter will be operated at 2364 West LPGA Blvd., Daytona Beach, Florida.

   (b)  The Humane Society will provide means to accept all stray dogs and other stray or seized domesticated animals delivered to the Shelter by the Impounding agency's law enforcement personnel, Animal Control Officers, or other designated officers appointed by the Impounding agency for this purpose.  The Humane Society will

provide Return to Field (RTF) for unsterilized cats following national animal welfare organization recommendations for the most humane practices with addressing cat overpopulation. The Humane Society will accept wild animals and livestock only if it has the ability and facilities to impound and control these animals, and the decision to accept or reject such animals will be solely within the discretion of the Humane Society. The Humane Society will require all persons who drop off or report injured or stray animals to the Shelter during the Shelter's normal operating hours to give their names, phone number, and current home and post office addresses and identify the place where the animals involved were located or picked up.

(c)   If the Impounding agency delivers an animal to the Shelter for impoundment discovers such animal bears information indicating ownership of the animal, the impounding agency representative shall take reasonable steps to identify the owner of the animal and contact said owner prior to delivering the animal to the Shelter. The impounding representative shall also provide all contact information gathered and documented attempts of contact for the owner/guardian to Halifax.   Regardless of the foregoing, any animal suspected of being infected with rabies or which has bitten or otherwise exposed any person to rabies, shall not be released to its owner until after such animal has been impounded for a period of ten (10) days and the Volusia Health Department, through its authorized representatives, has expressly approved, in writing, any such release.

(d)  When a stray domestic animal is delivered to the Shelter and is not suspected of having rabies or has not bitten or otherwise exposed any person to rabies, the Humane Society will impound the animal at the Impounding agency's expense for a period of not to exceed three (3) calendar days (unless otherwise provided in this Agreement).   If the owner has not retrieved the animal within the designated holding period, the Humane Society will thereafter, at its own expense, provide for the adoption or humane disposal of the animal in accordance with its routine methods and procedures**.**

(e)  When a stray cat is delivered to the Shelter and is not suspected of having rabies or has not bitten or otherwise exposed any person to rabies, the Humane Society will determine the eligibility of the animal for the RTF Program. After consultation with the Impounding agency, Humane Society will decide whether the cat will be referred for impoundment or RTF and notify the impounding agency. The Impounding agency representative will expressly inform the Humane Society if a cat is brought in as part of the Trap, Neuter and Return Program (TNR). The Humane Society will only perform feline sterilization services for cats brought to the Humane Society by an Animal Control Officer (ACO) or other Impounding agency person designated by the Police Department. Cats brought to the Humane Society by any other person will not be eligible for reimbursement by the Impounding agency. Fees for this service are listed in 3.b. under RTF/TNR Cats. The Impounding agency will only be responsible

for services or procedures that are requested and expressly included in this agreement. The Impounding agency will not pay for any other service or procedure. The RTF/TNR Program requires the following:

i.     The Humane Society and the Impounding agency shall mutually agree on the day(s) of the week that the Impounding agency will bring cats to the designated Humane Society facility. Said schedule shall be subject to change by mutual agreement of the parties. The Impounding agency shall at a minimum have one day reserved each week at a designated Humane Society facility to bring in cats for sterilization.

ii.    Surgeries may be completed at either:
Halifax Humane Society 2364 West LPGA Boulevard Daytona Beach, FL 32124
        -Or-
HHS Redinger Clinic 600 Mason Ave #150 Daytona Beach, FL 32117

Hereafter, Humane Society shall refer to both the location on LPGA Blvd. and Mason Ave.

iii.   All regular sterilizations are the same price for neuters and spays (males and females).  Each surgery includes complimentary ear tipping, FVRCP and rabies vaccines, and anesthesia.  Ear tipping must be completed according to Alley Cat Allies recommendations by removing at least 3/8 of an inch from the top of the left ear.

iv.    If the Impounding agency presents a cat for sterilization and the Humane Society finds the cat has already been sterilized, the Humane Society will provide anesthesia, ear tipping, FVRCP and rabies vaccine at the normal sterilization surgery cost.

v.     Upon presentation of a cat, the Humane Society, at its sole discretion, will determine if the cat is healthy enough to survive surgery and whether or not it should be euthanized.  The Humane Society recognizes that the Impounding agency does not have a licensed veterinarian on staff and does not have the ability to determine whether an animal should be euthanized.

vi.    All cats being returned to the Impounding agency staff from the Humane Society will have their ear tipped as described above.  No exceptions.  If a cat is returned to the Impounding agency staff without an ear tip, or with an ear tip of less than 3/8 of an inch from the top of the left ear, the Impounding agency cat will be returned to the Humane Society for the procedure without any additional charge to the Impounding agency.

vii.   No procedures other than those listed in this document will be paid for by the

Impounding agency.  The Impounding agency will only reimburse for procedures that have been documented and provided to the Impounding agency.  The Humane Society must provide at least the following information in order to receive reimbursement for each cat:

- Invoice number
- Visit Date
- Billing Date
- Animal Name and/or Number
- Impounding agency services provided
- Name of Impounding Agency Rep authorizing service(s)
- Cost for each service provided
- Total cost

**viii.**    The Humane Society will combine and send all invoices to the Impounding agency monthly.

**ix.**    ACO's will notify the Humane Society staff at the LPGA location whether a feline brought there is part of the TNR program, if it is for RTF, is wild, stray, confiscated, or seized.

**x.**    The Humane Society will only release RTF cats to the Impounding agency Animal Control Officer unless Impounding agency provided permission for a 3rd party release in writing from the agency's authority.

3.    **BILLING & PAYMENT**:

(a)    The Humane Society shall bill the Impounding agency pursuant to Paragraph 3(b), as applicable, for:

(i) each dog, cat, domesticated animal, injured animal, deceased animal, livestock animal, wild animal, or quarantined/confiscated animal delivered to the Shelter by either the Impounding agency's designated personnel, Police or Animal Control Officers;

(ii) each stray dog, cat, domesticated animal, injured animal, deceased animal, livestock animal or wild animal emanating from within Impounding agency the jurisdictional limits of the impounding agency and delivered to the Shelter by a private citizen who has provided their full name and contact information.  Owner surrendered animals will only be accepted via impounding agency with Supervisor approval from Halifax Humane Society.  Owner requested surrenders in the field should be referred to Halifax Humane Society directly; and

(iii) each dog, cat, domesticated animal, injured animal or deceased animal picked up at the request of the Impounding agency by the Humane Society within

Impounding agency jurisdictional limits of the impounding agency.

(b) In consideration of the agreements and undertakings to be performed by the Humane Society, the Impounding agency agrees to pay the following applicable fee(s) per animal to the Humane Society on a monthly basis, in arrears:

| Type of Animal | Fee |
|---|---|
| **Dog or cat** (if the cat is not eligible for RTF/TNR program) | |
| Impoundment | $156.00 |
| **Other domesticated animal** | $130.00 |
| **Livestock animal** | $195.00 |
| **Wild animal (Euthanasia)** | $ 71.50 |
| **Deceased on arrival (Disposal)** | $32.50 |
| **Quarantined animal (*e.g.*, Rabies)** | $390, $39 per day<br>Quarantine period determined by Florida State Statute |
| **Confiscated animal** | $130 for the 1st day of impoundment plus $45.50 for each additional day of impoundment |
| **Fees for RTF/TNR cats** | |
| **Sterilization Surgery**<br>Complimentary ear tipping, FVRCP, Rabies Vaccines | $58.50 |
| **Anesthesia Fee**<br>No surgery performed, ear tipping, FVRCP vaccine, rabies vaccine | $58.50 |
| **Euthanasia**<br>Veterinarian determined that patient cannot undergo surgery due to illness/disease | $58.50 |
| **Forensic calls and staff assistance upon request** | Staff Support:          $32.50 per hr.<br><br>Veterinarian Support:  $162.50 per hr. |

(c)     Payment must be made to the Humane Society within forty-five (45) days of the
date of a proper invoice, as required by the Florida Local Government Prompt
Payment Act (Part VII, Chapter 218, Florida Statutes) (the "Prompt Payment Act").
As provided by the Prompt Payment Act, any payment that is not made by the
Impounding agency within such time period shall bear interest from thirty (30) days
after the due date at a rate of one percent (1%) per month on the unpaid balance
until paid in full.  If the Impounding agency has a dispute about a charge on its
invoice, it must contact the Humane Society's Director of Administrative Services at
386-274-4703, extension 315, within fifteen (15) days of the date of the invoice.

(d)     The Humane Society will submit to the Impounding agency, with its monthly invoice,
a list of all pick up addresses of stray animals charged to the Impounding agency
account for animals that were not impounded by a an impounding agency's
designated personnel, the names and addresses of all persons claiming any stray
animals that are dropped off at the Shelter during normal operating hours, and, if
known, the names and addresses of all persons claiming stray animals that are
dropped off at the Shelter after-hours.

(e)     The Humane Society will make a good faith effort to collect the costs incurred
for the care of any animal that is served by the Humane Society and later
reclaimed by the animal's owner. Collections received by the Humane Society by an
animal owner shall be credited against the fees charged to the Impounding
Agency. The animal's owner is financially responsible for any services rendered
to the animal by the Humane Society and the Humane Society, without
indicating that payment is optional, will seek full payment for said services
prior to releasing the animal. The Humane Society may release an animal to its
owner without payment in the event the animal's owner completes a financial
affidavit indicating that the owner qualifies as indigent. The financial affidavit to be
used by Humane Society is attached hereto marked as **Exhibit A**.  If the attached
financial affidavit is completed by the animal owner, the Humane Society may
release the animal to the owner without collecting any fees and the Impounding
Agency shall be responsible for the charges associated with the released animal as
outlined herein.  A copy of the animal owner's financial affidavit shall be included
in the corresponding invoice to the Impounding Agency. If the  Humane  Society
does  not  have  the  animal  owner  complete  a  financial  affidavit  but  releases
the  animal  to  the  owner, the Impounding Agency shall not be charged for any of
the fees associated with the animal released.

4.     **RABIES QUARANTINE**:  The Humane Society will provide space for the confinement,
observation and care of any stray animal suspected of rabies, or any stray animal which has
bitten or otherwise exposed any person to rabies for a period of the state determined time for
quarantine and will accept, care for and dispose of any such animal delivered to the Shelter.
The Humane Society will notify the Volusia County Health Department of any rabies specimen

animal that dies during the quarantine period, and will allow the Volusia Impounding agency Health Department the opportunity to take custody of the remains of any such animal that becomes ill or dies while under confinement for such reasons. The Impounding agency impounding agency shall pay the applicable charges for quarantine service pursuant to Section 3(b) of this Agreement.

5.      **CONFISCATED ANIMALS – 828.073, F.S.**:  The Humane Society will agree to accept confiscated animals as strays or accept said animals as "confiscated" only when the provisions of Section 828.073, Florida Statutes are satisfied (*i.e.*, pursuant to a Court order after petition and hearing).  The Impounding agency shall be responsible for all charges and expenses incurred in confiscating an animal pursuant to § 828.073, Fla. Stat.  Upon request, a copy of the petition must be submitted by the seizing agent to the Humane Society within ten (10) business days of the request.  Failure to comply with this requirement will result in "confiscated" animals being deemed "stray" animals, at which point care of the animal will be charged to the Impounding agency at the default "stray" rates provided in Section 3(b) of this Agreement. The Impounding agency agrees to indemnify the Humane Society for any and all claims that may arise as a result of the Impounding agency decision to submit the animal as a stray, except that the cap on the amount and liability of the Impounding agency for indemnification or damages under this contract, regardless of the number or nature of claims in tort, equity, or contract, shall not exceed the dollar amount expended by the Impounding agency for Humane Society services in the contract year in which the claim arises.

6.      **DANGEROUS DOG LAW**:  Pursuant to Sections 767.12 and 767.13, Florida Statutes, it will be the sole responsibility of the Impounding agency's animal control authority to determine whether a dog is dangerous and to submit to the Humane Society the necessary paperwork as required by the applicable statutes.  If quarantine is necessary, a dog quarantined pursuant to Sections 767.12 and 767.13, Florida Statutes, may be quarantined for ten (10) business days at a bona fide boarding kennel or veterinarian's office of the seizing agent's or owner's choice.  Otherwise, the Humane Society will quarantine all dogs that the Impounding agency animal control authority determines to be dangerous for a maximum of ten (10) business days.  The Impounding agency shall pay the applicable charges for such service pursuant to Section 3(b) of this Agreement.  If the owner of the dog is unknown by the end of the quarantine period, the Impounding agency may request that euthanasia be performed by the Humane Society when it is the Impounding agency's belief that the dog poses a threat to public safety. The Impounding agency agrees to indemnify the Humane Society for any and all claims that may arise as a result of the Impounding agency decision to submit the animal under the Dangerous Dog Law, except that the cap on the amount and liability of the Impounding agency for indemnification or damages under this contract, regardless of the number or nature of claims in tort, equity, or contract, shall not exceed the dollar amount expended by the Impounding agency for Humane Society services in the contract year in which the claim arises.

7.      **CONFISCATED ANIMALS - OWNER OF ANIMAL IS IN CUSTODY / DECEASED / HOSPITALIZED**:  All animals whose owners are in police custody, deceased or hospitalized may

be placed in a bona fide boarding kennel or veterinary clinic at the owner's expense. The Humane Society will accept any such animals that are seized or taken by the Impounding agency. The Impounding agency will pay the applicable charges for such service (*i.e.*, "Confiscated Animal") pursuant to Section 3(b) of this Agreement. The Impounding agency agrees to indemnify the Humane Society for any and all claims that may arise as a result of the Impounding agency's decision to submit the animal as Confiscated/Owner of Animal in Custody/Deceased/Hospitalized, except that the cap on the amount and liability of the Impounding agency for indemnification or damages under this contract, regardless of the number or nature of claims in tort, equity, or contract, shall not exceed the dollar amount expended by the Impounding agency for Humane Society services in the contract year in which the claim arises. The impounding agency agrees to provide next of kin, emergency contact or any other guardian information to Halifax within 3 days of impoundment. Failure to do so by the impounding agency will forfeit any hold on the animal other than the mandatory 3 day holding period for stray animals.

8.    **CONFISCATED ANIMALS DUE TO OWNER EVICTION**:  Animals seized by the Impounding agency as a result of an owner eviction will be held by the Humane Society for 5 days.  The impounding agency agrees to leave notice of impoundment at the eviction location listing the whereabouts and descriptions of animal confiscated.  Impounding agency's representative will provide proof of such notice, agency report or photograph of notice on the dwelling with address or writ of possession displayed.   If not reclaimed by the owner, all charges accruing pursuant to Section 3(b) will be paid by the Impounding agency.

As the impounding agency, if the Impounding agency chooses not to have the Humane Society hold the animal for the entire reclamation period referenced above, the Impounding agency may submit the animal to the Humane Society as a "stray," in which case the animal will be held for three (3) days prior to disposition.  The Impounding agency agrees to indemnify the Humane Society for any and all claims that may arise as a result of the Impounding agency's decision to submit the animal as a "stray", except that the cap on the amount and liability of the Impounding agency for indemnification or damages under this contract, regardless of the number or nature of claims in tort, equity, or contract, shall not exceed the dollar amount expended by the Impounding agency for Humane Society services in the contract year in which the claim arises   The Impounding agency shall pay the applicable charges for such service pursuant to Section 3(b) of this Agreement.

9.    **REMEDY IN THE EVENT OF BREACH**:  In the event that the Impounding agency fails to make timely payment to the Humane Society for services rendered pursuant to this Agreement, the Humane Society, in its sole discretion, may elect to terminate this Agreement and cease providing services to the Impounding agency.  If the Humane Society exercises this option, it will provide the Impounding agency with thirty (30) days written notice of its decision to terminate the Agreement.  The Impounding agency will remain responsible for payment for all services rendered by the Humane Society prior to and during the thirty (30) day notice period.  Upon expiration of the thirty (30) day notice period, the Humane Society will no longer provide

any services to the Impounding agency.

10.    **WAIVER OF BREACH**:  The waiver by the Humane Society or the Impounding agency of any breach or violation of this Agreement will not operate as or be construed to be a waiver of any subsequent breach of this Agreement.

**11.  INSURANCE**: Humane Society shall maintain insurance of sufficient amounts during the life of this Agreement. Humane Society shall provide to the Impounding Agency with a certificate of insurance endorsing the Impounding Agency as an additional named insured, upon request. All insurance coverages of the Humane Society shall be primary and noncontributory. All insurance coverages of the Humane Society shall not seek contribution from any other insurance or self-insurance available to the Impounding Agency.

Policies shall be issued by insurers licensed and/or duly authorized under Florida Law to do business in the State of Florida and all insuring companies are required to have a minimum rating of "A-" in the "Best Key Rating Guide" published by A.M. Best & Company, Inc. Insurer shall provide the Impounding Agency written notice of cancellation, nonrenewal or any other changes in coverage no later than thirty (30) days prior to the effective date of the change and shall provide notice to the Impounding Agency no later than 10 days after non-payment.

Minimum insurance coverages that must remain in place for the life of the Agreement are as follows:

| | |
|---|---|
| Commercial General Liability: | Aggregate $2,000,000.00/ Each Occurrence $1,000,000.00 |
| Automobile Liability: | $1,000,000.00 |
| Umbrella Liability: | $1,000,000.00 |

Should at any time the Humane Society not maintain the insurance coverages required herein, the Impounding Agency may terminate the Agreement or at its sole discretion shall be authorized to purchase such coverages and charge the Humane Society for such coverages purchased. The Impounding Agency shall be under no obligation to purchase such insurance, nor shall it be responsible for the coverages purchased or the insurance company or companies used. The decision of the Impounding Agency to purchase such insurance coverages shall in no way be construed to be a waiver of any of its rights under the Agreement.

11.    **SOVEREIGN IMMUNITY:**  The Impounding agency expressly retains all rights, benefits, and immunities of sovereign immunity in accordance with §768.28, Florida Statutes. Notwithstanding anything set forth in any section of the Agreement to the contrary, nothing in the Agreement shall be deemed as a waiver of immunity of limits of liability of the Impounding agency beyond any statutory limited waiver of immunity or limits of liability which may have been adopted by the Florida Legislature or may be adopted by the Florida Legislature, and the cap on the amount and liability of the Impounding agency for damages, regardless of the number or nature of claims in tort, equity, or contract, shall not exceed the dollar amount set

by the legislature for tort. Nothing in this Agreement shall inure to the benefit of any third party for the purpose of allowing any claim against the Impounding agency, which would otherwise be barred under the Doctrine of Sovereign Immunity or by operation of law.

**12.    PUBLIC RECORDS**:  Pursuant to section 119.0701 (2)(a), Florida Statutes, the Impounding agency is required to provide the Humane Society with this statement and establish the following requirements as contractual obligations pursuant to the Agreement:

**IF THE HUMANE SOCIETY HAS QUESTIONS REGARDING THE APPLICATION OF CHAPTER 119, FLORIDA STATUTES, TO THE HUMANE SOCIETY'S DUTY TO PROVIDE PUBLIC RECORDS RELATING TO THIS AGREEMENT, CONTACT THE CUSTODIAN OF PUBLIC RECORDS AT 386-736-5935, email for Impounding Agency, by mail, Purchasing and Contracts Division, Attn: Public Records Custodian, 123 W. Indiana Ave. RM 302 DeLand, FL 32720.**

By entering into this Agreement, the Humane Society acknowledges and agrees that some records maintained, generated, received, or kept in connection with, or related to the performance of services provided under, this Agreement are public records subject to the public records disclosure requirements of section 119.07(1), Florida Statutes, and Article I, section 24 of the Florida Constitution. Pursuant to section 119.0701, Florida Statutes, any contractor entering into a contract for services with the Impounding agency, including the Humane Society, is required to comply with the following with respect to the applicable public records:

a) Keep and maintain public records required by the Impounding agency to perform the services and work provided pursuant to this Agreement.

b) Upon request from the Impounding agency's custodian of public records, provide the Impounding agency with a copy of the requested records or allow the records to be inspected or copied within a reasonable time at a cost that does not exceed the cost provided in Chapter 119, Florida Statutes, or as otherwise provided by law.

c) Ensure that public records that are exempt or confidential and exempt from public records disclosure requirements are not disclosed except as authorized by law for the duration of the contract term and following completion of the contract if the contractor does not transfer the records to the Impounding agency.

d) Upon completion of the contract, transfer, at no cost, to the Impounding agency all public records in the possession of the contractor or keep and maintain public records required by the Impounding agency to perform the service.  If the contractor transfers all public records to the Impounding agency upon completion of the contract, the contractor shall destroy any duplicate public records that are exempt or confidential and exempt from public records disclosure requirements.  If the contractor keeps and maintains public records upon completion of the contract, the contractor shall meet all applicable requirements for retaining public records.  All records stored electronically must be provided to the Impounding agency, upon request from the Impounding

agency's custodian of public records, in a format that is compatible with the information technology systems of the Impounding agency.

e) Requests to inspect or copy public records relating to the Impounding agency's contract for services must be made directly to the Impounding agency.  If contractor receives any such request, contractor shall instruct the requestor to contact the Impounding agency.  If the Impounding agency does not possess the records requested, the Impounding agency shall immediately notify the contractor of such request, and the contractor must provide the records to the Impounding agency or otherwise allow the records to be inspected or copied within a reasonable time.

The Humane Society acknowledges that failure to provide the applicable public records to the Impounding agency within a reasonable time may be subject to penalties under section 119.10, Florida Statutes.  The Humane Society further agrees not to release any records that are statutorily confidential or otherwise exempt from disclosure without first receiving prior written authorization from the Impounding agency.  Humane Society shall indemnify, defend, and hold the Impounding agency harmless for and against any and all claims, damage awards, and causes of action arising from Humane Society's failure to comply with the applicable public records disclosure requirements of section 119.07(1), Florida Statutes, or by Humane Society's failure to maintain any applicable public records that are exempt or confidential and exempt from the public records disclosure requirements, including, but not limited to, any third party claims or awards for attorney's fees and costs arising therefrom.  Humane Society authorizes Impounding agency to seek declaratory, injunctive, or other appropriate relief against Humane Society from a Circuit Court in Volusia Impounding agency on an expedited basis to enforce the requirements of this section.

13.    **E-VERIFY**:  Humane Society shall utilize the U.S. Department of Homeland Security's E-Verify system to verify the employment eligibility of all new employees hired by the Humane Society during the term of this Agreement and shall expressly require any sub-contractors performing services pursuant to this Agreement to likewise utilize the U.S. Department of Homeland Security's E-Verify system to verify the employment eligibility of all new employees hired by the sub-contractor during the term of this Agreement.

13.    **MEDIATION**:  Any dispute arising from this Agreement, including, but not limited to, disputes over fees for services, will be mediated prior to a lawsuit being filed.  Mediation will occur within sixty (60) days of written request by either party to mediate unless agreed to otherwise.  The written request must be delivered in accordance with the provisions of Paragraph 19, below, of this Agreement.  The cost of the mediator's fee will be borne equally by the parties.

14.    **ATTORNEY'S FEES**:  Both parties agree to bear the cost of their own attorneys' fees with respect to any disputes, lawsuits, or claims arising under this Agreement, except unless otherwise specifically allowed elsewhere in this Agreement or in the event of an action to recover amounts due under Part VII, Chapter 218, Florida Statutes, in which case, the court

shall award court costs and reasonable attorney's fees, including fees incurred through appeal, to the prevailing party.

15.     **GOVERNING LAW AND VENUE:**  The parties further agree that this Agreement will be governed by the laws of the State of Florida and that venue for any and all suits arising out of or otherwise attributable to this Agreement will lie exclusively in the courts of Volusia Impounding agency, Florida, unless the matter at issue is solely cognizable in federal court, in which case, venue shall be in the Middle District of Florida, Orlando Division.

16.     **SEVERABILITY**:  If any provision of this Agreement or any part of any provision of this Agreement is found to be invalid by a court of competent jurisdiction, such will not affect the validity of any other provision, or part thereof, of this Agreement.

17.     **ENTIRE AGREEMENT**:  This Agreement constitutes the entire and final understanding and agreement with respect to the subject matter hereof and supersedes all prior or contemporaneous negotiations, promises, covenants, agreements, or representations concerning all matters directly or indirectly, collaterally related to the subject matter of this Agreement.

18.     **AMENDMENTS**:  This Agreement cannot be amended or modified except by a writing executed by both of the parties hereto or their respective administrators, trustees, personal representatives and successors.

19.     **NOTICES**:  Any written notice required to be given under this Agreement is to be mailed by registered or certified mail, postage prepaid, to the party's business address or any other address designated for that purpose by written notice and sent to the attention of the Impounding agency Manager with respect to the Impounding agency and to the attention of the CEO with respect to the Humane Society.

IN WITNESS WHEREOF, the Humane Society and the Impounding agency have executed this
Agreement for Services between Halifax Humane Society Inc. and the Impounding agency of
Volusia, effective on the date and year as set forth above.

**HALIFAX HUMANE SOCIETY, INC.**

By: _Senn /Hwlner_

Name: _Sean Hawkins_                          Name:

Title:   Chief Executive Officer

Date:   _Aug. 23, 2024_

**IMPOUNDING AGENCY OF VOLUSIA**

By: _____

Title: _____

Date: _____

ATTEST:

By: _____

Name:  Christina Sutherin

Title:   Chief Operating Officer

Date: _____

ATTEST:

By: _____

Name: _____

Title: _____

Date: _____



**COUNTY OF VOLUSIA**
**ANIMAL SERVICES**
**RETURN TO CUSTODY**

**DECLARATION OF NO OR LOW INCOME**

This form should be completed <u>by an adult household member</u> if the household is claiming no or low income within the last 30 days.

_____    _____    _____

**Last Name**                       **First Name**                      **Phone Number**

_____    _____    _____

**Address**                         **City**                            **Zip**

**1A. I hereby certify that I do not individually receive income from any of the following sources:**

- Wages from employment (including commissions, tips, bonuses, fees, etc.)
- Income from operation of a business
- Rental income from real or personal property
- Interest or dividends from assets
- Social Security, annuities, insurance policies, retirement funds, pensions, or death benefits
- Unemployment or disability payments
- Public assistance payments (AFCD, SSI, TANF)
- Alimony, child support, or gifts received from persons not living in my household
- Sales from self-employed resources (Avon, Mary Kay, etc.)
- Any other source not named above

   **OR**

**1B. I hereby certify that I am low-income, as defined by Florida law, as a family or individual earning 80% or less of the area median income ($63,075)**

2. ☐ I have resources to pay for the daily care of the animal being returned to my custody.

   ☐ I need access to resources to supplement my source of funds to adequately care for the animal being returned to my custody.

**By my signature below, I certify and acknowledge the following:**

- That the forgoing is true, complete, and correct.
- Inquiries may be made to verify statements and a request for documentation to verify low or no-income status maybe requested by Volusia County Animal Services.
- That false statements or omissions are grounds for an at large citation if the animal was impounded and the fees not paid upon return to the owner.

_____    _____

**Signature**                                        **Date**

EXHIBIT FOUR

## Agreement between City of Ormond Beach
## and Edgewater Animal Shelter, Inc.

THIS AGREEMENT (the "Agreement") is made effective this _____24_____ day of
_____July_____, 2025, by and between the Edgewater Animal Shelter, Inc., a Florida nonprofit,
hereafter referred to as the "Shelter," and the City of Ormond Beach, a political subdivision of
the County of Volusia and the State of Florida, hereafter referred to as the "City."

WHEREAS, the Edgewater Animal Shelter is organized for the purpose, among others,
of preventing cruelty to animals and is interested in ensuring that impounded animals are
sheltered in a humane manner, and

WHEREAS, the City needs to be able to house any stray animal that is in need of
services and the City does not have the ability to house animals at the police station, and

WHEREAS. the Shelter agrees to accept animals from the City on a case-by-case basis.
The City will notify the Shelter in advance of any animals being brought to the Shelter for
acceptance, and

WHEARAS, the Shelter and the City desire to enter into an agreement to establish terms
and conditions under which the Shelter will accept animals from the City on a case-by-case
basis, and

NOW, THEREFORE, for and in consideration of the mutual covenants, conditions, and
provisions herein contained, it is expressly agreed and understood as follows:

1. **Term:** This Agreement shall take effect on the first day of the last signature and shall
   remain in full force and effect until terminated by either party.

2. **Animal Acceptance:** The Shelter agrees to accept animals from the City on a case-by-
   case basis. The City will notify the Shelter in advance of any animals being brought to
   the Shelter for acceptance. The Shelter further agrees to contact the City Animal Control
   Officer regarding any animal that is deposited at the shelter by a citizen of Ormond
   Beach, to allow the Animal Control Officer time to ascertain an owner for the animal can
   be located.

3. **Rate:** The City agrees to pay the Shelter a fee of $125 per animal accepted, including
   domestic cats. This fee covers the cost of intake, housing, veterinary care, and other
   associated expenses related to the care of the animal during its stay at the Shelter. The
   Shelter will bill the City one monthly invoice to cover the cost of any animals that are
   received by the Shelter from the City.

4. **Dangerous Dogs, Abused or Neglected Animals, and Police Confiscations:** The City
   agrees to pay the Shelter a fee of $125 per animal accepted by the Shelter as a dangerous
   dog, abused or neglected animal, or police confiscation.

5. **Quarantine Fee:** Any animal placed in the care of the Shelter without an identified owner will be quarantined to assess the potential for rabies exposure. The Shelter will administer a rabies vaccine to the animal during the quarantine period. If an owner is identified during the quarantine, the owner will be responsible for the costs associated with the quarantine, including the rabies vaccination. If the owner is not identified and the animal remains unclaimed, the City agrees to pay $400 for each animal that undergoes quarantine due to rabies exposure concerns.

6. **Notification:** The City will provide the Shelter with relevant information about each animal, including any known medical or behavioral issues, prior to transferring the animal to the Shelter's care.

7. **Health and Care:** The Shelter agrees to provide appropriate care, including shelter, food, water, medical attention, and socialization, to the animals accepted from the City.

8. **Holding Period.** The Shelter agrees to hold any impounded animal without identification or microchip for a period of three days prior to adoption or destruction. Any animal received by the Shelter that has identification or microchip shall be held for a period of seven days. If the owner fails to claim the animal at the expiration of the holding period, the Shelter shall deem the animal abandoned and the animal may be disposed of by the Shelter either through adoption or destruction of the animal. Any impounded animal may be destroyed before the end of the holding period for humane reasons related to relieving needless suffering resulting from injury, sickness, or disease as provided in F.S. § 828.05. The animal control officer may direct that an animal be held by the animal impounding facility for a period in excess of the applicable holding period.

9. **Transfer of Ownership:** The ownership of the animals will transfer to the Shelter until such time as they are adopted or otherwise transferred to new owners.

10. **Adoption:** The Shelter will make reasonable efforts to find suitable homes for the animals through its adoption program. Any adoption fees collected will remain the property of the Shelter.

11. **Reporting:** The Shelter agrees to provide periodic reports to the City detailing the number of animals accepted, their disposition (adoption, transfer, etc.), and any notable incidents.

12. **Termination:** Either party may terminate this agreement with or without cause with thirty (30) days written notice.

13. **Indemnification:** The City and the Shelter agree to indemnify, defend, and hold each other harmless from and against any claims, damages, liabilities, costs, and expenses arising from actions related to the execution of this Contract.

14. **Sovereign Immunity:** The City expressly retains all rights, benefits and immunities of sovereign immunity in accordance with Section 768.28, Florida Statues. Notwithstanding anything set forth in any section of the Contract to the contrary, nothing in the Contract shall be deemed as a waiver of immunity of limits of liability of the City beyond any statutory limited waiver of immunity or limits of liability which may have been or may be adopted by the Florida Legislature and the cap on the amount and liability of the City for damages regardless of the number or nature of claims in tort, equity or contract shall not exceed the dollar amount set by the legislature for tort. Nothing in the Contract shall inure to the benefit of any third party for the purpose of allowing any claim against the City, which would otherwise be barred under the Doctrine of Sovereign Immunity or by operation of law.

15. **Public Records:** The Shelter expressly agrees that it shall comply with the public records law provided in Florida Statutes, Chapter 119, and specifically to:

(a) Keep and maintain public records required by the City to perform the contracted service.

(b) Upon request from the City Clerk, provide the City with a copy of the requested records or allow the records to be inspected or copied within a reasonable time at a cost that does not exceed the cost provided in Chapter 119, Florida Statutes, or as otherwise provided by law.

(c) Ensure that public records that are exempt or confidential and exempt from public records disclosure requirements are not disclosed except as authorized by law for the duration of the contract term and following completion of the contract if the Shelter does not transfer the records to the City.

(d) Upon completion of the contract, transfer at no cost, to the City all public records in possession of the Shelter or keep and maintain public records required by the City to perform the service. If the Shelter transfers all public records to the City upon completion of the contract, the Shelter shall destroy any duplicate public records that are exempt or confidential and exempt from public records disclosure requirements. If the Shelter keeps and maintains public records upon the completion of the contract, the Shelter shall meet all applicable requirements for retaining public records. All records stored electronically must be provided to the City, upon request from the City Clerk, in a format that is compatible with the information technology systems of the City.

(e) Failure of the Shelter to comply with Public Records Law as provided by Florida Statutes, Chapter 119, shall subject the Shelter to penalties under Chapter 119.10 and subject this Agreement to termination for cause by the City.

**IF THE SHELTER HAS QUESTIONS REGARDING THE APPLICATION OF CHAPTER 119, FLORIDA STATUTES, TO THE SHELTER'S DUTY TO PROVIDE PUBLIC RECORDS RELATING TO THIS CONTRACT, CONTACT THE CUSTODIAN OF PUBLIC RECORDS AT:**

**CITY CLERK**
**22 SOUTH BEACH STREET**
**ORMOND BEACH, FLORIDA 32175.  (386)677-0311**
CITYCLERK@ORMONDBEACH.ORG

Ref:  Fla. Stat. §119.0701(2016)

16. **Entire Agreement:** This Contract constitutes the entire agreement between the City of
Ormond Beach and the Edgewater Animal Shelter and supersedes all prior
understandings, agreements, or representations, whether oral or written.

17. **Amendments:** Both parties will provide each other with at least 30 days advance written
notice of any proposed changes to this Agreement. Any amendment to the Agreement
shall be in writing and mutually agreed upon by both parties.

18. **Governing Law:**  This Contract shall be governed by and construed in accordance with
the laws of the state of Florida.

IN WITNESS WHEREOF, the EDGEWATER ANIMAL SHELTER and the CITY OF ORMOND
BEACH, have executed this Agreement for Services, effective on the date and year set forth
above.

EDGWATER ANIMAL SHELTER, INC          CITY OF ORMOND BEACH

BY:                                                                    
NAME: Kayla Kurtz                    City Manager Joyce Shanahan
TITLE: President
DATE: 7/23/25                        DATE: 7/23/2025


ATTEST: Roxanne Hicks               ATTEST:
BY:                                  BY:
NAME: Director Roxanne Hicks         NAME: Jessica Oten
TITLE: Director                      TITLE: Executive Assistant
DATE: 7/24/25                        DATE: 7/23/2025

EXHIBIT FIVE

**Sent:** Thursday, December 11, 2025 1:07 PM
**To:** Marcy LaHart <marcy@floridaanimallawyer.com>
**Subject:** Re: service agreement between Edgewater Animal Shelter and Ormond Beach

Ms. LaHart:

In the interest of avoiding another motion to dismiss and sanctions motion, see Ormond Beach Ordinance 2-300(c)(2)(e), which authorized the city manager to approve the Edgewater Animal Shelter contract without the involvement of the city commission

Stephanie M. Boomershine, Esq.
Bogin, Munns & Munns, P.A.
Gateway Center
1000 Legion Place
Suite 1000 (10th Floor)
Orlando, Florida 32801
Tel. 407-578-1334
Fax 407-578-2181
sboomershine@boginmunns.com



EXHIBIT SIX

## Sec. 2-300. Methods of source selection.

(a)   *Competitive sealed bidding.*

    (1)   *Conditions for use.* All contracts of the city involving a purchase in excess of $75,000.00 shall be awarded by competitive sealed bidding, except as otherwise provided in subsections (b) through (g) and (i) of this section.

    (2)   *Invitation for bids.* Following the written approval of a bid request, to include a cost estimate, by the department/division head, the appropriate intermediate manager, if any, and the city manager, an invitation for bids shall be issued, which shall include specifications and all contractual terms and conditions applicable to the procurement.

    (3)   *Public notice.* Adequate public notice of the invitation for bids shall be given a reasonable time, not less than ten calendar days, prior to the date set forth therein for the opening of bids. Such notice may include publication in a newspaper of general circulation a reasonable time prior to bid opening. The public notice shall state the place, date and time of bid opening.

    (4)   *Bid receipt and opening.* No bids shall be accepted unless they are received by the person designated and at or before the time specified in the invitation for bids. Bids shall be opened publicly, by the purchasing agent or their designee in the presence of one or more witnesses at the time and place designated in the invitation for bids. The amount of each bid and such other relevant information as the purchasing agent deems appropriate, together with the name of each bidder, shall be recorded; the record and each bid shall be open to public inspection in accordance with general law.

    (5)   *Bid acceptance and bid evaluation.* Bids shall be unconditionally accepted without alteration or correction, except as authorized in this division. Bids shall be evaluated based on the requirements set forth in the invitation for bids, which may include criteria to determine acceptability such as inspection, testing, quality, workmanship, delivery, and suitability for a particular purpose. Those criteria that will affect the bid price and be considered in evaluation for award shall be objectively measurable, such as discounts, transportation costs, and total or life cycle costs.

    (6)   *Correction or withdrawal of bids; cancellation of awards.* Correction or withdrawal of inadvertently erroneous bids before or after bid opening, or cancellation of awards or contracts based on such bid mistakes, may be permitted where appropriate. Mistakes discovered before bid opening may be modified or withdrawn by written or telegraphic notice received in the office designated in the invitation for bids prior to the time set for bid opening. After bid opening, corrections in bids shall be permitted only to the extent that the bidder can show by clear and convincing evidence that a mistake of a nonjudgmental character was made, the nature of the mistake and the bid price actually intended. After bid opening, no changes in bid prices or other provisions of bids prejudicial to the interest of the city or fair competition shall be permitted. In lieu of bid correction, a low bidder alleging a material mistake of fact may be permitted to withdraw its bid if:

        a.   The mistake is clearly evident on the face of the bid document, but the intended correct bid is not similarly evident; or

        b.   The bidder submits evidence which clearly and convincingly demonstrates that a mistake was made.

    All decisions to permit the correction or withdrawal of bids, or to cancel awards or contracts based on bid mistakes shall be supported by a written determination made by the city attorney.

    (7)   *Award.* The contract shall be awarded with reasonable promptness by appropriate written notice to the lowest responsible and responsive bidder whose bids meets the requirements and criteria set forth in the invitation for bids. In the event the low responsive and responsible bid for a construction project

exceeds the architectural or engineering estimate, the city manager or his designee is authorized, when time or economic considerations preclude resolicitation of work of a reduced scope, to negotiate an adjustment of the bid price with the low responsive and responsible bidder in order to bring the bid within the amount of available funds.

(8)  *Multistep sealed bidding.* When it is considered impractical to prepare initially a purchase description to support an award based on price, an invitation for bids may be issued requesting the submission of unpriced offers, to be followed by an invitation for bids limited to those bidders whose offers have been determined to be technically acceptable under the criteria set forth in the first solicitation.

(9)  *Use of competitive bids or proposals obtained by other entities.* The city may utilize a competitive bid or proposal solicited by any other municipal, county, state, federal governmental agency, or any combination of such agencies, that the purchasing agent, the finance director or designee deems to be in the best interest of the city. In addition, the purchase of goods may be made through a cooperative purchasing program/alliance if:

a.  The finance director or designee determines that the cooperative program has obtained the bid through a competitively bid selection process that substantially complies with the city's bidding process; and

b.  The finance director or designee determines that the purchase through the program is in the best interest of the city.

(b)  *Competitive sealed proposals.*

(1)  *Conditions for use.* When the city manager determines in writing that the use of competitive sealed bidding is either not practicable or not advantageous to the city, a contract may be entered into by use of the competitive sealed proposals method.

(2)  *Request for proposals.* Proposals shall be solicited through a request for proposals.

(3)  *Public notice.* Adequate public notice of the request for proposals shall be given in the same manner as provided in subsection (a)(3) of this section, provided the minimum time shall be 30 calendar days.

(4)  *Receipt of proposals.* No proposals shall be handled so as to permit disclosure of the identity of any offeror or the contents of any proposal to competing offerors during the process of negotiation.

(5)  *Evaluation factors.* The request of proposals shall state the relative importance of price and other evaluation factors.

(6)  *Discussion with responsible offerors and revisions to proposals.* As provided in the request for proposals, discussions may be conducted with responsible offerors who submit proposals determined to be reasonably susceptible of being selected for award for the purpose of clarification to ensure full understanding of and conformance to the solicitation requirements. Offerors shall be accorded fair and equal treatment with respect to any opportunity for discussion and revision of proposals, and such revisions may be permitted after submissions and prior to award for the purpose of obtaining best and final offers. In conducting discussions, there shall be no disclosure of the identity of competing offerors or of any information derived from proposals submitted by competing offerors.

(7)  *Award.* Award shall be made to the responsible offeror whose proposal is determined in writing to be the most advantageous to the city, taking into consideration price and the evaluation factors set forth in the request for proposals. No other factors or criteria shall be used in the evaluation.

(c)  *Contracting for professional services governed by the Consultants' Competitive Negotiations Act ("the Act").*

(1)  Professional services required for any project which is not within the scope of a continuing contract between the city and a service provider, which services are included within the scope of the Act, shall be procured in accordance with the provisions of the Act.

Created: 2025-07-31 13:21:09 [EST]

(Supp. No. 10)

(2) Professional services required for any project which is within the scope of a continuing contract between the city and a service provider, which services are included within the scope of the Act, shall be procured in accordance with the following procedure:

    a. The department head in charge of the project for which such services are required shall determine which of the service providers then under continuing contract with the city are potentially capable of providing the required services.

    b. Such department head shall then request each such provider to submit a proposed scope of services and a fee quotation therefor.

    c. Such department head shall, with such assistance as he deems necessary, review the proposals received; in the event he determines it to be in the overall best interest of the city he may, prior to completing his review, enter into negotiations with any service provider, as aforedescribed, which has submitted a proposal with respect to the proposed scope of services, the proposed fee, or both, in order to have the project completed in the most efficient and economical manner possible; upon the conclusion of any such negotiations, he shall complete his review of the proposals.

    d. Upon completion of his review of the proposals, such department head shall prepare and submit to the city manager his recommendation as to which of the aforedescribed service providers should, in his professional judgment, receive authorization to perform the work required. In making such determination he shall take into account:

        1. The factors set forth in F.S. § 287.055(4)(b), with respect to the service providers then under continuing contract with the city; and

        2. The price for which the services are to be rendered.

    e. If the proposal is for $75,000.00 or less, the city manager is the approving party and shall make the final decision in accordance with subsection (c)(2)f of this section. If the proposal is for more than $75,000.00, the city manager shall submit his recommendation, together with that of the department head, to the city commission for the final decision thereon.

    f. The approving party shall, giving due consideration to the recommendation and to the overall general welfare of the citizens of the city, determine whether or not to issue the work authorization and, if so, to which of the aforedescribed service providers. The decision of the approving party shall be final, subject only to certiorari review by the circuit court.

(d) *Contracting for independent auditing services.*

    (1) *Authority.* Independent auditing services shall be procured in accordance with the selection procedures specified in this subsection.

    (2) *Selection procedure.*

        a. The city commission shall serve as the city's auditor selection committee.

        b. The committee shall publicly announce, in a uniform and consistent manner, each occasion when auditing services are required to be purchased. Public notice must include a general description of the audit and must indicate how interested certified public accountants can apply for consideration.

        c. The committee shall encourage firms engaged in the lawful practice of public accounting who desire to provide professional services to submit annually a statement of qualifications and performance data.

d.   Any certified public accountant desiring to provide auditing services must first be qualified pursuant to law. The committee shall make a finding that the firm or individual to be employed is fully qualified to render the required services. Among the factors to be considered in making this finding are the capabilities, adequacy of personnel, past record, and experience of the firm or individual.

e.   The committee shall adopt, by resolution, procedures for the evaluation of professional services, including, but not limited to, capabilities, adequacy of personnel, past record, experience, results of recent external quality-control reviews, proposed fees for the performance of the services desired, and such other factors as may be determined by the committee to be applicable to its particular requirements.

f.   The public must not be excluded from the proceedings under this subsection (d).

g.   The committee shall evaluate current statements of qualifications and performance data on file with the committee, together with those that may be submitted by other firms regarding the proposed audit, and shall conduct discussions with, and may require public presentations by, no fewer than three firms regarding their qualifications, approach to the audit, and ability to furnish the required services.

h.   The committee shall select no fewer than three firms deemed to be the most highly qualified to perform the required services after considering such factors as the ability of professional personnel; past performance; willingness to meet time requirements; location; recent, current and projected workloads of the firms; proposed fees for the performance of the services desired; and the volume of work previously awarded to the firm by the city, with the object of effecting an equitable distribution of contracts among qualified firms, provided such distribution does not violate the principle of selection of the most highly qualified firms. If fewer than three firms desire to perform the services, the committee shall recommend such firms as it determines to be qualified.

i.   If the city commission receives more than one proposal for the same engagement, the city commission may rank, in order of preference, the firms to perform the engagement. The firm ranked first may then negotiate a contract with the city commission giving, among other things, a basis of its proposed fee for that engagement. If the city commission is unable to negotiate a satisfactory contract with that firm, negotiations with that firm shall be formally terminated, and the city commission shall then undertake negotiations with the second-ranked firm. Failing accord with the second-ranked firm, negotiations shall then be terminated with that firm and undertaken with the third-ranked firm. Negotiations with the other ranked firms shall be undertaken in the same manner. The city commission, in negotiating with firms, may reopen formal negotiations with any of the three top-ranked firms, but it may not negotiate with more than one firm at a time. The city commission shall also negotiate on the scope and quality of services. In making such determination, the city commission shall conduct a detailed analysis of the cost of the professional services required in addition to considering their scope and complexity. For contracts over $50,000.00, the city commission shall require the firm receiving the award to execute a truth-in-negotiation certificate stating that the rates of compensation and other factual unit costs supporting the compensation are accurate, complete, and current at the time of contracting. Such certificate shall also contain a description and disclosure of any understanding that places a limit on current or future-years' audit contract fees, including any arrangements, under which fixed limits on fees will not be subject to reconsideration if unexpected accounting or auditing issues are encountered. Such certificate shall also contain a description of any services rendered by the certified public accountant or firm of certified public accountants at rates or terms that are not customary. Any auditing service contract under which such a certificate is required must contain a provision that the original contract price and any

additions thereto shall be adjusted to exclude any significant sums by which the city commission determines the contract price was increased due to inaccurate or incomplete factual unit costs. All such contract adjustments shall be made within one year following the end of the contract.

j.   If the city commission is unable to negotiate a satisfactory contract with any of the selected firms, the committee shall select additional firms, and the city commission shall continue negotiations in accordance with this subsection (d) until an agreement is reached.

(e)   *Contracting for designated professional services.*

(1)   *Authority.* Professional services, other than independent auditing services and those services included within the scope of the Consultants' Competitive Negotiation Act, shall be procured in accordance with the selection procedures specified in this subsection.

(2)   *Selection procedure.*

a.   *Conditions for use.* Except as provided under subsections (e)(5) and (f) of this section, such professional services shall be procured in accordance with this subsection (e).

b.   *Statement of qualifications.* Persons engaged in providing the types of professional services desired may submit statements of qualifications and expressions of interest in providing such professional services. A uniform format for statements of qualifications may be specified by the city. Persons may amend these statements at any time by filing a new statement.

c.   *Public announcement and form of request for proposals.* Adequate notice of the need for such services shall be given by the city through a request for proposals. The request for proposals shall describe the services required, list the types of information and data required of each offeror, and state the relative importance of particular qualifications.

d.   *Quotation of proposed fees.* All those interested persons submitting proposals shall include a quotation of their proposed fees for the performance of their services on behalf of the city. The quotation of proposed fees shall include rates, fees, charges and other detailed cost proposal or cost breakdown information as may be required by the city's request for proposals. The fees quoted shall be considered as one factor in determining the person to render services to the city.

e.   *Discussions.* The department/division head procuring the required professional services or a designee of such officer may conduct discussions with any offeror who has submitted a proposal to determine such offeror's qualifications for further consideration. Discussions shall not disclose any information derived from proposals submitted by other offerors.

f.   *Award.* Award shall be made to the offeror determined in writing by the department/division head procuring the required professional services or a designee of such officer to be best qualified based on the evaluation factors set forth in the request for proposals and negotiation of compensation determined to be fair and reasonable. If compensation cannot be agreed upon with the best qualified offeror, then negotiations will be formally terminated with the selected offeror. If proposals were submitted by one or more other offerors determined to be qualified, negotiations may be conducted with such other offeror or offerors, in the order of their respective qualification ranking, and the contract may be awarded to the offeror then ranked best qualified if the amount of compensation is determined to be fair and reasonable.

(3)   *Current contracts.* No continuing contract between the city and any provider of professional services within the scope of this subsection (e) and in effect at the time of its adoption shall be impaired by its adoption; provided, however, that no expenditure thereunder which is in excess of $75,000.00 shall be made until it has first been approved by the city commission.

(4)  *Contract document.* Every procurement of professional services in accordance herewith, the cost of which shall exceed $75,000.00, shall be evidenced by a written agreement embodying all provisions and conditions of the procurement of such services.

(5)  *Exception.* This subsection (e) shall not be applicable to the provision of health and mental health services or drugs in the examination, diagnosis or treatment of sick or injured city employees or the providing of other benefits as required by the provisions of F.S. ch. 440.

(f)  *Small purchases.*

(1)  *General.*

a.  Any contract or expenditure, except as otherwise provided in this division, exceeding $75,000.00, shall be approved by resolution duly adopted by the city commission.

b.  Any expenditure between $25,000.00 and $75,000.00 shall require procurement through one (1) of the following methods:

i.  Solicitation of quotes through the city's procurement portal for a period of no less than ten (10) days.

ii.  Piggybacking of another municipality upon the approval of the finance director or designee.

iii.  Use of an active continuing contract which was entered into by way of a formal bid or RFP and was awarded with city commission approval.

iv.  Any other means which clearly demonstrates and documents an active attempt to provide competition and obtain the lowest cost with the approval of the finance director or designee.

c.  Any expenditure not exceeding $25,000.00 may be made in accordance with the small purchase procedures. Expenditures shall not be divided to constitute a small purchase.

(2)  *Small purchases over $2,500.00.* Insofar as it is practical for small purchases in excess of $2,500.00, no less than three businesses shall be solicited to submit written quotations. Businesses within the city shall be used to the maximum extent feasible. Award shall be made to the business that meets the city's terms, conditions and specifications and offering the lowest price. The businesses submitting quotations and the date and amount of each quotation shall be recorded and maintained as a public record.

(3)  *Small purchases of $2,500.00 or less.* The purchasing agent or the finance director's designee shall adopt operational procedures for making small purchases of $2,500.00 or less. Such operational procedures shall provide for obtaining adequate and reasonable competition for the supply, services or construction being purchased.

(g)  *Sole source procurement.* A contract may be made without competition when the department head or division manager certifies to the purchasing agent or the finance director's designee in writing that, after conducting a good faith review of available sources, there is only one source for the required item(s) or service(s). The purchasing agent or the finance director's designee shall conduct negotiations as appropriate as to price, delivery and terms. A record of sole procurements shall be maintained as a public record.

(h)  *Emergency procurements.* Notwithstanding any other provisions of this division, the finance director or his designee may make or authorize others to make emergency procurements of supplies, services or construction when there exists a threat to public health, welfare or safety, provided that such emergency procurements shall be made with such competition as is practicable under the circumstances. A written determination of the basis for the emergency and for the selection of the particular contractor shall be submitted to the purchasing agent or the finance director's designee by the department head or division manager and shall be included in the contract file. As soon as practicable, a record of each emergency

procurement that exceeds the small purchase threshold as stated in subsection (e) of this section shall be made and shall set forth the contractor's name, the amount and type of the contract, a listing of the item(s) procured under the contract, and the identification number of the contract file. A copy of such record shall be maintained as a public record.

(i)     *Cancellation of invitations for bids or requests for proposals.* An invitation for bids, a request for proposals or other solicitation may be canceled, or any or all bids or proposals may be rejected in whole or in part as may be specified in the solicitation, when it is for good cause and in the best interests of the city. The reasons therefor shall be made part of the contract file. Each solicitation issued by the city shall state that the solicitation may be canceled and that any bid or proposal may be rejected in whole or in part for good cause when in the best interests of the city. Notice of cancellation shall be sent to all businesses solicited. The notice shall identify the solicitation, explain the reason for cancellation and, where appropriate, explain that an opportunity will be given to compete on any resolicitation or any future procurement of similar items. Reasons for rejection shall be provided upon request by unsuccessful bidders or offerors.

(j)     *Alternative procurement method.* Notwithstanding any other provision of this division to the contrary, any purchase of used vehicles or used equipment may be made through a bid at a public auction, or through competitive negotiations, when such method(s) are recommended by the city manager and determined by city commission resolution to best protect the public welfare.

(Code 1983, § 2-300; Ord. No. 89-77, § 8, 11-7-1989; Ord. No. 91-60, § 1, 1-21-1992; Ord. No. 94-55, §§ 1, 2, 6-21-1994; Ord. No. 94-75, §§ 1—7, 7-19-1994; Ord. No. 97-15, §§ 1, 2, 4-1-1997; Ord. No. 97-37, §§ 1—3, 7-1-1997; Ord. No. 98-56, § 1, 12-22-1998; Ord. No. 2012-45, § 1, 1-8-2013; Ord. No. 2022-23, § 1, 8-3-2022; Ord. No. 2025-16, § 1, 4-15-2025)

**IN THE COUNTY COURT OF THE SEVENTH JUDICIAL CIRCUIT
IN AND FOR VOLUSIA COUNTY, FLORIDA**

**MICHAEL PUCKETT**,

                Plaintiff,                        Case No.:  2025-25303-CODL

vs.

**EDGEWATER ANIMAL SHELTER, INC.,**
and **JANE DOE,**

                Defendants.

_____/

**EDGEWATER ANIMAL SHELTER, INC'S MOTION TO DISMISS COUNTS II AND
III OF PLAINTIFF'S SECOND AMENDED COMPLAINT**

       Edgewater Animal Shelter, Inc. ("Edgewater") by and through undersigned counsel, files this Motion to Dismiss Counts II and III of Plaintiff's Second Amended Complaint. As grounds in support thereof, Edgewater states as follows:

**Factual History and Background**

       1.     On September 16, 2025, Plaintiff filed a Complaint for Replevin against Edgewater, seeking possession of two dogs that were delivered to Edgewater Animal Shelter by Ormond Beach Police Department after the Plaintiff's arrest. Doc. 3.

       2.     A Show Cause Hearing was held on September 29, 2025.

       3.     On October 8, 2025, this Court entered an Order On Preliminary OTSC Hearing and Granting Plaintiff's Motion to Amend Complaint (the "Order"). Doc. 14.  The Order dismissed Plaintiff's first Complaint and deemed Plaintiff's Amended Petition for Writ of Replevin and Complaint for Damages filed[1]. Order at ¶¶ 6, 9.

       4.     On October 21, 2025, Plaintiff – without a motion, without conferral with the

---

[1] Plaintiff filed a Motion for Reconsideration and Request for Leave to Amend on October 3, 2025 – prior to entry of the Order. Dkt. 12

undersigned, and without leave of court –filed a Second Amended Complaint.

5.      The Second Amended Complaint includes three causes of action: I (Replevin against Jane Doe – i.e. Goose's adopter); II (Conversion against Edgewater); and III (Intentional Infliction of Emotional Distress against Edgewater).

6.      As set forth below, Counts II and III – the only claims brought against Edgewater - must be dismissed with prejudice.

## Legal Standard

The purpose of a motion to dismiss is to test the legal sufficiency of the complaint. *Pacific Ins. CO., Ltd. v. Botelho*, 891 So. 2d 587 (Fla. 3d DCA 2004); *citing Barbado v. Green & Murphy, P.A.,* 758 So. 2d 1173, 1174 (Fla. 4th DCA 2000). The function of a motion to dismiss is to raise as a matter of law the sufficiency of the facts alleged to state a cause of action. *Connolly v. Sebeco*, 89 So. 2d 482, 483 (Fla. 1956). "Whether a complaint is sufficient to state a cause of action is an issue of law." *Brewer v. Clerk of the Circuit Court, Gadsden County*, 720 So. 2d 602, 603 (Fla. 1st DCA 1998); s*ee also Siegle v. Progressive Consumers Ins. Co.*, 819 So. 2d 732, 734 (Fla. 2002). A petition or complaint that contains irrelevancies, certain evidentiary allegations, or improper conclusions will be subject to dismissal for failure to state a cause of action. *Balbontin v. Porias,* 215 So. 2d 732 (Fla. 1968).

In order to survive a motion to dismiss, a complaint must set forth sufficient ultimate facts to state a cause of action. Fla. R. Civ. P. 1.140(b)(6). "[M]ere statements of opinion or conclusions unsupported by specific facts will not suffice. *Brandon v. County of Pinellas*, 141 So.2d 278 (Fla. 2d DCA 1962). A court "will not be bound by bare allegations which are unsupported or unsupportable. *Other Place of Miami, Inc. v. Hialleah Gardens*, 353 So. 2d 861, 862 (Fla. Dist. Ct. App. 1977).

## Legal Argument

As discussed in detail below, each of Plaintiff's claims against Edgewater must be dismissed with prejudice, because a third amendment as to the Edgewater claims would be futile.

### A. Count II of the Second Amended Complaint (Conversion) Must be Dismissed

Plaintiff alleges that Edgewater "intentionally exerted wrongful dominion over Macho Man and Goose", and interfered with Plaintiff's right of possession of the dogs by euthanizing Macho Man and transferring Goose to Jane Doe for adoption. *See* Plaintiff's Second Amended Complaint (the "2AC") at ¶¶ 53-55. Plaintiff demands unspecified damages for "suffering, mental anguish, loss of use of his property, loss of the intrinsic value of his property, and other compensatory damages". 2AC at ¶ 56. As discussed below, Count II must be dismissed because: a) Plaintiff failed to make the requisite demand for return of the property; b) at all times relevant to Plaintiff's claims, Edgewater (not Plaintiff) was the lawful owner of Goose and Macho Man; and c) Plaintiff's right to possession of Goose and Macho Man was terminated prior to the relevant time frame in the Second Amended Complaint.

### 1. Count II Must be Dismissed For Plaintiff's Failure to Make a Demand for Return of the Property or to Allege that Such a Demand Would Have Been Futile

As an initial matter, Count II must be dismissed due to Plaintiff's failure to demand return of Goose and Macho Man or, alternatively, to allege that such a demand would have been futile. Such demand is "an essential element in any claim for conversion and failure to make such a demand or allege the futility of doing so is fatal". *Shelby Mutual Insurance Co. of Shelby, Ohio v. Crain Press, Inc.*, 481 So.2d 501, 503 (Fla. 2d DCA 1985), *review denied*, 491 So.2d 278 (Fla. 1986). *See also Ginsberg v. Lennar Florida Holdings, Inc.*, 645 So.2d 490, 500 (Fla. 3d DCA 1994), *rev. denied*, 659 So.2d 272 (Fla. 1995).

### 2. Count II Must Be Dismissed due to Plaintiff's Failure to State a Cause of Action

Additionally, Count II must be dismissed for failure to state a cause of action. Conversion is "the exercise of wrongful dominion and control over property to the detriment <u>of the rights of its actual owner</u>. Where a person <u>having a right to possession of property</u> makes demand for its return and the property is not relinquished, a conversion has occurred". *Batista v. Rodriguez,* 388 So. 3d 1098, 1101 (Fla. 3d DCA 2024) (emphasis added)

<u>Edgewater was the Lawful Owner of Goose and Macho Man</u>

Plaintiff's conversion claim fails because, at all times relevant to his claims against Edgewater and Jane Doe, Plaintiff lacked the right to possession of Goose and Macho Man. To the contrary, *Edgewater* was the lawful owner of the dogs, and Edgewater's possession of and control over the dogs was authorized by law and not wrongful or improper in any way.

It is imperative to consider relevant Ormond Beach City, Edgewater City, and Volusia County ordinances when determining ownership of Goose and Macho Man. Edgewater's ownership, right to dominion, and control over Goose and Macho Man (as well as Plaintiff's termination of any previously-held possessory rights) is authorized and controlled by these laws.

A review of these laws confirms that Edgewater was the owner of Goose and Macho Man and did not wrongfully take either of them. As alleged by Plaintiff, the dogs were delivered to Edgewater by the Ormond Beach Police Department ("OBPD") after a two-day hold. 2AC at ¶ 16. This process is consistent with Ormond Beach law, which provides:

> An animal control officer has the authority to impound any animal at large…The city shall establish and operate, either independently or in cooperation with a humane society or a veterinarian, a suitable place for the impounding, care and final disposal of all animals picked up under the terms of this chapter and said place shall be known as the animal shelter. Ormond Beach Ordinance § 5-70; and

> It shall be the duty of the animal control officer… to keep all animals impounded pursuant to this article for a period not to exceed two days. If, at the expiration of two days from the date of impoundment, such animal has not been reclaimed, it may be transferred to an animal shelter. Ormond Beach Ordinance § 5-73.

OBPD's transfer of the dogs to Edgewater is also consistent with Edgewater City law, which states:

> If the owner of an impounded animal is incarcerated… the impounding facility or shelter having custody of the animal will hold the animal up to three days. During this three-day period, all reasonable means will be utilized in an attempt to contact the owner to make arrangements for care of the animal impounded. If no arrangements are made, custody will then revert to the city's animal shelter for adoption or euthanasia if necessary. Edgewater City Ordinance §5-40(b); and

> If an animal is not claimed within three days after impoundment, the animal shall be deemed unowned or abandoned and shall be disposed of pursuant to the requirements of this chapter and the rules and regulations of the impounding facility. Edgewater City Ordinance §5-41(b); and

> Any unclaimed animal shall become the property of the impounding facility after the three-day hold period, and may be humanely destroyed, maintained or disposed of by gift, sale or adoption pursuant to the requirements of this chapter and the rules and regulations of the impounding facility. Edgewater City Ordinance §5-41(e);

OBPD's conduct is likewise consistent with Volusia County law:

> Any unclaimed animal shall become the property of the animal services division. The animal services division shall determine the appropriate disposition of the animal, which may include, but is not limited to, humanely destroyed, transferred to a humane society, or placed in the custody of some person deemed to be a responsible and suitable owner who will agree to comply with all of the provisions of this article. Volusia County Ordinances, §14-40(c).

As supported by the allegations in the Second Amended Complaint, and as authorized by these ordinances, *Edgewater – not Plaintiff - was at all times relevant to this action the legal owner of Macho Man and Goose.* Specifically, and as specifically provided in the Edgewater City Ordinances above, because Plaintiff was unable to pay the impoundment fee to reclaim Goose and Macho Man after three days, the dogs were deemed abandoned by law and became the property of Edgewater.

Edgewater gained ownership of the animals not through an improper taking, but through legal procedure followed by OBPD. Accordingly, Edgewater's possession of Goose and Macho Man was not wrongful, and was not inconsistent with Plaintiff's right of possession of the animals.

<u>Plaintiff had No Right of Possession of Goose and Macho Man</u>

Additionally, in Florida, a plaintiff must have a present or immediate right of possession of the property in question. *Allen v. Universal C. I. T. Credit Corp.,* 133 So. 2d 442, 445 (Fla. 1st DCA 1961); *Page v. Matthews*, 386 So. 2d 815, 816 (Fla. 5th DCA 1980). Plaintiff cannot allege any such right. Plaintiff admits in the Second Amended Complaint:

- OBPD transferred Goose and Macho Man to Edgewater on or about August 19, 2025, after holding them for two days after Plaintiff's arrest. 2AC at ¶ 9, 16

- Edgewater advised Plaintiff that he was required to pay $490.00 in order to retrieve his animals. 2AC at ¶ 25

- Plaintiff was unable to pay Edgewater the impoundment fee and that he informed Edgewater of this fact.

Plaintiff's right of possession of Goose and Macho Man was terminated when the dogs remained impounded with OBPD. *See* Edgewater City Ordinance §5-40(b) (if no arrangements are made by the owner for the care of the impounded animals within three days, "custody will then revert to the city's animal shelter for adoption or euthanasia"). It is clear that any right of possession that Plaintiff had was terminated when he failed to pay the impoundment fees imposed by Edgewater. *Id.*

Edgewater must point out that, while the Complaint attempts to depict Edgewater as a shelter that callously refused to work with Plaintiff to arrange for a payment plan for the fee, Plaintiff entirely overlooks the fact that Edgewater was *prohibited by law* from returning the dogs to Plaintiff without payment of the impoundment fee. Indeed, Plaintiff's payment of the "full cost of impoundment" was *required* before he could reclaim the animals. *See* Edgewater Florida Ordinance § 5-41(c), Ormond Beach Ordinance § 5-72, and Volusia County Ordinance §14-62(e)[2].

---

[2] For example, §14-62(e) provides, "**Any person seeking to redeem or reclaim an animal impounded** under the provisions of this Article **shall pay the impoundment fees, boarding fees, license fees, and all other fees** resulting from impounding and caring for the animal." (emphasis added). § 5-41(c) requires that an owner of an impounded

6

Edgewater waited 28 days before adopting Goose to Jane Doe – far longer than was required by
law.

Finally, while the Second Amended Complaint entirely overlooks applicable city and
county ordinances, Plaintiff attempts to support his claims by alleging Edgewater's supposed
failure to comply with Fla. Stat. §828.073 (titled "Animals found in distress") and Part II of
Chapter 767, Fla Stat. (titled "Dangerous Dogs). However, neither statute is at all relevant to the
instant case, and Edgewater was not required to comply with them.

Fla. Stat. §828.073 is a *criminal* statute that sets forth the procedure a *law enforcement
officer* must follow when removing a "neglected or mistreated animal" from its custody or when
making such neglected or mistreated animal" the subject of an order to provide care. Edgewater is
not a law enforcement agency, animal control agency, or an agent appointed under §828.03 to
prosecute violators. Nor were Goose and Macho Man removed from Plaintiff's custody due to
neglect or mistreatment – as evidenced by the fact that the Plaintiff was not arrested for or charged
with animal cruelty. §828.073 is therefore not applicable to the situation that is the subject of this
action, and neither Edgewater nor OBPD were required to follow the procedure for removal of
neglected or mistreated animals set forth therein.

---

animal "pay impoundment fees before being entitled to resume possession".
§ 5-41(c) provides: Upon proof of ownership, **payment of any impoundment fees**, and the procurement of any
required vaccinations and tags, the owner of an impounded animal is entitled to resume possession. (emphasis
added)

§5-72 provides: "The owner of any animal impounded pursuant to city ordinance or Florida Statutes can reclaim such
animal, **upon payment of a license fee and the charges hereinafter imposed, and of all costs and charges incurred
by the city for impounding and maintenance of such animal**. No animal shall be reclaimed unless the owner
furnishes the animal control officer a certificate showing that the animal has been vaccinated against rabies within the
preceding 12 months. If the owner cannot furnish said certificate, the animal shall be transported to an animal shelter
or veterinarian where the appropriate vaccination can be administered prior to its release. Any of the duties herein
imposed upon the animal control officer may be delegated to an animal shelter by a service agreement approved by
resolution of the city commission. **In all instances of impoundment, owners of animals are responsible for the full
cost of impoundment as charged by the shelter."** (emphasis added)

Chapter 767 pertains to the classification and disposition of "dangerous dogs". Again, this statute is not relevant in the instant matter. No party attempted to declare Macho Man a "dangerous dog" and, more importantly, such designation is not necessary when an animal shelter determines that euthanizing a dog in its custody is appropriate. *See* Edgewater City Ordinance §5-41(e) and Volusia County Ordinance § 14-40(c).

In summary, Plaintiff's conversion claim must be dismissed. Plaintiff cannot allege ownership rights of Goose and Macho Man or that Edgewater exercised *wrongful* dominion or control over the dogs. To the contrary, the applicable law authorizes Edgewater's custody of the animals. Finally, Plaintiff failed to make the requisite demand for Goose and Macho Man prior to initiating the action.

### 3. Alternatively, Plaintiff's Demand for Damages as to Count II Must be Stricken.

Alternatively, if Count II is not dismissed, Plaintiff's demand for damages must be stricken. Plaintiff demands unspecified damages for "suffering, mental anguish, loss of use of his property, loss of the intrinsic value of his property, and other compensatory damages". 2AC at ¶ 56. However, it is well settled that damages for conversion are limited to the reasonable value of the property when converted. *Page*, 386 So. 2d at 816; *Foresight Enters., Inc. v. Leisure Time Props., Inc.,* 466 So. 2d 283, 286 (Fla. 5th DCA1985).

Plaintiff's damages (if any) would therefore be limited to the reasonable value of Goose and Macho Man in August of 2025. Plaintiff's demand for all other damages must be stricken.

### B. Count III (Intentional Infliction of Emotional Distress) Must Also be Dismissed

Like Count II, Plaintiff's claim for intentional infliction of emotional distress against Edgewater must be dismissed for failure to state a cause of action.

8

Plaintiff alleges that Edgewater acted with "deliberate indifference to Plaintiff's property rights in Goose and Macho Man and engaged in extreme and outrageous conduct by:

- Refusing to allow Plaintiff to reclaim Macho Man or Goose because he could not afford the fees unilaterally imposed by Edgewater;
- Refusing to allow Plaintiff to make payments for fees he owed to Edgewater for the impoundment of Goose and Macho Man
- Killing Macho Man
- Transferring possession of Goose to the adopter. (2AC at ¶ 58).

Put differently, Plaintiff alleges that Edgewater intentionally inflicted emotional distress upon him *simply by doing its job as authorized by law.* This argument is nonsensical and runs afoul of public policy and applicable law. Edgewater's conduct, even if it were extreme or outrageous, is simply not actionable. "A privilege exists as a matter of law to engage in reckless or even outrageous conduct if there is sufficient evidence that shows the defendant did no more than assert legal rights in a legally permissible way." *Canto v. J.B. Ivey and Company*, 595 So.2d 1025, 1028 (Fla. 1st DCA 1992), citing *Metropolitan Life Insurance Co. v. McCarson,* 467 So.2d 277, 279 (Fla. 1985). See also v. *Kowalski*, No. 2D2024-0382, 2025 WL 3019111, at *12 (Fla. 2d DCA Oct. 29, 2025) (To the extent the defendant took actions within its legal rights, "it cannot be liable for IIED").

Furthermore, as addressed in detail above, Edgewater's conduct was, at all times, authorized by law. Edgewater was *required* to collect the "full cost of impoundment" from Plaintiff before returning Goose and Macho Man. *See* Ormond Beach Ordinance § 5-72, Edgewater Florida Ordinance § 5-41(c), and Volusia County Ordinance §14-62(e) ("Any person seeking to redeem or reclaim an animal impounded under the provisions of this Article shall pay the impoundment fees, boarding fees, license fees, and all other fees resulting from impounding and caring for the

animal" and "In all instances of impoundment, owners of animals are responsible for the full cost

of impoundment as charged by the shelter."). Unfair as it may feel to Plaintiff, his claim for

intentional infliction of emotion distress is not supported by the application of law.

Edgewater was authorized by law to "humanely destroy" or "place in the custody of... a

suitable owner". Volusia County Ordinance §14-40(c). Edgewater's authority to euthanize Macho

Man and transfer possession of Goose to an adopter is also permissible under Fla. Stat. §

828.058(3)[3] and Edgewater Florida Ordinance §5-41(e) ("Any unclaimed animal shall become

the property of the impounding facility after the three-day hold period, and may be humanely

destroyed, maintained or disposed of by gift, sale or adoption pursuant to the requirements of

this chapter and the rules and regulations of the impounding facility.").

Because Edgewater did nothing more than assert its legal rights in a legally permissible

way, Count III must be dismissed.

<u>**Conclusion**</u>

As set forth above, Counts II and III of the Second Amended Complaint against Edgewater

must be dismissed. Moreover, Plaintiff's claims against Edgewater serve no purpose other than to

harass Edgewater and force it to spend its time and limited financial resources to defend this

frivolous lawsuit.

Plaintiff's counsel knew or should have known that the claims brought against Edgewater

are: a) not supported by the material facts necessary to establish such claims; and b) not supported

by the application of law to the material facts in this action. Therefore, Edgewater should be

awarded its reasonable attorney's fees to be paid in equal amounts by Plaintiff and his attorney.

---

[3] The August 17, 2925 OBPD police report (Case No. OB250800224) indicates that Plaintiff informed law enforcement officers that Goose and Macho Man "must be kept separate from each other because one would likely 'kill' the other due to behavioral aggression"

**WHEREFORE**, Edgewater Animal Shelter, Inc. respectfully requests that Counts II and III of Michael Puckett's Second Amended Complaint be dismissed with prejudice, that it awarded attorney's fees under Fla. Stat. §57.105(1)(a) and (b), and for such other relief as this Court may deem appropriate.

## <u>CERTIFICATE OF CONFERRAL</u>

I hereby certify that conferral prior to filing is not required under Fla. R. Civ. P. 1.202(c)(6).

Respectfully submitted on November 6, 2025.

<u>/s/ Stephanie M. Boomershine</u>
Stephanie M. Boomershine
Florida Bar No.:  0046667
Bogin, Munns & Munns, P.A.
1000 Legion Place, Suite 1000
Orlando FL 32801
Tel: (407) 578-1334
Fax: (407) 578-2181
<u>sboomershine@boginmunns.com</u>
<u>bmmservice@boginmunns.com</u>
Attorneys for Defendant Edgewater Animal Shelter, Inc.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 6, 2025 I electronically filed the foregoing by using the Florida Courts E-Filing Portal, which will send notice of this electronic filing to all counsel of record.

<u>/s/ Stephanie M. Boomershine</u>
Stephanie M. Boomershine

IN THE COUNTY COURT IN AND FOR
VOLUSIA COUNTY, FLORIDA

MICHAEL PUCKETT

     Plaintiff

vs.

EDGEWATER ANIMAL SHELTER

     Defendant

_____/

CASE NO: 2025 25303 CODL
Division 71
JUDGE Angela Dempsy

## **NOTICE OF APPEARANCE AND DESIGNATION OF EMAIL ADDRESS**

Please take notice that Marcy I. LaHart PA  hereby enters a notice as counsel for

Plaintiff Michael Puckett and pursuant to the Florida Rule of Judicial Administration 2.516

designates the following email addresses for service of all documents required to be served

in this proceeding.

Primary E-Mail Address:     marcy@floridaanimallawyer.com

Respectfully submitted this 24th day September, 2025.

BY:*/s/ Marcy LaHart*
Marcy I. LaHart, Esq.
Florida Bar No. 0967009
Marcy@floridaanimallawyer.com
861 SE 40th Street
Tacoma, WA 98418
(352) 545-7001

2025 25303 CODL

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on this 24th day of September, 2025 a true and correct copy of

the foregoing was furnished via electronic mail State Court E-Portal to all attorneys of record listed

in the Florida E-filing E-Portal.

BY<u>:/s/ Marcy LaHart</u>
Marcy I. LaHart, Esq.

IN THE COUNTY COURT, SEVENTH JUDICIAL CIRCUIT, IN AND FOR
VOLUSIA COUNTY, FLORIDA

MICHAEL PUCKETT,                    )
                                   )
        Plaintiff,                 )
                                   )
vs.                                )
                                   )    CASE NO.: 2025-25303 CODL
EDGEWATER ANIMAL SHELTER           )    Division: 71
INC.                               )
&                                  )
JANE DOE                           )
                                   )
        Defendants.                )
_____

## NOTICE OF THE DEPOSITION OF DEFENDANT
## EDGEWATER ANIMAL SHELTER INC. DUCES TECUM

To:     Stephanie M. Boomershine, Esq.
        Bogin, Munns & Munns, P.A.
        1000 Legion Place
        Suite 1000 (10th Floor)
        Orlando, Florida 32801
        sboomershine@boginmunns.com


**PLEASE TAKE NOTICE** that pursuant to Florida Rule of Civil Procedure 1.310(b)(6) the

undersigned will take the deposition of:

Deponent:     Edgewater Animal Shelter through its corporate representative with knowledge

concerning the topics listed in the Attached Schedule A.


Date:   November 14, 2025

Time:  1:00 PM EST

Invite Link: https://us02web.zoom.us/j/6437902535?omn=85471525512

Meeting ID     643 790 2535


MARCY I. LAHART, P.A

**The witness should bring:**

1. An unredacted copy of the Animal Record Summary pertaining to Goose, ID EDGE-A-28149.

2. Edgewater Animal Shelter Inc.'s entire file pertaining to Goose, including any adoption contract or other document, electronic or otherwise reflecting the address where Goose is located and/or the name and address of the person or entity that was given possession of Goose by Edgewater Animal Shelter Inc.

3. Edgewater Animal Shelter Inc.'s entire file pertaining to Macho Man.

4. Any and all correspondence, emails, memos, notes, text, writings or media of any type between or among you and any employee, agent, or representative of Edgewater Animal Shelter Inc. and/or the City of Ormond Beach regarding Goose, Macho Man or Michael Puckett.

5. Any contract between Edgewater Animal Shelter Inc. and the City of Ormond Beach.

**At least 5 days prior to the deposition** all documents responsive to this notice shall be made available to undersigned counsel via electronic transmission. This deposition is being taken for purposes of discovery, for use at trial, or for any other purpose allowed under the Florida Rules of Civil Procedure,

Dated this 3rd day of November, 2025.

BY:/s/ Marcy LaHart
Marcy I. LaHart, Esq.
Florida Bar No. 0967009
Marcy@floridaanimallawyer.com

Marcy I. LaHart, P.A

861 SE 40th Street
Tacoma, WA 98418
(561) 358-5436

SCHEDULE A

1. The issues and facts raised by the pleadings in the attached
   Second Amended Complaint in this matter.
2. The identity and contact information for the person(s) to
   whom Edgewater Animal Shelter Inc. transferred
   possession of Goose.
3. The destruction of Macho Man.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 3rd day of November , 2025 a true and correct copy

of the foregoing was furnished via electronic mail State Court E-Portal to all attorneys of record

listed in the Florida E-filing E-Portal.

BY:/s/ Marcy LaHart
Marcy I. LaHart, Esq.

MARCY I. LAHART, P.A

IN THE COUNTY COURT IN AND FOR
VOLUSIA COUNTY, FLORIDA

MICHAEL PUCKETT

      Plaintiff

vs.

EDGEWATER ANIMAL SHELTER INC.

and

JANE DOE

      Defendants

_____/

CASE NO: 2025 25303 CODL
Division 71
JUDGE Angela Dempsy

## SECOND AMENDED COMPLAINT FOR WRIT OF REPLEVIN, DAMAGES AND DEMAND FOR JURY TRIAL

Plaintiff, MICHAEL PUCKETT, sues Defendants EDGEWATER ANIMAL SHELTER INC. for Conversion and Intentional Infliction of Emotional Distress and sues JANE DOE to recover possession of personal property, and in support thereof states:

### JURISDICTION & VENUE

1.     This is an action for damages in excess of $8,000.00.

2.     Pursuant to § 47.011, Fla. Stat., venue is proper in Volusia County because the incidents giving rise to this cause of action occurred in Volusia County.

### PARTIES

3.     Plaintiff MICHAEL PUCKETT (hereinafter "Plaintiff "or "PUCKETT") is an adult individual that resides in Volusia County.

4.      Defendant EDGEWATER ANIMAL SHELTER INC. is a Florida not-for-profit corporation that owns and operates an animal shelter at 605 Mango Tree Drive, Edgewater, FL 32132. At all times relevant hereto, Defendant EDGEWATER ANIMAL SHELTER INC.  At all times relevant hereto, Defendant EDGEWATER ANIMAL SHELTER INC.  acquiesced in and ratified the decisions and actions made by its officers, directors, managers, supervisors, agents, and/or employees. All references in the instant complaint to Defendant EDGEWATER ANIMAL SHELTER INC.  includes its officers, directors, managers, supervisors, agents, and/or employees.

5.      Defendant JANE DOE is an adult individual that upon information and belief resides in Volusia County.

**FACTUAL BACKGROUND**

6.      PUCKETT suffers from Post Traumatic Stress Disorder (PTSD).

7.      Like many individuals that struggle with mental health, PUCKETT has experienced intermittent periods of homelessness.

8.      PUCKETT is indigent.

9.      On August 17, 2025 PUCKETT was arrested at a homeless encampment for trespassing.

10.     Upon his arrest PUCKETT asked a friend also staying at the homeless encampment to care for PUCKETT's two dogs, Goose and Macho Man until he was released.

11.     Goose and Macho Man provided PUCKETT affection, companionship and emotional support that helped ameliorate the symptoms of his PTSD.

12.     The friend agreed to care for both dogs until PUCKETT was released from jail.

2

13.    After PUCKETT was arrested, two Ormond Beach police officers went to the homeless encampment and "took custody of both dogs."

14.    Goose and Macho Man were not at large or unattended when they were seized by the Ormond Beach Police Department.

15.    PUCKETT was not notified about his dogs being seized by the Ormond Beach Police Department, despite PUCKETT's location being known to the Ormond Beach Police Department.

16.    The Ormond Beach Police Department held Goose and Macho Man for two days before transferring the dogs to the Defendant EDGEWATER ANIMAL SHELTER INC.

17.    PUCKETT was not notified about his dogs being transferred to the Defendant EDGEWATER ANIMAL SHELTER INC. despite his location being known by the Ormond Beach Police Department.

18.     After being released from custody, PUCKETT contacted his friend, who informed him his dogs had been taken from him by the Ormond Beach Police Department.

19.    PUCKETT contacted the Ormond Beach Police Department and was told his dogs were at the Halifax Humane Society.

20.    PUCKETT contacted the Halifax Humane Society and was informed Goose and Macho Man were not at the animal shelter operated by the Halifax Humane Society.

21.    PUCKETT again contacted the Ormond Beach Police Department and was finally told that his dogs had been taken to the EDGEWATER ANIMAL SHELTER INC.

22.    Plaintiff contacted Defendant EDGEWATER ANIMAL SHELTER INC. and asked what he needed to do to be reunited with his dogs.

3

23.    Defendant EDGEWATER ANIMAL SHELTER INC. claimed it was necessary "to check with the Ormond Beach Police Department" to find out if his dogs could even be returned to him and promised to get back to him.

24.    After not hearing from Defendant EDGEWATER ANIMAL SHELTER INC. Plaintiff tried repeatedly to reach someone at the animal shelter without success.

25.    Plaintiff finally went to the animal shelter in person and was told he could not have his dogs unless he paid $490.00.

26.    PUCKETT did not have the money demanded by Defendant EDGEWATER ANIMAL SHELTER INC. and informed them of such.

27.    PUCKETT pleaded to be allowed to make payments towards the money Defendant EDGEWATER ANIMAL SHELTER INC. claimed he owed.

28.    Defendant EDGEWATER ANIMAL SHELTER INC. flatly refused to make any arrangements for PUCKETT to pay the demanded charges over time.

29.    Plaintiff requested to be allowed to adopt his dogs and was flatly denied because Defendant EDGEWATER ANIMAL SHELTER INC. deemed him unfit to care for his dogs.

30.    Section 828.073 Fla. Stat. provides a process by which ownership of neglected or mistreated animals may be awarded to an animal welfare organization.

31.    Defendant EDGEWATER ANIMAL SHELTER INC. did not avail itself of the process mandated by Section 828.073 Fla. Stat. to be legally awarded ownership of Goose or Macho Man.

32.    Although the timing is not entirely certain, notwithstanding Plaintiff's concerted efforts to be reunited with his dog, Defendant EDGEWATER ANIMAL SHELTER INC.,

4

though fully aware that Plaintiff wished to reclaim Macho Man, without any prior notice to Plaintiff, killed Macho Man, claiming that the dog was "aggressive."

33.     EDGEWATER ANIMAL SHELTER INC. did not follow the statutory procedure provided in Part II of Chapter 767, Fla. Stat. required for an animal control authority to declare a dog dangerous or to confiscate an allegedly dangerous dog for purposes of destruction, instead unilaterally terminating Macho Man's life and Plaintiff's property rights in Macho Man.

34.     Defendant EDGEWATER ANIMAL SHELTER INC., though fully aware that Plaintiff wished to reclaim Goose, nonetheless transferred possession of the dog to a third party, referred to in the instant complaint as "JANE DOE."

35.     Macho Man was unique and irreplaceable; no other dog will have the same personality and characteristics of Macho Man. Macho Man has special, intrinsic value to Plaintiff.

36.     Goose is unique and irreplaceable; no other dog will have the same personality and characteristics as Goose. Goose has special, intrinsic value to Plaintiff.

37.     JANE DOE has possession and control of Goose, property lawfully belonging to Plaintiff.

38.     Plaintiff will seek leave of Court to amend his Second Amended Complaint to state the true name of JANE DOE when it has been ascertained.

39.     Upon learning of Macho Man's death and Goose's transfer Plaintiff was overcome with grief and so emotionally distraught that he became physically ill.

40.     Plaintiff still suffers extreme emotional distress because of Defendant EDGEWATER ANIMAL SHELTER INC. heartless and intentional conduct in

deliberately depriving him of the possession, companionship, love and emotional support of Goose and Macho Man.

41.    At no point did Plaintiff release his legal ownership of Goose and Macho Man to the Defendant EDGEWATER ANIMAL SHELTER INC.

## COUNT I-REPLEVIN

42.    Plaintiff realleges and incorporates paragraphs 1-41 as though fully set forth herein.

43.    This is a replevin action to recover possession of personal property to which the Plaintiff MICHAEL PUCKETT is lawfully entitled.

44.    The property to be replevied is a male Bully Mixed Breed dog named "Goose."

45.    The economic value of Goose is approximately $ 200.00.

46.    Goose was neither taken on an order or judgment of a court against Plaintiff, nor under an execution or judgment against Plaintiff or against the property.

47.    Goose was not taken for a tax, assessment or fine pursuant to law.

48.    PUCKETT is the owner of Goose, never relinquished ownership of Goose, and is entitled to possession of Goose.

49.    Plaintiff seeks entry of an order to show cause directed to Defendant JANE DOE pursuant to F.S. 78.067, and an immediate hearing on Plaintiff's right to possession of Goose.

50.    Plaintiff also requests expedited discovery regarding JANE DOE's identity and address.

## COUNT II-CONVERSION

51.    Plaintiff realleges and incorporates paragraphs 1-41 as though fully set forth herein.

6

52.    Defendant EDGEWATER ANIMAL SHELTER INC. was fully aware that Goose and Macho Man were Plaintiff's property.

53.    Defendant EDGEWATER ANIMAL SHELTER INC. intentionally exerted wrongful dominion over Plaintiff's personal property, Macho Man.

54.    Defendant EDGEWATER ANIMAL SHELTER INC. intentionally exerted wrongful dominion over Plaintiff's personal property, Goose.

55.    Defendant EDGEWATER ANIMAL SHELTER INC. killed Macho Man and transferred Goose to JANE DOE without disclosing to her/him PUCKETT's actual ownership interest in Goose, thereby interfering with PUCKETT's right of possession.

56.    As a direct and proximate result of the intentional actions, as alleged in this Count, Defendant EDGEWATER ANIMAL SHELTER INC. is civilly liable to PUCKETT for suffering, mental anguish, loss of use of his property, loss of the intrinsic value of his property and other compensatory damages.

**COUNT III- INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

57.    Plaintiff realleges and incorporates paragraphs 1- 41 as though fully set forth herein.

58.    Defendant EDGEWATER ANIMAL SHELTER INC. acted with deliberate indifference to Plaintiff's property rights in Goose and Macho Man and engaged in extreme and outrageous conduct through the following acts and omissions:

    a)  Refusing to allow Plaintiff to reclaim Macho Man or Goose because he could not afford the fees it unilaterally imposed;

    b)  Refusing to allow Plaintiff to make payments for fees he allegedly owned to Defendant EDGEWATER ANIMAL SHELTER INC. for Macho Man and Goose;

7

    c) Killing Plaintiff's dog Macho Man knowing that Plaintiff had not abandoned Macho Man or relinquished his ownership interest in Macho Man and desperately desired to be reunited with Macho Man;

    d) Transferring possession of Goose to JANE DOE knowing that Plaintiff had not abandoned Goose or relinquished his ownership interest in Goose and desperately desired to be reunited with Goose.

59.    Defendant EDGEWATER ANIMAL SHELTER INC. intended to cause emotional distress to PUCKETT or had a reckless disregard for the risk their actions posed for causing emotional distress to PUCKETT.

60.    Defendant EDGEWATER ANIMAL SHELTER INC.'s conduct in killing one of his dogs and intentionally depriving him of possession, love, companionship and emotional support of the other was outrageous and beyond all bounds of decency to be regarded as odious and utterly intolerable in a civilized community.

61.    As a direct and proximate result of the extreme and outrageous conduct and intentional infliction of emotional distress by Defendant EDGEWATER ANIMAL SHELTER INC. Plaintiff PUCKETT suffered severe emotional distress.

<b>JURY DEMAND</b>

62.    Plaintiff requests a jury trial as to damages and all other issues so triable.

**WHEREFORE,** Plaintiff demands a judgment for damages against Defendant EDGEWATER ANIMAL SHELTER INC. and a judgment for replevin against Defendant JANE DOE, together with the costs of this action, and whatever other relief the court deems just and appropriate.

8

Respectfully submitted this 21st day of October, 2025.

By: s/ *Marcy LaHart*
Marcy I. LaHart, Esq.
Florida Bar No. 0967009
Marcy@floridaanimallawyer.com
861 SE 40th Street
Tacoma, WA 98418
(352) 545-7001

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 21st day of October, 2025 a true and correct copy of the foregoing was furnished via electronic mail State Court E-Portal to all attorneys of record listed in the Florida E-filing E-Portal.

By: s/ *Marcy LaHart*
Marcy I. LaHart, Esq.

9

IN THE COUNTY COURT, SEVENTH JUDICIAL CIRCUIT, IN AND FOR
VOLUSIA COUNTY, FLORIDA

| | | |
|---|---|---|
| MICHAEL PUCKETT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | CASE NO.: 2025-25303 CODL |
| EDGEWATER ANIMAL SHELTER | ) | Division: 71 |
| INC. | ) | |
| & | ) | |
| JANE DOE | ) | |
| | ) | |
| Defendants. | | |

_____

## **NOTICE OF REMOTE DEPOSITION DUCES TECUM**

To:     Christopher W. Wickersham, Sr., Esquire
        Wickersham & Bowers
        Post Office Drawe 2250
        Daytona Beach, FL 32115
        lbowers@wickershamandbowers.com
        Randi@wickershamandbowers.com
        cwickersham@wickershamandbowers.com


PLEASE TAKE NOTICE that pursuant to Florida Rule of Civil Procedure 1.310 the undersigned

will take the deposition of **Roxanne Hicks** upon oral examination before an official court

reporter or other officer authorized by law to take depositions via zoom **on October, 23 2025 at**

**1:00 PM** (EST).

Invite Link: https://us02web.zoom.us/j/6437902535?omn=85471525512

Meeting ID     643 790 2535


**The witness should bring:**



MARCY I. LAHART, P.A

1. An unredacted copy of the Animal Record Summary pertaining to Goose, ID EDGE-A-28149.

2. Edgewater Animal Shelter Inc.'s entire file pertaining to Goose, including any adoption contract or other document, electronic or otherwise reflecting the address where Goose is located and/or the name and address of the person or entity that was given possession of Goose by Edgewater Animal Shelter Inc.

3. Edgewater Animal Shelter Inc.'s entire file pertaining to Macho Man.

4. Any and all correspondence, emails, memos, notes, text, writings or media of any type between or among you and any employee, agent, or representative of Edgewater Animal Shelter Inc. and/or the City of Ormond Beach regarding Goose, Macho Man or Michael Puckett.

5. Any contract between Edgewater Animal Shelter Inc. and the City of Ormond Beach.

**At least 5 days prior to the deposition** all documents responsive to this notice shall be made available to undersigned counsel via electronic transmission. This deposition is being taken for purposes of discovery, for use at trial, or for any other purpose allowed under the Florida Rules of Civil Procedure,

Dated this 10th day of October, 2025.

BY:/s/ Marcy LaHart
Marcy I. LaHart, Esq.
Florida Bar No. 0967009
Marcy@floridaanimallawyer.com
861 SE 40th Street
Tacoma, WA 98418
(561) 358-5436

MARCY I. LAHART, P.A

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 10th day  of October, 2025 a true and correct copy of

the  foregoing was furnished via electronic mail State Court E-Portal to all attorneys of record

listed in the Florida E-filing E-Portal.

BY:/s/ Marcy LaHart
Marcy I. LaHart, Esq.

IN THE COUNTY COURT, SEVENTH JUDICIAL CIRCUIT, IN AND FOR
VOLUSIA COUNTY, FLORIDA

| | | |
|---|---|---|
| MICHAEL PUCKETT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | CASE NO.: 2025-25303 CODL |
| EDGEWATER ANIMAL SHELTER | ) | Division: 71 |
| INC. | ) | |
| & | ) | |
| JANE DOE | ) | |
| | ) | |
| Defendants. | | |

_____

## NOTICE OF CANCELLATION OF DEPOSITION

PLEASE TAKE NOTICE that the deposition of Edgewater Animal Shelter through its

Corporate Representative scheduled to take place via zoom on **November 14, 2025 at 1:00 PM**

**(EST)** has been cancelled.

**I HEREBY CERTIFY** that on this 13th day of November, 2025 a true and correct copy

of the foregoing was electronically filed with the Clerk of Court using the Florida Courts E-Portal which

will send a notice of electronic filing to all attorneys of record listed in the Florida E-filing E-Portal.

BY:/s/ Marcy LaHart
Marcy I. LaHart, Esq.
Florida Bar No. 0967009
Marcy@floridaanimallawyer.com
861 SE 40th Street
Tacoma, WA 98418
(561) 358-5436

MARCY I. LAHART, P.A

IN THE COUNTY COURT, SEVENTH JUDICIAL CIRCUIT, IN AND FOR
VOLUSIA COUNTY, FLORIDA

| | | |
|---|---|---|
| MICHAEL PUCKETT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | CASE NO.: 2025-25303 CODL |
| EDGEWATER ANIMAL SHELTER | ) | Division: 71 |
| INC. | ) | |
| & | ) | |
| JANE DOE | ) | |
| | ) | |
| Defendants. | | |

_____

## **NOTICE OF CANCELLATION OF DEPOSITION**

PLEASE TAKE NOTICE that the deposition of **Roxanne Hicks** scheduled to take place

via zoom on **October, 23 2025 at 1:00 PM** (EST) has been cancelled.

**I HEREBY CERTIFY** that on this 22nd day of October, 2025 a true and correct copy

of the foregoing was electronically filed with the Clerk of Court using the Florida Courts E-Portal which

will send a notice of electronic filing to all attorneys of record listed in the Florida E-filing E-Portal.

BY:/s/ Marcy LaHart
Marcy I. LaHart, Esq.
Florida Bar No. 0967009
Marcy@floridaanimallawyer.com
861 SE 40th Street
Tacoma, WA 98418
(561) 358-5436

MARCY I. LAHART, P.A

IN THE COUNTY COURT OF THE SEVENTH JUDICIAL CIRCUIT
IN AND FOR VOLUSIA COUNTY, FLORIDA

**MICHAEL PUCKETT**,
          Plaintiff,

                                    Case No.:  2025-25303-CODL
                                    Division:  71

vs.

**EDGEWATER ANIMAL SHELTER, INC.,**
and **JANE DOE,**
          Defendants.
_____/

## ORDER GRANTING EDGEWATER ANIMAL SHELTER'S MOTION TO DISMISS COUNTS II AND III OF THE SECOND AMENDED COMPLAINT

**THIS CAUSE** came before the Court for a hearing on Defendant Edgewater Animal Sheltter, Inc.'s Motion to Dismiss Counts II and III of Plaintiff Michael Puckett's Second Amended Complaint (Doc. # 22) on December 10, 2025 at 2:30 p.m.

The Court, having heard and considered legal arguments from counsel for Plaintiff and Defendant, and having reviewed the Motion to Dismiss and Plaintiff's Response to the Motion to Dismiss (Doc. # 29), the relevant legal standard, and pertinent case law and statutes, and being otherwise advised in the premises, finds as follows.

1. Edgewater's Motion to Dismiss Counts II and III of the Second Amended Complaint is GRANTED.

2. Counts II and III of the Second Amended Complaint, filed on October 21, 2025, are DISMISSED WITHOUT PREJUDICE.

3.     Plaintiff is granted leave to file a Third Amended Complaint.

**DONE AND ORDERED** at Deland, Volusia County, Florida.

12/16/2025 1:16 PM 2025
25303 CODL

e-Signed 12/16/2025 1:16 PM 2025 25303 CODL
**ANGELA A. DEMPSEY**
**COUNTY JUDGE**

Copies of foregoing is being served to all attorneys/interested parties identified on the E-Portal Electronic Service List via transmission of Notices of Electronic Filing generated by the E-Portal System.

2

IN THE COUNTY COURT, SEVENTH
JUDICIAL CIRCUIT, IN AND FOR
VOLUSIA COUNTY, FLORIDA

CASE NO.:    2025 25303 CODL
DIVISION:    71

MICHAEL PUCKETT
Plaintiff(s)

v.

EDGEWATER ANIMAL SHELTER
Defendant(s)

_____/

### ORDER ON PRELIMINARY OTSC HEARING AND GRANTING
### PLAINTIFF'S MOTION TO AMEND COMPLAINT

THIS CAUSE has come before the Court for hearing on the Replevin Order to Show Cause, held

September 29, 2025, and Plaintiff's subsequent Motion to Amend Complaint. The Court being fully

advised in the premises, finds as follows:

1. Plaintiff via his original complaint for replevin seeks return of his two dogs, which were left

   in the care of a friend, to his knowledge, upon being arrested for trespass on August 18,

   2025, but thereafter seized by the Ormond Beach Police Department and turned over to the

   Edgewater Animal Shelter.

2. Defendant was released from jail on Thursday, August 21, 2025, and immediately started

   searching for his friend he believed had his dogs.  He found out they were seized by law

   enforcement that night, and went to Halifax Humane Society on Friday morning, mistakenly

   believing they were there.  Upon their opening at noon, he discovered they were not at

   Halifax, and he was directed to the Ormond Beach Police Department.  He found out his

dogs were at the Edgewater Animal Shelter on Friday at approximately 2:00 pm.  Upon calling, he was advised him had until 4 pm to get to the Edgewater Aimal Shelter and pay over $368.00 for Goose, and he was told he would not be getting Macho Man back and he was fostered out.  Defendant did not have the money to pay for the dog's release, but attempted to make it there anyway by 4pm unsuccessfully.  He returned on Monday, August 25, 2025, and offered to make payments, but was denied.  The owner hold had been released at that point, so he, and later his boss tried to adopt his dogs back, however they were both denied.

3.  Despite desperately trying to obtain the return of both dogs to no avail, Macho Man, was euthanized by the Edgewater Animal Shelter on Tuesday, August 26, 2025, within two business days of the release of the owner-hold, and with the knowledge Plaintiff desperately wanted them back.

4.  The other dog, Goose, was adopted out approximately one week later to an unknown party.

5.  At the time of the OTSC hearing, the evidence showed that the Edgewater Animal Shelter had possession of neither dog, as they had destroyed one, and adopted out the other.

6.  At the time of the hearing, no further action could be taken by the Court, other than to deny a preliminary writ and indicate the case would be dismissed as there were no further matters pending that could be addressed.

7.  On October 3, 2025, prior to the Court entering a written Order, Plaintiff filed his Motion for Leave to Amend to include a demand for damages, and the addition of the unknown party adopter.

8.  The Court, having reviewed the Motion and Amended pleading hereby GRANTS the motion for leave to amend.

9.  The Amended Petition for Writ of Replevin, Complaint for Damages, and Demand for Jury

    Trial, shall be deemed filed and is the operative Complaint in this matter.

10. The parties may conduct discovery pursuant to the Rules of Civil Procedure.

11. No other action is taken pursuant to the OTSC hearing, and no further OTSC hearing will be

    scheduled unless requested by motion.

DONE AND ORDERED in chambers, in Volusia County, Florida, on 08 day of October, 2025.

10/8/2025 10:52 AM 2025 25303
CODL

e-Signed 10/8/2025 10:52 AM 2025 25303 CODL

ANGELA A. DEMPSEY
COUNTY JUDGE

Copies to:  All parties of record                    CASE NO.:  2025 25303 CODL

MICHAEL PUCKETT
EDGEWATER ANIMAL SHELTER

IN THE COUNTY COURT, SEVENTH
JUDICIAL CIRCUIT, IN AND FOR
VOLUSIA COUNTY, FLORIDA

CASE NO.:    2025 25303 CODL
DIVISION:    71

MICHAEL PUCKETT
Plaintiff(s)

v.

EDGEWATER ANIMAL SHELTER INC and JANE DOE
Defendant(s)

_____/

**ORDER PARTIALLY AND TEMPORARILY GRANTING
DEFENDANTS' MOTION FOR PROTECTIVE ORDER PENDING  A HEARING ON
DEFENDANT'S MOTION TO DISMISS**

THIS CAUSE has come before the Court upon Defendants' Motion for Protective Order. The Court

being fully advised in the premises, finds as follows:

Defendant's Motion to Dismiss shall be set for hearing.  Plaintiff's deposition of Defendant's

representative may occur, however, Defendant may withhold only the identifying information (name,

address, phone number) of Goose's adopter pending the outcome of the Defendant's Motion to Dismiss.

The Deposition may otherwise proceed.  Defendant shall coordinate hearing time with opposing counsel

and the undersigned's office.

DONE AND ORDERED in chambers, in Volusia County, Florida, on 13 day of November, 2025.

11/13/2025 1:11 PM 2025 25303 CODL

e-Signed 11/13/2025 1:11 PM 2025 25303 CODL

ANGELA A. DEMPSEY
COUNTY JUDGE

Order-Civil – 3/11/2016

Copies to:  All parties of record

CASE NO.:  2025 25303 CODL

MICHAEL PUCKETT
EDGEWATER ANIMAL SHELTER INC
JANE DOE

IN THE COUNTY COURT IN AND FOR
VOLUSIA COUNTY, FLORIDA

MICHAEL PUCKETT

        Plaintiff

vs.

EDGEWATER ANIMAL SHELTER

        Defendant

_____/

CASE NO: 2025 25303 CODL
Division 71
JUDGE Angela Dempsy

PLAINTIFF'S AMENDED[1] MOTION FOR RECONSIDERATION AND REQUEST FOR LEAVE TO AMEND

Plaintiff Michael Puckett ("Plaintiff" and/or "Puckett"), by and through undersigned counsel, respectfully moves for reconsideration of this Honorable Court's September 29, 2025 ruling that his Petition for Writ of Replevin should be dismissed and for leave to file an Amended Petition for Writ of Replevin and in support states:

*Introduction*

1.      Petitioner Michael Puckett filed a Petition for Writ of Replevin on September 16, 2025 seeking to be reunited with his two dogs, Goose and Macho Man, who were transferred to the Defendant Edgewater Animal Shelter Inc. after Plaintiff was arrested for trespassing at a homeless encampment.

2.      An Order to Show Cause was issued on September 18, 2025 setting a hearing for September 29, 2025.

3.      At the September 29, 2025 hearing Roxanne Hicks testified that although she was aware that the dogs belonged to Plaintiff and that Plaintiff desired that his dogs be returned,

_____

[1] Amended to add paragraph 17 noting that this motion is opposed.

because Plaintiff was unable to immediately pay the $490.00 Defendant claimed Plaintiff

owed in one lump sum, Macho Man had been destroyed due to alleged "aggression" and

Goose had been adopted to a third party.

*The Adoption Agreement is Void*

4.      Plaintiff's counsel made a public records request for the adoption contract

pertaining to Goose, and was provided a redacted copy of an "Animal Record Summary"

which is attached hereto as Exhibit A.

5.      Although the Defendant did not cite an exemption authorizing the redaction as

required by §119.07(e) Fla. Stat. (2025)[2], presumably the adopter's identifying was withheld

based upon § 823.15 (7) Fla. Stat., an exemption enacted in 2024. Section 823.15(7), Fla.

Stat. exempts "[p]ersonal identifying information of a person who fosters, adopts, or

otherwise receives legal custody of an animal from an animal shelter or animal control

agency . . . ."

6.      Ignoring for now the warrantless seizure of Plaintiff's dogs and the questionable

constitutionality of Defendant's unilateral termination of Plaintiff's property rights in his

dogs, Goose was adopted to an undisclosed third party in violation of § 823.15(3) Fla. Stat.

which requires that all dogs adopted from a public or private animal shelter that have reached

sexual maturity be spayed or neutered <u>before</u> custody of the animal is relinquished.

7.      Goose is an adult dog that has reached sexual maturity; apparently in its great

haste to ensure Plaintiff would never see his dog again, Defendant transferred Goose to a

third party in clear violation of Florida law.

---

[2] Section 119.07 (1)(e) Fla. Stat. provides: "If the person who has custody of a public record contends that all or part of the record is exempt from inspection and copying, he or she shall state the basis of the exemption that he or she contends is applicable to the record, including the statutory citation to an exemption created or afforded by statute."

8.      Notwithstanding its clear legal obligation under § 823.15(3) Fla. Stat., Defendant purportedly released Goose to a third party who has six months in which to have him sterilized. It is axiomatic that a contract entered in violation of a statute is void. *See Loc. No. 234, United Ass'n of Journeymen & Apprentices v. Henley & Beckwith, Inc*., 66 So. 2d 818, 821 (Fla. 1953)(an agreement that is violative of a provision of a constitution or a valid statute, or an agreement which cannot be performed without violating such a constitutional or statutory provision, is illegal and void)

*Ormond Beach was without authority to seize Plaintiff's Dogs*

9.      Plaintiff's dogs were his private property, and he was entitled to due process before being permanently deprived of his property by the government or any entity acting on the government's behalf. *Cty. of Pasco v. Riehl Cty. of Pasco v. Riehl*, 620 So. 2d 229 (Fla. 2d DCA 1993)

10.     Goose and Macho Man were not seized pursuant to Part II of Chapter 767, Fla. Stat. for a dangerous dog investigation nor were they made the subject of a petition for custody filed pursuant to § 828.073, Fla. Stat.

11.     Section 5-70 of the "Ormond Beach, Florida, Code of Ordinances" (hereinafter City Code) provides that "[a]n animal control officer has the authority to impound any animal <u>at large</u>, pursuant to the enforcement or violation of any ordinance of this chapter or as provided by Florida Statutes." (emphasis added)

12.     Goose and Macho Man were not impounded by an animal control officer. Plaintiff testified that he had left his dogs in the care of a friend when he was arrested. Nonetheless, according to Defendant's Exhibit B, police officers went to the location where Plaintiff had been arrested and "took custody of both dogs." No exigent circumstances were

noted.

13.    Section 5-71 of the City Code requires that "immediately after impounding any animal under the provisions of section 5-70, it shall be the duty of the impounding officer to make every reasonable effort to identify and notify the owner of the animal." Plaintiff was not notified that his dogs had been "taken into custody" by the Ormond Beach Police Department even though he was presumably easy to find as he was being held in the Volusia County Jail.

14.    It is a well settled rule that statutes authorizing seizure and confiscation of personal property must be strictly construed. *L. Maxcy, Inc. v. Mayo*, 142 Fla. 707, 714 (1940). Ormond Beach's authority to seize Plaintiff's dogs is questionable and the fact that it did not follow its City Code indisputable. Unequivocally Plaintiff never transferred ownership of Goose and Macho Man to Ormond Beach, and while Ormond Beach may have had possession of the dogs it did not take any legal steps to acquire ownership of them.

15.    Defendant was subsequently given possession of the dogs by Ormond Beach. Defendant knew Plaintiff had not surrendered the dogs or otherwise transferred ownership of them, and that Plaintiff wanted both of his dogs returned. Defendant's possession of Goose and Macho Man did not confer upon it a right to permanently deprive Plaintiff of his personal property merely because Plaintiff was too poor to immediately pay all charges exacted by Defendant.

16.    While the violations of Plaintiff's constitutional rights cannot be addressed in a replevin action, his right of possession of Goose can and should be. Based upon the above, Plaintiff requests permission to file the Amended Petition for Writ of Replevin attached hereto as Exhibit B and to conduct discovery regarding the identity of the person in

possession of Goose so that his right to possession of Goose may be adjudicated.

17.    Undersigned counsel consulted counsel for the Defendant Edgewater Animal

Shelter Inc. and was informed that this motion is opposed.

Respectfully submitted this 3rd day October, 2025.

BY:*/s/ Marcy LaHart*
Marcy I. LaHart, Esq.
Florida Bar No. 0967009
Marcy@floridaanimallawyer.com
861 SE 40th Street
Tacoma, WA 98418
(561) 358-5436

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 3rd day of October, 2025 a true and correct copy of the

foregoing was furnished via electronic mail State Court E-Portal to all attorneys of record listed in

the Florida E-filing E-Portal.

<u>BY:/s/ Marcy LaHart</u>
Marcy I. LaHart, Esq.

Exhibit A

Animal Record Summary





**Edgewater Animal Shelter**
605 Mango Tree Dr
Edgewater, FL 32132
(386) 402-7476

## 🐾 Animal Record Summary

### Goose



| | |
|---|---|
| **ID** | EDGE-A-28149 |
| **Species** | Dog |
| **Breed** | Terrier, Pit Bull |
| **Color** | Brindle |
| **Pattern** | None |
| **Sex** | Male |
| **Altered** | Yes |
| **DOB** | 02/16/2021 |
| **Age (Y/M/D)** | 4Y/7M/12D |
| **Microchip #** | ▬▬▬▬ ▬▬▬▬ |

## 🗐 Memos

### Disclaimer
08/19/2025 by Megan Sb

The Adopted Pet has not been sterilized prior to this adoption, the Adopter SHALL have 6 months to bring Adopted Pet back to EAS to be sterilized, unless other written instructions are provided and signed by EAS veterinary staff. Should an Adopted Pet not be returned for sterilization in the required time frame the Adopter forfeits the spay/neuter included in the adoption fee and all sterilization fees default to the Adopter's expense. If the Adopter chooses to use another service to complete this procedure it will be at the Adopter's expense. EAS makes every effort to ensure that it does not let an unaltered Adopted Pet leave the shelter; however, EAS will allow an unaltered animal leave its possession when WAS determines, at its sole discretion, that it is in the best interest of the Adopted Pet to be adopted in an unaltered condition. In the instance that the Adopted Pet is unaltered, Adopter hereby warrants, represents, and agrees that the Adopted Pet will not be bred, whether accidental or intentional, prior to being sterilized.

### Kennel Card / Website Memo
09/02/2025 by Dynah Jackson

Hello! I'm Goose! I came into the shelter after my owner faced hard times and could no longer care for me. I am a big hunk who loves all the love! I am great with other dogs but I am not a big fan of kitty cats, they

> scare me a lot! I would love to find my forever family! I love playing outside, but I also would love to be a
> couch potato and snuggle all day!

## 🏥 Complete Medical History

### ID Numbers

| Microchip Number | Issued Date | Microchip Issuer |
|---|---|---|
| ███████ | 08/22/2025 | Petlink / Datamars |

| Rabies Tag Number |
|---|
| 26270 |

### Weight

| Weight | Date |
|---|---|
| 77 lbs | 08/21/2025 |

### Vaccinations Next Due

**Bordetella (Kennel Cough)**
08/22/2026

**DHPP**
08/22/2026

**Rabies**
08/21/2026

### Vaccination History

**DHPP**
RECOMBITEK C4 (Merial) (Merial)
08/22/2025 – Completed

| | | | |
|---|---|---|---|
| Lot # | 45853B | Route | SQ (subcutaneous) |
| Exp. Date | 02/15/2026 | Site | Left front leg |
| Vaccinated By | Jewely Throm | | |
| Notes | None | | |

**Bordetella (Kennel Cough)**
RECOMBITEK Oral Bordetella (Merial) (Merial)
08/22/2025 – Completed

| | | | |
|---|---|---|---|
| Lot # | 33141B | Route | PO (oral) |
| Exp. Date | 11/19/2027 | Site | Mouth |
| Vaccinated By | Jewely Throm | | |

| **Notes** | None |

### Rabies
IMRAB 1 TF (Merial) (Merial)

08/21/2025 – Completed

| **Lot #** | 22144 | **Route** | SQ (subcutaneous) |
| **Exp. Date** | 01/16/2027 | **Site** | Right front leg |
| **Vaccinated By** | Dr. Kayla Kurtz | **Clinic** | Edgewater Animal Shelter |
| **Veterinarian** | Dr. Kayla Kurtz | **Rabies Tag Number** | 26270 |
| **Notes** | None | | |

## Treatments Next Due

### NexGard PLUS Chew for Dogs, 66.1-132 lbs.
150 mg Afoxolaner chewable tablet, 720 mg Moxidectin chewable tablet, 300 mg Pyrantel chewable tablet
1 tablet(s) PO (by mouth) every 30 days (Q30D)

10/22/2025 – Scheduled

## Treatment History

### NexGard PLUS Chew for Dogs, 66.1-132 lbs.
150 mg Afoxolaner chewable tablet, 720 mg Moxidectin chewable tablet, 300 mg Pyrantel chewable tablet
1 tablet(s) PO (by mouth) every 30 days (Q30D) until further notice

09/22/2025 - – In Progress

## Active Diagnoses

### Apparently Healthy
08/21/2025 – Active

| **Diagnosed by** | Dr. Kayla Kurtz |

## Scheduled Diagnostic Tests

### Heartworm test
VetScan Canine Heartworm Rapid Test (Abaxis)

08/22/2026 - Scheduled

## Diagnostic Tests History

### Fecal Float
Fecal Analysis (Generic)

08/25/2025 – Completed

| **Results** | Fecal-Float: Positive |
| **Test By** | Jewely Throm |
| **Notes** | Cocc |
| | Treating with Marquis |

### Heartworm test

VetScan Canine Heartworm Rapid Test (Abaxis)

**08/22/2025 – Completed**

| | |
|---|---|
| **Results** | Heartworm: Negative, Microfilaria : Negative |
| **Test By** | Jewely Throm |

### Fecal Float
Fecal Analysis (Generic)

**09/12/2025 – Completed**

| | |
|---|---|
| **Results** | Fecal-Float: Negative |
| **Test By** | Lilian Yerke |

## Physical Exam History

### Vet Exam: Complete vet exam
**08/21/2025 | 1:05 pm – Completed**

| | | | |
|---|---|---|---|
| **Examination By** | Dr. Kayla Kurtz | **Clinic** | Edgewater Animal Shelter |
| **Exam Reason** | New Intake | | |
| **Reason Notes** | Ormond Beach ACO on 08/19 - Needs vet check and RV | | |

#### Subjective
stray intake, has not completed 72 hr stray hold

#### Objective
BAR- friendly

| | | | |
|---|---|---|---|
| **Weight** | 77 lbs | **Body Condition Score** | 7 - Overweight |
| **Temperature** | 100.7°F | **Heart rate** | 96 bpm |
| **Respiratory rate** | 42 bpm | **Mm color** | Pink |
| **Mm touch** | Moist | **Crt** | 2 |
| **Hydration** | Normal | **Attitude** | BAR |
| **Pain** | None | | |
| **Eyes** | No ocular abnormalities detected | | |
| **Ears** | No aural discharge or abnormalities detected | | |
| **Nose/Mouth/Dental** | No nasal discharge. No obvious dental or oral abnormalities | | |
| **Lymph nodes** | No peripheral lymphadenopathy | | |
| **Cardiovascular** | Normal sinus rhythm, no murmurs ausculted | | |
| **Respiratory** | Normal lung sounds. Normal respiratory rate and effort | | |
| **Abdomen** | Soft and non-painful, no abnormalities detected | | |
| **Urogenital** | No external abnormalities. Rectal examination not performed. Testicles palp wnl | | |
| **Musculoskeletal** | No evidence of lameness. Full orthopedic examination not performed | | |
| **Neurological** | Normal gait and mentation. Full neurologic examination not performed | | |
| **Integument** | No evidence of parasites, masses, or other lesions | | |

| Diagnosis Type | Diagnosis Notes | Status |
|---|---|---|
| Apparently Healthy | | Active |

#### Plan
Admin RV. Complete stray hold then process/neuter then MTA

## Procedures/Surgeries History

### Canine Neuter
**08/26/2025 | 2:33 pm – Completed**

| | | | |
|---|---|---|---|
| **Surgeon** | Dr. Kayla Kurtz | **Clinic** | Edgewater Animal Shelter |

| Memo | Weight: 77.0#<br>Ketamine: 1.8ml IV<br>Midazolam: 1.8ml IV<br>Torb: 0.77ml SQ<br>Carprofen: 75mg :Give 1 tab PO BID X 3 days | | |
| Suture Size | 3-0 | Suture Type | PDS II |
| Spermatocord Ligation | Miller's | Incision Closure | 3-Layer |
| Skin Glue | Yes | Castration Type | Closed Castration |
| Is Routine | Routine | Scrotal Castration | Pre-scrotal Castration |

## ✚ Behavioral Plans

**Disclaimer**
Shelters are unusual and unnatural environments; we can't guarantee that these results are 100% predictive of the way and animal will behave in the home.

## ✚ Behavior Assessments

**Disclaimer**
Shelters are unusual and unnatural environments; we can't guarantee that these results are 100% predictive of the way and animal will behave in the home.

## ✚ History

### Intakes/Outcomes

| Date | Visit # | Event | Person/Partner | Jurisdiction | User |
|------|---------|-------|----------------|--------------|------|
| 08/19/2025 | 1 | Stray In | Ormond Beach Animal Control | City of Ormond Beach | Megan Sb |

| Found Date & Time: | 08/17/2025 07:45 pm | Found Address: |
|---|---|---|
| Found by: | Ormond Beach Animal Control | 170 W Granada Blvd<br>Cross Street: U.S Rte 1 |
| Found Condition: | - | FL 32174 |
| Found Notes: | - | Volusia |

| 09/15/2025 | 1 | Adoption | ███████ | Unknown | Jewely Throm |

### Statuses

Days Adoptable: 0 | Days Onsite: 28 | Days in Custody: 28

| Status Name | User | Start Date | End Date | # of Days |
|-------------|------|------------|----------|-----------|
| Healthy In Home | Jewely Throm | 09/15/2025 12:42 pm | N/A | 16 |

| Status Name | User | Start Date | End Date | # of Days |
|---|---|---|---|---|
| Stray Hold | Megan Sb | 08/19/2025 07:45 pm | 09/15/2025 12:42 pm | 27 |

## Locations

| Visit # | Parent Site | Site | Start Date | User | End Date |
|---|---|---|---|---|---|
| 1 | Dog Intake Kennel 1 | Dog Intake Kennel 1 | 08/19/2025 07:45 pm | Megan Sb | 09/15/2025 12:42 pm |
| 1 | ███████ | ███ | 09/15/2025 12:42 pm | Jewely Throm | Current |

## Categories

| Date | Category Type | Previous Value | New Value | User |
|---|---|---|---|---|
| No category history available | | | | |

# 🩺 Files

## Photos

 

## Documents

2 pits ormond aco.pdf                                                08/19/2025

# SHELTERLUV

Exhibit B

Proposed Amended Complaint

IN THE COUNTY COURT IN AND FOR
VOLUSIA COUNTY, FLORIDA

MICHAEL PUCKETT

      Plaintiff

vs.

EDGEWATER ANIMAL SHELTER INC.

and

JANE DOE

      Defendants

_____/

CASE NO: 2025 25303 CODL
Division 71
JUDGE Angela Dempsy

**AMENDED PETITION FOR WRIT OF REPLEVIN, COMPLAINT FOR DAMAGES
AND DEMAND FOR JURY TRIAL**

Plaintiff, MICHAEL PUCKETT, pursuant to §78.01, et. Seq. Fla. Stat. and Rules

1.100(a) and 1.110, Fla. R. Civ. Pro. sues the Defendants EDGEWATER ANIMAL SHELTER

INC. for damages and JANE DOE to recover possession of personal property, and in support

thereof states:

**JURISDICTION & VENUE**

1.     This is a replevin action to recover possession of personal property to which the Plaintiff

MICHAEL PUCKETT is lawfully entitled.

2.     The property to be replevied is a male Bully Mixed Breed dog named "Goose."

3.     The economic value of Bear is $ 200.00.

4.     Pursuant to § 47.011, Fla. Stat., venue is proper in Volusia County because the incidents giving rise to this cause of action occurred in Volusia County.

## PARTIES

5.     Plaintiff MICHAEL PUCKETT (hereinafter "Plaintiff "or "PUCKETT") is an adult individual that resides in Volusia County.

6.     Defendant EDGEWATER ANIMAL SHELTER INC. is a Florida not-for-profit corporation that owns and operates an animal shelter at 605 Mango Tree Drive, Edgewater, FL 32132.

7.     Defendant Jane Doe is an adult individual that upon information and belief resides in Volusia County.

## FACTUAL BACKGROUND

8.     On August 17, 2025 PUCKETT was arrested at a homeless encampment for trespassing.

9.     Upon his arrest PUCKETT asked a friend also staying at the homeless encampment where he was arrested if he would care for PUCKETT's two dogs, Goose and Macho Man until he was released.

10.     The friend agreed to care for the dogs until PUCKETT was released from jail.

11.     After PUCKETT was arrested, two Ormand Beach police officers went to the homeless encampment and "took custody of both dogs."

12.     PUCKETT was not notified about his dogs being taken by the Ormond Beach Police Department, despite his location being known.

13.     The Ormond Beach Police Department held Goose and Macho Man for two days before transferring them to the Defendant EDGEWATER ANIMAL SHELTER INC.

14.    PUCKETT was not notified about his dogs being transferred to the Defendant
EDGEWATER ANIMAL SHELTER INC. despite his location being known.

15.    After being released from custody, PUCKETT learned that his dogs had been taken to the
EDGEWATER ANIMAL SHELTER INC.

16.    Plaintiff contacted Defendant EDGEWATER ANIMAL SHELTER INC. and asked what
he needed to do to be reunited with his dogs. Defendant EDGEWATER ANIMAL SHELTER
INC. claimed it needed to check with the Ormond Beach Police Department to find out if his dogs
could be returned to him and promised to get back to him.

17.    After not hearing from Defendant EDGEWATER ANIMAL SHELTER INC. Plaintiff
tried repeatedly to reach someone at the animal shelter without success.

18.    Plaintiff finally went to the animal shelter in person and was told he could not have his
dogs unless he paid $490.00. Plaintiff did not have the money demanded by Defendant
EDGEWATER ANIMAL SHELTER INC., and his pleas to be allowed to make payments fell on
deaf ears.

19.    Plaintiff requested to be allowed to adopt his dogs and was flatly denied because Defendant
EDGEWATER ANIMAL SHELTER INC. deemed him unfit to care for his dogs.

20.    Although the timing is not entirely certain, notwithstanding Plaintiff's concerted efforts to
be reunited with his dog, Defendant EDGEWATER ANIMAL SHELTER INC. destroyed Macho
Man without any prior notice to Plaintiff, claiming that the dog was aggressive.

21.    Defendant EDGEWATER ANIMAL SHELTER INC., though fully aware that Plaintiff
wished to reclaim Goose, nonetheless adopted the dog out to a third party, referred to in the instant
complaint as "Jane Doe."

22.     Goose's adoption violates Florida law, which requires that any sexually mature dog or cat be sterilized before the animal shelter relinquishes custody of the animal.

23.     Goose was neither taken on an order or judgment of a court against Plaintiff, nor under an execution or judgment against Plaintiff or against the property.

24.     Goose was not taken for a tax, assessment or fine pursuant to law.

25.     PUCKETT is the owner of Goose, never relinquished ownership of Goose, and is entitled to possession of Goose.

## COUNT I-REPLEVIN

26.     Plaintiff realleges and incorporates paragraphs 1- 25 as though fully set forth herein.

27.     Plaintiff seeks entry of an order to show cause directed to Defendant Jane Doe pursuant to F.S. 78.067, and an immediate hearing on Plaintiff's right to possession of Goose.

28.     Plaintiff also requests expedited discovery regarding Jane Doe's identity and address.

## COUNT II-DAMAGES

29.     Defendant EDGEWATER ANIMAL SHELTER INC. wrongfully refused to return Plaintiff's dogs to him, and leveraged its superior financial resources to deprive him of his property.

30.     Plaintiff seeks damages from Defendant EDGEWATER ANIMAL SHELTER INC. pursuant to §78.01 Fla. Stat. for injury he sustained based upon the Defendant EDGEWATER ANIMAL SHELTER INC.'s wrongful detention of his dogs.

## JURY TRIAL

31.     Plaintiff requests a jury trial as to damages and all other issues so triable.

**WHEREFORE,** Plaintiff demands a judgment for damages against Defendant EDGEWATER

ANIMAL SHELTER INC. and a judgment for replevin against Defendant JANE DOE, together

with the costs of this action, and whatever other relief the court deems just and appropriate.

Respectfully submitted this _____ day of October, 2025.

By_____
Marcy I. LaHart, Esq.
Florida Bar No. 0967009
Marcy@floridaanimallawyer.com
861 SE 40th Street
Tacoma, WA 98418
(352) 545-7001

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this  day of October, 2025 a true and correct copy

of the foregoing was furnished via electronic mail State Court E-Portal to all attorneys of

record listed in the Florida E-filing E-Portal.

_____
Marcy I. LaHart, Esq.

## IN THE CIRCUIT/COUNTY COURT IN AND FOR VOLUSIA COUNTY, FLORIDA

CASE NO. 2025 25303 CODL
JUDGE Angela A. Dempsey
DIVISION 71

MICHAEL PUCKETT v.                    EDGEWATER ANIMAL SHELTER

Plaintiff(s)                                   Defendant(s)

### REPLEVIN ORDER TO SHOW CAUSE

THE STATE OF FLORIDA
To Each Sheriff of This State:
    YOU ARE COMMANDED to serve this order on defendant(s):
EDGEWATER ANIMAL SHELTER
C/O KAYLA KURTZ

by personal service as provided by law, if possible, or if you are unable to personally serve
defendant within the time specified, by placing a copy of this order with a copy of the Summons
on the claimed property located at:

605 MANGO TREE
EDGEWATER, FL 32132
at least Five (5) days before the hearing scheduled below, excluding the day of service and
intermediate Saturdays, Sundays and legal holidays. Non personal service as provided in this order
shall be effective to afford notice to defendant of this order, but for no other purpose.

    Defendant shall show cause before a judge of this Court on the following date, time and
location:

Date: MONDAY, SEPTEMBER 29, 2025, at 10:30 a.m.
DeLand Courthouse            VIA ZOOM https://zoom.us/j/7298437446
101 N. Alabama Avenue
Deland, FL 32721-6043

why the property claimed by plaintiff in the complaint filed in this action should not be taken from
the possession of defendant and delivered to plaintiff.

    If the defendant fails to appear as ordered, defendant shall be deemed to have waived the
right to a hearing. The Court may thereupon order the Clerk to issue a Writ of Replevin.

    ORDERED at  DeLand, Volusia County, Florida on  Sept. 17, 2025

                                        _____
                                        Circuit/County Court Judge

### SEE REVERSE SIDE FOR VERY IMPORTANT INFORMATION.

CL-0094-1709

Defendant may file affidavits, appear personally or with an attorney and present testimony at the time of the hearing, or, on a finding by the Court pursuant to Section 78.067(2), Florida Statutes (1979), that the plaintiff is entitled to possession of the property described in the complaint pending final adjudication of the claim of the parties, file with the court a written undertaking executed by a surety approved by the Court in an amount equal to the value of the property to stay in order authorizing the delivery of the property to the plaintiff.

A copy of the above was mailed to the plaintiff/plaintiff/s attorney by U.S. Mail this date. Dated: September 19, 2025

LAURA E ROTH
CLERK OF THE CIRCUIT COURT
BY: /s/ Kate Nash
DEPUTY CLERK

Orig. fwd to:
VSO for SOP

**If English is not your native language and you need assistance understanding the court's proceedings, you will need to bring someone to interpret for you as this service is not provided by the court.**

**Si el inglés no es su lengua materna y va a necesitar ayuda para entender el proceso judicial, tendrá que traer a alguien para que le interprete ya que el tribunal no ofrece este servicio.**

## SEE NEXT PAGE FOR VERY IMPORTANT INFORMATION.

CL-0094-1709



## REQUESTS FOR ACCOMMODATIONS BY PERSONS WITH DISABILITIES   If you are a person with a disability who needs an accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Court Administration, 125 E. Orange Ave., Ste. 300, Daytona Beach, FL 32114, (386) 257-6096, at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the appearance is less than 7 days; if you are hearing or voice impaired, call 711.

**THESE ARE NOT COURT INFORMATION NUMBERS**



## SOLICITUD DE ADAPTACIONES PARA PERSONAS CON DISCAPACIDADES

**Si usted es una persona con discapacidad que necesita una adaptación para poder participar en este procedimiento, usted tiene el derecho a que se le proporcione cierta asistencia, sin incurrir en gastos.  Comuníquese con la Oficina de Administración Judicial (Court Administration), 125 E. Orange Ave., Ste. 300, Daytona Beach, FL 32114, (386) 257-6096,  con no menos de 7 días de antelación de su cita de comparecencia ante el juez, o de inmediato al recibir esta notificación si la cita de comparecencia está dentro de un plazo menos de 7 días; si usted tiene una discapacidad del habla o del oído, llame al 711.**

**ESTOS NUMEROS TELEFONICOS NO SON PARA OBTENER INFORMACION JUDICIAL**

CL-0094-1709

**IN THE CIRCUIT/COUNTY COURT IN AND FOR VOLUSIA COUNTY, FLORIDA**

CASE NO.  2025 25303 CODL
JUDGE  Angela A. Dempsey
DIVISION  71

MICHAEL PUCKETT v.                         EDGEWATER ANIMAL SHELTER


Plaintiff(s)                                        Defendant(s)

**REPLEVIN ORDER TO SHOW CAUSE**

THE STATE OF FLORIDA
To Each Sheriff of This State:
        YOU ARE COMMANDED to serve this order on defendant(s):
EDGEWATER ANIMAL SHELTER
C/O KAYLA KURTZ

by personal service as provided by law, if possible, or if you are unable to personally serve defendant within the time specified, by placing a copy of this order with a copy of the Summons on the claimed property located at:

605 MANGO TREE
EDGEWATER, FL 32132
at least Five (5) days before the hearing scheduled below, excluding the day of service and intermediate Saturdays, Sundays and legal holidays. Non personal service as provided in this order shall be effective to afford notice to defendant of this order, but for no other purpose.

        Defendant shall show cause before a judge of this Court on the following date, time and location:

Date:  MONDAY, SEPTEMBER 29, 2025, at 10:30 a.m.
DeLand Courthouse                    VIA ZOOM  https://zoom.us/j/7298437446
101 N. Alabama Avenue
Deland, FL 32721-6043

why the property claimed by plaintiff in the complaint filed in this action should not be taken from the possession of defendant and delivered to plaintiff.

        If the defendant fails to appear as ordered, defendant shall be deemed to have waived the right to a hearing. The Court may thereupon order the Clerk to issue a Writ of Replevin.

        ORDERED at   DeLand, Volusia County, Florida on  Sept. 17, 2025

                                                Circuit/County Court Judge

**SEE REVERSE SIDE FOR VERY IMPORTANT INFORMATION.**

CL-0094-1709

Defendant may file affidavits, appear personally or with an attorney and present testimony at the time of the hearing, or, on a finding by the Court pursuant to Section 78.067(2), Florida Statutes (1979), that the plaintiff is entitled to possession of the property described in the complaint pending final adjudication of the claim of the parties, file with the court a written undertaking executed by a surety approved by the Court in an amount equal to the value of the property to stay in order authorizing the delivery of the property to the plaintiff.

A copy of the above was mailed to the plaintiff/plaintiff/s attorney by U.S. Mail this date.
Dated: _____

K. Johnson
Deputy Clerk

Orig. fwd to:

**If English is not your native language and you need assistance understanding the court's proceedings, you will need to bring someone to interpret for you as this service is not provided by the court.**

**Si el inglés no es su lengua materna y va a necesitar ayuda para entender el proceso judicial, tendrá que traer a alguien para que le interprete ya que el tribunal no ofrece este servicio.**

## SEE NEXT PAGE FOR VERY IMPORTANT INFORMATION.

CL-0094-1709



## REQUESTS FOR ACCOMMODATIONS BY PERSONS WITH DISABILITIES

If you are a person with a disability who needs an accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Court Administration, 125 E. Orange Ave., Ste. 300, Daytona Beach, FL 32114, (386) 257-6096, at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the appearance is less than 7 days; if you are hearing or voice impaired, call 711.

**THESE ARE NOT COURT INFORMATION NUMBERS**



## SOLICITUD DE ADAPTACIONES PARA PERSONAS CON DISCAPACIDADES

Si usted es una persona con discapacidad que necesita una adaptación para poder participar en este procedimiento, usted tiene el derecho a que se le proporcione cierta asistencia, sin incurrir en gastos. Comuníquese con la Oficina de Administración Judicial (Court Administration), 125 E. Orange Ave., Ste. 300, Daytona Beach, FL 32114, (386) 257-6096, con no menos de 7 días de antelación de su cita de comparecencia ante el juez, o de inmediato al recibir esta notificación si la cita de comparecencia está dentro de un plazo menos de 7 días; si usted tiene una discapacidad del habla o del oído, llame al 711.

**ESTOS NUMEROS TELEFONICOS NO SON PARA OBTENER INFORMACION JUDICIAL**

CL-0094-1709

IN THE COUNTY COURT IN AND FOR
VOLUSIA COUNTY, FLORIDA

MICHAEL PUCKETT

     Plaintiff

vs.

EDGEWATER ANIMAL SHELTER INC.

and

JANE DOE

     Defendants

_____/

CASE NO: 2025 25303 CODL
Division 71
JUDGE Angela Dempsy

## PLAINTIFF MICHAEL PUCKETT's RESPONSE TO EDGEWATER ANIMAL HOSPITAL'S MOTION TO DISMISS

Plaintiff, Michael Puckett responds to Defendant Edgewater Animal Shelter's "Motion to Dismiss Counts II and III of Plaintiff's Second Amended Complaint" and in opposition states:

### I.    Procedural History

On September 16, 2025 Plaintiff Michael Puckett ("Plaintiff" or "Puckett") filed a pro se Replevin Complaint seeking possession of his two dogs, Goose and Macho Man, believing his dogs were at the Edgewater Animal Shelter. An Order to Show Cause was entered the following day setting a hearing on September 29, 2025 at which the Defendant Edgewater Animal Shelter Inc. ("Defendant" or "EAS") was required to show cause "why the property claimed by plaintiff in the complaint filed in this action should not be taken from the possession of the defendant and delivered to plaintiff."

On September 24, 2025 undersigned counsel filed a Notice of Appearance; two days later on September 26, 2025 Attorney Christopher W. Wickersham entered a Notice of Appearance on behalf of Defendant EAS.

At the September 29, 2025 hearing EAS presented the testimony of its Director, Roxanne Hicks, who testified under oath that although EAS was fully aware that Puckett wanted his dogs back, because Puckett could not afford the fees demanded by EAS, Macho Man had been destroyed because the dog was allegedly aggressive, and Goose had been adopted out to an undisclosed third party.

After the September 29, 2025 hearing Plaintiff's counsel received, pursuant to a public records request, an "Animal Record Summary" regarding Goose that stated on the very first page "The Adopted pet has not been sterilized prior to adoption," and filed a Motion for Reconsideration and Request for Leave to Amend on October 2, 2025. October 8, 2025 an Order was entered deeming the Amended Petition for Writ of Replevin, Complaint for Damages, and Demand for Jury Trial filed and "the operative Complaint in this matter."

Upon the pronouncement of Attorney Stephanie Boomershine, who entered an appearance on behalf of EAS on October 17, 2025, that notwithstanding the disclaimer on page 1 of EAS's "Animal Record Summary" Goose was in fact altered prior to his adoption, a Second Amended Complaint was filed on behalf of Plaintiff on October 21, 2025.[1] Three weeks later EAS filed its Motion to Dismiss Counts II and III of the Second Amended Complaint.

---

[1] EAS is apparently salty about the filing of a Second Amended Complaint, complaining that such filing was "without a motion, without conferral with the undersigned, and without leave of court." EAS has yet to file a responsive pleading in this matter and fails

2

## II.  Legal Standard

The primary purpose of a motion to dismiss is to request the trial court to determine whether the complaint properly states a cause of action upon which relief can be granted and, if it does not, to enter an order of dismissal. *See*, *Sobi v. Fairfield Resorts, Inc*., 846 So. 2d 1204, 1206 (Fla. 5th DCA 2003). The function of a motion to dismiss is to raise as a question of law the sufficiency of the facts alleged to state a cause of action. *See, Varnes v. Dawkins,* 624 So.2d 349, 350 (Fla. 1st DCA 1993). It is axiomatic that in ruling on a motion to dismiss a court is confined to the four corners of the complaint and must consider all well-pled allegations as true. *Music Royalty Consulting, Inc. v. Am. Soc'y of Composers, Authors & Publishers (ASCAP)*, 314 So. 3d 377, 379 (Fla. 3d DCA 2020).

## III.     Plaintiff has pled a cause of action for conversion.

EAS asserts that Plaintiff's conversion claim "must be dismissed due to Plaintiff's failure to demand return of Goose and Macho Man or, alternatively, to allege that such a demand would be futile." EAS is wrong; proof of demand is not required to prevail on a conversion claim. *Rosenthal v. Equus Prop. Homeowners Hoa*, 369 So. 3d 719, 722 (Fla. 4th DCA 2023) (Nevertheless, proof of "demand" is not required to prevail on a conversion claim.) *accord Batista v. Rodriguez*, 388 So. 3d 1098, 1101 (Fla. 3d DCA 2024) ("To state a claim for conversion, one must allege facts sufficient to show ownership of the subject property and facts that the other party wrongfully asserted dominion over that property.") See also *Hannah v. Malk Holdings*, 368 So. 3d 1087, 1091(Fla. 6th DCA 2023) (To state a claim for conversion, one must allege facts

_____

to cite any authority for its insinuation that the filing of a Second Amended Complaint was improper.

3

sufficient to show ownership of the subject property and facts that the other party wrongfully asserted dominion over that property. Proof of a plaintiff's demand and a defendant's refusal is unnecessary when a plaintiff can demonstrate that the unauthorized act constituted a conversion regardless of a demand.) *citing Goodrich v. Malowne*y, 157 So. 2d 829, 832 (Fla. 2d DCA 1963) (The generally accepted rule is that demand and refusal are unnecessary where the act complained of amounts to a conversion regardless of whether a demand is made.) *citing Louisville & N.R. Co. v. Citizens' & Peoples' Nat'l Bank of Pensacola*, 74 Fla. 385, 77 So. 104, 105 (Fla. 1917).

Furthermore, even if Puckett was required to allege he made a demand for return of his dogs to state a cause of action for conversion, the Second Amended Complaint alleges:

1) Plaintiff contacted Defendant EDGEWATER ANIMAL SHELTER INC. and asked what he needed to do to be reunited with his dogs. ¶ 22
2) PUCKETT pleaded to be allowed to make payments towards the money Defendant EDGEWATER ANIMAL SHELTER INC. claimed he owed. ¶ 27
3) Plaintiff requested to be allowed to adopt his dogs and was flatly denied because Defendant EDGEWATER ANIMAL SHELTER INC. deemed him unfit to care for his dogs. ¶ 29

EAS's unsupported argument raises "form over substance" to new heights. The factual allegations of the complaint establish that Plaintiff communicated to EAS that he wanted Goose and Macho Man to be returned, and those allegations are apparently undisputed. Plaintiff was not required to utter the magic word "demand" nor is he required to allege that he spouted that magic word to state a cause of action for conversion. *Edwards v. Landsman*, 51 So. 3d 1208, 1213 (Fla. 4th DCA 2011) ([T]o state a claim for conversion, one must allege facts sufficient to show ownership of the subject property and facts that the other party wrongfully asserted dominion over that property.)

4

The Second Amended Complaint more than adequately states a cause of action for conversion by asserting that Plaintiff owned Goose and Macho Man, and that EAS was aware Plaintiff wanted his dogs to be returned but killed Macho Man and disappeared Goose nonetheless.

### A. Goose and Macho Man were Never Property of EAS

According to EAS "it is imperative to consider relevant Ormond Beach City, Edgewater City, and Volusia County ordinances," and supposedly based upon a combination of provisions contained in those ordinances, EAS had extinguished Puckett's property rights in Goose and Macho Man.

It is equally imperative that this court construe "relevant Ormond Beach City, Edgewater City, and Volusia County ordinances" to affect a constitutional outcome whenever possible. *DeSisto College Inc. v. Town of Howey-In-The-Hills*, 706 F. Supp. 1479 (M.D. Fla.), affirmed, 888 F.2d 766 (11th Cir. 1989). (Rules of construction require that the ordinance be interpreted, if possible, as constitutional.) An ordinance that allows a not-for-profit corporation to obtain ownership of personal property simply because the owner of the property is unable to pay fees leveraged by that corporation is unconstitutional. *See Barrow v. Holland*, 125 So.2d 749, 751 (Fla.1960) (Once any animal has been legitimately reduced to private control, confinement, and possession, it becomes private property. When that occurs, the owner thereof cannot be deprived of the use thereof, except in accord with all of the elements of due process.) The purpose of ordinances imposing time limits on claiming an animal at an animal shelter is to allow stray animals or abandoned animals to be rehomed without unduly burdening the facility caring for the animals. Hold periods are not intended to effectuate a forfeiture when the

5

owner of an animal is known simply because the owner is poor.

**B. Ormond Beach Code of Ordinances does not compel forfeiture of Goose and Macho Man**

Defendant claims the delivery of Goose and Macho Man to the clutches of EAS was "consistent with Ormond Beach law," specifically citing Ormond Beach Ordinance § 5-70, which provides that *"[a]n animal control officer has the authority to impound any animal at large, pursuant to the enforcement or violation of any ordinance of this chapter or as provided by Florida Statutes."* However, §5-72 of the Ormond Beach Code states that *"[t]he owner of any animal impounded pursuant to city ordinance or Florida Statutes can reclaim such animal, upon payment of a license fee and the charges hereinafter imposed, and of all costs and charges incurred <u>by the city</u> for impounding and maintenance of such animal*." (emphasis added) Section 5-72 further provides that "*the duties herein imposed upon the animal control officer may be delegated to <u>an animal shelter by a service agreement approved by resolution of the city commission</u>. In all instances of impoundment, owners of animals are responsible for the full cost of impoundment as charged by the shelter*." (emphasis added)

First, at the time Goose and Macho Man were transferred to the Edgewater Animal Shelter the only service agreement approved by resolution of the city commission was with the Halifax Humane Society, there is no such resolution regarding EAS. The Ormond Beach Code provided EAS <u>zero authority</u> to condition the return of Puckett's dogs on payment of a fee unilaterally imposed by EAS that EAS knew Puckett could not afford. Even if EAS had such authority, nothing in the Ormond Beach Code requires a dog owner to pay the full amount of the "impoundment fee" in one lump payment.

Second, the agreement between Ormond Beach and the Halifax Humane Society,

6

attached hereto as Exhibit 1, states on page 6 of 13 that "the Humane Society may release
an animal to its owner without payment in the event the animal's owner completes a
financial affidavit indicating that the owner qualifies as indigent." The minutes of the
September 18, 2024 Ormond Beach City Commission meeting, which on page 7 reflects
the city commission's approval of Resolution No. 2024-157 authorizing execution of the
agreement is attached hereto as Exhibit 2. Presumably the city commission would not
have approved the agreement by resolution if reuniting dogs with owners of limited
financial means violated the city code.

       The assertion that EAS was legally unable to return Puckett's dog unless he
coughed up $490.00 is absurd. EAS has not identified any authority to charge Puckett at
all, let alone any provision of the Ormond Beach Code stating that impoundment fees
may not be waived for indigent dog owners or paid in installments.


### C. The Animal Services Ordinance of the City of Edgewater, Florida does not apply to dogs that were not impounded in Edgewater

       EAS asserts in its motion to dismiss that "as specifically provided in the
Edgewater City Ordinances above, because Plaintiff was unable to pay the impoundment
fee to reclaim Goose and Macho Man after three days, the dogs were deemed abandoned
by law and became the property of Edgewater."

       Section 5-40 of the City of Edgewater's Code of Ordinances authorizes animal
control officers to, under specified conditions, "*pick up, capture, catch, procure and
impound in a holding facility*" animals within the City of Edgewater. Section 5-41 of the
Code, entitled, **Disposition of Impounded Animals**, regulates what happens to animals
after those animals within the Edgewater city limits are impounded by animal control

officers. Impounding facility is defined in the Code as "*any holding or impounding facility owned or under contract with the City of Edgewater for services or one that is designated from time to time by the city.*" Presumably EAS does not have a contract with the City of Edgewater to hold animals brought to the private shelter from other jurisdictions.

The Edgewater ordinance on its face does not apply to animals that have been transferred to a private animal shelter that simply happens to be located in the City of Edgewater, and provides EAS no authority to terminate ownership of an animal that was not impounded by an animal control officer within the City's jurisdiction.

Even if the Edgewater Code did apply to Goose and Macho Man, Section 5-41(e) states that "[a]ny unclaimed animal shall become the property of the impounding facility after the three-day hold period, and may be humanely destroyed, maintained or disposed of by gift, sale or adoption pursuant to the requirements of this chapter and the rules and regulations of the impounding facility." EAS is not "the impounding facility" as that term is defined, and Goose and Macho Man were not unclaimed, Puckett attempted to claim his dogs, but EAS would not allow him to do so. This provision is clearly intended to apply to animals whose owner is unknown and does not look for their lost pet, not to dog owners known to be desperate to be reunited with their pets but unable to afford the fees demanded by a non-profit corporation.

None of the many ordinances cited by EAS compelled the forfeiture of Goose and Macho Man to EAS. The obligation to construe the various provisions of Volusia County, Edgewater and Ormond Beach consistent with constitutional constraints forbids any such tortured interpretation. Puckett has stated a claim for conversion.

8

## IV.    *Puckett's Claims for Damages is Valid*

EAS asserts that Puckett's damages for conversion are limited to the "reasonable value of Goose and Macho Man" and all other damage claims must be stricken. EAS fails to enlighten the Court as to how it should determine the reasonable value of Goose and Macho Man. Goose and Macho Man were Puckett's emotional support animals. As alleged in the Second Amended Complaint, Goose and Macho Man provided Puckett affection, companionship and emotional support that helped ameliorate the symptoms of his PTSD. Restricting the owner of irreplaceable companion animals to recovering only their pets' fair market value fails to fully compensate the injured party. This is especially true of animals that provide therapeutic support to an individual that struggles with mental health issues.

Florida Courts have held that in some cases damages in a conversion case can include compensation for the loss of use of the property. See for example, *R&B Holding Co. v. Christopher Advert. Grp., Inc*., 994 So. 2d 329, 331-32 (Fla. 3d DCA 2008), pointing out that damages for conversion can include an award for loss of use of property not otherwise compensated by an award for the conversion of chattel.

In Florida, when a wrong is shown, it becomes the duty of court and jury to apply a test that will reasonably compensate the person wronged rather than one that makes it impossible to do so. *Fla. Pub. Utils. Co. v. Wester*, 150 Fla. 378, 382 (Fla. 1942). More than fifty years ago the Florida Supreme Court concluded that in the case of intentional injury to or destruction of a pet, damages are not capped by the animal's market value. *LaPorte v. Associated Independents, Inc*., 163 So. 2d 267, 269 (Fla. 1964) ("The restriction of the loss of a pet to its intrinsic value in circumstances such as the ones

9

before us is a principle we cannot accept. Without indulging in a discussion of the affinity

between 'sentimental value' and 'mental suffering', we feel that the affection of a master

for his dog is a very real thing and that the malicious destruction of the pet provides an

element of damage for which the owner should recover, irrespective of the value of the

animal because of its special training such as a Seeing Eye dog or sheep dog.")


### V.    Plaintiff has pled a cause of action for Intentional Infliction of Emotional Distress.

EAS asserts that it was just doing its job when it refused to return Goose and

Macho Man to Puckett. According to EAS:

> Edgewater was *required* to collect the "full cost of
> impoundment" from Plaintiff before returning Goose and
> Macho Man. *See* Ormond Beach Ordinance § 5-72,
> Edgewater Florida Ordinance § 5-41(c), and Volusia
> County Ordinance §14-62(e) ("Any person seeking to
> redeem or reclaim an animal impounded under the
> provisions of this Article shall pay the impoundment fees,
> boarding fees, license fees, and all other fees resulting
> from impounding and caring for the animal" and "In all
> instances of impoundment, owners of animals are
> responsible for the full cost of impoundment as charged by
> the shelter.") (emphasis in the original)


Volusia County's Ordinance applies only in unincorporated areas of the County

and in incorporated areas of municipalities that contract with the County to provide

animal control services, which does not include the City of Edgewater. § 14-35, Volusia

County Code of Ordinances. Even if the County ordinance  did apply, the ordinance does

not indicate that the full cost of impoundment may not be paid in installments, or that

such fees may not be waived. The form Halifax Humane Society asks indigent pet

owners to complete when releasing an animal to its owner without payment is a Volusia

County Form[2], suggesting that Volusia County, like Halifax Humane Society works with low-income pet owners rather than unilaterally terminating their ownership of a beloved pet based upon an inability to pay. The inapplicability of Edgewater's ordinance to an animal not impounded in Edgewater was addressed above, as was the fact that EAS has no service agreement with Ormond Beach approved by resolution of the city commission, and nothing in Ormond Beach's code compelled the forfeiture of Goose and Macho Man to EAS based solely on Puckett's inability to pay fees as demanded by EAS.

Simply put, rather than extend Puckett some much needed grace, which was well within its power, EAS destroyed one of his dogs and deprived him of the other because Puckett did not have $490. EAS did so knowing that Puckett had not abandoned his dogs and to the contrary desperately wanted them back, after Puckett had offered to make payments towards the fees demanded and even attempted to adopt them and when rebuffed attempted to have a friend adopt them. EAS's mantra of inability to return Puckett's dogs to him based upon various provisions in an inapplicable county ordinance and two city ordinances fails; none of the cited authorities allowed much less required EAS to effectuate a forfeiture of Puckett's property based upon his inability to immediately pay the fees EAS unilaterally imposed.

To prove intentional infliction of emotional distress, Puckett must show: (1) The wrongdoer's conduct was intentional or reckless, that is, he intended his behavior when he knew or should have known that emotional distress would likely result; (2) the conduct was outrageous, that is, as to go beyond all bounds of decency, and to be regarded as odious and utterly intolerable in a civilized community; (3) the conduct

---

[2] The form is the last page of Exhibit 1.

caused emotional distress; and (4) the emotional distress was severe." *Deauville Hotel Mgmt., LLC v. Ward*, 219 So. 3d 949, 954-55 (Fla. 3d DCA 2017).

The Second Amended Complaint properly alleges facts that if true establish a valid claim for intentional infliction of emotional distress. The EAS oft repeated albeit baseless mantra that it was "simply doing its job as authorized by law" does not change the fact that it deprived Puckett of the love and companionship of his beloved dogs because Puckett did not have $490. Puckett's factual allegations are sufficient to support a claim for outrageous conduct as required for an intentional infliction of emotional distress claim.

## VI.    Conclusion

The arguments asserted in the Defendant's Motion to Dismiss all fail as a matter of law. The motion should be denied, and the Defendant should be ordered to promptly file an answer to the complaint.

By: s/ *Marcy LaHart*
Marcy I. LaHart, Esq.
Florida Bar No. 0967009
Marcy@floridaanimallawyer.com
861 SE 40th Street
Tacoma, WA 98418
(352) 545-7001


### CERTIFICATE OF SERVICE

I hereby certify that on December 3, 2025 I electronically filed the foregoing by using the Florida Courts E-Filing Portal, which will send notice of this electronic filing to all counsel of record.

By: s/ *Marcy LaHart*
Marcy I. LaHart, Esq.

# EXHIBIT ONE

**AGREEMENT FOR SERVICES BETWEEN**
**Halifax Humane Society, Inc.**
**AND**
**The Impounding agency**

**This Services Agreement** ("Agreement") is hereby entered into by and between the **Halifax Humane Society, Inc.**, a Florida non-profit corporation, with its principal address at 2364 West LPGA Boulevard, Daytona Beach, Florida 32124 ("Humane Society"), and the **Impounding agency**, a municipal corporation, with its primary address at ("Impounding agency address").

**WHEREAS,** in order to enforce the ordinances of the Impounding agency and the laws of the State of Florida with respect to stray animals, the Impounding agency desires to deliver stray animals to the Humane Society for the humane impoundment and humane disposition of said animals; and

**WHEREAS,** the Humane Society is organized for the purpose, among others, of preventing cruelty to animals and is interested in assuring that impounded animals are sheltered in a humane manner and those which must be destroyed, be so destroyed humanely.

**NOW, THEREFORE,** for and in consideration of the mutual covenants, conditions and provisions herein contained, it is expressly agreed and understood as follows:

1.    **TERM**:  This Agreement will take effect on the 1st day of October 2024, and will remain in full force and effect for an initial twelve (12) month period ending on midnight between September 30, 2025. The parties shall have the option to extend the contract or enter into contract negotiations if they so desire. This contract may be renewed by the Impounding agency for up to three (3) twelve (12) month periods, with a 10% increase of fees per renewal.

2.    **ANIMAL SHELTER, RETURN TO FIELD, AND TRAP, NEUTER, AND RETURN**:

(a)  The Humane Society will maintain and operate an animal shelter ("Shelter") in a manner adequate for the confinement, remedial treatment, and, if necessary, disposal of stray dogs, cats, or other animals, which may be delivered to the Humane Society from all areas within the jurisdiction of the Impounding Agency, and the Humane Society will furnish, at its sole expense, all supervision, labor, animal food, tools, supplies and other things necessary for the satisfactory performance of the services herein agreed to be provided.  Remedial care will be provided for injured animals during operating hours when there is a staff veterinarian available, at the Humane Society's sole expense.  The Shelter will be operated at 2364 West LPGA Blvd., Daytona Beach, Florida.

(b)  The Humane Society will provide means to accept all stray dogs and other stray or seized domesticated animals delivered to the Shelter by the Impounding agency's law enforcement personnel, Animal Control Officers, or other designated officers appointed by the Impounding agency for this purpose.  The Humane Society will

provide Return to Field (RTF) for unsterilized cats following national animal welfare organization recommendations for the most humane practices with addressing cat overpopulation. The Humane Society will accept wild animals and livestock only if it has the ability and facilities to impound and control these animals, and the decision to accept or reject such animals will be solely within the discretion of the Humane Society. The Humane Society will require all persons who drop off or report injured or stray animals to the Shelter during the Shelter's normal operating hours to give their names, phone number, and current home and post office addresses and identify the place where the animals involved were located or picked up.

(c)   If the Impounding agency delivers an animal to the Shelter for impoundment discovers such animal bears information indicating ownership of the animal, the impounding agency representative shall take reasonable steps to identify the owner of the animal and contact said owner prior to delivering the animal to the Shelter. The impounding representative shall also provide all contact information gathered and documented attempts of contact for the owner/guardian to Halifax.   Regardless of the foregoing, any animal suspected of being infected with rabies or which has bitten or otherwise exposed any person to rabies, shall not be released to its owner until after such animal has been impounded for a period of ten (10) days and the Volusia Health Department, through its authorized representatives, has expressly approved, in writing, any such release.

(d)   When a stray domestic animal is delivered to the Shelter and is not suspected of having rabies or has not bitten or otherwise exposed any person to rabies, the Humane Society will impound the animal at the Impounding agency's expense for a period of not to exceed three (3) calendar days (unless otherwise provided in this Agreement).   If the owner has not retrieved the animal within the designated holding period, the Humane Society will thereafter, at its own expense, provide for the adoption or humane disposal of the animal in accordance with its routine methods and procedures**.**

(e)   When a stray cat is delivered to the Shelter and is not suspected of having rabies or has not bitten or otherwise exposed any person to rabies, the Humane Society will determine the eligibility of the animal for the RTF Program. After consultation with the Impounding agency, Humane Society will decide whether the cat will be referred for impoundment or RTF and notify the impounding agency. The Impounding agency representative will expressly inform the Humane Society if a cat is brought in as part of the Trap, Neuter and Return Program (TNR). The Humane Society will only perform feline sterilization services for cats brought to the Humane Society by an Animal Control Officer (ACO) or other Impounding agency person designated by the Police Department. Cats brought to the Humane Society by any other person will not be eligible for reimbursement by the Impounding agency. Fees for this service are listed in 3.b. under RTF/TNR Cats. The Impounding agency will only be responsible

for services or procedures that are requested and expressly included in this agreement. The Impounding agency will not pay for any other service or procedure. The RTF/TNR Program requires the following:

i.    The Humane Society and the Impounding agency shall mutually agree on the day(s) of the week that the Impounding agency will bring cats to the designated Humane Society facility. Said schedule shall be subject to change by mutual agreement of the parties. The Impounding agency shall at a minimum have one day reserved each week at a designated Humane Society facility to bring in cats for sterilization.

ii.    Surgeries may be completed at either:
Halifax Humane Society 2364 West LPGA Boulevard Daytona Beach, FL 32124
     -Or-
HHS Redinger Clinic 600 Mason Ave #150 Daytona Beach, FL 32117

Hereafter, Humane Society shall refer to both the location on LPGA Blvd. and Mason Ave.

iii.    All regular sterilizations are the same price for neuters and spays (males and females).  Each surgery includes complimentary ear tipping, FVRCP and rabies vaccines, and anesthesia.  Ear tipping must be completed according to Alley Cat Allies recommendations by removing at least 3/8 of an inch from the top of the left ear.

iv.    If the Impounding agency presents a cat for sterilization and the Humane Society finds the cat has already been sterilized, the Humane Society will provide anesthesia, ear tipping, FVRCP and rabies vaccine at the normal sterilization surgery cost.

v.    Upon presentation of a cat, the Humane Society, at its sole discretion, will determine if the cat is healthy enough to survive surgery and whether or not it should be euthanized.  The Humane Society recognizes that the Impounding agency does not have a licensed veterinarian on staff and does not have the ability to determine whether an animal should be euthanized.

vi.    All cats being returned to the Impounding agency staff from the Humane Society will have their ear tipped as described above.  No exceptions.  If a cat is returned to the Impounding agency staff without an ear tip, or with an ear tip of less than 3/8 of an inch from the top of the left ear, the Impounding agency cat will be returned to the Humane Society for the procedure without any additional charge to the Impounding agency.

vii.    No procedures other than those listed in this document will be paid for by the

Impounding agency.  The Impounding agency will only reimburse for procedures that have been documented and provided to the Impounding agency.  The Humane Society must provide at least the following information in order to receive reimbursement for each cat:

- Invoice number
- Visit Date
- Billing Date
- Animal Name and/or Number
- Impounding agency services provided
- Name of Impounding Agency Rep authorizing service(s)
- Cost for each service provided
- Total cost

**viii.**    The Humane Society will combine and send all invoices to the Impounding agency monthly.

**ix.**    ACO's will notify the Humane Society staff at the LPGA location whether a feline brought there is part of the TNR program, if it is for RTF, is wild, stray, confiscated, or seized.

**x.**    The Humane Society will only release RTF cats to the Impounding agency Animal Control Officer unless Impounding agency provided permission for a 3rd party release in writing from the agency's authority.

3.    **BILLING & PAYMENT**:

(a)    The Humane Society shall bill the Impounding agency pursuant to Paragraph 3(b), as applicable, for:

(i) each dog, cat, domesticated animal, injured animal, deceased animal, livestock animal, wild animal, or quarantined/confiscated animal delivered to the Shelter by either the Impounding agency's designated personnel, Police or Animal Control Officers;

(ii) each stray dog, cat, domesticated animal, injured animal, deceased animal, livestock animal or wild animal emanating from within Impounding agency the jurisdictional limits of the impounding agency and delivered to the Shelter by a private citizen who has provided their full name and contact information.  Owner surrendered animals will only be accepted via impounding agency with Supervisor approval from Halifax Humane Society.  Owner requested surrenders in the field should be referred to Halifax Humane Society directly; and

(iii) each dog, cat, domesticated animal, injured animal or deceased animal picked up at the request of the Impounding agency by the Humane Society within

Impounding agency jurisdictional limits of the impounding agency.

(b) In consideration of the agreements and undertakings to be performed by the Humane Society, the Impounding agency agrees to pay the following applicable fee(s) per animal to the Humane Society on a monthly basis, in arrears:

| Type of Animal | Fee |
|---|---|
| **Dog or cat** (if the cat is not eligible for RTF/TNR program)<br>Impoundment | $156.00 |
| **Other domesticated animal** | $130.00 |
| **Livestock animal** | $195.00 |
| **Wild animal (Euthanasia)** | $ 71.50 |
| **Deceased on arrival (Disposal)** | $32.50 |
| **Quarantined animal (*e.g.*, Rabies)** | $390, $39 per day<br>Quarantine period determined by Florida State Statute |
| **Confiscated animal** | $130 for the 1st day of impoundment plus $45.50 for each additional day of impoundment |
| **Fees for RTF/TNR cats**<br>**Sterilization Surgery**<br>Complimentary ear tipping, FVRCP, Rabies Vaccines | $58.50 |
| **Anesthesia Fee**<br>No surgery performed, ear tipping, FVRCP vaccine, rabies vaccine | $58.50 |
| **Euthanasia**<br>Veterinarian determined that patient cannot undergo surgery due to illness/disease | $58.50 |
| **Forensic calls and staff assistance upon request** | Staff Support:          $32.50 per hr.<br><br>Veterinarian Support:  $162.50 per hr. |

(c)     Payment must be made to the Humane Society within forty-five (45) days of the date of a proper invoice, as required by the Florida Local Government Prompt Payment Act (Part VII, Chapter 218, Florida Statutes) (the "Prompt Payment Act"). As provided by the Prompt Payment Act, any payment that is not made by the Impounding agency within such time period shall bear interest from thirty (30) days after the due date at a rate of one percent (1%) per month on the unpaid balance until paid in full.  If the Impounding agency has a dispute about a charge on its invoice, it must contact the Humane Society's Director of Administrative Services at 386-274-4703, extension 315, within fifteen (15) days of the date of the invoice.

(d)     The Humane Society will submit to the Impounding agency, with its monthly invoice, a list of all pick up addresses of stray animals charged to the Impounding agency account for animals that were not impounded by a an impounding agency's designated personnel, the names and addresses of all persons claiming any stray animals that are dropped off at the Shelter during normal operating hours, and, if known, the names and addresses of all persons claiming stray animals that are dropped off at the Shelter after-hours.

(e)     The Humane Society will make a good faith effort to collect the costs incurred for the care of any animal that is served by the Humane Society and later reclaimed by the animal's owner. Collections received by the Humane Society by an animal owner shall be credited against the fees charged to the Impounding Agency. The animal's owner is financially responsible for any services rendered to the animal by the Humane Society and the Humane Society, without indicating that payment is optional, will seek full payment for said services prior to releasing the animal. The Humane Society may release an animal to its owner without payment in the event the animal's owner completes a financial affidavit indicating that the owner qualifies as indigent. The financial affidavit to be used by Humane Society is attached hereto marked as **Exhibit A**.  If the attached financial affidavit is completed by the animal owner, the Humane Society may release the animal to the owner without collecting any fees and the Impounding Agency shall be responsible for the charges associated with the released animal as outlined herein.  A copy of the animal owner's financial affidavit shall be included in the corresponding invoice to the Impounding Agency. If the Humane Society does not have the animal owner complete a financial affidavit but releases the animal to the owner, the Impounding Agency shall not be charged for any of the fees associated with the animal released.

4.     **RABIES QUARANTINE**:  The Humane Society will provide space for the confinement, observation and care of any stray animal suspected of rabies, or any stray animal which has bitten or otherwise exposed any person to rabies for a period of the state determined time for quarantine and will accept, care for and dispose of any such animal delivered to the Shelter. The Humane Society will notify the Volusia County Health Department of any rabies specimen

animal that dies during the quarantine period, and will allow the Volusia Impounding agency Health Department the opportunity to take custody of the remains of any such animal that becomes ill or dies while under confinement for such reasons. The Impounding agency impounding agency shall pay the applicable charges for quarantine service pursuant to Section 3(b) of this Agreement.

5.      **CONFISCATED ANIMALS – 828.073, F.S.**:  The Humane Society will agree to accept confiscated animals as strays or accept said animals as "confiscated" only when the provisions of Section 828.073, Florida Statutes are satisfied (*i.e.*, pursuant to a Court order after petition and hearing).   The Impounding agency shall be responsible for all charges and expenses incurred in confiscating an animal pursuant to § 828.073, Fla. Stat.  Upon request, a copy of the petition must be submitted by the seizing agent to the Humane Society within ten (10) business days of the request.  Failure to comply with this requirement will result in "confiscated" animals being deemed "stray" animals, at which point care of the animal will be charged to the Impounding agency at the default "stray" rates provided in Section 3(b) of this Agreement. The Impounding agency agrees to indemnify the Humane Society for any and all claims that may arise as a result of the Impounding agency decision to submit the animal as a stray, except that the cap on the amount and liability of the Impounding agency for indemnification or damages under this contract, regardless of the number or nature of claims in tort, equity, or contract, shall not exceed the dollar amount expended by the Impounding agency for Humane Society services in the contract year in which the claim arises.

6.      **DANGEROUS DOG LAW**:  Pursuant to Sections 767.12 and 767.13, Florida Statutes, it will be the sole responsibility of the Impounding agency's animal control authority to determine whether a dog is dangerous and to submit to the Humane Society the necessary paperwork as required by the applicable statutes.  If quarantine is necessary, a dog quarantined pursuant to Sections 767.12 and 767.13, Florida Statutes, may be quarantined for ten (10) business days at a bona fide boarding kennel or veterinarian's office of the seizing agent's or owner's choice. Otherwise, the Humane Society will quarantine all dogs that the Impounding agency animal control authority determines to be dangerous for a maximum of ten (10) business days.  The Impounding agency shall pay the applicable charges for such service pursuant to Section 3(b) of this Agreement.  If the owner of the dog is unknown by the end of the quarantine period, the Impounding agency may request that euthanasia be performed by the Humane Society when it is the Impounding agency's belief that the dog poses a threat to public safety. The Impounding agency agrees to indemnify the Humane Society for any and all claims that may arise as a result of the Impounding agency decision to submit the animal under the Dangerous Dog Law, except that the cap on the amount and liability of the Impounding agency for indemnification or damages under this contract, regardless of the number or nature of claims in tort, equity, or contract, shall not exceed the dollar amount expended by the Impounding agency for Humane Society services in the contract year in which the claim arises.

7.      **CONFISCATED ANIMALS - OWNER OF ANIMAL IS IN CUSTODY / DECEASED / HOSPITALIZED**:  All animals whose owners are in police custody, deceased or hospitalized may

be placed in a bona fide boarding kennel or veterinary clinic at the owner's expense. The Humane Society will accept any such animals that are seized or taken by the Impounding agency. The Impounding agency will pay the applicable charges for such service (*i.e.*, "Confiscated Animal") pursuant to Section 3(b) of this Agreement. The Impounding agency agrees to indemnify the Humane Society for any and all claims that may arise as a result of the Impounding agency's decision to submit the animal as Confiscated/Owner of Animal in Custody/Deceased/Hospitalized, except that the cap on the amount and liability of the Impounding agency for indemnification or damages under this contract, regardless of the number or nature of claims in tort, equity, or contract, shall not exceed the dollar amount expended by the Impounding agency for Humane Society services in the contract year in which the claim arises. The impounding agency agrees to provide next of kin, emergency contact or any other guardian information to Halifax within 3 days of impoundment. Failure to do so by the impounding agency will forfeit any hold on the animal other than the mandatory 3 day holding period for stray animals.

8.     **CONFISCATED ANIMALS DUE TO OWNER EVICTION**:  Animals seized by the Impounding agency as a result of an owner eviction will be held by the Humane Society for 5 days.  The impounding agency agrees to leave notice of impoundment at the eviction location listing the whereabouts and descriptions of animal confiscated.  Impounding agency's representative will provide proof of such notice, agency report or photograph of notice on the dwelling with address or writ of possession displayed.   If not reclaimed by the owner, all charges accruing pursuant to Section 3(b) will be paid by the Impounding agency.

As the impounding agency, if the Impounding agency chooses not to have the Humane Society hold the animal for the entire reclamation period referenced above, the Impounding agency may submit the animal to the Humane Society as a "stray," in which case the animal will be held for three (3) days prior to disposition.  The Impounding agency agrees to indemnify the Humane Society for any and all claims that may arise as a result of the Impounding agency's decision to submit the animal as a "stray", except that the cap on the amount and liability of the Impounding agency for indemnification or damages under this contract, regardless of the number or nature of claims in tort, equity, or contract, shall not exceed the dollar amount expended by the Impounding agency for Humane Society services in the contract year in which the claim arises  The Impounding agency shall pay the applicable charges for such service pursuant to Section 3(b) of this Agreement.

9.     **REMEDY IN THE EVENT OF BREACH**:  In the event that the Impounding agency fails to make timely payment to the Humane Society for services rendered pursuant to this Agreement, the Humane Society, in its sole discretion, may elect to terminate this Agreement and cease providing services to the Impounding agency.  If the Humane Society exercises this option, it will provide the Impounding agency with thirty (30) days written notice of its decision to terminate the Agreement.  The Impounding agency will remain responsible for payment for all services rendered by the Humane Society prior to and during the thirty (30) day notice period. Upon expiration of the thirty (30) day notice period, the Humane Society will no longer provide

any services to the Impounding agency.

10.     **WAIVER OF BREACH**:  The waiver by the Humane Society or the Impounding agency of any breach or violation of this Agreement will not operate as or be construed to be a waiver of any subsequent breach of this Agreement.

**11.  INSURANCE**: Humane Society shall maintain insurance of sufficient amounts during the life of this Agreement. Humane Society shall provide to the Impounding Agency with a certificate of insurance endorsing the Impounding Agency as an additional named insured, upon request. All insurance coverages of the Humane Society shall be primary and noncontributory. All insurance coverages of the Humane Society shall not seek contribution from any other insurance or self-insurance available to the Impounding Agency.

Policies shall be issued by insurers licensed and/or duly authorized under Florida Law to do business in the State of Florida and all insuring companies are required to have a minimum rating of "A-" in the "Best Key Rating Guide" published by A.M. Best & Company, Inc. Insurer shall provide the Impounding Agency written notice of cancellation, nonrenewal or any other changes in coverage no later than thirty (30) days prior to the effective date of the change and shall provide notice to the Impounding Agency no later than 10 days after non-payment.

Minimum insurance coverages that must remain in place for the life of the Agreement are as follows:
Commercial General Liability:        Aggregate $2,000,000.00/ Each Occurrence $1,000,000.00
Automobile Liability:        $1,000,000.00
Umbrella Liability:        $1,000,000.00

Should at any time the Humane Society not maintain the insurance coverages required herein, the Impounding Agency may terminate the Agreement or at its sole discretion shall be authorized to purchase such coverages and charge the Humane Society for such coverages purchased. The Impounding Agency shall be under no obligation to purchase such insurance, nor shall it be responsible for the coverages purchased or the insurance company or companies used. The decision of the Impounding Agency to purchase such insurance coverages shall in no way be construed to be a waiver of any of its rights under the Agreement.

11.     **SOVEREIGN IMMUNITY:**  The Impounding agency expressly retains all rights, benefits, and immunities of sovereign immunity in accordance with §768.28, Florida Statutes. Notwithstanding anything set forth in any section of the Agreement to the contrary, nothing in the Agreement shall be deemed as a waiver of immunity of limits of liability of the Impounding agency beyond any statutory limited waiver of immunity or limits of liability which may have been adopted by the Florida Legislature or may be adopted by the Florida Legislature, and the cap on the amount and liability of the Impounding agency for damages, regardless of the number or nature of claims in tort, equity, or contract, shall not exceed the dollar amount set

by the legislature for tort. Nothing in this Agreement shall inure to the benefit of any third party for the purpose of allowing any claim against the Impounding agency, which would otherwise be barred under the Doctrine of Sovereign Immunity or by operation of law.

**12.    PUBLIC RECORDS**:  Pursuant to section 119.0701 (2)(a), Florida Statutes, the Impounding agency is required to provide the Humane Society with this statement and establish the following requirements as contractual obligations pursuant to the Agreement:

**IF THE HUMANE SOCIETY HAS QUESTIONS REGARDING THE APPLICATION OF CHAPTER 119, FLORIDA STATUTES, TO THE HUMANE SOCIETY'S DUTY TO PROVIDE PUBLIC RECORDS RELATING TO THIS AGREEMENT, CONTACT THE CUSTODIAN OF PUBLIC RECORDS AT 386-736-5935, email for Impounding Agency, by mail, Purchasing and Contracts Division, Attn: Public Records Custodian, 123 W. Indiana Ave. RM 302 DeLand, FL 32720.**

By entering into this Agreement, the Humane Society acknowledges and agrees that some records maintained, generated, received, or kept in connection with, or related to the performance of services provided under, this Agreement are public records subject to the public records disclosure requirements of section 119.07(1), Florida Statutes, and Article I, section 24 of the Florida Constitution. Pursuant to section 119.0701, Florida Statutes, any contractor entering into a contract for services with the Impounding agency, including the Humane Society, is required to comply with the following with respect to the applicable public records:

a) Keep and maintain public records required by the Impounding agency to perform the services and work provided pursuant to this Agreement.

b) Upon request from the Impounding agency's custodian of public records, provide the Impounding agency with a copy of the requested records or allow the records to be inspected or copied within a reasonable time at a cost that does not exceed the cost provided in Chapter 119, Florida Statutes, or as otherwise provided by law.

c) Ensure that public records that are exempt or confidential and exempt from public records disclosure requirements are not disclosed except as authorized by law for the duration of the contract term and following completion of the contract if the contractor does not transfer the records to the Impounding agency.

d) Upon completion of the contract, transfer, at no cost, to the Impounding agency all public records in the possession of the contractor or keep and maintain public records required by the Impounding agency to perform the service.  If the contractor transfers all public records to the Impounding agency upon completion of the contract, the contractor shall destroy any duplicate public records that are exempt or confidential and exempt from public records disclosure requirements.  If the contractor keeps and maintains public records upon completion of the contract, the contractor shall meet all applicable requirements for retaining public records.  All records stored electronically must be provided to the Impounding agency, upon request from the Impounding

agency's custodian of public records, in a format that is compatible with the information technology systems of the Impounding agency.

e) Requests to inspect or copy public records relating to the Impounding agency's contract for services must be made directly to the Impounding agency. If contractor receives any such request, contractor shall instruct the requestor to contact the Impounding agency. If the Impounding agency does not possess the records requested, the Impounding agency shall immediately notify the contractor of such request, and the contractor must provide the records to the Impounding agency or otherwise allow the records to be inspected or copied within a reasonable time.

The Humane Society acknowledges that failure to provide the applicable public records to the Impounding agency within a reasonable time may be subject to penalties under section 119.10, Florida Statutes. The Humane Society further agrees not to release any records that are statutorily confidential or otherwise exempt from disclosure without first receiving prior written authorization from the Impounding agency. Humane Society shall indemnify, defend, and hold the Impounding agency harmless for and against any and all claims, damage awards, and causes of action arising from Humane Society's failure to comply with the applicable public records disclosure requirements of section 119.07(1), Florida Statutes, or by Humane Society's failure to maintain any applicable public records that are exempt or confidential and exempt from the public records disclosure requirements, including, but not limited to, any third party claims or awards for attorney's fees and costs arising therefrom. Humane Society authorizes Impounding agency to seek declaratory, injunctive, or other appropriate relief against Humane Society from a Circuit Court in Volusia Impounding agency on an expedited basis to enforce the requirements of this section.

13.    **E-VERIFY**: Humane Society shall utilize the U.S. Department of Homeland Security's E-Verify system to verify the employment eligibility of all new employees hired by the Humane Society during the term of this Agreement and shall expressly require any sub-contractors performing services pursuant to this Agreement to likewise utilize the U.S. Department of Homeland Security's E-Verify system to verify the employment eligibility of all new employees hired by the sub-contractor during the term of this Agreement.

13.    **MEDIATION**: Any dispute arising from this Agreement, including, but not limited to, disputes over fees for services, will be mediated prior to a lawsuit being filed. Mediation will occur within sixty (60) days of written request by either party to mediate unless agreed to otherwise. The written request must be delivered in accordance with the provisions of Paragraph 19, below, of this Agreement. The cost of the mediator's fee will be borne equally by the parties.

14.    **ATTORNEY'S FEES**: Both parties agree to bear the cost of their own attorneys' fees with respect to any disputes, lawsuits, or claims arising under this Agreement, except unless otherwise specifically allowed elsewhere in this Agreement or in the event of an action to recover amounts due under Part VII, Chapter 218, Florida Statutes, in which case, the court

shall award court costs and reasonable attorney's fees, including fees incurred through appeal, to the prevailing party.

15.      **GOVERNING LAW AND VENUE:**  The parties further agree that this Agreement will be governed by the laws of the State of Florida and that venue for any and all suits arising out of or otherwise attributable to this Agreement will lie exclusively in the courts of Volusia Impounding agency, Florida, unless the matter at issue is solely cognizable in federal court, in which case, venue shall be in the Middle District of Florida, Orlando Division.

16.      **SEVERABILITY**:  If any provision of this Agreement or any part of any provision of this Agreement is found to be invalid by a court of competent jurisdiction, such will not affect the validity of any other provision, or part thereof, of this Agreement.

17.      **ENTIRE AGREEMENT**:  This Agreement constitutes the entire and final understanding and agreement with respect to the subject matter hereof and supersedes all prior or contemporaneous negotiations, promises, covenants, agreements, or representations concerning all matters directly or indirectly, collaterally related to the subject matter of this Agreement.

18.      **AMENDMENTS**:  This Agreement cannot be amended or modified except by a writing executed by both of the parties hereto or their respective administrators, trustees, personal representatives and successors.

19.      **NOTICES**:  Any written notice required to be given under this Agreement is to be mailed by registered or certified mail, postage prepaid, to the party's business address or any other address designated for that purpose by written notice and sent to the attention of the Impounding agency Manager with respect to the Impounding agency and to the attention of the CEO with respect to the Humane Society.

IN WITNESS WHEREOF, the Humane Society and the Impounding agency have executed this Agreement for Services between Halifax Humane Society Inc. and the Impounding agency of Volusia, effective on the date and year as set forth above.

**HALIFAX HUMANE SOCIETY, INC.**                    **IMPOUNDING AGENCY OF VOLUSIA**

By: _Sean Hawkins_                                    By: _____
Name: _Sean Hawkins_        Name:                    Name:
Title:  Chief Executive Officer                       Title:
Date: _Aug. 23, 2024_                                 Date: _____


ATTEST:                                               ATTEST:

By: _____                           By: _____
Name: Christina Sutherin                              Name:
Title:   Chief Operating Officer                      Title:
Date: _____                         Date: _____



**COUNTY OF VOLUSIA**
**ANIMAL SERVICES**
**RETURN TO CUSTODY**

**DECLARATION OF NO OR LOW INCOME**

This form should be completed <u>by an adult household member</u> if the household is claiming no or low income within the last 30 days.

_____    _____    _____

**Last Name**                                          **First Name**                                 **Phone Number**

_____    _____    _____

**Address**                                              **City**                                         **Zip**

**1A. I hereby certify that I do not individually receive income from any of the following sources:**

- Wages from employment (including commissions, tips, bonuses, fees, etc.)
- Income from operation of a business
- Rental income from real or personal property
- Interest or dividends from assets
- Social Security, annuities, insurance policies, retirement funds, pensions, or death benefits
- Unemployment or disability payments
- Public assistance payments (AFCD, SSI, TANF)
- Alimony, child support, or gifts received from persons not living in my household
- Sales from self-employed resources (Avon, Mary Kay, etc.)
- Any other source not named above

   **OR**

**1B. I hereby certify that I am low-income, as defined by Florida law, as a family or individual earning 80% or less of the area median income ($63,075)**

2. ☐ I have resources to pay for the daily care of the animal being returned to my custody.

   ☐ I need access to resources to supplement my source of funds to adequately care for the animal being returned to my custody.

**By my signature below, I certify and acknowledge the following:**

- That the forgoing is true, complete, and correct.
- Inquiries may be made to verify statements and a request for documentation to verify low or no-income status maybe requested by Volusia County Animal Services.
- That false statements or omissions are grounds for an at large citation if the animal was impounded and the fees not paid upon return to the owner.

_____    _____

**Signature**                                                                   **Date**

# EXHIBIT TWO

**MINUTES**
**ORMOND BEACH CITY COMMISSION**
**HELD AT CITY HALL COMMISSION CHAMBERS**

| September 18, 2024 | 7:00 p.m. | Commission Chambers |
| --- | --- | --- |

Present: Mayor Bill Partington, Commissioners Lori Tolland, Travis Sargent, Susan Persis, and Harold Briley, City Manager Joyce Shanahan, City Attorney Randy Hayes, Assistant City Manager Shawn Finley, Assistant City Manager Claire Whitley, and City Clerk Susan Carroll Dauderis.

### *A G E N D A*

1. **CALL TO ORDER**

2. **INVOCATION**

3. **PLEDGE OF ALLEGIANCE**

4. **PRESENTATIONS AND PROCLAMATIONS**
   A. Recognition of Florida Legislators
   B. Evelyn Rebostini

5. **ADOPTION OF FISCAL YEAR 2024-2025 MILLAGE RATES AND BUDGET**

   A. **RESOLUTION NO. 2024-146**: A RESOLUTION ADOPTING FINAL MILLAGE RATES TO BE LEVIED FOR FISCAL YEAR 2024-2025; DIRECTING CERTIFICATION; EXPRESSING LEGISLATIVE INTENT; AND SETTING FORTH AN EFFECTIVE DATE.
      *Staff Contact:*  *Kelly McGuire, Finance Director, (386) 676-3226*

   B. **ORDINANCE NO. 2024-25:** AN ORDINANCE ADOPTING THE ANNUAL BUDGET FOR THE 2024-2025 FISCAL YEAR BEGINNING OCTOBER 1, 2024 AND ENDING SEPTEMBER 30, 2025; REPEALING ALL INCONSISTENT ORDINANCES OR PARTS THEREOF; AND SETTING FORTH AN EFFECTIVE DATE. **(SECOND READING)**
      *Staff Contact:*  *Kelly McGuire, Finance Director, (386) 676-3226*

6. **AUDIENCE REMARKS - REGARDING ITEMS NOT ON THE AGENDA**

7. **APPROVAL OF MINUTES**
   A. Minutes from City Commission meeting - September 4, 2024

8. **CONSENT AGENDA**
   The action proposed is stated for each item on the Consent Agenda. Unless a City Commissioner removes an item from the Consent Agenda, no discussion on individual items will occur and a single motion will approve all items.

   A. **RESOLUTION NO. 2024-147**: A RESOLUTION AUTHORIZING THE EXECUTION OF A NON-EXCLUSIVE FRANCHISE AGREEMENT BETWEEN THE CITY AND FENCE SERVICE, INC. D/B/A AAA DUMPSTER RENTAL AND D/B/A F.S.I. ROLL OFF CONTAINER SERVICE REGARDING THE COLLECTION OF CONSTRUCTION AND DEMOLITION DEBRIS; AND SETTING FORTH AN EFFECTIVE DATE.
      *Staff Contact:*  *Kevin Gray, Deputy Public Works Director, (386) 676-3325*

   B. **RESOLUTION NO. 2024-148**: A RESOLUTION RATIFYING, AFFIRMING AND AUTHORIZING EXPENDITURES FOR

SERVICES FROM EMPIRE COMPUTING AND CONSULTING, INC. FOR BARRACUDA BACKUP PROTECTION; AND SETTING FORTH AN EFFECTIVE DATE.

    ***Staff Contact:***    *Chuck Osteen, Information Technology Manager, (386) 615-7031*

C.  **RESOLUTION NO. 2024-149**: A RESOLUTION ACCEPTING A BID FROM SGS CONTRACTING SERVICES, INC. FOR CONSTRUCTION SERVICES REGARDING THE WATER RECLAMATION FACILITY ULTRAVIOLET DISINFECTION CONVERSION PROJECT, UNDER BID NO. 2024-24; AUTHORIZING THE EXECUTION OF A CONTRACT AND PAYMENT THEREFOR; REJECTING ALL OTHER BIDS; AND SETTING FORTH AN EFFECTIVE DATE.

    ***Staff Contact:***    *Bob Preis, Utilities Manager, (386) 676-3305*

D.  **RESOLUTION NO. 2024-151**: A RESOLUTION ACCEPTING A PROPOSAL FROM MCKIM & CREED, INC. TO PROVIDE CONSTRUCTION ADMINISTRATION SERVICES REGARDING THE FLEMING AVENUE DRAINAGE IMPROVEMENTS PROJECT; AUTHORIZING THE EXECUTION OF A WORK AUTHORIZATION THERETO; AND SETTING FORTH AN EFFECTIVE DATE.

    ***Staff Contact:***    *Alex Schumann, City Engineer, (386) 676-3302*

E.  **RESOLUTION NO. 2024-152**: A RESOLUTION AUTHORIZING AN EMERGENCY PROCUREMENT OF A HIPOWER PORTABLE GENERATOR FROM ALTERNATIVE POWER SOLUTIONS, INC. FOR USE AT THE HUDSON WELL FIELD IN THE HUNTERS RIDGE SUBDIVISION; AUTHORIZING THE EXECUTION OF A PURCHASE AUTHORIZATION; AND SETTING FORTH AN EFFECTIVE DATE.

    ***Staff Contact:***    *Bob Preis, Utilities Manager, (386) 676-3305*

F.  **RESOLUTION NO. 2024-153**: A RESOLUTION APPROVING AND AUTHORIZING REVISIONS TO THE CITY'S FEE SCHEDULE FOR CULTURAL AND RECREATIONAL PROGRAMS AND FACILITIES OPERATED BY THE LEISURE SERVICES DEPARTMENT; AND SETTING FORTH AN EFFECTIVE DATE.

    ***Staff Contact:***    *Robert Carolin, Leisure Services Director, (386) 676-3279*

G.  **RESOLUTION NO. 2024-156**: A RESOLUTION AUTHORIZING THE EXECUTION OF AN INTERLOCAL AGREEMENT BETWEEN THE CITY AND THE STATE ATTORNEY OF THE SEVENTH JUDICIAL CIRCUIT FOR PROSECUTION OF VIOLATIONS OF CITY ORDINANCES PUNISHABLE BY INCARCERATION; AND SETTING FORTH AN EFFECTIVE DATE.

    ***Staff Contact:***    *Randy Hayes, City Attorney, (386) 676-3217*

H.  **RESOLUTION NO. 2024-157**: A RESOLUTION AUTHORIZING THE EXECUTION OF AN AGREEMENT FOR SERVICES BETWEEN THE CITY AND HALIFAX HUMANE SOCIETY, INC.; AND SETTING FORTH AN EFFECTIVE DATE.

    ***Staff Contact:***    *Jesse Godfrey, Police Chief, (386) 676-3500*

I.  **RESOLUTION NO. 2024-158**: A RESOLUTION APPROVING A SETTLEMENT PROPOSAL REGARDING THE WORKERS' COMPENSATION CLAIM OF MICHAEL BAKAYSA; AUTHORIZING THE EXECUTION OF ANY AND ALL DOCUMENTS INCIDENTAL THERETO; AUTHORIZING PAYMENT RELATIVE THERETO; AND SETTING FORTH AN EFFECTIVE DATE.

    ***Staff Contact:***    *Randy Hayes, City Attorney, (386) 676-3217*

J. **RFP - Cross Connection Control Program Management Services**

    *Staff Contact:*    *Bob Preis, Utilities Manager, (386) 676-3305*

    *Disposition:*    Approve as recommended in the City Manager staff report dated September 18, 2024.

K. **City Manager's Monthly Report, September 2024**

    *Staff Contact:*    *Joyce Shanahan, City Manager, (386) 676-3200*

    *Disposition:*    Accept as information as recommended in the City Manager staff report dated September 18, 2024.

**9.**    **PUBLIC HEARINGS**

A. **ORDINANCE NO. 2024-26:** AN ORDINANCE AMENDING CHAPTER 2, DISTRICT AND GENERAL REGULATIONS, ARTICLE IV, CONDITIONAL AND SPECIAL EXCEPTION REGULATIONS, SECTION 2-57, CRITERIA FOR REVIEW OF SPECIFIC CONDITIONAL AND SPECIAL EXCEPTION, SUBSECTION (37), HOUSES OF WORSHIP, OF THE CITY OF ORMOND BEACH LAND DEVELOPMENT CODE, BY AMENDING THE CONDITIONS FOR HOUSES OF WORSHIP; REPEALING ALL INCONSISTENT ORDINANCES OR PARTS THEREOF; PROVIDING FOR SEVERABILITY; AND SETTING FORTH AN EFFECTIVE DATE.

    *Staff Contact:*    *Steven Spraker, Planning Director, (386) 676-3341*

B. **ORDINANCE NO. 2024-27:** AN ORDINANCE APPROVING THE FINAL PLAT FOR THE "BRADFORD LAKES" SUBDIVISION, SHOWN WITHIN PHASE 4 OF THE PLANTATION OAKS PLANNED RESIDENTIAL DEVELOPMENT; ESTABLISHING CONDITIONS AND EXPIRATION DATE OF APPROVAL; AND SETTING FORTH AN EFFECTIVE DATE.

    *Staff Contact:*    *Steven Spraker, Planning Director, (386) 676-3341*

C. **ORDINANCE NO. 2024-28:** AN ORDINANCE APPROVING THE FINAL PLAT FOR THE "BRADFORD PARK" SUBDIVISION; ESTABLISHING CONDITIONS AND EXPIRATION DATE OF APPROVAL; AND SETTING FORTH AN EFFECTIVE DATE.

    *Staff Contact:*    *Steven Spraker, Planning Director, (386) 676-3341*

D. **ORDINANCE NO. 2024-29:** AN ORDINANCE CHANGING THE NAME OF "HALIFAX STREET" TO "CLIFFHAVEN COURT", AND "MATANZAS STREET" TO "RIDGEHAVEN AVENUE", SAID STREETS BEING LOCATED IN THE RIDGEHAVEN SUBDIVISION AREA; REPEALING ALL INCONSISTENT ORDINANCES OR PARTS THEREOF; PROVIDING FOR TRANSMITTAL AND RECORDING IN THE PUBLIC RECORDS OF VOLUSIA COUNTY; AND SETTING FORTH AN EFFECTIVE DATE.

    *Staff Contact:*    *Steven Spraker, Planning Director, (386) 676-3341*

E. **RESOLUTION NO. 2024-133:** A RESOLUTION AUTHORIZING THE EXECUTION AND ISSUANCE OF A DEVELOPMENT ORDER FOR A SPECIAL EXCEPTION TO ALLOW OUTDOOR ACTIVITY TO INCLUDE THE PERMANENT OUTDOOR STORAGE, DISPLAY, AND SALES OF MERCHANDISE AT THE LOWES HOME IMPROVEMENT STORE LOCATED AT 1340 WEST GRANADA BOULEVARD; ESTABLISHING CONDITIONS AND EXPIRATION DATE OF APPROVAL; AND SETTING FORTH AN EFFECTIVE

DATE.

    ***Staff Contact:***     *Steven Spraker, Planning Director, (386) 676-3341*

**10.**    **RESOLUTIONS**

    A.    **RESOLUTION NO. 2024-154**: A RESOLUTION ESTABLISHING FUEL FLOWAGE FEES, LANDING FEES, AND AIRCRAFT TIE DOWN FEES AT THE ORMOND BEACH MUNICIPAL AIRPORT; AND SETTING FORTH AN EFFECTIVE DATE.

        ***Staff Contact:***     *Steven Lichliter, Airport Manager, (386) 615-7019*

    B.    **RESOLUTION NO. 2024-155**: A RESOLUTION AUTHORIZING THE EXECUTION OF AN AGREEMENT BETWEEN THE CITY AND VECTOR AIRPORT SYSTEMS, LLC, FOR THE PROVISION OF PLANEPASS AIRCRAFT OPERATING FEE BILLING AND COLLECTION SERVICES AT THE ORMOND BEACH MUNICIPAL AIRPORT; AND SETTING FORTH AN EFFECTIVE DATE.

        ***Staff Contact:***     *Steven Lichliter, Airport Manager, (386) 615-7019*

    C.    **RESOLUTION NO. 2024-159**: A RESOLUTION APPOINTING A MEMBER AND AN ALTERNATE MEMBER TO SERVE ON THE OPIOID ABATEMENT FUNDING ADVISORY BOARD; ESTABLISHING TERM AND CONDITIONS OF SERVICE; AND SETTING FORTH AN EFFECTIVE DATE.

        ***Staff Contact:***     *Susan Dauderis, City Clerk, (386) 676-3340*

    D.    **RESOLUTION NO. 2024-160**: A RESOLUTION ACCEPTING A PROPOSAL FROM BROWN & BROWN INSURANCE SERVICES, INC., FOR THE PROVISION OF PROPERTY, LIABILITY AND WORKERS' COMPENSATION INSURANCE FOR VARIOUS LINES OF INSURANCE COVERAGE THROUGH VARIOUS INSURANCE CARRIERS, INCLUDING PROPERTY, INLAND MARINE, AUTO PHYSICAL DAMAGE, EXCESS WORKERS' COMPENSATION, CRIME, ACCIDENTAL DEATH AND DISMEMBERMENT (POLICE OFFICERS AND FIREFIGHTERS), NATIONAL FLOOD INSURANCE PROGRAM (NFIP) FLOOD, POLLUTION, PROFESSIONAL LIABILITY (EMT'S AND PARAMEDICS), GENERAL LIABILITY (INCLUDING LAW ENFORCEMENT LIABILITY), TENANT AND USERS LIABILITY (TULIP) (SPECIAL EVENTS), CYBER LIABILITY, AND ACTIVE SHOOTER LIABILITY INSURANCE; AUTHORIZING THE EXECUTION OF DOCUMENTS RELATIVE THERETO; AUTHORIZING PAYMENT THEREFOR; AND SETTING FORTH AN EFFECTIVE DATE.

        ***Staff Contact:***     *Kelly McGuire, Finance Director, (386) 676-3226*

**11.**    **REPORTS, SUGGESTIONS, REQUESTS**

**12.**    **ADJOURNMENT**

*M I N U T E S*

Item #1 – Meeting Call to Order

Mayor Partington called the meeting to order at 7:01 p.m.

Item #2 – Invocation

Father Roy Allison, St. James Episcopal Church, provided the invocation.

<u>Item #3 – Pledge of Allegiance</u>

Mayor Partington led the Pledge of Allegiance.

<u>Item #4 – Presentations and Proclamations</u>

<u>Item #4A – Recognition of Florida Legislators</u>

Mayor Partington presented a plaque of appreciation and Key to the City to Representative Tom Leek for his work and dedication to the community. He recognized Representative Webster Barnaby, Representative Chase Tramont, and Florida Senator Tom Wright with a plaque of appreciation.

<u>Item #4B – Evelyn Rebostini</u>

Mayor Partington presented a proclamation and Key to the City to Ms. Evelyn Rebostini, honoring her work as the Ormond Beach Police Department's Victim Advocate and congratulating her on her retirement.

Ms. Rebostini thanked the Commission, city staff, and co-workers for their support and friendship over the years and discussed her career with the city.

<u>Item #5 – Adoption of Fiscal Year 2024-2025 Millage Rates and Budget</u>

Mayor Partington opened the Public Hearings.

<u>Item #5A –Millage Rates for 2024-2025 Fiscal Year</u>

City Clerk Susan C. Dauderis read by title only:

RESOLUTION NO. 2024-146
A RESOLUTION ADOPTING FINAL MILLAGE RATES TO BE LEVIED FOR FISCAL YEAR 2024-2025; DIRECTING CERTIFICATION; EXPRESSING LEGISLATIVE INTENT; AND SETTING FORTH AN EFFECTIVE DATE.

Mayor Partington stated per Florida Statute, he was required to state the millage rate for the City of Ormond Beach necessary to fund the Fiscal Year (FY) 2024-2025 budget was 4.0960 mills, noting the rate was 12.82 percent above the rolled back rate of 3.6305 mills and the debt service millage rate was 0.065 for the 2010 General Obligation Bond Sinking Fund.

Mayor Partington stated it was a public hearing and inquired if there were any members of the public who wished to speak or ask questions prior to adoption of the millage rate and budget.

Mr. Sean Daly, 1106 Northside Drive, expressed concerns regarding the tax increase and the Ormond Beach Municipal Airport's budget. He discussed the funds owed by the airport and not using taxpayer dollars to support it.

**Commissioner Briley moved, seconded by Commissioner Tolland, for approval of Resolution No. 2024-146, as read by title only.**

Mayor Partington stated the operating millage of 4.0960 mills was 12.82 percent above the rolled back millage rate and the resolution included adoption of the debt service millage rate of 0.065 for the 2010 General Obligation Bond Sinking Fund.

| Call Vote: | | |
|---|---|---|
| | Commissioner Tolland | Yes |
| | Commissioner Sargent | Yes |
| | Commissioner Persis | Yes |
| | Commissioner Briley | Yes |
| Carried. | Mayor Partington | Yes |

Mayor Partington announced the operating millage rate was set at 4.0960 mills, which was 12.82 percent above the rolled back millage rate of 3.6305 mills.

<u>Item #5B – Adoption of Annual Budget for the 2024-2025 Fiscal Year</u>

City Clerk Susan C. Dauderis read by title only:

ORDINANCE NO. 2024-25
AN ORDINANCE ADOPTING THE ANNUAL BUDGET FOR THE 2024-2025 FISCAL YEAR BEGINNING OCTOBER 1, 2024 AND ENDING SEPTEMBER 30, 2025; REPEALING ALL INCONSISTENT ORDINANCES OR PARTS THEREOF; AND SETTING FORTH AN EFFECTIVE DATE. **(SECOND READING)**

**Commissioner Persis moved, seconded by Commissioner Briley, for approval of Ordinance No. 2024-25, on second reading, as read by title only.**

Mayor Partington requested for the City Clerk to call the vote to adopt the budget of $131,976,868.

| Call Vote: | | |
|---|---|---|
| | Commissioner Sargent | Yes |
| | Commissioner Persis | Yes |
| | Commissioner Briley | Yes |
| | Commissioner Tolland | Yes |
| Carried. | Mayor Partington | Yes |

Mayor Partington closed the Public Hearings.

Item #6 – Audience Remarks

Ms. Cindy Costa, 6 Walden Lane, voiced concerns regarding North Beach Street and the state of the roadway. She requested the city look into repairs to make the street safer for drivers.

Ms. Alicya Simmons, 705 North Peninsula Avenue, requested for the city to look into a grant from the Daytona Beach Racing and Recreation Center Fund for the Ormond Beach Tennis Center. She discussed the needs of the tennis center, personal funds the current operator put into the programs at the facility, and the growth since the current operator started.

Ms. Connie Colby, 108 Roble Lane, discussed the rules regarding parks within the city and their regulation. She expressed concerns surrounding the use of the parks, specifically motorbikes and drones. She voiced concerns regarding code enforcement and the way citizens report concerns.

Item #7 – Approval of Minutes

Mayor Partington advised the minutes from the September 4, 2024, meeting had been sent to the Commission for review and posted on the city's website for public viewing. He asked for any corrections, additions, or omissions. He stated, hearing no corrections, the minutes would stand approved as presented.

**Commissioner Sargent moved, seconded by Commissioner Tolland, for approval of the September 4, 2024, City Commission meeting minutes.**

**The motion passed by voice vote.**

Item #8 – Consent Agenda

Mayor Partington advised the actions proposed for the items on the Consent Agenda were so stated on the agenda. He asked if any member of the Commission had questions or wished to discuss any items separately.

Commissioner Briley requested Item 8H be pulled from the Consent Agenda.

**Commissioner Persis moved, seconded by Commissioner Sargent, for approval of the Consent Agenda, absent Item 8H.**

| Call Vote: | | |
|---|---|---|
| | Commissioner Persis | Yes |
| | Commissioner Briley | Yes |
| | Commissioner Tolland | Yes |
| | Commissioner Sargent | Yes |
| Carried. | Mayor Partington | Yes |

<u>Item #8H – Humane Society Contract FY 2024-2025</u>

City Clerk Susan C. Dauderis read by title only:

RESOLUTION NO. 2024-157
A RESOLUTION AUTHORIZING THE EXECUTION OF AN AGREEMENT FOR SERVICES BETWEEN THE CITY AND HALIFAX HUMANE SOCIETY, INC.; AND SETTING FORTH AN EFFECTIVE DATE.

Ms. Colby expressed concerns regarding the stray cats in her neighborhood and the return of the stray cats once they were neutered by the Humane Society. She requested the city renegotiate the contract for the Humane Society to not return the cats.

Commissioner Briley deferred to staff for information for Ms. Colby; whereby, Ms. Joyce Shanahan, City Manager, stated the contract called for just Trap, Neuter, and Release (TNR).

Captain Chris Roos, Ormond Beach Police Department, discussed the Humane Society's TNR program and the life span of wild cats. He noted if there were better plans, staff would be happy to review. He explained there were no cat colonies in the area Ms. Colby expressed concerns with.

Commissioner Tolland expressed support of revisiting the contract to see what further could be done to prevent the return of the stray cats.

Ms. Claire Whitley, Assistant City Manager, stated staff would discuss the request with the Humane Society before the next contract; whereby, Mayor Partington noted if a resolution to the request could happen sooner than the next contract to bring it back to the Commission before then.

Commissioner Persis requested the Humane Society go look at Ms. Colby's areas of concern.

Commissioner Tolland suggested having data of how many cats were in the area to determine if there were needs for a revised program.

**Commissioner Briley moved, seconded by Commissioner Sargent, for approval of Resolution No. 2024-157, as read by title only.**

| Call Vote: | | |
|---|---|---|
| | Commissioner Briley | Yes |
| | Commissioner Tolland | Yes |
| | Commissioner Sargent | Yes |
| | Commissioner Persis | Yes |
| Carried. | Mayor Partington | Yes |

<u>Comments on the Consent Agenda</u>

Commissioner Sargent expressed support for Item 8I regarding the Settlement of Workers' Compensation Claim for Michael Bakaysa.

Mayor Partington voiced support of Item 8C regarding the Bid Award for the Water Reclamation Facility Ultra-Violet Disinfection Conversion and the state money that helped fund the project, and Item 8D regarding the Work Authorization for the Construction Administrative Services for the Fleming Avenue Drainage project.

<u>Item #9 – Public Hearings</u>

Mayor Partington opened the Public Hearings.

<u>Item #9A – Land Development Code Amendment, Houses of Worship Conditions</u>

City Clerk Susan C. Dauderis read by title only:

ORDINANCE NO. 2024-26
AN ORDINANCE AMENDING CHAPTER 2, DISTRICT AND GENERAL REGULATIONS, ARTICLE IV, CONDITIONAL AND SPECIAL EXCEPTION REGULATIONS, SECTION 2-57, CRITERIA FOR REVIEW OF SPECIFIC

CONDITIONAL AND SPECIAL EXCEPTION, SUBSECTION (37), HOUSES OF WORSHIP, OF THE CITY OF ORMOND BEACH LAND DEVELOPMENT CODE, BY AMENDING THE CONDITIONS FOR HOUSES OF WORSHIP; REPEALING ALL INCONSISTENT ORDINANCES OR PARTS THEREOF; PROVIDING FOR SEVERABILITY; AND SETTING FORTH AN EFFECTIVE DATE.

Mr. Steven Spraker, Planning Director, explained the item was for reduced setback and stated the Planning Board recommended approval.

Mayor Partington noted it was a unanimous approval by the Planning Board and explained there were no projects being proposed, the item was the starting point for any future projects.

**Commissioner Sargent moved, seconded by Commissioner Briley, to approve Ordinance No. 2024-26, on first reading, as read by title only.**

| Call Vote: | | |
|---|---|---|
| | Commissioner Tolland | Yes |
| | Commissioner Sargent | Yes |
| | Commissioner Persis | Yes |
| | Commissioner Briley | Yes |
| Carried. | Mayor Partington | Yes |

Item #9B – Bradford Lakes, Final Plat

City Clerk Susan C. Dauderis read by title only:

ORDINANCE NO. 2024-27
AN ORDINANCE APPROVING THE FINAL PLAT FOR THE "BRADFORD LAKES" SUBDIVISION, SHOWN WITHIN PHASE 4 OF THE PLANTATION OAKS PLANNED RESIDENTIAL DEVELOPMENT; ESTABLISHING CONDITIONS AND EXPIRATION DATE OF APPROVAL; AND SETTING FORTH AN EFFECTIVE DATE.

Mr. Spraker explained the item was for the final plat for the Bradford Lakes subdivision located within the Plantation Oaks Planned Residential Development and stated the Planning Board unanimously recommended approval.

**Commissioner Sargent moved, seconded by Commissioner Persis, to approve Ordinance No. 2024-27, on first reading, as read by title only.**

| Call Vote: | | |
|---|---|---|
| | Commissioner Sargent | Yes |
| | Commissioner Persis | Yes |
| | Commissioner Briley | Yes |
| | Commissioner Tolland | Yes |
| Carried. | Mayor Partington | Yes |

Item #9C – Bradford Park, Final Plat

City Clerk Susan C. Dauderis read by title only:

ORDINANCE NO. 2024-28
AN ORDINANCE APPROVING THE FINAL PLAT FOR THE "BRADFORD PARK" SUBDIVISION; ESTABLISHING CONDITIONS AND EXPIRATION DATE OF APPROVAL; AND SETTING FORTH AN EFFECTIVE DATE.

**Commissioner Briley moved, seconded by Commissioner Sargent, to approve Ordinance No. 2024-28, on first reading, as read by title only.**

| Call Vote: | | |
|---|---|---|
| | Commissioner Persis | Yes |
| | Commissioner Briley | Yes |
| | Commissioner Tolland | Yes |
| | Commissioner Sargent | Yes |
| Carried. | Mayor Partington | Yes |

Item #9D – RidgeHaven Subdivision, Street Name Changes

City Clerk Susan C. Dauderis read by title only:

ORDINANCE NO. 2024-29

AN ORDINANCE CHANGING THE NAME OF "HALIFAX STREET" TO "CLIFFHAVEN COURT", AND "MATANZAS STREET" TO "RIDGEHAVEN AVENUE", SAID STREETS BEING LOCATED IN THE RIDGEHAVEN SUBDIVISION AREA; REPEALING ALL INCONSISTENT ORDINANCES OR PARTS THEREOF; PROVIDING FOR TRANSMITTAL AND RECORDING IN THE PUBLIC RECORDS OF VOLUSIA COUNTY; AND SETTING FORTH AN EFFECTIVE DATE.

**Commissioner Sargent moved, seconded by Commissioner Persis, to approve Ordinance No. 2024-29, on first reading, as read by title only.**

| Call Vote: | | |
|---|---|---|
| | Commissioner Briley | Yes |
| | Commissioner Tolland | Yes |
| | Commissioner Sargent | Yes |
| | Commissioner Persis | Yes |
| Carried. | Mayor Partington | Yes |

Item #9E – 1340 West Granada Blvd, Lowe's Special Exception for Outdoor Activity

City Clerk Susan C. Dauderis read by title only:

RESOLUTION NO. 2024-133

A RESOLUTION AUTHORIZING THE EXECUTION AND ISSUANCE OF A DEVELOPMENT ORDER FOR A SPECIAL EXCEPTION TO ALLOW OUTDOOR ACTIVITY TO INCLUDE THE PERMANENT OUTDOOR STORAGE, DISPLAY, AND SALES OF MERCHANDISE AT THE LOWES HOME IMPROVEMENT STORE LOCATED AT 1340 WEST GRANADA BOULEVARD; ESTABLISHING CONDITIONS AND EXPIRATION DATE OF APPROVAL; AND SETTING FORTH AN EFFECTIVE DATE.

Mr. Spraker explained the Special Exception for Lowe's for their outdoor activity and displays. He reviewed the history of the Special Exception, and the updated proposal since the last time it was brought before the City Commission.

Mr. Joey Posey, 420 South Nova Road, noted he was the attorney for the applicant and reviewed the updated plan and updated landscaping. He stated Lowes was very responsive to the City Commissions requests and understood their concerns.

Commissioner Tolland stated she spoke with Mr. Posey regarding the proposed plans and appreciated the updated landscaping. She inquired if there were concerns regarding pedestrian safety; whereby, Mr. Roger Strcula, Upham Engineering, explained there were minimal parking spaces along the building, therefore pedestrian safety was not a concern.

Commissioner Persis indicated she spoke with Mr. Posey and thanked him for the updates to the plan.

Commissioner Sargent discussed his concerns regarding future change of management and noted his hope of better communication between the store managers regarding the special exception.

Commissioner Briley expressed concerns regarding the grills, lawnmowers, and plants for sale outside of the store, noting the continued violations.

Mr. Posey stated it was a delicate balance for the store to promote the sale of their products and put all the product behind the fencing.

Commissioner Sargent stated he was supportive of items in front of the store to promote sales. He thanked Lowe's for working with the city to become compliant with the Special Exception.

Commissioner Briley voiced concerns with the Special Exception, noting it was a Special Exception and Lowe's had violated the development order.

Mr. Posey expressed understanding of the concerns, noting he would pass them along.

Commissioner Tolland inquired if all product was contained within the painted squares in front of Lowe's would Commissioner Briley approve; whereby, Commissioner Briley stated yes, if the products were contained in the squares, and expressed concerns due to prior actions. Commissioner Tolland emphasized compliance, noting other smaller stores had the same special exception.

**Commissioner Sargent moved, seconded by Commissioner Persis, to approve Resolution No. 2024-133, as read by title only.**

| Call Vote: | Commissioner Tolland | Yes |
|---|---|---|
| | Commissioner Sargent | Yes |
| | Commissioner Persis | Yes |
| | Commissioner Briley | Yes |
| Carried. | Mayor Partington | Yes |

Mayor Partington closed the Public Hearings.

Item #10 – Resolutions

Item #10A – Airport Rates and Fees

City Clerk Susan C. Dauderis read by title only:

RESOLUTION NO. 2024-154
A RESOLUTION ESTABLISHING FUEL FLOWAGE FEES, LANDING FEES, AND AIRCRAFT TIE DOWN FEES AT THE ORMOND BEACH MUNICIPAL AIRPORT; AND SETTING FORTH AN EFFECTIVE DATE.

Mr. Brian Rademacher, Economic Development Director, reviewed the Ormond Beach Municipal Airport's budget deficit, the advantage of the proposed landing fees, and proposed agreement with Vector Airport Systems, LLC, noting the agreement was Item 10B. He reviewed the proposed landing fees and where the fees would be applied. He reviewed the purchasing process utilized for the agreement with Vector Airport Systems, LLC.

Mr. Douglas Shinn, 2806 South Peninsula Drive, Daytona Beach, 32118, discussed unintended consequences, including the potential for grants provided to the airport to be taken away due to a decrease in number of operations as a result of the landing fees. He noted the number of pilots who would utilize other airports without landing fees, which could affect other local non-airport related businesses.

Mr. Daryl Hickman, 323 River Vale Lane, stated there was a call for a boycott of any airport that imposes the fees. He stated he owned a business at the airport and would be directly impacted, and the fee would also affect the local business economy. He inquired if the fees would stop when the airport debt was paid off or if the fees were indefinite.

Mr. Patrick Murphy, 678 Swan Range Road, Orange City, 32763, stated he was speaking as Vice President of Sunrise Aviation and stated he had a neutral position on it as his company was exempt from the landing fees. He noted he understood the city's need for the landing fees, that pilot aviation was already expensive, and worried about the added fees. He explained the concern as the airport's fueler, there may be a decrease in fuel purchases due to a decrease in landings.

Mr. Terence Perkins, 108 Heritage Circle, expressed concerns regarding safety and potential pull of grants for funding due to lack of landings caused by the fees.

Mr. Richard Isherwood, 1531 Poplar Drive, reviewed the airport funding grants and discussed other funding options for the airport.

Mr. Gordon Arbeitman, 3107 Inishmore Drive, discussed Vector Airport Systems, LLC and noted there were companies that could present to staff the pros and cons of the landing fees before a decision was made.

Ms. Samantha Bowyer, 68 Seacrest Drive, voiced concerns regarding the data collection process for the landing fee calculation and potential safety concerns. She discussed the Federal Aviation Administration's Reauthorization Act of 2024 and potential violations of the act with the landing fees. She noted the fees would discourage student pilots as the fees would be passed onto their training cost. She suggested the city focus on attracting

businesses to fill the empty space of the vacant golf course next to the airport, and promote events such as air and car shows.

Mr. Tony Arnaoutis, 17 Tiffany Circle, discussed the aviation fees internationally and locally, and requested the Commission reconsider adding the landing fees.

Mr. Daly voiced concerns with the Daytona flight schools, and noted the majority of the flights out of the airport were from the flight schools. He noted the landing fees would be put onto the student's flight training costs. He believed the fees would help the debt without costing the tax payers money.

Mr. Ron Serra, 1761 Mitchell Court, Port Orange, 32128, stated he disagreed with the implementation of the landing fees. He discussed the local economy growth due to the aviation field. He discussed other states who were competing for the Florida aviation business. He stated he was a flight instructor and students were discussing landing fees being add to their tuition costs, noting they discussed looking elsewhere for training.

Mr. Bob Brown, 918 Lake Lindley Drive South, DeLand, 32724, expressed concerns of the landing fees being in the same ordinance as the fuel and tiedown fees. He discussed concerns regarding the exemptions and the collection of the fees.

Mr. Matthew Serra, 1761 Mitchell Court, Port Orange, 32128, discussed his history with aviation. He stated the fees would cause changes in the trainings, as pilots would lessen the number of landings in training sessions. He discussed fees pilots currently face and expressed concerns regarding pilot shortages. He requested an exemption for all aircrafts under 6,000 pounds, noting the precedence from other airports.

Ms. Sharon Serra, 1761 Mitchell Court, Port Orange, 32128, requested the landing fees be removed from the ordinance for further review. She explained her belief was Vector Airport Systems, LLC used standard pricing for all airports instead of customizing the fees to each individual airport based on needs, and felt that was not the correct way to go about it. She discussed the rulings around landing fees.

Mr. David Gall, unlisted address, Port Orange, 32128, reviewed his aviation background and expressed concerns regarding landing fees specifically for flight trainings.

Mr. Terence Anderson, 101 Ray Lake Drive, discussed the importance of flight schools practicing landings for safety reasons.

Mr. Michael Galluzzi, 1008 Flying M Court, Edgewater, 32132, indicated he worked for the NASA Research Institute, specializing in advanced air mobility. He shared some research from surrounding airports and across Central Florida. He expressed concerns regarding the landing fees, including unwarranted surveillance. He stated he would like to share a proposal for a public/private partnership and would provide further details.

Mr. Andre Maye, 2002 Yellowfin Drive, Port Orange, 32128, stated the United States of America was number one in aviation trainings and noted comparison to international fees. He expressed concerns regarding how the fees would impact flight schools.

Mr. Robert Jex, 55 Front Street, Palm Coast, 32137, stated the proposal would not improve safety, pilot production, or long-term funds. He stated there were other positive ways to generate funds, including attracting new aviation businesses.

Mayor Partington stated he received a letter from Ms. Stacy Heaton, the Southern Regional Manager for Aircraft Owners and Pilots Association (AOPA), opposing the landing fees.

**Commissioner Sargent moved, seconded by Commissioner Briley, to approve Resolution No. 2024-154, as read by title only, for discussion purposes.**

Commissioner Sargent discussed the airport's debt and inquired if the landing fees were presented to the Aviation Advisory Board; whereby, Mr. Rademacher stated it was not brought to the Aviation Advisory Board but would be discussed with them at their next scheduled meeting. Commissioner Sargent stated the advisory board should make a recommendation before the item was brought before the Commission.

Commissioner Sargent and Commissioner Briley withdrew their motion and second respectively for Resolution No. 2024-154.

**Commissioner Sargent moved, seconded by Commissioner Persis, to table Items 10A and 10B until they were brought before the Aviation Advisory Board for review.**

Commissioner Persis stated she had many questions and would like more time to learn about the issues.

Commissioner Tolland indicated she learned information during the comments and would need answers to questions she had.

Commissioner Sargent and Commissioner Tolland promoted citizens to apply online for the city's advisory boards.

Commissioner Briley agreed the Aviation Advisory Board needed to review the item and with Mr. Daly's comments regarding tax payer dollars not supporting the airport.

| Call Vote: | Commissioner Persis | Yes |
| | Commissioner Briley | Yes |
| | Commissioner Tolland | Yes |
| | Commissioner Sargent | Yes |
| Carried. | Mayor Partington | Yes |

Item #10C – Opioid Abatement Advisory Board Appointments

City Clerk Susan C. Dauderis read by title only:

RESOLUTION NO. 2024-159
A RESOLUTION APPOINTING A MEMBER AND AN ALTERNATE MEMBER TO SERVE ON THE OPIOID ABATEMENT FUNDING ADVISORY BOARD; ESTABLISHING TERM AND CONDITIONS OF SERVICE; AND SETTING FORTH AN EFFECTIVE DATE.

Mayor Partington explained he would like to continue his service through the end of his mayoral obligations.

Commissioner Briley nominated Commissioner Tolland for the alternate role; whereby, Commissioner Persis agreed.

Commissioner Tolland expressed support of serving as the alternate.

**Commissioner Briley moved, seconded by Commissioner Persis, to approve Resolution No. 2024-159, as read by title only, with Mayor Partington as the primary member and Commissioner Tolland as the alternate member.**

Ms. Susan Dauderis, City Clerk, explained Volusia County indicated Mayor Partington could serve through October, a new primary member could be named to replace him when he leaves, and an alternate member could be named.

Mayor Partington stated he believed he could fill the role as primary member until his mayoral duties were completed, then the item could be brought back to the Commission to fill the vacancy of the primary member.

| Call Vote: | Commissioner Briley | Yes |
| | Commissioner Tolland | Yes |
| | Commissioner Sargent | Yes |
| | Commissioner Persis | Yes |
| Carried. | Mayor Partington | Yes |

Item #10D – Intent to Award RFP 2024-29 Property, Liability and Workers' Compensation Insurance

City Clerk Susan C. Dauderis read by title only:

RESOLUTION NO. 2024-160
A RESOLUTION ACCEPTING A PROPOSAL FROM FOUNDATION RISK PARTNERS PUBLIC ENTITY SERVICES, FOR THE PROVISION OF PROPERTY, LIABILITY AND WORKERS' COMPENSATION INSURANCE

FOR VARIOUS LINES OF INSURANCE COVERAGE THROUGH VARIOUS INSURANCE CARRIERS; AUTHORIZING THE EXECUTION OF DOCUMENTS RELATIVE THERETO; AUTHORIZING PAYMENT THEREFOR; AND SETTING FORTH AN EFFECTIVE DATE.

Mr. Kelly McGuire, Finance Director, explained the item was regarding the two proposals received during the city's Request for Proposal (RFP), one from Brown & Brown Insurance Services, Inc. (Brown & Brown) and one from Foundation Risk Partners Public Entity Services (Foundation Risk Partners). She stated the prices from each proposal, noting neither included flood insurance information due to rates not being available at the time of the proposal openings. She stated there were four coverages that Foundation Risk Partners did not provide in their proposal and indicated they could assume existing coverages. She discussed the qualifications of the firms and underlying insurance trusts; all were highly qualified, noting both companies were considered equal in qualifications. She stated staff recommended Brown & Brown due to the lower price.

Commissioner Tolland and Commissioner Sargent abstained from the vote due to potential conflicts of interest.

Representative Leek explained he was speaking in his capacity as Chief Legal Officer of Foundation Risk Partners and discussed the company. He expressed concerns regarding the proposal from Brown & Brown not including the affidavit required by Section 287.138 of Florida Statutes. He stated by Statute the Brown & Brown proposal should be deemed unresponsive. He introduced other members of his team, including Ms. Jo Thacker, Mr. David Lodwick, and Mr. Alan Florez of Foundation Risk Partners.

Ms. Jo Thacker, 780 West Granada Boulevard, stated there was a whereas clause in the resolution stating a second alternative was neither authorized nor consistent with the RFP, and expressed concerns with the RFP conflicting the Code of Ordinances referenced within the resolution. She stated concerns with the Code of Ordinances not referencing if forms and affidavits could be submitted after the proposal was opened.

Mr. David Lodwick, 780 West Granada Boulevard, reviewed proposal "Option 2" that was provided to the Commission and reviewed the option in detail.

Mr. Alan Florez, 780 West Granada Boulevard, reiterated Representative Leeks statement regarding the affidavit and bid fairness. He reviewed the handout provided to the Commission and discussed the risk factors related to hurricanes.

Commissioner Briley expressed concerns regarding compliance; whereby, Mayor Partington believed everything complied now if accepted.

Ms. McGuire indicated everything was in compliance, noting the affidavit was included in the agenda packet.

Mayor Partington noticed the notary stamp and signature dates of expiration did not match in the packet and commented that could be a clerical error.

Commissioner Sargent inquired when the bids were due; whereby, Ms. McGuire stated June 9, 2024, but was extended a week due to additional questions. Commissioner Sargent inquired if policy documents were up to date within the packet, as there was a policy provided that had expired dates; whereby, Ms. McGuire assured the Commission the policy was within date and would renew in 2025. He expressed concerns regarding the storm policy limits.

Commissioner Tolland expressed support of the competitive bidding process, noting Brown & Brown's proposal was $300,000 less than the prior year.

Commissioner Briley expressed concerns regarding the shared policy limits.

Commissioner Persis inquired if Mr. Randy Hayes, City Attorney, had anything to add; whereby, Mr. Hayes stated what was presented was the recommendation from the Insurance Program Committee. He indicated historically and customarily during the presentation of the bids, it was allowed for the vendor to provide clarification or affidavits if needed. He noted the item was the Committee's best recommendation based on the RFP. He discussed what would need to happen if the Commission wished to proceed with Brown & Brown or if they chose to proceed with Foundation Risk Partners.

Mr. Steve Farmer, Brown & Brown Executive Vice President, reviewed his history with the city and Brown & Brown. He discussed the proposed insurance trusts and the shared policies. He discussed the proposal and improvement in the insurance market, his connections which helped to lower the rate, and noted the Insurance Program Committee recommended their proposal.

Commissioner Sargent reviewed prior prices of the city's insurance policies, increasing through the years.

Mayor Partington inquired about the compliance of the affidavit; whereby, Ms. McGuire stated the purchasing department addressed the issue of the affidavit to bring the bid into compliance. He asked what the Committee's thought was on the shared limit versus named storm limit; whereby, Ms. McGuire stated the city's RFP solicited proposals for the same coverage levels, and the Foundation Risk Partners alternate proposal was not consistent with the current insurance program, therefore the Committee only considered the primary Foundation Risk Partners proposal.

Mayor Partington stated the city only wanted the best for the residents. He reviewed other municipalities utilizing Foundation Risk Partners and questioned why the city would not consider proposals outside of the scope of service; whereby, Ms. McGuire stated the RFP called for a specific scope of service, which Foundation Risk Partners' alternate proposal did not match.

Commissioner Persis expressed concerns regarding the storm policy.

Commissioner Tolland stated needs change and inquired if the city could accept proposals outside of scope of service.

Ms. Shanahan stated the RFP was approved by the Commission before getting sent out to bid with the scope of service to maintain the same coverages.

Mayor Partington stated Foundation Risk Partners had the lowest cost with the alternate proposal.

Commissioner Tolland inquired about the affidavit being submitted late; whereby, Mr. Hayes stated it was a matter of interpretation, noting the Statutes required an affidavit and one was provided, noting past bids were accepted with the late submission of the affidavit. He explained it was up to the Commission to agree or disagree with the recommendation of the Insurance Program Committee. He reviewed the process of the Committee and what was needed from the Commission if they agreed or disagreed with the recommendation.

Mayor Partington inquired about the shared limit versus named storm limit; whereby, Mr. Lodwick stated it depended on the circumstances. Mr. Lodwick discussed issues with shared limit coverages and reviewed the named storm coverage with the dedicated limit.

Mr. Farmer stated the shared limit program was very transparent, noting it was reviewed every year and was never close to being exceeded.

Commissioner Tolland inquired how the shared limit versus dedicated limit effect the level of service during an event; whereby, Mr. Farmer indicated each insurance company handles events differently, noting during any event he was always there to assist the city.

Mr. Lodwick discussed the requirements and process of the dedicated limit coverage and assessments during events.

Mr. Farmer inquired if there were any issues with the current providers; whereby, Mr. Hayes stated there were no issues in coverage or level of service of the existing provider.

Commissioner Sargent inquired when the city last sent insurance out to bid; whereby, Mr. Farmer stated he participated in many bids for insurance with the city.

Ms. McGuire stated 2017 was the last time the Agent of Record for insurance went out to bid.

Commissioner Tolland inquired if there were only two bids every time; whereby, Ms. McGuire stated Brown & Brown was always responsive to the RFP's.

Mayor Partington expressed support of both companies, noting he's worked with both through the city and through the Florida League of Cities. He stated as the agreement was for a year he was comfortable going with the cheaper proposal from Foundation Risk Partners.

Commissioner Briley inquired if the proposal was cheaper by $40,000; whereby, Ms. McGuire stated that was correct but the four coverages not quoted would need to be assumed.

Commissioner Persis expressed support of the lower proposal.

**Commissioner Briley moved, seconded by Commissioner Persis, to approve Resolution No. 2024-160, as read by title only, for discussion purposes.**

Mr. Hayes inquired on the Commissions stance of the affidavit; whereby, Mayor Partington stated he believed the bid to be deemed non-compliant due to the missing affidavit upon bid opening.

Mayor Partington stated the third whereas clause should be amended as well, since both companies were qualified and able, noting the disagreement was the shared limit versus the named storm limit. He discussed the Florida League of Cities insurance program.

Mr. Hayes requested a recess to amend the resolution in favor of Foundation Risk Partners and include the requested amendments.

Mayor Partington recessed the City Commission meeting at 10:11 p.m.

Mayor Partington reconvened the City Commission meeting at 10:38 p.m.

Mr. Hayes explained there was a revised resolution, noting the incorporated findings discussed.

Mr. Hayes read the change in the resolution title:

> A RESOLUTION ACCEPTING A PROPOSAL FROM FOUNDATION RISK PARTNERS PUBLIC ENTITY SERVICES, FOR THE PROVISION OF PROPERTY, LIABILITY AND WORKERS' COMPENSATION INSURANCE FOR VARIOUS LINES OF INSURANCE COVERAGE…

Mr. Hayes reviewed the revised whereas clauses that changed from Resolution 2024-160.

Commissioner Briley and Commissioner Persis withdrew their motion and second, respectively.

Mr. Hayes requested a new Resolution number for the updated resolution; whereby, Ms. Dauderis stated Resolution number 2024-161 would be assigned.

**Commissioner Briley moved, seconded by Commissioner Persis, to approve Resolution No. 2024-161, as amended to award the bid to Foundation Risk Partners.**

Commissioner Sargent inquired if there was anything needed by the Commission regarding the policies that would be assumed by Foundation Risk Partners; whereby, Ms. McGuire stated the policies were included in the updated Resolution.

Commissioner Briley, Commissioner Persis, and Mayor Partington expressed support of both agencies.

Call Vote:

| | |
|---|---|
| Commissioner Sargent | Abstained |
| Commissioner Persis | Yes |
| Commissioner Briley | Yes |
| Commissioner Tolland | Abstained |
| Mayor Partington | Yes |

Carried.

# FORM 8B  MEMORANDUM OF VOTING CONFLICT FOR COUNTY, MUNICIPAL, AND OTHER LOCAL PUBLIC OFFICERS

| LAST NAME—FIRST NAME—MIDDLE NAME<br>Tolland, Loretta (Lori) Riehl | NAME OF BOARD, COUNCIL, COMMISSION, AUTHORITY, OR COMMITTEE<br>City of Ormond Beach Commission |
|---|---|
| MAILING ADDRESS<br>5 Broadriver Rd | THE BOARD, COUNCIL, COMMISSION, AUTHORITY OR COMMITTEE ON WHICH I SERVE IS A UNIT OF:<br>☑ CITY     ☐ COUNTY     ☐ OTHER LOCAL AGENCY |
| CITY                    COUNTY<br>Ormond Beach, FL 32174 | NAME OF POLITICAL SUBDIVISION:<br>commissioner zone one |
| DATE ON WHICH VOTE OCCURRED<br>Sept 18, 2024 | MY POSITION IS:<br>☑ ELECTIVE     ☐ APPOINTIVE |

## WHO MUST FILE FORM 8B

This form is for use by any person serving at the county, city, or other local level of government on an appointed or elected board, council, commission, authority, or committee. It applies to members of advisory and non-advisory bodies who are presented with a voting conflict of interest under Section 112.3143, Florida Statutes.

Your responsibilities under the law when faced with voting on a measure in which you have a conflict of interest will vary greatly depending on whether you hold an elective or appointive position. For this reason, please pay close attention to the instructions on this form before completing and filing the form.

## INSTRUCTIONS FOR COMPLIANCE WITH SECTION 112.3143, FLORIDA STATUTES

A person holding elective or appointive county, municipal, or other local public office MUST ABSTAIN from voting on a measure which would inure to his or her special private gain or loss. Each elected or appointed local officer also MUST ABSTAIN from knowingly voting on a measure which would inure to the special gain or loss of a principal (other than a government agency) by whom he or she is retained (including the parent, subsidiary, or sibling organization of a principal by which he or she is retained); to the special private gain or loss of a relative; or to the special private gain or loss of a business associate. Commissioners of community redevelopment agencies (CRAs) under Sec. 163.356 or 163.357, F.S., and officers of independent special tax districts elected on a one-acre, one-vote basis are not prohibited from voting in that capacity.

For purposes of this law, a "relative" includes only the officer's father, mother, son, daughter, husband, wife, brother, sister, father-in-law, mother-in-law, son-in-law, and daughter-in-law. A "business associate" means any person or entity engaged in or carrying on a business enterprise with the officer as a partner, joint venturer, coowner of property, or corporate shareholder (where the shares of the corporation are not listed on any national or regional stock exchange).

\*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*

### ELECTED OFFICERS:

In addition to abstaining from voting in the situations described above, you must disclose the conflict:

PRIOR TO THE VOTE BEING TAKEN by publicly stating to the assembly the nature of your interest in the measure on which you are abstaining from voting; *and*

WITHIN 15 DAYS AFTER THE VOTE OCCURS by completing and filing this form with the person responsible for recording the minutes of the meeting, who should incorporate the form in the minutes.

\*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*

### APPOINTED OFFICERS:

Although you must abstain from voting in the situations described above, you are not prohibited by Section 112.3143 from otherwise participating in these matters. However, you must disclose the nature of the conflict before making any attempt to influence the decision, whether orally or in writing and whether made by you or at your direction.

IF YOU INTEND TO MAKE ANY ATTEMPT TO INFLUENCE THE DECISION PRIOR TO THE MEETING AT WHICH THE VOTE WILL BE TAKEN:

• You must complete and file this form (before making any attempt to influence the decision) with the person responsible for recording the minutes of the meeting, who will incorporate the form in the minutes. (Continued on page 2)

**APPOINTED OFFICERS (continued)**

- A copy of the form must be provided immediately to the other members of the agency.

- The form must be read publicly at the next meeting after the form is filed.

IF YOU MAKE NO ATTEMPT TO INFLUENCE THE DECISION EXCEPT BY DISCUSSION AT THE MEETING:

- You must disclose orally the nature of your conflict in the measure before participating.

- You must complete the form and file it within 15 days after the vote occurs with the person responsible for recording the minutes of the meeting, who must incorporate the form in the minutes. A copy of the form must be provided immediately to the other members of the agency, and the form must be read publicly at the next meeting after the form is filed.

---

## DISCLOSURE OF LOCAL OFFICER'S INTEREST

I, _Loretta (Lori) Tolland_ , hereby disclose that on _Sept 18_ , 20 _24_ :

(a) A measure came or will come before my agency which (check one or more)

___ inured to my special private gain or loss;

___ inured to the special gain or loss of my business associate, _____ ;

_✓_ inured to the special gain or loss of my relative, _Christopher Tolland_ ;

___ inured to the special gain or loss of _____ , by whom I am retained; or

___ inured to the special gain or loss of _____ , which is the parent subsidiary, or sibling organization or subsidiary of a principal which has retained me.

(b) The measure before my agency and the nature of my conflicting interest in the measure is as follows:

_Resolution NO 2024-160 - Accepting a proposal from Brown & Brown Insurance Services -_

_My son works for a competing insurance broker._

If disclosure of specific information would violate confidentiality or privilege pursuant to law or rules governing attorneys, a public officer, who is also an attorney, may comply with the disclosure requirements of this section by disclosing the nature of the interest in such a way as to provide the public with notice of the conflict.

_Sept 18, 2024_
Date Filed

Signature _Loretta R Tolland_

---

NOTICE: UNDER PROVISIONS OF FLORIDA STATUTES §112.317, A FAILURE TO MAKE ANY REQUIRED DISCLOSURE CONSTITUTES GROUNDS FOR AND MAY BE PUNISHED BY ONE OR MORE OF THE FOLLOWING: IMPEACHMENT, REMOVAL OR SUSPENSION FROM OFFICE OR EMPLOYMENT, DEMOTION, REDUCTION IN SALARY, REPRIMAND, OR A CIVIL PENALTY NOT TO EXCEED $10,000.

CE FORM 8B – EFF. 11/2013
Adopted by reference in Rule 34-7.010(1)(f), F.A.C.

PAGE 2

# FORM 8B   MEMORANDUM OF VOTING CONFLICT FOR COUNTY, MUNICIPAL, AND OTHER LOCAL PUBLIC OFFICERS

| | |
|---|---|
| LAST NAME—FIRST NAME—MIDDLE NAME<br>Sargent - Travis - Craig | NAME OF BOARD, COUNCIL, COMMISSION, AUTHORITY, OR COMMITTEE<br>Commission |
| MAILING ADDRESS<br>406 N. Beach St. | THE BOARD, COUNCIL, COMMISSION, AUTHORITY OR COMMITTEE ON WHICH I SERVE IS A UNIT OF:<br>☑ CITY    ☐ COUNTY    ☐ OTHER LOCAL AGENCY |
| CITY<br>Ormond Beach    COUNTY<br>Volusia | NAME OF POLITICAL SUBDIVISION: |
| DATE ON WHICH VOTE OCCURRED<br>09-18-24 | MY POSITION IS:<br>☑ ELECTIVE    ☐ APPOINTIVE |

## WHO MUST FILE FORM 8B

This form is for use by any person serving at the county, city, or other local level of government on an appointed or elected board, council, commission, authority, or committee. It applies to members of advisory and non-advisory bodies who are presented with a voting conflict of interest under Section 112.3143, Florida Statutes.

Your responsibilities under the law when faced with voting on a measure in which you have a conflict of interest will vary greatly depending on whether you hold an elective or appointive position. For this reason, please pay close attention to the instructions on this form before completing and filing the form.

## INSTRUCTIONS FOR COMPLIANCE WITH SECTION 112.3143, FLORIDA STATUTES

A person holding elective or appointive county, municipal, or other local public office MUST ABSTAIN from voting on a measure which would inure to his or her special private gain or loss. Each elected or appointed local officer also MUST ABSTAIN from knowingly voting on a measure which would inure to the special gain or loss of a principal (other than a government agency) by whom he or she is retained (including the parent, subsidiary, or sibling organization of a principal by which he or she is retained); to the special private gain or loss of a relative; or to the special private gain or loss of a business associate. Commissioners of community redevelopment agencies (CRAs) under Sec. 163.356 or 163.357, F.S., and officers of independent special tax districts elected on a one-acre, one-vote basis are not prohibited from voting in that capacity.

For purposes of this law, a "relative" includes only the officer's father, mother, son, daughter, husband, wife, brother, sister, father-in-law, mother-in-law, son-in-law, and daughter-in-law. A "business associate" means any person or entity engaged in or carrying on a business enterprise with the officer as a partner, joint venturer, coowner of property, or corporate shareholder (where the shares of the corporation are not listed on any national or regional stock exchange).

\*          \*          \*          \*          \*          \*          \*          \*          \*          \*          \*          \*          \*          \*          \*          \*

## ELECTED OFFICERS:

In addition to abstaining from voting in the situations described above, you must disclose the conflict:

PRIOR TO THE VOTE BEING TAKEN by publicly stating to the assembly the nature of your interest in the measure on which you are abstaining from voting; *and*

WITHIN 15 DAYS AFTER THE VOTE OCCURS by completing and filing this form with the person responsible for recording the minutes of the meeting, who should incorporate the form in the minutes.

\*          \*          \*          \*          \*          \*          \*          \*          \*          \*          \*          \*          \*          \*          \*          \*

## APPOINTED OFFICERS:

Although you must abstain from voting in the situations described above, you are not prohibited by Section 112.3143 from otherwise participating in these matters. However, you must disclose the nature of the conflict before making any attempt to influence the decision, whether orally or in writing and whether made by you or at your direction.

IF YOU INTEND TO MAKE ANY ATTEMPT TO INFLUENCE THE DECISION PRIOR TO THE MEETING AT WHICH THE VOTE WILL BE TAKEN:

• You must complete and file this form (before making any attempt to influence the decision) with the person responsible for recording the minutes of the meeting, who will incorporate the form in the minutes.  (Continued on page 2)

CE FORM 8B - EFF. 11/2013<br>Adopted by reference in Rule 34-7.010(1)(f), F.A.C.

PAGE 1

**APPOINTED OFFICERS** (continued)

- A copy of the form must be provided immediately to the other members of the agency.

- The form must be read publicly at the next meeting after the form is filed.

IF YOU MAKE NO ATTEMPT TO INFLUENCE THE DECISION EXCEPT BY DISCUSSION AT THE MEETING:

- You must disclose orally the nature of your conflict in the measure before participating.

- You must complete the form and file it within 15 days after the vote occurs with the person responsible for recording the minutes of the meeting, who must incorporate the form in the minutes. A copy of the form must be provided immediately to the other members of the agency, and the form must be read publicly at the next meeting after the form is filed.

## DISCLOSURE OF LOCAL OFFICER'S INTEREST

I, _Travis Sargent_ , hereby disclose that on _Sept. 18_ , 20 _24_ :

(a) A measure came or will come before my agency which (check one or more)

___ inured to my special private gain or loss;

✓ inured to the special gain or loss of my business associate, _Foundation Risk Partners_ ;

___ inured to the special gain or loss of my relative,_____ ;

___ inured to the special gain or loss of _____ , by

whom I am retained; or

___ inured to the special gain or loss of _____ , which

is the parent subsidiary, or sibling organization or subsidiary of a principal which has retained me.

(b) The measure before my agency and the nature of my conflicting interest in the measure is as follows:

If disclosure of specific information would violate confidentiality or privilege pursuant to law or rules governing attorneys, a public officer, who is also an attorney, may comply with the disclosure requirements of this section by disclosing the nature of the interest in such a way as to provide the public with notice of the conflict.

_9/18/24_

Date Filed

Signature

NOTICE: UNDER PROVISIONS OF FLORIDA STATUTES §112.317, A FAILURE TO MAKE ANY REQUIRED DISCLOSURE CONSTITUTES GROUNDS FOR AND MAY BE PUNISHED BY ONE OR MORE OF THE FOLLOWING: IMPEACHMENT, REMOVAL OR SUSPENSION FROM OFFICE OR EMPLOYMENT, DEMOTION, REDUCTION IN SALARY, REPRIMAND, OR A CIVIL PENALTY NOT TO EXCEED $10,000.

CE FORM 8B - EFF. 11/2013
Adopted by reference in Rule 34-7.010(1)(f), F.A.C.

PAGE 2

<u>Item #11 – Reports, Suggestions, Requests</u>

<u>Events, Updates, Congratulations, and Requests</u>
Ms. Shanahan noted upcoming meetings and events.

Commissioner Sargent reviewed upcoming events and events he attended, including the 9/11 and Crime Stoppers events.

Commissioner Persis discussed upcoming events, events she attended, and thanked staff for their work with an issue that occurred.

Commissioner Briley reviewed events he attended.

Commissioner Tolland congratulated Ms. Rebostini and Representative Leek for their service. She discussed events she attended, upcoming events, and provided updates from Ormond Beach MainStreet. She requested an education push on social media regarding code enforcement regulations. She suggested a thin black trim to be used in the city landscaping with mulch to help contain it and prevent runoff into the streets.

Mayor Partington discussed the budget, highlighting the public safety items, and noted the city was the second lowest tax rate in Volusia County. He thanked those who participated in the 9/11 event.

<u>Tomoka State Park</u>
Commissioner Briley inquired if there was any interest by the Commission to write a letter from the Commission as a whole to the State regarding the proposed paving of Tomoka State Park; whereby, Mayor Partington and Commissioner Sargent stated they had no interest in sending a letter.

Commissioner Tolland stated she would support a letter requesting a more permanent permeable product due to flooding concerns.

<u>Item #12 – Adjournment</u>

The meeting was adjourned at 11:02 p.m.

APPROVED:    October 2, 2024

BY:    _____
Bill Partington, Mayor

ATTEST:

_____
Susan Carroll Dauderis,
City Clerk

IN THE COUNTY COURT IN AND FOR
VOLUSIA COUNTY, FLORIDA

MICHAEL PUCKETT

      Plaintiff

vs.

EDGEWATER ANIMAL SHELTER INC.

and

JANE DOE

      Defendants

_____/

CASE NO: 2025 25303 CODL
Division 71
JUDGE Angela Dempsy

## SECOND AMENDED COMPLAINT FOR WRIT OF REPLEVIN, DAMAGES AND DEMAND FOR JURY TRIAL

Plaintiff, MICHAEL PUCKETT, sues Defendants EDGEWATER ANIMAL

SHELTER INC. for Conversion and Intentional Infliction of Emotional Distress and sues

JANE DOE to recover possession of personal property, and in support thereof states:

### JURISDICTION & VENUE

1.      This is an action for damages in excess of $8,000.00.

2.      Pursuant to § 47.011, Fla. Stat., venue is proper in Volusia County because the

incidents giving rise to this cause of action occurred in Volusia County.

### PARTIES

3.      Plaintiff MICHAEL PUCKETT (hereinafter "Plaintiff "or "PUCKETT") is an

adult individual that resides in Volusia County.

4.      Defendant EDGEWATER ANIMAL SHELTER INC. is a Florida not-for-profit

corporation that owns and operates an animal shelter at 605 Mango Tree Drive,

Edgewater, FL 32132. At all times relevant hereto, Defendant EDGEWATER ANIMAL

SHELTER INC.  At all times relevant hereto, Defendant EDGEWATER ANIMAL

SHELTER INC.  acquiesced in and ratified the decisions and actions made by its officers,

directors, managers, supervisors, agents, and/or employees. All references in the instant

complaint to Defendant EDGEWATER ANIMAL SHELTER INC.  includes its officers,

directors, managers, supervisors, agents, and/or employees.

5.      Defendant JANE DOE is an adult individual that upon information and belief

resides in Volusia County.

## FACTUAL BACKGROUND

6.      PUCKETT suffers from Post Traumatic Stress Disorder (PTSD).

7.      Like many individuals that struggle with mental health, PUCKETT has experienced

intermittent periods of homelessness.

8.      PUCKETT is indigent.

9.      On August 17, 2025 PUCKETT was arrested at a homeless encampment for

trespassing.

10.     Upon his arrest PUCKETT asked a friend also staying at the homeless encampment

to care for PUCKETT's two dogs, Goose and Macho Man until he was released.

11.     Goose and Macho Man provided PUCKETT affection, companionship and

emotional support that helped ameliorate the symptoms of his PTSD.

12.     The friend agreed to care for both dogs until PUCKETT was released from jail.

2

13. After PUCKETT was arrested, two Ormond Beach police officers went to the homeless encampment and "took custody of both dogs."

14. Goose and Macho Man were not at large or unattended when they were seized by the Ormond Beach Police Department.

15. PUCKETT was not notified about his dogs being seized by the Ormond Beach Police Department, despite PUCKETT's location being known to the Ormond Beach Police Department.

16. The Ormond Beach Police Department held Goose and Macho Man for two days before transferring the dogs to the Defendant EDGEWATER ANIMAL SHELTER INC.

17. PUCKETT was not notified about his dogs being transferred to the Defendant EDGEWATER ANIMAL SHELTER INC. despite his location being known by the Ormond Beach Police Department.

18. After being released from custody, PUCKETT contacted his friend, who informed him his dogs had been taken from him by the Ormond Beach Police Department.

19. PUCKETT contacted the Ormond Beach Police Department and was told his dogs were at the Halifax Humane Society.

20. PUCKETT contacted the Halifax Humane Society and was informed Goose and Macho Man were not at the animal shelter operated by the Halifax Humane Society.

21. PUCKETT again contacted the Ormond Beach Police Department and was finally told that his dogs had been taken to the EDGEWATER ANIMAL SHELTER INC.

22. Plaintiff contacted Defendant EDGEWATER ANIMAL SHELTER INC. and asked what he needed to do to be reunited with his dogs.

3

23.    Defendant EDGEWATER ANIMAL SHELTER INC. claimed it was necessary "to check with the Ormond Beach Police Department" to find out if his dogs could even be returned to him and promised to get back to him.

24.    After not hearing from Defendant EDGEWATER ANIMAL SHELTER INC. Plaintiff tried repeatedly to reach someone at the animal shelter without success.

25.    Plaintiff finally went to the animal shelter in person and was told he could not have his dogs unless he paid $490.00.

26.    PUCKETT did not have the money demanded by Defendant EDGEWATER ANIMAL SHELTER INC. and informed them of such.

27.    PUCKETT pleaded to be allowed to make payments towards the money Defendant EDGEWATER ANIMAL SHELTER INC. claimed he owed.

28.    Defendant EDGEWATER ANIMAL SHELTER INC. flatly refused to make any arrangements for PUCKETT to pay the demanded charges over time.

29.    Plaintiff requested to be allowed to adopt his dogs and was flatly denied because Defendant EDGEWATER ANIMAL SHELTER INC. deemed him unfit to care for his dogs.

30.    Section 828.073 Fla. Stat. provides a process by which ownership of neglected or mistreated animals may be awarded to an animal welfare organization.

31.    Defendant EDGEWATER ANIMAL SHELTER INC. did not avail itself of the process mandated by Section 828.073 Fla. Stat. to be legally awarded ownership of Goose or Macho Man.

32.    Although the timing is not entirely certain, notwithstanding Plaintiff's concerted efforts to be reunited with his dog, Defendant EDGEWATER ANIMAL SHELTER INC.,

4

though fully aware that Plaintiff wished to reclaim Macho Man, without any prior notice to Plaintiff, killed Macho Man, claiming that the dog was "aggressive."

33.    EDGEWATER ANIMAL SHELTER INC. did not follow the statutory procedure provided in Part II of Chapter 767, Fla. Stat. required for an animal control authority to declare a dog dangerous or to confiscate an allegedly dangerous dog for purposes of destruction, instead unilaterally terminating Macho Man's life and Plaintiff's property rights in Macho Man.

34.    Defendant EDGEWATER ANIMAL SHELTER INC., though fully aware that Plaintiff wished to reclaim Goose, nonetheless transferred possession of the dog to a third party, referred to in the instant complaint as "JANE DOE."

35.    Macho Man was unique and irreplaceable; no other dog will have the same personality and characteristics of Macho Man. Macho Man has special, intrinsic value to Plaintiff.

36.    Goose is unique and irreplaceable; no other dog will have the same personality and characteristics as Goose. Goose has special, intrinsic value to Plaintiff.

37.    JANE DOE has possession and control of Goose, property lawfully belonging to Plaintiff.

38.    Plaintiff will seek leave of Court to amend his Second Amended Complaint to state the true name of JANE DOE when it has been ascertained.

39.    Upon learning of Macho Man's death and Goose's transfer Plaintiff was overcome with grief and so emotionally distraught that he became physically ill.

40.    Plaintiff still suffers extreme emotional distress because of Defendant EDGEWATER ANIMAL SHELTER INC. heartless and intentional conduct in

5

deliberately depriving him of the possession, companionship, love and emotional support of Goose and Macho Man.

41.    At no point did Plaintiff release his legal ownership of Goose and Macho Man to the Defendant EDGEWATER ANIMAL SHELTER INC.

## COUNT I-REPLEVIN

42.    Plaintiff realleges and incorporates paragraphs 1-41 as though fully set forth herein.

43.    This is a replevin action to recover possession of personal property to which the Plaintiff MICHAEL PUCKETT is lawfully entitled.

44.    The property to be replevied is a male Bully Mixed Breed dog named "Goose."

45.    The economic value of Goose is approximately $ 200.00.

46.    Goose was neither taken on an order or judgment of a court against Plaintiff, nor under an execution or judgment against Plaintiff or against the property.

47.    Goose was not taken for a tax, assessment or fine pursuant to law.

48.    PUCKETT is the owner of Goose, never relinquished ownership of Goose, and is entitled to possession of Goose.

49.    Plaintiff seeks entry of an order to show cause directed to Defendant JANE DOE pursuant to F.S. 78.067, and an immediate hearing on Plaintiff's right to possession of Goose.

50.    Plaintiff also requests expedited discovery regarding JANE DOE's identity and address.

## COUNT II-CONVERSION

51.    Plaintiff realleges and incorporates paragraphs 1-41 as though fully set forth herein.

6

52.     Defendant EDGEWATER ANIMAL SHELTER INC. was fully aware that Goose
and Macho Man were Plaintiff's property.

53.     Defendant EDGEWATER ANIMAL SHELTER INC. intentionally exerted
wrongful dominion over Plaintiff's personal property, Macho Man.

54.     Defendant EDGEWATER ANIMAL SHELTER INC. intentionally exerted
wrongful dominion over Plaintiff's personal property, Goose.

55.     Defendant EDGEWATER ANIMAL SHELTER INC. killed Macho Man and
transferred Goose to JANE DOE without disclosing to her/him PUCKETT's actual
ownership interest in Goose, thereby interfering with PUCKETT's right of possession.

56.     As a direct and proximate result of the intentional actions, as alleged in this Count,
Defendant EDGEWATER ANIMAL SHELTER INC. is civilly liable to PUCKETT for
suffering, mental anguish, loss of use of his property, loss of the intrinsic value of his
property and other compensatory damages.

**COUNT III- INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

57.     Plaintiff realleges and incorporates paragraphs 1- 41 as though fully set forth herein.

58.     Defendant EDGEWATER ANIMAL SHELTER INC. acted with deliberate
indifference to Plaintiff's property rights in Goose and Macho Man and engaged in extreme
and outrageous conduct through the following acts and omissions:

   a)   Refusing to allow Plaintiff to reclaim Macho Man or Goose because he
        could not afford the fees it unilaterally imposed;

   b)   Refusing to allow Plaintiff to make payments for fees he allegedly owned
        to Defendant EDGEWATER ANIMAL SHELTER INC. for Macho Man
        and Goose;

7

c) Killing Plaintiff's dog Macho Man knowing that Plaintiff had not abandoned Macho Man or relinquished his ownership interest in Macho Man and desperately desired to be reunited with Macho Man;

d)  Transferring possession of Goose to JANE DOE knowing that Plaintiff had not abandoned Goose or relinquished his ownership interest in Goose and desperately desired to be reunited with Goose.

59.    Defendant EDGEWATER ANIMAL SHELTER INC. intended to cause emotional distress to PUCKETT or had a reckless disregard for the risk their actions posed for causing emotional distress to PUCKETT.

60.    Defendant EDGEWATER ANIMAL SHELTER INC.'s conduct in killing one of his dogs and intentionally depriving him of possession, love, companionship and emotional support of the other was outrageous and beyond all bounds of decency to be regarded as odious and utterly intolerable in a civilized community.

61.    As a direct and proximate result of the extreme and outrageous conduct and intentional infliction of emotional distress by Defendant EDGEWATER ANIMAL SHELTER INC. Plaintiff PUCKETT suffered severe emotional distress.

**JURY DEMAND**

62.    Plaintiff requests a jury trial as to damages and all other issues so triable.

**WHEREFORE,** Plaintiff demands a judgment for damages against Defendant EDGEWATER ANIMAL SHELTER INC. and a judgment for replevin against Defendant JANE DOE, together with the costs of this action, and whatever other relief the court deems just and appropriate.

Respectfully submitted this 21st day of October, 2025.


By: s/ *Marcy LaHart*
Marcy I. LaHart, Esq.
Florida Bar No. 0967009
Marcy@floridaanimallawyer.com
861 SE 40th Street
Tacoma, WA 98418
(352) 545-7001


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 21st day of October, 2025 a true and correct copy of the foregoing was furnished via electronic mail State Court E-Portal to all attorneys of record listed in the Florida E-filing E-Portal.

By: s/ *Marcy LaHart*
Marcy I. LaHart, Esq.

9

IN THE COUNTY COURT IN AND FOR
VOLUSIA COUNTY, FLORIDA

MICHAEL PUCKETT

      Plaintiff

vs.

EDGEWATER ANIMAL SHELTER INC.

and

JANE DOE

      Defendants

_____/

CASE NO: 2025 25303 CODL
Division 71
JUDGE Angela Dempsy

## **THIRD AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND RELIEF, WRIT OF REPLEVIN, DAMAGES AND DEMAND FOR JURY TRIAL**

      Plaintiff, MICHAEL PUCKETT, sues Defendants EDGEWATER ANIMAL SHELTER INC., and in support thereof states:

### **JURISDICTION & VENUE**

1.      This is an action for replevin, declaratory relief and damages of $50,000.00.

2.      Pursuant to § 47.011, Fla. Stat., venue is proper in Volusia County because the incidents giving rise to this cause of action occurred in Volusia County.

### **PARTIES**

3.      Plaintiff MICHAEL PUCKETT (hereinafter "Plaintiff "or "PUCKETT") is an adult individual that resides in Volusia County.

4.      Defendant EDGEWATER ANIMAL SHELTER INC. is a Florida not-for-profit

corporation that owns and operates an animal shelter at 605 Mango Tree Drive,

Edgewater, FL 32132.

5.      Defendant JANE DOE is an adult individual that upon information and belief

resides in Volusia County.

**FACTS COMMON TO ALL COUNTS**

6.      PUCKETT suffers from Post Traumatic Stress Disorder (PTSD).

7.      Like many individuals that struggle with mental health, PUCKETT has

experienced intermittent periods of homelessness.

8.      PUCKETT is indigent.

9.      At all times relevant to this complaint PUCKETT was the owner of two dogs,

Goose and Macho Man. Goose is a large brindle cane Corso mix, Macho Man was a

smaller lab/pit mix.

10.     Goose and Macho Man provided PUCKETT affection, companionship and

emotional support that helped ameliorate the symptoms of his PTSD.

11.     On August 17, 2025, PUCKETT was arrested for allegedly trespassing at a

homeless encampment located at 1700 North US Highway 1 in Ormond Beach.

12.     Upon his arrest PUCKETT asked Timothy Boring, a friend also staying at the

homeless encampment, to care for PUCKETT's two dogs, Goose and Macho Man until he

was released.

13.     Timothy Boring agreed to care for both dogs until PUCKETT was released from

jail.

14.     After PUCKETT was arrested, two Ormond Beach community service officers went to the homeless encampment and took PUCKETT's two dogs.

15.     Goose and Macho Man were not at large or unattended when they were seized by the Ormond Beach Police Department; they were being looked after and cared for by Timothy Boring.

16.     Ormond Beach did not seize Goose and Macho Man because the animals were being abused or neglected or because the dogs were a threat to public safety; Goose and Macho Man were seized upon the mistaken belief that if something happened to the dogs while PUCKETT was incarcerated Ormond Beach would be liable.

17.     The Community Service officers that indicated they "took custody" of Goose and Macho Man described both dogs as having a "nice disposition." The Ormond Beach Police Department Incident Report is marked, attached hereto and incorporated by reference as Exhibit 1.

18.     Ormond Beach Police Department did not notify PUCKETT that it had seized his dogs, despite PUCKETT's location being known to the Ormond Beach Police Department.

19.     On August 19, less than 48 hours after the Ormond Beach Police Department seized Goose and Macho Man both dogs were transferred to the Defendant EDGEWATER ANIMAL SHELTER INC.

20.     The Ormond Beach Police Department did not notify PUCKETT about his dogs being transferred to the Defendant EDGEWATER ANIMAL SHELTER INC. despite PUCKETT's location being known by the Ormond Beach Police Department.

21.     PUCKETT was released from custody on August 21, 2025 at approximately 6:30 pm after being sentenced to time served.

3

22.     After being released from custody, PUCKETT was driven by friends to the homeless encampment at 1700 North US Highway 1 in Ormond Beach so he could be reunited with his dogs.

23.     Mr. Boring informed PUCKETT that Goose and Macho Man had been seized by the Ormond Beach Police Department.

24.     PUCKETT called the Ormond Beach Police Department, who informed him that Macho Man and Goose had been taken to the Halifax Humane Society.

25.     Halifax Humane Society did not open until noon on the following day, Friday, August 22, 2025.

26.     As soon as the Halifax Humane Society opened on Friday August 22, 2025, PUCKETT called and was informed Goose and Macho Man were not at the animal shelter operated by the Halifax Humane Society. It was suggested PUCKETT call the Volusia County Sheriff's Office.

27.     The Volusia County Sheriff's Office transferred PUCKETT to Volusia County Animal Control.

28.     After multiple phone calls, PUCKETT eventually learned that his dogs had been taken to the EDGEWATER ANIMAL SHELTER INC.

29.     Plaintiff contacted Defendant EDGEWATER ANIMAL SHELTER INC. at 1:17 pm on Friday, August 22, 2025. No one answered the phone and he left a message.

30.     PUCKETT was finally able to speak with an employee of EDGEWATER ANIMAL SHELTER INC. at 2:29 pm.

4

31.     PUCKETT claimed his dogs on August 22, 2025 by calling and informing EDGEWATER ANIMAL SHELTER INC. that Macho Man and Goose were his dogs and he wanted them back.

32.     PUCKETT informed EDGEWATER ANIMAL SHELTER INC. asked what he needed to do to get Goose and Macho Man released.

33.     PUCKETT was immediately told "You are not going to get the black dog back, he has been 'fostered out,'[1] and your bill for the other dog is $368 and he is scheduled to be neutered and you'll be responsible for that also."

34.     PUCKETT questioned how Macho Man could have been fostered out and why Goose was scheduled to be neutered given that the three-day stray hold had not expired.

35.     PUCKETT was transferred to another employee and then to the Director of EDGEWATER ANIMAL SHELTER INC., Ms. Roxanne Hicks.

36.     PUCKETT asked Ms. Hicks how one of his dogs could be fostered out given that it had not been three days since the dogs were brought to the animal shelter. Ms. Hicks stated that what was counted is the number of nights the dogs had been at the shelter, and that the time the dogs were held by the Ormond Beach Police Department also counted toward the three-day stray hold.

37.     PUCKETT argued that the time the dogs were in the custody of Ormond Beach could not be counted and Ms. Hicks replied: "I am the animal shelter, I can do whatever I want."

---

[1] It makes no sense that EDGEWATER ANIMAL SHELTER INC. would "foster out" a dog that was allegedly so aggressive it had to be destroyed. On information and belief Macho Man was already dead by Friday, August 22, 2025.

5

38.    Ms. Hicks told PUCKETT that he could not have his dogs back because Ormond Beach would not allow it.

39.    PUCKETT informed Ms. Hicks that Ormond Beach had told him exactly the opposite, and that he would call Ormond Beach again for further clarification, but Ms. Hicks insisted that she would call Ormond Beach to inquire as to whether PUCKETT could have his dogs back, promising she would call PUCKETT back after speaking with Ormond Beach.

40.    After hearing nothing from Ms. Hicks for more than an hour, PUCKETT called the animal shelter again at 2:29 pm, but his call was not answered.

41.    PUCKETT, who does not have a working vehicle, anxiously waited for the promised return call from Ms. Hicks until 3:40 pm.  When it was obvious his calls were being intentionally ignored, PUCKETT was given a ride to EDGEWATER ANIMAL SHELTER INC., which closed at 4:00 pm.

42.    PUCKETT called multiple times while enroute to the animal shelter to inform EDGEWATER ANIMAL SHELTER INC. he was on his way. When his calls were again ignored, he left messages.

43.    PUCKETT arrived at the shelter shortly after 4 pm on Friday, August 22, 2025; although the shelter was closed, he could see people inside.

44.    PUCKETT continued to call EDGEWATER ANIMAL SHELTER INC. from the parking lot but his calls were not answered, and he could not gain access to the shelter because of a closed gate.

45.    All together PUCKETT called EDGEWATER ANIMAL SHELTER INC. sixteen times on Friday, August 22, 2025 attempting to be reunited with his dogs.

6

46.    PUCKETT returned to the animal shelter on Monday, August 25th and demanded that his dogs be returned to him.

47.    PUCKETT was told he could not have Goose and Macho Man back unless he paid $490.00.

48.    PUCKETT did not have all the money demanded by Defendant EDGEWATER ANIMAL SHELTER INC. and informed them of such.

49.    PUCKETT offered to pay every penny he had immediately and pleaded to be allowed to make payments towards the money Defendant EDGEWATER ANIMAL SHELTER INC. claimed he owed.

50.    Defendant EDGEWATER ANIMAL SHELTER INC. flatly refused to make any arrangements for PUCKETT to pay the demanded charges over time and called the Edgewater Police Department to have PUCKETT trespassed from the premises.

51.    PUCKETT later requested to be allowed to adopt his dogs and was flatly denied because Defendant EDGEWATER ANIMAL SHELTER INC. deemed him unfit to care for his dogs.

52.    PUCKETT's employer went to the shelter and requested to adopt Goose and Macho Man but was also refused by EDGEWATER ANIMAL SHELTER INC.

53.    Although the timing is not entirely certain, notwithstanding Plaintiff's concerted efforts to be reunited with his dog, Defendant EDGEWATER ANIMAL SHELTER INC., though fully aware that Plaintiff wished to reclaim Macho Man, without any prior notice to PUCKETT killed Macho Man, claiming that the dog was "aggressive."

7

54.    Defendant EDGEWATER ANIMAL SHELTER INC., though fully aware that Plaintiff wished to reclaim Goose, nonetheless transferred possession of the dog to a third party, referred to in the instant complaint as "JANE DOE."

55.    Macho Man was unique and irreplaceable; no other dog will have the same personality and characteristics of Macho Man. Macho Man had special, intrinsic value to PUCKETT.

56.    Goose is unique and irreplaceable; no other dog will have the same personality and characteristics as Goose. Goose has special, intrinsic value to PUCKETT.

57.    JANE DOE has possession and control of Goose, property lawfully belonging to Plaintiff.

58.    Plaintiff will seek leave of Court to amend his Third Amended Complaint to state the true name of JANE DOE when it has been ascertained.

59.    Upon learning of Macho Man's death and Goose's transfer Plaintiff was overcome with grief and so emotionally distraught that he became physically ill.

60.    Plaintiff still suffers extreme emotional distress because of Defendant EDGEWATER ANIMAL SHELTER INC. heartless and intentional conduct in deliberately depriving him of the possession, companionship, love and emotional support of Goose and Macho Man.

61.    At no point did Plaintiff release his legal ownership of Goose and Macho Man to the Defendant EDGEWATER ANIMAL SHELTER INC.

62.    EDGEWATER ANIMAL SHELTER INC. is apparently unclear what authority effectuated PUCKETT's alleged forfeiture of his dogs as it has argued that "it is imperative

8

to consider relevant Ormond Beach City, Edgewater City, and Volusia County ordinances. . . ."

63.     EDGEWATER ANIMAL SHELTER INC. asserts based upon language cherry picked from three different code of ordinances that it was authorized if not downright required to permanently deprive PUCKETT of the love and companionship of Goose and Macho Man.

64.     Volusia County's Animal Control Ordinance does not apply within Ormond Beach or the City of Edgewater. Volusia County's Animal Control Ordinance applies only in the unincorporated areas of the county and in the incorporated areas of any municipality that contracts with the county. Furthermore, Volusia County's Animal Control Ordinance does not and could not grant a non-profit organization ownership of an animal seized in a municipality where Volusia County is not contracted to perform animal control functions. *See* Section 14-35 Volusia County Code of Ordinances.

65.     EDGEWATER ANIMAL SHELTER INC. refers to itself as "Edgewater" in documents filed with this Court, but the animal shelter is not owned or operated by the City of Edgewater.

66.     EDGEWATER ANIMAL SHELTER INC. is not a municipality with authority to perform municipal services or exercise municipal powers; it is a private non-profit organization.

67.     The provisions contained in the "Animal Services Ordinance of the City of Edgewater, Florida" regarding "impounded animals" apply only to animals impounded within the City of Edgewater.

9

68.     The Edgewater Animal Services Ordinance does not and cannot grant a private, non-profit organization ownership of an animal seized in another jurisdiction.

69.     Section 5-72 of the Ormond Beach Code states that "[t]he owner of any animal impounded pursuant to city ordinance or Florida Statutes can reclaim such animal, upon payment of a license fee and the charges hereinafter imposed, and of all costs and charges incurred *by the city* for impounding and maintenance of such animal."(emphasis added)

70.     Section 5-72 further provides that "the duties herein imposed upon the animal control officer may be delegated to an animal shelter *by a service agreement approved by resolution of the city commission*." (emphasis added)

71.     On September 18, 2024 the Ormond Beach City Commission approved Resolution No. 2024-157 authorizing execution of an "Agreement for Services" with the Halifax Humane Society, Inc. which became effective on October 1, 2024.  The minutes of the September 18, 2024 meeting of the Ormond Beach City Commission meeting are marked, attached hereto and incorporated by reference as Exhibit 2.

72.     The Agreement for Services between Ormond Beach and the Halifax Humane Society, Inc. marked, attached hereto and incorporated by reference as Exhibit 3, states on page 6 of 13 that "the Humane Society may release an animal to its owner without payment in the event the animal's owner completes a financial affidavit indicating that the owner qualifies as indigent." The financial affidavit, a Volusia County form, is attached to the "Agreement for Services."

73.     On July 23, 2025 Ormond Beach City Manager Joyce Shanahan executed an agreement with Defendant EDGEWATER ANIMAL SHELTER INC. However, the agreement was not approved by resolution of the Ormond Beach city commission before

10

it was signed by the City Manager, nor has it been approved by resolution of the Ormond

Beach city commission in the many months since its unauthorized execution. The

unauthorized agreement is  marked, attached hereto and incorporated by reference as

Exhibit 4.

74.    EDGEWATER ANIMAL SHELTER INC. has not been delegated animal control

functions by Ormond Beach because such delegation requires a services agreement

approved by the Ormond Beach city commission.

75.    There is not a legally valid agreement between Defendant EDGEWATER

ANIMAL SHELTER INC. and Ormond Beach authorizing EDGEWATER ANIMAL

SHELTER INC. to charge dog owners or to withhold dog owners' pets if the owner cannot

afford fees unilaterally imposed by EDGEWATER ANIMAL SHELTER INC.

76.    EDGEWATER ANIMAL SHELTER INC. was not acting pursuant to authority

delegated by Ormond Beach when it demanded $490.00 from PUCKETT as a condition

precedent to the return of his personal property.

77.    EDGEWATER ANIMAL SHELTER INC. was not acting pursuant to authority

delegated by Ormond Beach when it refused to return Goose to PUCKETT.

78.    EDGEWATER ANIMAL SHELTER INC. was not acting pursuant to authority

delegated by Ormond Beach when it destroyed Macho Man.

## PROCEDURAL HISTORY

79.    On September 16, 2025 PUCKETT filed a *pro se* Replevin Complaint seeking

possession of his two dogs, Goose and Macho Man, believing his dogs were at the

Edgewater Animal Shelter.

11

80.    An Order to Show Cause was entered the following day setting a hearing on September 29, 2025 at which EDGEWATER ANIMAL SHELTER INC. was required to show cause "why the property claimed by plaintiff in the complaint filed in this action should not be taken from the possession of the defendant and delivered to plaintiff."

81.    On September 24, 2025 undersigned counsel filed a Notice of Appearance; two days later on September 26, 2025 Attorney Christopher W. Wickersham entered a Notice of Appearance on behalf of Defendant EDGEWATER ANIMAL SHELTER INC.

82.    EDGEWATER ANIMAL SHELTER INC. had destroyed Macho Man and disappeared Goose approximately a month before the hearing but did not inform PUCKETT or his attorney that it no longer had possession of the dogs, necessitating a hearing that wasted the resources of the Court and the parties.

83.    At the September 29, 2025 hearing EDGEWATER ANIMAL SHELTER INC. presented the testimony of its Director, Roxanne Hicks, who testified under oath that although EDGEWATER ANIMAL SHELTER INC. was fully aware that PUCKETT wanted his dogs back, because PUCKETT could not afford the fees demanded by EDGEWATER ANIMAL SHELTER INC., Macho Man had been destroyed because the dog was allegedly aggressive, and Goose had been adopted out to an undisclosed third party.

84.    Ms. Hicks also testified under oath that even though the 3 day stray hold had been up on Friday August 22, 2025, had PUCKETT been able to pay the $490.00 demanded on Monday, August 25, 2025 she would have allowed him to have his dogs, testimony which contradicts EDGEWATER ANIMAL SHELTER INC.'s more recent assertions that it had no flexibility regarding the stray hold period.

12

85.    Upon the testimony of Roxanne Hicks that Goose and Macho Man were no longer

in the possession of EDGEWATER ANIMAL SHELTER INC. the court ruled that the

replevin complaint should be dismissed.

86.    After the September 29, 2025 hearing Plaintiff's counsel received, pursuant to a

public records request, an "Animal Record Summary" regarding Goose that stated on the

very first page "The Adopted pet has not been sterilized prior to adoption."

87.    Because it is illegal for an animal shelter to release an unaltered animal to an

adopter except under narrow circumstances inapplicable to Goose, PUCKETT filed a

Motion for Reconsideration and Request for Leave to Amend on October 2, 2025.

88.    October 8, 2025 an Order was entered deeming the Amended Petition for Writ of

Replevin, Complaint for Damages, and Demand for Jury Trial filed and "the operative

Complaint in this matter."

89.    Upon the pronouncement of Attorney Stephanie Boomershine, who entered an

appearance on behalf of EDGEWATER ANIMAL SHELTER INC. on October 17, 2025,

that notwithstanding the disclaimer the first page of EDGEWATER ANIMAL SHELTER

INC.'s "Animal Record Summary" Goose was in fact altered prior to his adoption, a

Second Amended Complaint was filed on behalf of Plaintiff on October 21, 2025.

90.    Three weeks later filed EDGEWATER ANIMAL SHELTER INC. its Motion to

Dismiss Counts II and III of the Second Amended Complaint, asserting that PUCKETT

had not stated a cause of action of action for conversion or intentional infliction of

emotional distress, and that depriving PUCKETT of his dogs was not only authorized but

mandated by "relevant Ormond Beach City, Edgewater City, and Volusia County

ordinances."

13

91.    A hearing was held on December 10, 2025 at which EDGEWATER ANIMAL SHELTER INC.'s motion to dismiss was granted without prejudice to allow PUCKETT to file the instant Third Amended Complaint.

### COUNT I-REPLEVIN

92.    Plaintiff realleges and incorporates paragraphs 1- 78 and 83-84 as though fully set forth herein.

93.    This is a replevin action to recover possession of personal property to which the Plaintiff MICHAEL PUCKETT is lawfully entitled.

94.    The property to be replevied is a male Cane Corso mixed breed dog named "Goose."

95.    The economic value of Goose is approximately $ 200.00.

96.    Goose's value to PUCKETT is not economic; until wrongfully converted by EDGEWATER ANIMAL SHELTER INC., Goose was an emotional support animal that provided therapeutic support to PUCKETT and has emotional and intrinsic value to PUCKETT.

97.    Goose was neither taken on an order or judgment of a court against Plaintiff, nor under an execution or judgment against Plaintiff or against the property.

98.    Goose was not taken for a tax, assessment or fine pursuant to law.

99.    PUCKETT is the owner of Goose, never relinquished ownership of Goose, and is entitled to possession of Goose.

100.    Plaintiff seeks entry of an order to show cause directed to Defendant JANE DOE pursuant to F.S. 78.067, and an immediate hearing on Plaintiff's right to possession of Goose.

14

101.    Plaintiff also requests expedited discovery regarding JANE DOE's identity and address.

**WHEREFORE,** Plaintiff demands a judgment for replevin against Defendant JANE DOE.


## COUNT II-CONVERSION

102.    Plaintiff realleges and incorporates paragraphs 1-78 and 83-84 as though fully set forth herein.

103.    Defendant EDGEWATER ANIMAL SHELTER INC. was fully aware that Goose and Macho Man were Plaintiff's property.

104.    PUCKETT demanded that EDGEWATER ANIMAL SHELTER INC. return Goose and Macho Man to him.

105.    Defendant EDGEWATER ANIMAL SHELTER INC. intentionally exerted wrongful dominion over Plaintiff's personal property, Goose and Macho Man.

106.    Defendant EDGEWATER ANIMAL SHELTER INC. killed Macho Man and transferred Goose to JANE DOE without disclosing to her/him PUCKETT's actual ownership interest in Goose, thereby interfering with PUCKETT's right of possession.

107.    As a direct and proximate result of the intentional actions, as alleged in this Count, Defendant EDGEWATER ANIMAL SHELTER INC. is civilly liable to PUCKETT for loss of use of his property, loss of the intrinsic value of his property and other compensatory damages.

**WHEREFORE,** Plaintiff demands a judgment for damages against Defendant EDGEWATER ANIMAL SHELTER INC. in an amount not in excess of the jurisdictional limits of this court.

15

## COUNT III- INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

108.    Plaintiff realleges and incorporates paragraphs 1-78 and 83-84 as though fully set forth herein.

109.    Defendant EDGEWATER ANIMAL SHELTER INC. acted with deliberate indifference to PUCKETT's property rights in Goose and Macho Man and engaged in extreme and outrageous conduct by killing Macho Man and transferring Goose to Jane Doe merely because PUCKETT could not immediately pay in full the sum EDGEWATER ANIMAL SHELTER INC. illegally attempted to extract from PUCKETT.

110.    Defendant EDGEWATER ANIMAL SHELTER INC. intended to cause emotional distress to PUCKETT or had a reckless disregard for the risk its actions posed for causing emotional distress to PUCKETT.

111.    Defendant EDGEWATER ANIMAL SHELTER INC.'s conduct in killing one of his dogs and intentionally depriving him of possession, love, companionship and emotional support of the other because he is indigent was outrageous and beyond all bounds of decency to be regarded as odious and utterly intolerable in a civilized community.

112.    PUCKETT did not have to be physically present and observe Macho Man's death to suffer foreseeable emotional distress as a direct and proximate result of the extreme and outrageous conduct by Defendant EDGEWATER ANIMAL SHELTER INC.

113.    PUCKETT did not have to be physically present at the animal shelter and watch Jane Doe load Goose into a vehicle and depart with his dog to suffer emotional distress as a direct and proximate result of the extreme and outrageous conduct by Defendant EDGEWATER ANIMAL SHELTER INC.

16

114.    As a direct and proximate result of the extreme and outrageous conduct by Defendant EDGEWATER ANIMAL SHELTER INC., PUCKETT suffered severe emotional distress.

**WHEREFORE,** Plaintiff demands a judgment for damages against Defendant EDGEWATER ANIMAL SHELTER INC. in an amount not in excess of the jurisdictional limits of this court.

## COUNT IV

### Declaratory Relief Regarding Validity of the July 24, 2025 Agreement Between Ormond Beach and Edgewater Animal Shelter Inc.

115.    Plaintiff realleges and incorporates paragraphs 1-78 and 83-84 as though fully set forth herein.

116.    Plaintiff seeks a declaration that the services agreement with Edgewater Animal Shelter Inc. signed by the City Manager of Ormond Beach, Exhibit 4 to this complaint, is invalid because it was not approved by a resolution of the Ormand Beach city commission as required by Section 5-72 of the Ormond Beach Code.

117.    In Florida, the case law is clear that "[i]n order for a contract with a city to be valid, it must comply with the city charter or ordinances." *City of Hollywood v. Witt*, 789 So.2d 1130, 1131-32 (4th DCA 2001), accord *Town of Indian River Shores v. Coll*, 378 So. 2d 53 (Fla. 4th DCA 1979)(refusing to enforce an alleged employment contract executed by the mayor of a municipality, where an ordinance required that contracts had to be authorized by the city council), *see also Ramsey v. City of Kissimmee*, 139 Fla. 107, 190 So. 474 (Fla. 1939), in which the Florida Supreme Court held that even though a contract

17

for engineering services was presented to the city commission, because there was no

evidence of any motion, resolution or ordinance adopted approving the contract, the

contract was not valid, notwithstanding execution of the contract by the Mayor.

118.    The purpose of a declaratory judgment is to afford relief for a person's insecurity

and uncertainty with respect to their rights, status, or other equitable or legal relations.

119.    There is a bona fide, actual, present need for a declaratory judgment to determine

this matter.

120.    The parties have an actual, present, adverse interest in the subject matter.

121.    There is a bona fide, present dispute amongst the parties regarding their rights and

obligations.

122.    The requested declaration deals with a presently ascertainable set of facts.

123.    The rights of the Plaintiff are dependent upon the facts set forth herein or law

applicable to these facts.

124.    The parties to this action have an actual, present, adverse and antagonistic interest

in the subject matter, either in fact or in law.

125.    The antagonistic and adverse interests are all before the Court by proper process.

126.    The relief sought is not merely the giving of legal advice by the Court, or the answer

to questions propounded out of curiosity.

127.    No vote was ever taken by the Ormond Beach city commission at a publicly noticed

meeting which authorized the City Manager to execute an agreement with the Defendant

EDGEWATER ANIMAL SHELTER INC. on behalf of Ormond Beach.

128.    Before a service agreement may be legally instituted, a public vote by the city

commission was required both by Ormond Beach city ordinance and the Government in

the Sunshine Law. See *Broward County v. Conner*, 660 So. 2d 288, 290 (Fla. 4th DCA

1995) (interpreting Sunshine Law) (If the county could not have entered into a contract

without action taken at a properly noticed public meeting, the actions of the county's

attorneys could not bind the county in the absence of proper commission approval.)

129.    Defendant EDGEWATER ANIMAL SHELTER INC. through email from counsel,

has asserted that Ormond Beach Ordinance 2-300(c)(2)(e), "authorized the city manager to

approve the Edgewater Animal Shelter contract without the involvement of the city

commission." The email is marked, attached hereto and incorporated by reference as

Exhibit 5.

130.    The ordinance cited by Defendant's counsel applies exclusively to contracts "for

professional services required for any project which is *within the scope of a continuing*

*contract between the city and a service provider*, which services are included within the

scope of the professional services within the scope of the [Consultants' Competitive

Negotiations] Act[2]." (emphasis added) The ordinance is marked, attached hereto and

incorporated by reference as Exhibit 6.

131.    Section 2-300(c)(2)(e) of the Ormond Beach Code allows the City Manager, upon

the recommendation of a department head, to sign off on services of specified

professionals who already have existing contracts with the City, provided the proposal is

for $75,000.00 or less.

132.    The Consultants' Competitive Negotiations Act in § 287.055(2)(a) Fla. Stat. defines

"professional services" as:

> services within the scope of the practice of architecture,
> professional engineering, landscape architecture, or
> registered surveying and mapping, as defined by the laws of

---

[2] See §287.055 Fla. Stat.

the state, or those performed by any architect, professional engineer, landscape architect, or registered surveyor and mapper in connection with his or her professional employment or practice.

133.    Notably absent from the definition of professional services for which the Ormond Beach City Manager may contract "without involvement of the city commission" are 1) the duties of an animal control officer or 2) temporarily sheltering domestic animals.

134.    Section 2-300(c)(2)(e) of the Ormond Beach Code provided the City Manager no authority to enter an agreement with EDGEWATER ANIMALS SHELTER INC.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court declare that the services agreement executed by the Ormond Beach City Manager is not legally valid because it was not approved by a resolution of the Ormond Beach city commission during a duly noticed public meeting.

## COUNT V

### Declaratory Relief Regarding Edgewater Animal Shelter Inc.'s Authority to Refuse to Return Goose and Macho Man

135.    Plaintiff realleges and incorporates paragraphs 1-78 and 83-84 as though fully set forth herein.

136.    Plaintiff seeks a declaration that EDGEWATER ANIMAL SHELTER INC. was without authority to deprive him of his personal property, specifically his dogs Goose and Macho Man, and that the adoption agreement between EDGEWATER ANIMAL SHELTER INC. and Jane Doe purporting to transfer ownership of Goose to Jane Doe is void.

137.    One who contracts with a municipality is bound to know the limitations of the City's contracting authority. *Indian River Shores v. Coll*, 378 So. 2d 53, 55 (Fla. 4th DCA 1979)

20

138.    The unauthorized services agreement signed by the City Manager of Ormond Beach is invalid because it did not delegate the duties or authorities of Ormond Beach animal control officers to EDGEWATER ANIMAL SHELTER INC.

139.    EDGEWATER ANIMAL SHELTER INC. did not acquire ownership of Goose and Macho Man by the agreement or by operation of any applicable law.

140.    EDGEWATER ANIMAL SHELTER INC. had no authority to destroy Macho Man.

141.    EDGEWATER ANIMAL SHELTER INC. had no authority to transfer Goose to Jane Doe.

142.    PUCKETT did not bring his dogs to the City of Edgewater nor deliver them to the Edgewater Animal Shelter Inc.

143.    PUCKETT did not surrender his dogs or abandon them; PUCKETT claimed his dogs and EDGEWATER ANIMAL SHELTER INC. refused to return them to PUCKETT.

144.    EDGEWATER ANIMAL SHELTER INC. had no authority to condition returning PUCKETT's personal property on his payment of a unilaterally imposed fee.

145.    EDGEWATER ANIMAL SHELTER INC. had no authority to refuse to return Goose and Macho Man when PUCKETT requested his dogs be returned.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court declare that Defendant EDGEWATER ANIMAL SHELTER INC. had no authority to withhold Goose and Macho Man, to destroy Macho Man or to sell, transfer or otherwise convey Goose to Jane Doe and that any agreement transferring Goose to Jane Doe is void.

**COUNT VI**
**(Plead in the Alternative)**
**Declaratory Relief Regarding Constitutionally Interpreting Stray Hold Periods**

146.     Plaintiff realleges and incorporates paragraphs 1-78 and 83-84 as though fully set forth herein.

147.     Plaintiff seeks a declaration that any stray hold period that arguably applied to EDGEWATER ANIMAL SHELTER INC.'s possession of Goose and Macho did not extinguish his rights as the dogs' known owner.

148.     Assuming that any one of the multiple codes that EDGEWATER ANIMAL SHELTER INC. has deemed "imperative for consideration" actually applied to Goose and Macho Man, nothing in any of the codes cited required or allowed forfeiture of PUCKETT's dogs to EDGEWATER ANIMAL SHELTER INC.

149.     Stray hold periods provided by all three codes apply to animals that were "impounded," not animals that were seized whose owners are known. For example, Section 5-70 of the Ormond Beach Code states that "[a]n animal control officer has the authority to impound *any animal at large*, pursuant to the enforcement or violation of any ordinance of this chapter or as provided by Florida Statutes." (emphasis added)

150.     Goose and Macho man were not "at large" when seized by Ormond Beach. Even the community service officers that took PUCKETT's dogs from Tim Boring indicated that the dogs were "taken into custody," not impounded. See Exhibit 1.

151.     Section 5-72 of the Ormond Beach Code states that "[i]n all instances of impoundment, owners of animals are responsible for the full cost of impoundment as charged by the shelter." It does NOT state that the owners of animals must pay the full cost of impoundment BEFORE the animal is returned to its owner, or that the inability to immediately pay the costs of impoundment as charged by the shelter allows the shelter to permanently deprive animal owners of their pets.

22

152.    To the contrary, the services agreement between Ormand Beach and Halifax Humane Society, the only valid agreement between Ormond Beach and any entity that operates an animal shelter, specifically authorizes waiver of impoundment fees for pet owners like PUCKETT that are indigent.

153.    Time limits for pet owners to claim their animals are imposed to allow stray animals or abandoned animals to be rehomed after an unknown owner has had a sufficient opportunity to look for their lost pet.

154.    The public policy considerations that are the basis for hold periods for stray animals are to avoid imposing undue financial burdens upon animal shelters of caring for animals for extended periods of time by allowing municipalities and animal welfare organizations that operate animal shelters to make  appropriate disposition of an animal whose owner is unknown or unwilling to reclaim their animal after a certain period of impoundment has expired. Finite hold periods also prevent animals from being subject to long-term confinement that is detrimental to their welfare.

155.    Hold periods are not intended to effectuate a forfeiture when an animal's owner is known simply because the owner is indigent.

156.    An ordinance that results in forfeiture of personal property, including animals, without due process simply because the owner of the property is indigent is unconstitutional. See *Barrow v. Holland*, 125 So.2d 749, 751 (Fla.1960) (Once any animal has been legitimately reduced to private control, confinement, and possession, it becomes private property. When that occurs, the owner thereof cannot be deprived of the use thereof, except in accord with all of the elements of due process.)

23

157.    Assuming arguendo that any of the "relevant Ormond Beach City, Edgewater City, and Volusia County ordinances" identified imperative by EDGEWATER ANIMAL SHELTER INC. allowed EDGEWATER ANIMAL SHELTER INC. to act as the agent of any of the three governments, it is imperative that the relevant ordinance must be given a constitutional interpretation if possible. *DeSisto College Inc. v. Town of Howey-In-The-Hills*, 706 F. Supp. 1479 (M.D. Fla.), *affirmed*, 888 F.2d 766 (11th Cir. 1989). (Rules of construction require that the ordinance be interpreted, if possible, as constitutional.)

158.    Forfeitures are considered "harsh extractions" not favored by the legal system and accordingly forfeiture provisions are strictly construed. In doubtful cases the courts will construe ambiguous statutes, or even clear forfeiture provisions resting on uncertain authority, against any loss and in favor of an owner's retention of property. *Mulligan v. City of Hollywood*, 871 So. 2d 249, 253 (Fla. 4th DCA 2003), *quashed,* 934 So. 2d 1238 (Fla. 2006).

159.    Interpreting a stray hold period to require or allow forfeiture of an indigent dog owner's private property interest in his beloved pets when the owner is known and diligently attempted to reclaim his property cannot be reconciled with the requirements of the Florida and Federal Constitution that property owners must be provided with due process before their property can be taken by the government or any agent acting on the government's behalf.

**WHEREFORE,** Plaintiff respectfully requests that this Honorable Court declare that the ordinances cited by EDGEWATER ANIMAL SHELTER INC.  did not authorize or require forfeiture of Goose and Macho Man to EDGEWATER ANIMAL SHELTER INC.

24

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all issues so triable.


Respectfully submitted this 16th day of December, 2025.


        By: s/ *Marcy LaHart*
        Marcy I. LaHart, Esq.
        Florida Bar No. 0967009
        Marcy@floridaanimallawyer.com
        861 SE 40th Street
        Tacoma, WA 98418
        (352) 545-7001


## CERTIFICATE OF SERVICE

     I HEREBY CERTIFY that on this a true and correct copy of the foregoing was

furnished via electronic mail State Court E-Portal to all attorneys of record listed in the

Florida E-filing E-Portal.

By: s/ *Marcy LaHart*
Marcy I. LaHart, Esq.

EXHIBIT ONE

EXHIBIT B

# Ormond Beach Police Department
## - Incident Report -

### CASE No.: OB250800224

| Agency ORI Number: FL0640400 | Reporting Agency: Ormond Beach Police Department | | ☐ Domestic Violence | ☐ Juvenile | Nature of Call Trespassers |
|---|---|---|---|---|---|

**EVENT**

| Reported Date/Time 08/17/2025 08:56:00 | Dispatch Date/Time 08/17/2025 08:56:00 | Arrival Date/Time 08/17/2025 08:56:00 | Completed Date/Time 08/17/2025 11:04:00 | Incident From Date/Time 08/17/2025 08:56:00 | | Incident To Date/Time |
|---|---|---|---|---|---|---|
| Commonplace Name ORMOND CROSSING WEST, LLC | Incident Location 1700 N US HWY 1 | | City Ormond Beach | State FLORIDA | Zip Code 32174 | County VOLUSIA | Zone OB8 |

**OFFENSES**

| Offense No. 1 | | | | |
|---|---|---|---|---|
| Felony/Misdemeanor Misdemeanor | UCR/NIBRS Code 810.09 2a | Description 810.09 2a TRESPASSING-TRESPASS FAIL TO LEAVE PROP ON ORDER OF OWNER | | Attempted/Completed Completed |
| Location Type Field/Woods | # Prem. Entered | Method of Entry | Offender Suspected of Using Not Applicable (Mutually Exclusive) | Criminal Activity/Gang |
| Weapon Types | | | Bias Motivation None (no bias) | Cargo Theft / Activity Type |

**SUBJECT**

| Subject No. 1 | | | | | | | Attorney: | | |
|---|---|---|---|---|---|---|---|---|---|
| Last Name WHITE | First Name SAUNDRA | Middle Name DEE | Suffix | Maiden Name | Nickname | Sex F | Race White | | Ethnicity Non-Hispanic |
| Date of Birth 11/18/1971 | Place Of Birth | Age 53 | To Age | Height | Weight | Eye Color | Hair Color | Hair Length | Hair Style / Facial Hair / Build |
| Complexion | Glasses | Teeth | | Speech/Voice | | Physical Feature Code | | Special Identifiers | |
| Clothing Descrption | | | Resident Status Non-Resident | Immigration Status United States Citizen | Education Level | | | Social Security Number 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 | |
| Driver's License Number RQ765610 | | State OH | Misc ID Number / Type / State — / — / — | | | | | | |

- Contact Information -

| Last Known Address GENERAL DELIVERY, Apt ORMOND BEACH | | City Ormond Beach | | State FL | Zip Code 32174 | County Volusia | | Country USA | |
|---|---|---|---|---|---|---|---|---|---|
| Employer/School Name | Employer/School Phone | Employer/School Address | City | | County | | State | Zip Code | Country |
| Cell Phone (386) 278-5625 | Home Phone | Work Phone | Email UNKNOWN | | Social Media Information | | | | |
| Heroin/Opioid? No — / — | Narcan Administered? / patient respond? | Narcan Dosage | Date/Time Administered | Who Administered | | Narcotic Involved | Transported to Hospital | | |

- Related Offenses -

| 1 | Code 810.09 2a | Description TRESPASSING-TRESPASS FAIL TO LEAVE PROP ON ORDER OF OWNER | | UCR Code 90J |
|---|---|---|---|---|

| Subject No. 2 | | | | | | | Attorney: | | |
|---|---|---|---|---|---|---|---|---|---|
| Last Name PUCKETT | First Name MICHAEL | Middle Name KELLY | Suffix | Maiden Name | Nickname | Sex M | Race White | | Ethnicity Non-Hispanic |
| Date of Birth 12/12/1968 | Place Of Birth | Age 56 | To Age | Height | Weight | Eye Color | Hair Color | Hair Length | Hair Style / Facial Hair / Build |
| Complexion | Glasses | Teeth | | Speech/Voice | | Physical Feature Code | | Special Identifiers | |
| Clothing Descrption | | | Resident Status Resident | Immigration Status United States Citizen | Education Level | | | Social Security Number 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 | |
| Driver's License Number T62708075 | | State VA | Misc ID Number / Type / State — / — / — | | | | | | |

- Contact information -

| Last Known Address GENERAL DELIVERY, Apt ORMOND BEACH | | City Ormond Beach | | State FL | Zip Code 32174 | County Volusia | | Country USA | |
|---|---|---|---|---|---|---|---|---|---|
| Employer/School Name | Employer/School Phone | Employer/School Address | City | | County | | State | Zip Code | Country |
| Cell Phone | Home Phone | Work Phone | Email UNKNOWN | | Social Media Information | | | | |
| Heroin/Opioid? No — / — | Narcan Administered? / patient respond? | Narcan Dosage | Date/Time Administered | Who Administered | | Narcotic Involved | Transported to Hospital | | |

- Related Offenses -

| 1 | Code 810.09 2a | Description TRESPASSING-TRESPASS FAIL TO LEAVE PROP ON ORDER OF OWNER | | UCR Code 90J |
|---|---|---|---|---|

**BUS/STATE/GOV**

| Business/State/Gov No. 1 - VICTIM OF INCIDENT | | | | | |
|---|---|---|---|---|---|
| Organization Name ORMOND CROSSING WEST, LLC | | | Organization Phone (301) 448-9425 | | Victim Type Business |
| Address 1700 N US HWY 1 | Apt | City Ormond Beach | State FLORIDA | Zip Code 32174 | County VOLUSIA | Country USA |

- Related Offenses -

| 1 | Code 810.09 2a | Description TRESPASSING-TRESPASS FAIL TO LEAVE PROP ON ORDER OF OWNER | | UCR Code 90J |
|---|---|---|---|---|

The Ormond Beach Police Department has received a significant uptick in transient related complaints from citizens and business owners along the North US Highway 1 / Interstate 95 corridor. Many of the transient related complaints have been associated with criminal conduct, to include: public intoxication, brawling, loitering, burglary, theft, illicit narcotics use (and overdoses), trespassing, aggressive panhandling, littering, etcetera.

The Ormond Beach Police Department recently identified a large homeless encampment situated upon a vacant parcel of land located at 1700 North US Highway 1. The property is owned by Ormond Crossing West, LLC and is a designated trespass enforcement site. Ormond Crossing West, LLC has entered into a Trespass Enforcement Agreement with the Ormond Beach Police Department authorizing its officers to issue trespass warnings, remove and arrest undesired person(s) from the property at law enforcement's discretion. The Ormond Beach Police Department retains a copy of the Trespass Enforcement Affidavit.

On today's date, August 17, 2025, at approximately 9:03am, Officer Garcia encountered Saundra White within the homeless encampment located at 1700 North US Highway 1. Officer Garcia previously issued White a formal trespass warning from this very same location on May 6, 2025 during a prior domestic violence related investigation (OB250500076). During that previous trespassing investigation Officer Garcia explained to White that she would be subject to arrest if she was found on the property again.

On today's date, August 17, 2025, at approximately 9:10am, Officer Garcia encountered Michael Puckett within the homeless encampment located at 1700 North US Highway 1. Officer Garcia previously issued Puckett a formal trespass warning from this very same location on June 12, 2025 during a prior trespassing investigation (CAD #P251630768). During that previous trespassing investigation Officer Garcia explained to Puckett that he would be subject to arrest if he was found on the property again.

Officer Garcia determined that probable cause existed to place both White and Puckett under arrest for Trespass After Warning for returning the property again today, August 17, 2025, after having been previously warned. White and Puckett were subsequently placed under arrest and transported to the Volusia County Branch Jail where they were turned over to Corrections officials.

It should be noted that Puckett's two large mixed breed (pit-bull) dogs were present within the transient camp at the time of Puckett's arrest. Puckett was unable to provide a name or contact information for anyone capable of providing appropriate care and shelter for either dog. Puckett disclosed that the two dogs must be kept separate from each other because one would likely "kill" the other due to behavioral aggression. CSO Stephens and CSO Davis responded to the transient camp and took custody of both dogs. See supplement by CSO Stephens for details pertaining to the placement and final disposition of each dog.

| | | | | | | | Spoke With | | Date/Time Spoke With |
|---|---|---|---|---|---|---|---|---|---|
| ☐ Victim Advocate  ☐ Triad  ☐ SA Referral | | | | ☐ DCF Hotline ☐ CAC | | | | | |
| ☐ FCIC/NCIC Entry  ☐ FCIC/NCIC Cancel  ☐ T.T. BOLO | | | Date | By | | | Connecting Report Number | | Agency |
| Copies To | | Additional Forms Attached | | | | | If Other Attachment Selected, Describe | | |

| | | | |
|---|---|---|---|
| **Officer No. 1** | | | |
| Officer Name<br>Garcia, Thomas OB344 | Involvement Type<br>Reporting | Unit<br>10A58 | Signature Date<br>08/17/2025 09:19:00 |
| Officer Signature | *Thornton* | | |
| **Officer No. 2** | | | |
| Officer Name<br>Llanes, Ray OB426 | Involvement Type<br>Approving | Unit | Signature Date<br>08/17/2025 18:00:40 |
| Officer Signature | | | |

# Ormond Beach Police Department
## - Incident Supplement -

### CASE No.: OB250800224

| Agency ORI Number:<br>FL0640400 | Reporting Agency:<br>Ormond Beach Police Department | Supplement Reported Date<br>8/20/2025 |
|---|---|---|

**NARRATIVE**

Two dogs were removed from the camp when it was evacuated:

1 - Adult intact male pit, brown brindle in color, collar with no tags, no chip, nice disposition.

2 - Adult intact male pit mix, black in color, collar with no tags, no chip, nice disposition.

Both dogs were held at the PD dog pens until Tuesday afternoon, in case we were contacted by the owner(s) so that the dogs could be turned over to them instead of going to the shelter. Having heard from no one, the dogs were taken to Edgewater Animal Shelter Tuesday afternoon.

**ADMIN INFO**

☐ Victim Advocate  ☐ Triad  ☐ SA Referral          ☐ DCF Hotline  ☐ CAC     Spoke With                          Date/Time Spoke With

☐ FCIC/NCIC Entry  ☐ FCIC/NCIC Cancel  ☐ T.T. BOLO     Date     By          Connecting Report Number          Agency

Copies To                          Additional Forms Attached                 If Other Attachment Selected, Describe

**OFFICER**

Officer No. 1
Officer Name
Stephens, Cris OB105

Involvement Type
Reporting

Unit

Signature Date
08/20/2025 08:58:00

Officer Signature

# EXHIBIT TWO

**MINUTES**
**ORMOND BEACH CITY COMMISSION**
**HELD AT CITY HALL COMMISSION CHAMBERS**

| September 18, 2024 | 7:00 p.m. | Commission Chambers |
|---|---|---|

Present: Mayor Bill Partington, Commissioners Lori Tolland, Travis Sargent, Susan Persis, and Harold Briley, City Manager Joyce Shanahan, City Attorney Randy Hayes, Assistant City Manager Shawn Finley, Assistant City Manager Claire Whitley, and City Clerk Susan Carroll Dauderis.

*A G E N D A*

1. **CALL TO ORDER**

2. **INVOCATION**

3. **PLEDGE OF ALLEGIANCE**

4. **PRESENTATIONS AND PROCLAMATIONS**
   A. Recognition of Florida Legislators
   B. Evelyn Rebostini

5. **ADOPTION OF FISCAL YEAR 2024-2025 MILLAGE RATES AND BUDGET**

   A. **RESOLUTION NO. 2024-146**: A RESOLUTION ADOPTING FINAL MILLAGE RATES TO BE LEVIED FOR FISCAL YEAR 2024-2025; DIRECTING CERTIFICATION; EXPRESSING LEGISLATIVE INTENT; AND SETTING FORTH AN EFFECTIVE DATE.
      *Staff Contact:*     *Kelly McGuire, Finance Director, (386) 676-3226*

   B. **ORDINANCE NO. 2024-25:** AN ORDINANCE ADOPTING THE ANNUAL BUDGET FOR THE 2024-2025 FISCAL YEAR BEGINNING OCTOBER 1, 2024 AND ENDING SEPTEMBER 30, 2025; REPEALING ALL INCONSISTENT ORDINANCES OR PARTS THEREOF; AND SETTING FORTH AN EFFECTIVE DATE. **(SECOND READING)**
      *Staff Contact:*     *Kelly McGuire, Finance Director, (386) 676-3226*

6. **AUDIENCE REMARKS - REGARDING ITEMS NOT ON THE AGENDA**

7. **APPROVAL OF MINUTES**
   A. Minutes from City Commission meeting - September 4, 2024

8. **CONSENT AGENDA**
   The action proposed is stated for each item on the Consent Agenda. Unless a City Commissioner removes an item from the Consent Agenda, no discussion on individual items will occur and a single motion will approve all items.

   A. **RESOLUTION NO. 2024-147**: A RESOLUTION AUTHORIZING THE EXECUTION OF A NON-EXCLUSIVE FRANCHISE AGREEMENT BETWEEN THE CITY AND FENCE SERVICE, INC. D/B/A AAA DUMPSTER RENTAL AND D/B/A F.S.I. ROLL OFF CONTAINER SERVICE REGARDING THE COLLECTION OF CONSTRUCTION AND DEMOLITION DEBRIS; AND SETTING FORTH AN EFFECTIVE DATE.
      *Staff Contact:*     *Kevin Gray, Deputy Public Works Director, (386) 676-3325*

   B. **RESOLUTION NO. 2024-148**: A RESOLUTION RATIFYING, AFFIRMING AND AUTHORIZING EXPENDITURES FOR

SERVICES FROM EMPIRE COMPUTING AND CONSULTING, INC. FOR BARRACUDA BACKUP PROTECTION; AND SETTING FORTH AN EFFECTIVE DATE.

    **Staff Contact:**    *Chuck Osteen, Information Technology Manager, (386) 615-7031*

C.   **RESOLUTION NO. 2024-149**: A RESOLUTION ACCEPTING A BID FROM SGS CONTRACTING SERVICES, INC. FOR CONSTRUCTION SERVICES REGARDING THE WATER RECLAMATION FACILITY ULTRAVIOLET DISINFECTION CONVERSION PROJECT, UNDER BID NO. 2024-24; AUTHORIZING THE EXECUTION OF A CONTRACT AND PAYMENT THEREFOR; REJECTING ALL OTHER BIDS; AND SETTING FORTH AN EFFECTIVE DATE.

    **Staff Contact:**    *Bob Preis, Utilities Manager, (386) 676-3305*

D.   **RESOLUTION NO. 2024-151**: A RESOLUTION ACCEPTING A PROPOSAL FROM MCKIM & CREED, INC. TO PROVIDE CONSTRUCTION ADMINISTRATION SERVICES REGARDING THE FLEMING AVENUE DRAINAGE IMPROVEMENTS PROJECT; AUTHORIZING THE EXECUTION OF A WORK AUTHORIZATION THERETO; AND SETTING FORTH AN EFFECTIVE DATE.

    **Staff Contact:**    *Alex Schumann, City Engineer, (386) 676-3302*

E.   **RESOLUTION NO. 2024-152**: A RESOLUTION AUTHORIZING AN EMERGENCY PROCUREMENT OF A HIPOWER PORTABLE GENERATOR FROM ALTERNATIVE POWER SOLUTIONS, INC. FOR USE AT THE HUDSON WELL FIELD IN THE HUNTERS RIDGE SUBDIVISION; AUTHORIZING THE EXECUTION OF A PURCHASE AUTHORIZATION; AND SETTING FORTH AN EFFECTIVE DATE.

    **Staff Contact:**    *Bob Preis, Utilities Manager, (386) 676-3305*

F.   **RESOLUTION NO. 2024-153**: A RESOLUTION APPROVING AND AUTHORIZING REVISIONS TO THE CITY'S FEE SCHEDULE FOR CULTURAL AND RECREATIONAL PROGRAMS AND FACILITIES OPERATED BY THE LEISURE SERVICES DEPARTMENT; AND SETTING FORTH AN EFFECTIVE DATE.

    **Staff Contact:**    *Robert Carolin, Leisure Services Director, (386) 676-3279*

G.   **RESOLUTION NO. 2024-156**: A RESOLUTION AUTHORIZING THE EXECUTION OF AN INTERLOCAL AGREEMENT BETWEEN THE CITY AND THE STATE ATTORNEY OF THE SEVENTH JUDICIAL CIRCUIT FOR PROSECUTION OF VIOLATIONS OF CITY ORDINANCES PUNISHABLE BY INCARCERATION; AND SETTING FORTH AN EFFECTIVE DATE.

    **Staff Contact:**    *Randy Hayes, City Attorney, (386) 676-3217*

H.   **RESOLUTION NO. 2024-157**: A RESOLUTION AUTHORIZING THE EXECUTION OF AN AGREEMENT FOR SERVICES BETWEEN THE CITY AND HALIFAX HUMANE SOCIETY, INC.; AND SETTING FORTH AN EFFECTIVE DATE.

    **Staff Contact:**    *Jesse Godfrey, Police Chief, (386) 676-3500*

I.   **RESOLUTION NO. 2024-158**: A RESOLUTION APPROVING A SETTLEMENT PROPOSAL REGARDING THE WORKERS' COMPENSATION CLAIM OF MICHAEL BAKAYSA; AUTHORIZING THE EXECUTION OF ANY AND ALL DOCUMENTS INCIDENTAL THERETO; AUTHORIZING PAYMENT RELATIVE THERETO; AND SETTING FORTH AN EFFECTIVE DATE.

    **Staff Contact:**    *Randy Hayes, City Attorney, (386) 676-3217*

J. **RFP - Cross Connection Control Program Management Services**
   *Staff Contact:*    *Bob Preis, Utilities Manager, (386) 676-3305*
   *Disposition:*    Approve as recommended in the City Manager staff report dated September 18, 2024.

K. **City Manager's Monthly Report, September 2024**
   *Staff Contact:*    *Joyce Shanahan, City Manager, (386) 676-3200*
   *Disposition:*    Accept as information as recommended in the City Manager staff report dated September 18, 2024.

**9.    PUBLIC HEARINGS**

A. **ORDINANCE NO. 2024-26:** AN ORDINANCE AMENDING CHAPTER 2, DISTRICT AND GENERAL REGULATIONS, ARTICLE IV, CONDITIONAL AND SPECIAL EXCEPTION REGULATIONS, SECTION 2-57, CRITERIA FOR REVIEW OF SPECIFIC CONDITIONAL AND SPECIAL EXCEPTION, SUBSECTION (37), HOUSES OF WORSHIP, OF THE CITY OF ORMOND BEACH LAND DEVELOPMENT CODE, BY AMENDING THE CONDITIONS FOR HOUSES OF WORSHIP; REPEALING ALL INCONSISTENT ORDINANCES OR PARTS THEREOF; PROVIDING FOR SEVERABILITY; AND SETTING FORTH AN EFFECTIVE DATE.
   *Staff Contact:*    *Steven Spraker, Planning Director, (386) 676-3341*

B. **ORDINANCE NO. 2024-27:** AN ORDINANCE APPROVING THE FINAL PLAT FOR THE "BRADFORD LAKES" SUBDIVISION, SHOWN WITHIN PHASE 4 OF THE PLANTATION OAKS PLANNED RESIDENTIAL DEVELOPMENT; ESTABLISHING CONDITIONS AND EXPIRATION DATE OF APPROVAL; AND SETTING FORTH AN EFFECTIVE DATE.
   *Staff Contact:*    *Steven Spraker, Planning Director, (386) 676-3341*

C. **ORDINANCE NO. 2024-28:** AN ORDINANCE APPROVING THE FINAL PLAT FOR THE "BRADFORD PARK" SUBDIVISION; ESTABLISHING CONDITIONS AND EXPIRATION DATE OF APPROVAL; AND SETTING FORTH AN EFFECTIVE DATE.
   *Staff Contact:*    *Steven Spraker, Planning Director, (386) 676-3341*

D. **ORDINANCE NO. 2024-29:** AN ORDINANCE CHANGING THE NAME OF "HALIFAX STREET" TO "CLIFFHAVEN COURT", AND "MATANZAS STREET" TO "RIDGEHAVEN AVENUE", SAID STREETS BEING LOCATED IN THE RIDGEHAVEN SUBDIVISION AREA; REPEALING ALL INCONSISTENT ORDINANCES OR PARTS THEREOF; PROVIDING FOR TRANSMITTAL AND RECORDING IN THE PUBLIC RECORDS OF VOLUSIA COUNTY; AND SETTING FORTH AN EFFECTIVE DATE.
   *Staff Contact:*    *Steven Spraker, Planning Director, (386) 676-3341*

E. **RESOLUTION NO. 2024-133:** A RESOLUTION AUTHORIZING THE EXECUTION AND ISSUANCE OF A DEVELOPMENT ORDER FOR A SPECIAL EXCEPTION TO ALLOW OUTDOOR ACTIVITY TO INCLUDE THE PERMANENT OUTDOOR STORAGE, DISPLAY, AND SALES OF MERCHANDISE AT THE LOWES HOME IMPROVEMENT STORE LOCATED AT 1340 WEST GRANADA BOULEVARD; ESTABLISHING CONDITIONS AND EXPIRATION DATE OF APPROVAL; AND SETTING FORTH AN EFFECTIVE

DATE.
    ***Staff Contact:***    *Steven Spraker, Planning Director, (386) 676-3341*

**10.**    **RESOLUTIONS**

A.    **RESOLUTION NO. 2024-154**: A RESOLUTION ESTABLISHING FUEL FLOWAGE FEES, LANDING FEES, AND AIRCRAFT TIE DOWN FEES AT THE ORMOND BEACH MUNICIPAL AIRPORT; AND SETTING FORTH AN EFFECTIVE DATE.
    ***Staff Contact:***    *Steven Lichliter, Airport Manager, (386) 615-7019*

B.    **RESOLUTION NO. 2024-155**: A RESOLUTION AUTHORIZING THE EXECUTION OF AN AGREEMENT BETWEEN THE CITY AND VECTOR AIRPORT SYSTEMS, LLC, FOR THE PROVISION OF PLANEPASS AIRCRAFT OPERATING FEE BILLING AND COLLECTION SERVICES AT THE ORMOND BEACH MUNICIPAL AIRPORT; AND SETTING FORTH AN EFFECTIVE DATE.
    ***Staff Contact:***    *Steven Lichliter, Airport Manager, (386) 615-7019*

C.    **RESOLUTION NO. 2024-159**: A RESOLUTION APPOINTING A MEMBER AND AN ALTERNATE MEMBER TO SERVE ON THE OPIOID ABATEMENT FUNDING ADVISORY BOARD; ESTABLISHING TERM AND CONDITIONS OF SERVICE; AND SETTING FORTH AN EFFECTIVE DATE.
    ***Staff Contact:***    *Susan Dauderis, City Clerk, (386) 676-3340*

D.    **RESOLUTION NO. 2024-160**: A RESOLUTION ACCEPTING A PROPOSAL FROM BROWN & BROWN INSURANCE SERVICES, INC., FOR THE PROVISION OF PROPERTY, LIABILITY AND WORKERS' COMPENSATION INSURANCE FOR VARIOUS LINES OF INSURANCE COVERAGE THROUGH VARIOUS INSURANCE CARRIERS, INCLUDING PROPERTY, INLAND MARINE, AUTO PHYSICAL DAMAGE, EXCESS WORKERS' COMPENSATION, CRIME, ACCIDENTAL DEATH AND DISMEMBERMENT (POLICE OFFICERS AND FIREFIGHTERS), NATIONAL FLOOD INSURANCE PROGRAM (NFIP) FLOOD, POLLUTION, PROFESSIONAL LIABILITY (EMT'S AND PARAMEDICS), GENERAL LIABILITY (INCLUDING LAW ENFORCEMENT LIABILITY), TENANT AND USERS LIABILITY (TULIP) (SPECIAL EVENTS), CYBER LIABILITY, AND ACTIVE SHOOTER LIABILITY INSURANCE; AUTHORIZING THE EXECUTION OF DOCUMENTS RELATIVE THERETO; AUTHORIZING PAYMENT THEREFOR; AND SETTING FORTH AN EFFECTIVE DATE.
    ***Staff Contact:***    *Kelly McGuire, Finance Director, (386) 676-3226*

**11.**    **REPORTS, SUGGESTIONS, REQUESTS**

**12.**    **ADJOURNMENT**

***M I N U T E S***

Item #1 – Meeting Call to Order

Mayor Partington called the meeting to order at 7:01 p.m.

Item #2 – Invocation

Father Roy Allison, St. James Episcopal Church, provided the invocation.

Item #3 – Pledge of Allegiance

Mayor Partington led the Pledge of Allegiance.

Item #4 – Presentations and Proclamations

Item #4A – Recognition of Florida Legislators

Mayor Partington presented a plaque of appreciation and Key to the City to Representative Tom Leek for his work and dedication to the community. He recognized Representative Webster Barnaby, Representative Chase Tramont, and Florida Senator Tom Wright with a plaque of appreciation.

Item #4B – Evelyn Rebostini

Mayor Partington presented a proclamation and Key to the City to Ms. Evelyn Rebostini, honoring her work as the Ormond Beach Police Department's Victim Advocate and congratulating her on her retirement.

Ms. Rebostini thanked the Commission, city staff, and co-workers for their support and friendship over the years and discussed her career with the city.

Item #5 – Adoption of Fiscal Year 2024-2025 Millage Rates and Budget

Mayor Partington opened the Public Hearings.

Item #5A –Millage Rates for 2024-2025 Fiscal Year

City Clerk Susan C. Dauderis read by title only:

RESOLUTION NO. 2024-146
A RESOLUTION ADOPTING FINAL MILLAGE RATES TO BE LEVIED FOR FISCAL YEAR 2024-2025; DIRECTING CERTIFICATION; EXPRESSING LEGISLATIVE INTENT; AND SETTING FORTH AN EFFECTIVE DATE.

Mayor Partington stated per Florida Statute, he was required to state the millage rate for the City of Ormond Beach necessary to fund the Fiscal Year (FY) 2024-2025 budget was 4.0960 mills, noting the rate was 12.82 percent above the rolled back rate of 3.6305 mills and the debt service millage rate was 0.065 for the 2010 General Obligation Bond Sinking Fund.

Mayor Partington stated it was a public hearing and inquired if there were any members of the public who wished to speak or ask questions prior to adoption of the millage rate and budget.

Mr. Sean Daly, 1106 Northside Drive, expressed concerns regarding the tax increase and the Ormond Beach Municipal Airport's budget. He discussed the funds owed by the airport and not using taxpayer dollars to support it.

**Commissioner Briley moved, seconded by Commissioner Tolland, for approval of Resolution No. 2024-146, as read by title only.**

Mayor Partington stated the operating millage of 4.0960 mills was 12.82 percent above the rolled back millage rate and the resolution included adoption of the debt service millage rate of 0.065 for the 2010 General Obligation Bond Sinking Fund.

| Call Vote: | | |
|---|---|---|
| | Commissioner Tolland | Yes |
| | Commissioner Sargent | Yes |
| | Commissioner Persis | Yes |
| | Commissioner Briley | Yes |
| Carried. | Mayor Partington | Yes |

Mayor Partington announced the operating millage rate was set at 4.0960 mills, which was 12.82 percent above the rolled back millage rate of 3.6305 mills.

Item #5B – Adoption of Annual Budget for the 2024-2025 Fiscal Year

City Clerk Susan C. Dauderis read by title only:

ORDINANCE NO. 2024-25
AN ORDINANCE ADOPTING THE ANNUAL BUDGET FOR THE 2024-2025 FISCAL YEAR BEGINNING OCTOBER 1, 2024 AND ENDING SEPTEMBER 30, 2025; REPEALING ALL INCONSISTENT ORDINANCES OR PARTS THEREOF; AND SETTING FORTH AN EFFECTIVE DATE. **(SECOND READING)**

**Commissioner Persis moved, seconded by Commissioner Briley, for approval of Ordinance No. 2024-25, on second reading, as read by title only.**

Mayor Partington requested for the City Clerk to call the vote to adopt the budget of $131,976,868.

| Call Vote: | | |
|---|---|---|
| | Commissioner Sargent | Yes |
| | Commissioner Persis | Yes |
| | Commissioner Briley | Yes |
| | Commissioner Tolland | Yes |
| Carried. | Mayor Partington | Yes |

Mayor Partington closed the Public Hearings.

Item #6 – Audience Remarks

Ms. Cindy Costa, 6 Walden Lane, voiced concerns regarding North Beach Street and the state of the roadway. She requested the city look into repairs to make the street safer for drivers.

Ms. Alicya Simmons, 705 North Peninsula Avenue, requested for the city to look into a grant from the Daytona Beach Racing and Recreation Center Fund for the Ormond Beach Tennis Center. She discussed the needs of the tennis center, personal funds the current operator put into the programs at the facility, and the growth since the current operator started.

Ms. Connie Colby, 108 Roble Lane, discussed the rules regarding parks within the city and their regulation. She expressed concerns surrounding the use of the parks, specifically motorbikes and drones. She voiced concerns regarding code enforcement and the way citizens report concerns.

Item #7 – Approval of Minutes

Mayor Partington advised the minutes from the September 4, 2024, meeting had been sent to the Commission for review and posted on the city's website for public viewing. He asked for any corrections, additions, or omissions. He stated, hearing no corrections, the minutes would stand approved as presented.

**Commissioner Sargent moved, seconded by Commissioner Tolland, for approval of the September 4, 2024, City Commission meeting minutes.**

**The motion passed by voice vote.**

Item #8 – Consent Agenda

Mayor Partington advised the actions proposed for the items on the Consent Agenda were so stated on the agenda. He asked if any member of the Commission had questions or wished to discuss any items separately.

Commissioner Briley requested Item 8H be pulled from the Consent Agenda.

**Commissioner Persis moved, seconded by Commissioner Sargent, for approval of the Consent Agenda, absent Item 8H.**

| Call Vote: | | |
|---|---|---|
| | Commissioner Persis | Yes |
| | Commissioner Briley | Yes |
| | Commissioner Tolland | Yes |
| | Commissioner Sargent | Yes |
| Carried. | Mayor Partington | Yes |

Item #8H – Humane Society Contract FY 2024-2025

City Clerk Susan C. Dauderis read by title only:

RESOLUTION NO. 2024-157
A RESOLUTION AUTHORIZING THE EXECUTION OF AN AGREEMENT
FOR SERVICES BETWEEN THE CITY AND HALIFAX HUMANE
SOCIETY, INC.; AND SETTING FORTH AN EFFECTIVE DATE.

Ms. Colby expressed concerns regarding the stray cats in her neighborhood and the
return of the stray cats once they were neutered by the Humane Society. She requested
the city renegotiate the contract for the Humane Society to not return the cats.

Commissioner Briley deferred to staff for information for Ms. Colby; whereby, Ms. Joyce
Shanahan, City Manager, stated the contract called for just Trap, Neuter, and Release
(TNR).

Captain Chris Roos, Ormond Beach Police Department, discussed the Humane
Society's TNR program and the life span of wild cats. He noted if there were better
plans, staff would be happy to review. He explained there were no cat colonies in the
area Ms. Colby expressed concerns with.

Commissioner Tolland expressed support of revisiting the contract to see what further
could be done to prevent the return of the stray cats.

Ms. Claire Whitley, Assistant City Manager, stated staff would discuss the request with
the Humane Society before the next contract; whereby, Mayor Partington noted if a
resolution to the request could happen sooner than the next contract to bring it back to
the Commission before then.

Commissioner Persis requested the Humane Society go look at Ms. Colby's areas of
concern.

Commissioner Tolland suggested having data of how many cats were in the area to
determine if there were needs for a revised program.

**Commissioner Briley moved, seconded by Commissioner Sargent, for approval of
Resolution No. 2024-157, as read by title only.**

| | | |
|---|---|---|
| Call Vote: | Commissioner Briley | Yes |
| | Commissioner Tolland | Yes |
| | Commissioner Sargent | Yes |
| | Commissioner Persis | Yes |
| Carried. | Mayor Partington | Yes |

Comments on the Consent Agenda

Commissioner Sargent expressed support for Item 8I regarding the Settlement of
Workers' Compensation Claim for Michael Bakaysa.

Mayor Partington voiced support of Item 8C regarding the Bid Award for the Water
Reclamation Facility Ultra-Violet Disinfection Conversion and the state money that
helped fund the project, and Item 8D regarding the Work Authorization for the
Construction Administrative Services for the Fleming Avenue Drainage project.

Item #9 – Public Hearings

Mayor Partington opened the Public Hearings.

Item #9A – Land Development Code Amendment, Houses of Worship Conditions

City Clerk Susan C. Dauderis read by title only:

ORDINANCE NO. 2024-26
AN ORDINANCE AMENDING CHAPTER 2, DISTRICT AND GENERAL
REGULATIONS, ARTICLE IV, CONDITIONAL AND SPECIAL EXCEPTION
REGULATIONS, SECTION 2-57, CRITERIA FOR REVIEW OF SPECIFIC

CONDITIONAL AND SPECIAL EXCEPTION, SUBSECTION (37), HOUSES OF WORSHIP, OF THE CITY OF ORMOND BEACH LAND DEVELOPMENT CODE, BY AMENDING THE CONDITIONS FOR HOUSES OF WORSHIP; REPEALING ALL INCONSISTENT ORDINANCES OR PARTS THEREOF; PROVIDING FOR SEVERABILITY; AND SETTING FORTH AN EFFECTIVE DATE.

Mr. Steven Spraker, Planning Director, explained the item was for reduced setback and stated the Planning Board recommended approval.

Mayor Partington noted it was a unanimous approval by the Planning Board and explained there were no projects being proposed, the item was the starting point for any future projects.

**Commissioner Sargent moved, seconded by Commissioner Briley, to approve Ordinance No. 2024-26, on first reading, as read by title only.**

| Call Vote: | | |
|---|---|---|
| | Commissioner Tolland | Yes |
| | Commissioner Sargent | Yes |
| | Commissioner Persis | Yes |
| | Commissioner Briley | Yes |
| Carried. | Mayor Partington | Yes |

Item #9B – Bradford Lakes, Final Plat

City Clerk Susan C. Dauderis read by title only:

ORDINANCE NO. 2024-27
AN ORDINANCE APPROVING THE FINAL PLAT FOR THE "BRADFORD LAKES" SUBDIVISION, SHOWN WITHIN PHASE 4 OF THE PLANTATION OAKS PLANNED RESIDENTIAL DEVELOPMENT; ESTABLISHING CONDITIONS AND EXPIRATION DATE OF APPROVAL; AND SETTING FORTH AN EFFECTIVE DATE.

Mr. Spraker explained the item was for the final plat for the Bradford Lakes subdivision located within the Plantation Oaks Planned Residential Development and stated the Planning Board unanimously recommended approval.

**Commissioner Sargent moved, seconded by Commissioner Persis, to approve Ordinance No. 2024-27, on first reading, as read by title only.**

| Call Vote: | | |
|---|---|---|
| | Commissioner Sargent | Yes |
| | Commissioner Persis | Yes |
| | Commissioner Briley | Yes |
| | Commissioner Tolland | Yes |
| Carried. | Mayor Partington | Yes |

Item #9C – Bradford Park, Final Plat

City Clerk Susan C. Dauderis read by title only:

ORDINANCE NO. 2024-28
AN ORDINANCE APPROVING THE FINAL PLAT FOR THE "BRADFORD PARK" SUBDIVISION; ESTABLISHING CONDITIONS AND EXPIRATION DATE OF APPROVAL; AND SETTING FORTH AN EFFECTIVE DATE.

**Commissioner Briley moved, seconded by Commissioner Sargent, to approve Ordinance No. 2024-28, on first reading, as read by title only.**

| Call Vote: | | |
|---|---|---|
| | Commissioner Persis | Yes |
| | Commissioner Briley | Yes |
| | Commissioner Tolland | Yes |
| | Commissioner Sargent | Yes |
| Carried. | Mayor Partington | Yes |

Item #9D – RidgeHaven Subdivision, Street Name Changes

City Clerk Susan C. Dauderis read by title only:

ORDINANCE NO. 2024-29

AN ORDINANCE CHANGING THE NAME OF "HALIFAX STREET" TO "CLIFFHAVEN COURT", AND "MATANZAS STREET" TO "RIDGEHAVEN AVENUE", SAID STREETS BEING LOCATED IN THE RIDGEHAVEN SUBDIVISION AREA; REPEALING ALL INCONSISTENT ORDINANCES OR PARTS THEREOF; PROVIDING FOR TRANSMITTAL AND RECORDING IN THE PUBLIC RECORDS OF VOLUSIA COUNTY; AND SETTING FORTH AN EFFECTIVE DATE.

**Commissioner Sargent moved, seconded by Commissioner Persis, to approve Ordinance No. 2024-29, on first reading, as read by title only.**

| Call Vote: | | |
|---|---|---|
| | Commissioner Briley | Yes |
| | Commissioner Tolland | Yes |
| | Commissioner Sargent | Yes |
| | Commissioner Persis | Yes |
| Carried. | Mayor Partington | Yes |

Item #9E – 1340 West Granada Blvd, Lowe's Special Exception for Outdoor Activity

City Clerk Susan C. Dauderis read by title only:

RESOLUTION NO. 2024-133

A RESOLUTION AUTHORIZING THE EXECUTION AND ISSUANCE OF A DEVELOPMENT ORDER FOR A SPECIAL EXCEPTION TO ALLOW OUTDOOR ACTIVITY TO INCLUDE THE PERMANENT OUTDOOR STORAGE, DISPLAY, AND SALES OF MERCHANDISE AT THE LOWES HOME IMPROVEMENT STORE LOCATED AT 1340 WEST GRANADA BOULEVARD; ESTABLISHING CONDITIONS AND EXPIRATION DATE OF APPROVAL; AND SETTING FORTH AN EFFECTIVE DATE.

Mr. Spraker explained the Special Exception for Lowe's for their outdoor activity and displays. He reviewed the history of the Special Exception, and the updated proposal since the last time it was brought before the City Commission.

Mr. Joey Posey, 420 South Nova Road, noted he was the attorney for the applicant and reviewed the updated plan and updated landscaping. He stated Lowes was very responsive to the City Commissions requests and understood their concerns.

Commissioner Tolland stated she spoke with Mr. Posey regarding the proposed plans and appreciated the updated landscaping. She inquired if there were concerns regarding pedestrian safety; whereby, Mr. Roger Strcula, Upham Engineering, explained there were minimal parking spaces along the building, therefore pedestrian safety was not a concern.

Commissioner Persis indicated she spoke with Mr. Posey and thanked him for the updates to the plan.

Commissioner Sargent discussed his concerns regarding future change of management and noted his hope of better communication between the store managers regarding the special exception.

Commissioner Briley expressed concerns regarding the grills, lawnmowers, and plants for sale outside of the store, noting the continued violations.

Mr. Posey stated it was a delicate balance for the store to promote the sale of their products and put all the product behind the fencing.

Commissioner Sargent stated he was supportive of items in front of the store to promote sales. He thanked Lowe's for working with the city to become compliant with the Special Exception.

Commissioner Briley voiced concerns with the Special Exception, noting it was a Special Exception and Lowe's had violated the development order.

Mr. Posey expressed understanding of the concerns, noting he would pass them along.

Commissioner Tolland inquired if all product was contained within the painted squares in front of Lowe's would Commissioner Briley approve; whereby, Commissioner Briley stated yes, if the products were contained in the squares, and expressed concerns due to prior actions. Commissioner Tolland emphasized compliance, noting other smaller stores had the same special exception.

**Commissioner Sargent moved, seconded by Commissioner Persis, to approve Resolution No. 2024-133, as read by title only.**

| | | |
|---|---|---|
| Call Vote: | Commissioner Tolland | Yes |
| | Commissioner Sargent | Yes |
| | Commissioner Persis | Yes |
| | Commissioner Briley | Yes |
| Carried. | Mayor Partington | Yes |

Mayor Partington closed the Public Hearings.

Item #10 – Resolutions

Item #10A – Airport Rates and Fees

City Clerk Susan C. Dauderis read by title only:

RESOLUTION NO. 2024-154
A RESOLUTION ESTABLISHING FUEL FLOWAGE FEES, LANDING FEES, AND AIRCRAFT TIE DOWN FEES AT THE ORMOND BEACH MUNICIPAL AIRPORT; AND SETTING FORTH AN EFFECTIVE DATE.

Mr. Brian Rademacher, Economic Development Director, reviewed the Ormond Beach Municipal Airport's budget deficit, the advantage of the proposed landing fees, and proposed agreement with Vector Airport Systems, LLC, noting the agreement was Item 10B. He reviewed the proposed landing fees and where the fees would be applied. He reviewed the purchasing process utilized for the agreement with Vector Airport Systems, LLC.

Mr. Douglas Shinn, 2806 South Peninsula Drive, Daytona Beach, 32118, discussed unintended consequences, including the potential for grants provided to the airport to be taken away due to a decrease in number of operations as a result of the landing fees. He noted the number of pilots who would utilize other airports without landing fees, which could affect other local non-airport related businesses.

Mr. Daryl Hickman, 323 River Vale Lane, stated there was a call for a boycott of any airport that imposes the fees. He stated he owned a business at the airport and would be directly impacted, and the fee would also affect the local business economy. He inquired if the fees would stop when the airport debt was paid off or if the fees were indefinite.

Mr. Patrick Murphy, 678 Swan Range Road, Orange City, 32763, stated he was speaking as Vice President of Sunrise Aviation and stated he had a neutral position on it as his company was exempt from the landing fees. He noted he understood the city's need for the landing fees, that pilot aviation was already expensive, and worried about the added fees. He explained the concern as the airport's fueler, there may be a decrease in fuel purchases due to a decrease in landings.

Mr. Terence Perkins, 108 Heritage Circle, expressed concerns regarding safety and potential pull of grants for funding due to lack of landings caused by the fees.

Mr. Richard Isherwood, 1531 Poplar Drive, reviewed the airport funding grants and discussed other funding options for the airport.

Mr. Gordon Arbeitman, 3107 Inishmore Drive, discussed Vector Airport Systems, LLC and noted there were companies that could present to staff the pros and cons of the landing fees before a decision was made.

Ms. Samantha Bowyer, 68 Seacrest Drive, voiced concerns regarding the data collection process for the landing fee calculation and potential safety concerns. She discussed the Federal Aviation Administration's Reauthorization Act of 2024 and potential violations of the act with the landing fees. She noted the fees would discourage student pilots as the fees would be passed onto their training cost. She suggested the city focus on attracting

businesses to fill the empty space of the vacant golf course next to the airport, and promote events such as air and car shows.

Mr. Tony Arnaoutis, 17 Tiffany Circle, discussed the aviation fees internationally and locally, and requested the Commission reconsider adding the landing fees.

Mr. Daly voiced concerns with the Daytona flight schools, and noted the majority of the flights out of the airport were from the flight schools. He noted the landing fees would be put onto the student's flight training costs. He believed the fees would help the debt without costing the tax payers money.

Mr. Ron Serra, 1761 Mitchell Court, Port Orange, 32128, stated he disagreed with the implementation of the landing fees. He discussed the local economy growth due to the aviation field. He discussed other states who were competing for the Florida aviation business. He stated he was a flight instructor and students were discussing landing fees being add to their tuition costs, noting they discussed looking elsewhere for training.

Mr. Bob Brown, 918 Lake Lindley Drive South, DeLand, 32724, expressed concerns of the landing fees being in the same ordinance as the fuel and tiedown fees. He discussed concerns regarding the exemptions and the collection of the fees.

Mr. Matthew Serra, 1761 Mitchell Court, Port Orange, 32128, discussed his history with aviation. He stated the fees would cause changes in the trainings, as pilots would lessen the number of landings in training sessions. He discussed fees pilots currently face and expressed concerns regarding pilot shortages. He requested an exemption for all aircrafts under 6,000 pounds, noting the precedence from other airports.

Ms. Sharon Serra, 1761 Mitchell Court, Port Orange, 32128, requested the landing fees be removed from the ordinance for further review. She explained her belief was Vector Airport Systems, LLC used standard pricing for all airports instead of customizing the fees to each individual airport based on needs, and felt that was not the correct way to go about it. She discussed the rulings around landing fees.

Mr. David Gall, unlisted address, Port Orange, 32128, reviewed his aviation background and expressed concerns regarding landing fees specifically for flight trainings.

Mr. Terence Anderson, 101 Ray Lake Drive, discussed the importance of flight schools practicing landings for safety reasons.

Mr. Michael Galluzzi, 1008 Flying M Court, Edgewater, 32132, indicated he worked for the NASA Research Institute, specializing in advanced air mobility. He shared some research from surrounding airports and across Central Florida. He expressed concerns regarding the landing fees, including unwarranted surveillance. He stated he would like to share a proposal for a public/private partnership and would provide further details.

Mr. Andre Maye, 2002 Yellowfin Drive, Port Orange, 32128, stated the United States of America was number one in aviation trainings and noted comparison to international fees. He expressed concerns regarding how the fees would impact flight schools.

Mr. Robert Jex, 55 Front Street, Palm Coast, 32137, stated the proposal would not improve safety, pilot production, or long-term funds. He stated there were other positive ways to generate funds, including attracting new aviation businesses.

Mayor Partington stated he received a letter from Ms. Stacy Heaton, the Southern Regional Manager for Aircraft Owners and Pilots Association (AOPA), opposing the landing fees.

**Commissioner Sargent moved, seconded by Commissioner Briley, to approve Resolution No. 2024-154, as read by title only, for discussion purposes.**

Commissioner Sargent discussed the airport's debt and inquired if the landing fees were presented to the Aviation Advisory Board; whereby, Mr. Rademacher stated it was not brought to the Aviation Advisory Board but would be discussed with them at their next scheduled meeting. Commissioner Sargent stated the advisory board should make a recommendation before the item was brought before the Commission.

Commissioner Sargent and Commissioner Briley withdrew their motion and second respectively for Resolution No. 2024-154.

**Commissioner Sargent moved, seconded by Commissioner Persis, to table Items 10A and 10B until they were brought before the Aviation Advisory Board for review.**

Commissioner Persis stated she had many questions and would like more time to learn about the issues.

Commissioner Tolland indicated she learned information during the comments and would need answers to questions she had.

Commissioner Sargent and Commissioner Tolland promoted citizens to apply online for the city's advisory boards.

Commissioner Briley agreed the Aviation Advisory Board needed to review the item and with Mr. Daly's comments regarding tax payer dollars not supporting the airport.

| Call Vote: | | |
|---|---|---|
| | Commissioner Persis | Yes |
| | Commissioner Briley | Yes |
| | Commissioner Tolland | Yes |
| | Commissioner Sargent | Yes |
| Carried. | Mayor Partington | Yes |

Item #10C – Opioid Abatement Advisory Board Appointments

City Clerk Susan C. Dauderis read by title only:

RESOLUTION NO. 2024-159
A RESOLUTION APPOINTING A MEMBER AND AN ALTERNATE MEMBER TO SERVE ON THE OPIOID ABATEMENT FUNDING ADVISORY BOARD; ESTABLISHING TERM AND CONDITIONS OF SERVICE; AND SETTING FORTH AN EFFECTIVE DATE.

Mayor Partington explained he would like to continue his service through the end of his mayoral obligations.

Commissioner Briley nominated Commissioner Tolland for the alternate role; whereby, Commissioner Persis agreed.

Commissioner Tolland expressed support of serving as the alternate.

**Commissioner Briley moved, seconded by Commissioner Persis, to approve Resolution No. 2024-159, as read by title only, with Mayor Partington as the primary member and Commissioner Tolland as the alternate member.**

Ms. Susan Dauderis, City Clerk, explained Volusia County indicated Mayor Partington could serve through October, a new primary member could be named to replace him when he leaves, and an alternate member could be named.

Mayor Partington stated he believed he could fill the role as primary member until his mayoral duties were completed, then the item could be brought back to the Commission to fill the vacancy of the primary member.

| Call Vote: | | |
|---|---|---|
| | Commissioner Briley | Yes |
| | Commissioner Tolland | Yes |
| | Commissioner Sargent | Yes |
| | Commissioner Persis | Yes |
| Carried. | Mayor Partington | Yes |

Item #10D – Intent to Award RFP 2024-29 Property, Liability and Workers' Compensation Insurance

City Clerk Susan C. Dauderis read by title only:

RESOLUTION NO. 2024-160
A RESOLUTION ACCEPTING A PROPOSAL FROM FOUNDATION RISK PARTNERS PUBLIC ENTITY SERVICES, FOR THE PROVISION OF PROPERTY, LIABILITY AND WORKERS' COMPENSATION INSURANCE

FOR VARIOUS LINES OF INSURANCE COVERAGE THROUGH VARIOUS INSURANCE CARRIERS; AUTHORIZING THE EXECUTION OF DOCUMENTS RELATIVE THERETO; AUTHORIZING PAYMENT THEREFOR; AND SETTING FORTH AN EFFECTIVE DATE.

Mr. Kelly McGuire, Finance Director, explained the item was regarding the two proposals received during the city's Request for Proposal (RFP), one from Brown & Brown Insurance Services, Inc. (Brown & Brown) and one from Foundation Risk Partners Public Entity Services (Foundation Risk Partners). She stated the prices from each proposal, noting neither included flood insurance information due to rates not being available at the time of the proposal openings. She stated there were four coverages that Foundation Risk Partners did not provide in their proposal and indicated they could assume existing coverages. She discussed the qualifications of the firms and underlying insurance trusts; all were highly qualified, noting both companies were considered equal in qualifications. She stated staff recommended Brown & Brown due to the lower price.

Commissioner Tolland and Commissioner Sargent abstained from the vote due to potential conflicts of interest.

Representative Leek explained he was speaking in his capacity as Chief Legal Officer of Foundation Risk Partners and discussed the company. He expressed concerns regarding the proposal from Brown & Brown not including the affidavit required by Section 287.138 of Florida Statutes. He stated by Statute the Brown & Brown proposal should be deemed unresponsive. He introduced other members of his team, including Ms. Jo Thacker, Mr. David Lodwick, and Mr. Alan Florez of Foundation Risk Partners.

Ms. Jo Thacker, 780 West Granada Boulevard, stated there was a whereas clause in the resolution stating a second alternative was neither authorized nor consistent with the RFP, and expressed concerns with the RFP conflicting the Code of Ordinances referenced within the resolution. She stated concerns with the Code of Ordinances not referencing if forms and affidavits could be submitted after the proposal was opened.

Mr. David Lodwick, 780 West Granada Boulevard, reviewed proposal "Option 2" that was provided to the Commission and reviewed the option in detail.

Mr. Alan Florez, 780 West Granada Boulevard, reiterated Representative Leeks statement regarding the affidavit and bid fairness. He reviewed the handout provided to the Commission and discussed the risk factors related to hurricanes.

Commissioner Briley expressed concerns regarding compliance; whereby, Mayor Partington believed everything complied now if accepted.

Ms. McGuire indicated everything was in compliance, noting the affidavit was included in the agenda packet.

Mayor Partington noticed the notary stamp and signature dates of expiration did not match in the packet and commented that could be a clerical error.

Commissioner Sargent inquired when the bids were due; whereby, Ms. McGuire stated June 9, 2024, but was extended a week due to additional questions. Commissioner Sargent inquired if policy documents were up to date within the packet, as there was a policy provided that had expired dates; whereby, Ms. McGuire assured the Commission the policy was within date and would renew in 2025. He expressed concerns regarding the storm policy limits.

Commissioner Tolland expressed support of the competitive bidding process, noting Brown & Brown's proposal was $300,000 less than the prior year.

Commissioner Briley expressed concerns regarding the shared policy limits.

Commissioner Persis inquired if Mr. Randy Hayes, City Attorney, had anything to add; whereby, Mr. Hayes stated what was presented was the recommendation from the Insurance Program Committee. He indicated historically and customarily during the presentation of the bids, it was allowed for the vendor to provide clarification or affidavits if needed. He noted the item was the Committee's best recommendation based on the RFP. He discussed what would need to happen if the Commission wished to proceed with Brown & Brown or if they chose to proceed with Foundation Risk Partners.

Mr. Steve Farmer, Brown & Brown Executive Vice President, reviewed his history with the city and Brown & Brown. He discussed the proposed insurance trusts and the shared policies. He discussed the proposal and improvement in the insurance market, his connections which helped to lower the rate, and noted the Insurance Program Committee recommended their proposal.

Commissioner Sargent reviewed prior prices of the city's insurance policies, increasing through the years.

Mayor Partington inquired about the compliance of the affidavit; whereby, Ms. McGuire stated the purchasing department addressed the issue of the affidavit to bring the bid into compliance. He asked what the Committee's thought was on the shared limit versus named storm limit; whereby, Ms. McGuire stated the city's RFP solicited proposals for the same coverage levels, and the Foundation Risk Partners alternate proposal was not consistent with the current insurance program, therefore the Committee only considered the primary Foundation Risk Partners proposal.

Mayor Partington stated the city only wanted the best for the residents. He reviewed other municipalities utilizing Foundation Risk Partners and questioned why the city would not consider proposals outside of the scope of service; whereby, Ms. McGuire stated the RFP called for a specific scope of service, which Foundation Risk Partners' alternate proposal did not match.

Commissioner Persis expressed concerns regarding the storm policy.

Commissioner Tolland stated needs change and inquired if the city could accept proposals outside of scope of service.

Ms. Shanahan stated the RFP was approved by the Commission before getting sent out to bid with the scope of service to maintain the same coverages.

Mayor Partington stated Foundation Risk Partners had the lowest cost with the alternate proposal.

Commissioner Tolland inquired about the affidavit being submitted late; whereby, Mr. Hayes stated it was a matter of interpretation, noting the Statutes required an affidavit and one was provided, noting past bids were accepted with the late submission of the affidavit. He explained it was up to the Commission to agree or disagree with the recommendation of the Insurance Program Committee. He reviewed the process of the Committee and what was needed from the Commission if they agreed or disagreed with the recommendation.

Mayor Partington inquired about the shared limit versus named storm limit; whereby, Mr. Lodwick stated it depended on the circumstances. Mr. Lodwick discussed issues with shared limit coverages and reviewed the named storm coverage with the dedicated limit.

Mr. Farmer stated the shared limit program was very transparent, noting it was reviewed every year and was never close to being exceeded.

Commissioner Tolland inquired how the shared limit versus dedicated limit effect the level of service during an event; whereby, Mr. Farmer indicated each insurance company handles events differently, noting during any event he was always there to assist the city.

Mr. Lodwick discussed the requirements and process of the dedicated limit coverage and assessments during events.

Mr. Farmer inquired if there were any issues with the current providers; whereby, Mr. Hayes stated there were no issues in coverage or level of service of the existing provider.

Commissioner Sargent inquired when the city last sent insurance out to bid; whereby, Mr. Farmer stated he participated in many bids for insurance with the city.

Ms. McGuire stated 2017 was the last time the Agent of Record for insurance went out to bid.

Commissioner Tolland inquired if there were only two bids every time; whereby, Ms. McGuire stated Brown & Brown was always responsive to the RFP's.

Mayor Partington expressed support of both companies, noting he's worked with both through the city and through the Florida League of Cities. He stated as the agreement was for a year he was comfortable going with the cheaper proposal from Foundation Risk Partners.

Commissioner Briley inquired if the proposal was cheaper by $40,000; whereby, Ms. McGuire stated that was correct but the four coverages not quoted would need to be assumed.

Commissioner Persis expressed support of the lower proposal.

**Commissioner Briley moved, seconded by Commissioner Persis, to approve Resolution No. 2024-160, as read by title only, for discussion purposes.**

Mr. Hayes inquired on the Commissions stance of the affidavit; whereby, Mayor Partington stated he believed the bid to be deemed non-compliant due to the missing affidavit upon bid opening.

Mayor Partington stated the third whereas clause should be amended as well, since both companies were qualified and able, noting the disagreement was the shared limit versus the named storm limit. He discussed the Florida League of Cities insurance program.

Mr. Hayes requested a recess to amend the resolution in favor of Foundation Risk Partners and include the requested amendments.

Mayor Partington recessed the City Commission meeting at 10:11 p.m.

Mayor Partington reconvened the City Commission meeting at 10:38 p.m.

Mr. Hayes explained there was a revised resolution, noting the incorporated findings discussed.

Mr. Hayes read the change in the resolution title:

> A RESOLUTION ACCEPTING A PROPOSAL FROM FOUNDATION RISK PARTNERS PUBLIC ENTITY SERVICES, FOR THE PROVISION OF PROPERTY, LIABILITY AND WORKERS' COMPENSATION INSURANCE FOR VARIOUS LINES OF INSURANCE COVERAGE…

Mr. Hayes reviewed the revised whereas clauses that changed from Resolution 2024-160.

Commissioner Briley and Commissioner Persis withdrew their motion and second, respectively.

Mr. Hayes requested a new Resolution number for the updated resolution; whereby, Ms. Dauderis stated Resolution number 2024-161 would be assigned.

**Commissioner Briley moved, seconded by Commissioner Persis, to approve Resolution No. 2024-161, as amended to award the bid to Foundation Risk Partners.**

Commissioner Sargent inquired if there was anything needed by the Commission regarding the policies that would be assumed by Foundation Risk Partners; whereby, Ms. McGuire stated the policies were included in the updated Resolution.

Commissioner Briley, Commissioner Persis, and Mayor Partington expressed support of both agencies.

| Call Vote: | | |
|---|---|---|
| | Commissioner Sargent | Abstained |
| | Commissioner Persis | Yes |
| | Commissioner Briley | Yes |
| | Commissioner Tolland | Abstained |
| Carried. | Mayor Partington | Yes |

# FORM 8B  MEMORANDUM OF VOTING CONFLICT FOR COUNTY, MUNICIPAL, AND OTHER LOCAL PUBLIC OFFICERS

LAST NAME—FIRST NAME—MIDDLE NAME
Tolland, Loretta (Lori) Riehl

MAILING ADDRESS
5 Broadriver Rd

CITY                    COUNTY
Ormond Beach , FL  32174

DATE ON WHICH VOTE OCCURRED
Sept 18, 2024

NAME OF BOARD, COUNCIL, COMMISSION, AUTHORITY, OR COMMITTEE
City of Ormond Beach Commission

THE BOARD, COUNCIL, COMMISSION, AUTHORITY OR COMMITTEE ON WHICH I SERVE IS A UNIT OF:
☑ CITY      ☐ COUNTY      ☐ OTHER LOCAL AGENCY

NAME OF POLITICAL SUBDIVISION:
Commissioner Zone one

MY POSITION IS:
☑ ELECTIVE      ☐ APPOINTIVE

## WHO MUST FILE FORM 8B

This form is for use by any person serving at the county, city, or other local level of government on an appointed or elected board, council, commission, authority, or committee. It applies to members of advisory and non-advisory bodies who are presented with a voting conflict of interest under Section 112.3143, Florida Statutes.

Your responsibilities under the law when faced with voting on a measure in which you have a conflict of interest will vary greatly depending on whether you hold an elective or appointive position. For this reason, please pay close attention to the instructions on this form before completing and filing the form.

## INSTRUCTIONS FOR COMPLIANCE WITH SECTION 112.3143, FLORIDA STATUTES

A person holding elective or appointive county, municipal, or other local public office MUST ABSTAIN from voting on a measure which would inure to his or her special private gain or loss. Each elected or appointed local officer also MUST ABSTAIN from knowingly voting on a measure which would inure to the special gain or loss of a principal (other than a government agency) by whom he or she is retained (including the parent, subsidiary, or sibling organization of a principal by which he or she is retained); to the special private gain or loss of a relative; or to the special private gain or loss of a business associate. Commissioners of community redevelopment agencies (CRAs) under Sec. 163.356 or 163.357, F.S., and officers of independent special tax districts elected on a one-acre, one-vote basis are not prohibited from voting in that capacity.

For purposes of this law, a "relative" includes only the officer's father, mother, son, daughter, husband, wife, brother, sister, father-in-law, mother-in-law, son-in-law, and daughter-in-law. A "business associate" means any person or entity engaged in or carrying on a business enterprise with the officer as a partner, joint venturer, coowner of property, or corporate shareholder (where the shares of the corporation are not listed on any national or regional stock exchange).

*     *     *     *     *     *     *     *     *     *     *     *     *     *     *     *

## ELECTED OFFICERS:

In addition to abstaining from voting in the situations described above, you must disclose the conflict:

PRIOR TO THE VOTE BEING TAKEN by publicly stating to the assembly the nature of your interest in the measure on which you are abstaining from voting; and

WITHIN 15 DAYS AFTER THE VOTE OCCURS by completing and filing this form with the person responsible for recording the minutes of the meeting, who should incorporate the form in the minutes.

*     *     *     *     *     *     *     *     *     *     *     *     *     *     *     *

## APPOINTED OFFICERS:

Although you must abstain from voting in the situations described above, you are not prohibited by Section 112.3143 from otherwise participating in these matters. However, you must disclose the nature of the conflict before making any attempt to influence the decision, whether orally or in writing and whether made by you or at your direction.

IF YOU INTEND TO MAKE ANY ATTEMPT TO INFLUENCE THE DECISION PRIOR TO THE MEETING AT WHICH THE VOTE WILL BE TAKEN:

• You must complete and file this form (before making any attempt to influence the decision) with the person responsible for recording the minutes of the meeting, who will incorporate the form in the minutes. (Continued on page 2)

**APPOINTED OFFICERS (continued)**

- A copy of the form must be provided immediately to the other members of the agency.

- The form must be read publicly at the next meeting after the form is filed.

IF YOU MAKE NO ATTEMPT TO INFLUENCE THE DECISION EXCEPT BY DISCUSSION AT THE MEETING:

- You must disclose orally the nature of your conflict in the measure before participating.

- You must complete the form and file it within 15 days after the vote occurs with the person responsible for recording the minutes of the meeting, who must incorporate the form in the minutes. A copy of the form must be provided immediately to the other members of the agency, and the form must be read publicly at the next meeting after the form is filed.

---

## DISCLOSURE OF LOCAL OFFICER'S INTEREST

I, _Loretta (Lori) Tolland_ , hereby disclose that on _Sept 18_ , 20 _24_ :

(a) A measure came or will come before my agency which (check one or more)

___ inured to my special private gain or loss;

___ inured to the special gain or loss of my business associate, _____ ;

✓ inured to the special gain or loss of my relative, _Christopher Tolland_ ;

___ inured to the special gain or loss of _____ , by whom I am retained; or

___ inured to the special gain or loss of _____ , which is the parent subsidiary, or sibling organization or subsidiary of a principal which has retained me.

(b) The measure before my agency and the nature of my conflicting interest in the measure is as follows:

_Resolution NO 2024-160 - Accepting a proposal from Brown & Brown Insurance Services -_

_My son works for a competing insurance broker._

If disclosure of specific information would violate confidentiality or privilege pursuant to law or rules governing attorneys, a public officer, who is also an attorney, may comply with the disclosure requirements of this section by disclosing the nature of the interest in such a way as to provide the public with notice of the conflict.

_Sept 18, 2024_
Date Filed

Signature _Loretta R Tolland_

---

NOTICE: UNDER PROVISIONS OF FLORIDA STATUTES §112.317, A FAILURE TO MAKE ANY REQUIRED DISCLOSURE CONSTITUTES GROUNDS FOR AND MAY BE PUNISHED BY ONE OR MORE OF THE FOLLOWING: IMPEACHMENT, REMOVAL OR SUSPENSION FROM OFFICE OR EMPLOYMENT, DEMOTION, REDUCTION IN SALARY, REPRIMAND, OR A CIVIL PENALTY NOT TO EXCEED $10,000.

CE FORM 8B – EFF. 11/2013
Adopted by reference in Rule 34-7.010(1)(f), F.A.C.

PAGE 2

# FORM 8B   MEMORANDUM OF VOTING CONFLICT FOR COUNTY, MUNICIPAL, AND OTHER LOCAL PUBLIC OFFICERS

| | |
|---|---|
| LAST NAME—FIRST NAME—MIDDLE NAME<br>Sargent - Travis - Craig | NAME OF BOARD, COUNCIL, COMMISSION, AUTHORITY, OR COMMITTEE<br>Commission |
| MAILING ADDRESS<br>406 N. Beach St. | THE BOARD, COUNCIL, COMMISSION, AUTHORITY OR COMMITTEE ON WHICH I SERVE IS A UNIT OF:<br>☑ CITY     ☐ COUNTY     ☐ OTHER LOCAL AGENCY |
| CITY<br>Ormond Beach     COUNTY<br>Volusia | NAME OF POLITICAL SUBDIVISION: |
| DATE ON WHICH VOTE OCCURRED<br>09-18-24 | MY POSITION IS:<br>☑ ELECTIVE     ☐ APPOINTIVE |

## WHO MUST FILE FORM 8B

This form is for use by any person serving at the county, city, or other local level of government on an appointed or elected board, council, commission, authority, or committee. It applies to members of advisory and non-advisory bodies who are presented with a voting conflict of interest under Section 112.3143, Florida Statutes.

Your responsibilities under the law when faced with voting on a measure in which you have a conflict of interest will vary greatly depending on whether you hold an elective or appointive position. For this reason, please pay close attention to the instructions on this form before completing and filing the form.

## INSTRUCTIONS FOR COMPLIANCE WITH SECTION 112.3143, FLORIDA STATUTES

A person holding elective or appointive county, municipal, or other local public office MUST ABSTAIN from voting on a measure which would inure to his or her special private gain or loss. Each elected or appointed local officer also MUST ABSTAIN from knowingly voting on a measure which would inure to the special gain or loss of a principal (other than a government agency) by whom he or she is retained (including the parent, subsidiary, or sibling organization of a principal by which he or she is retained); to the special private gain or loss of a relative; or to the special private gain or loss of a business associate. Commissioners of community redevelopment agencies (CRAs) under Sec. 163.356 or 163.357, F.S., and officers of independent special tax districts elected on a one-acre, one-vote basis are not prohibited from voting in that capacity.

For purposes of this law, a "relative" includes only the officer's father, mother, son, daughter, husband, wife, brother, sister, father-in-law, mother-in-law, son-in-law, and daughter-in-law. A "business associate" means any person or entity engaged in or carrying on a business enterprise with the officer as a partner, joint venturer, coowner of property, or corporate shareholder (where the shares of the corporation are not listed on any national or regional stock exchange).

\*          \*          \*          \*          \*          \*          \*          \*          \*          \*          \*          \*          \*          \*          \*          \*          \*

## ELECTED OFFICERS:

In addition to abstaining from voting in the situations described above, you must disclose the conflict:

PRIOR TO THE VOTE BEING TAKEN by publicly stating to the assembly the nature of your interest in the measure on which you are abstaining from voting; and

WITHIN 15 DAYS AFTER THE VOTE OCCURS by completing and filing this form with the person responsible for recording the minutes of the meeting, who should incorporate the form in the minutes.

\*          \*          \*          \*          \*          \*          \*          \*          \*          \*          \*          \*          \*          \*          \*          \*          \*

## APPOINTED OFFICERS:

Although you must abstain from voting in the situations described above, you are not prohibited by Section 112.3143 from otherwise participating in these matters. However, you must disclose the nature of the conflict before making any attempt to influence the decision, whether orally or in writing and whether made by you or at your direction.

IF YOU INTEND TO MAKE ANY ATTEMPT TO INFLUENCE THE DECISION PRIOR TO THE MEETING AT WHICH THE VOTE WILL BE TAKEN:

• You must complete and file this form (before making any attempt to influence the decision) with the person responsible for recording the minutes of the meeting, who will incorporate the form in the minutes.  (Continued on page 2)

CE FORM 8B - EFF. 11/2013
Adopted by reference in Rule 34-7.010(1)(f), F.A.C.

PAGE 1

**APPOINTED OFFICERS (continued)**

- A copy of the form must be provided immediately to the other members of the agency.
- The form must be read publicly at the next meeting after the form is filed.

IF YOU MAKE NO ATTEMPT TO INFLUENCE THE DECISION EXCEPT BY DISCUSSION AT THE MEETING:

- You must disclose orally the nature of your conflict in the measure before participating.
- You must complete the form and file it within 15 days after the vote occurs with the person responsible for recording the minutes of the meeting, who must incorporate the form in the minutes. A copy of the form must be provided immediately to the other members of the agency, and the form must be read publicly at the next meeting after the form is filed.

## DISCLOSURE OF LOCAL OFFICER'S INTEREST

I, _Travis Sargent_ , hereby disclose that on _Sept. 18_ , 20 _24_ :

(a) A measure came or will come before my agency which (check one or more)

___ inured to my special private gain or loss;

✓ inured to the special gain or loss of my business associate, _Foundation Risk Partners_ ;

___ inured to the special gain or loss of my relative,_____ ;

___ inured to the special gain or loss of _____ , by

whom I am retained; or

___ inured to the special gain or loss of _____ , which

is the parent subsidiary, or sibling organization or subsidiary of a principal which has retained me.

(b) The measure before my agency and the nature of my conflicting interest in the measure is as follows:

If disclosure of specific information would violate confidentiality or privilege pursuant to law or rules governing attorneys, a public officer, who is also an attorney, may comply with the disclosure requirements of this section by disclosing the nature of the interest in such a way as to provide the public with notice of the conflict.

_9/18/24_
Date Filed

Signature

NOTICE: UNDER PROVISIONS OF FLORIDA STATUTES §112.317, A FAILURE TO MAKE ANY REQUIRED DISCLOSURE CONSTITUTES GROUNDS FOR AND MAY BE PUNISHED BY ONE OR MORE OF THE FOLLOWING: IMPEACHMENT, REMOVAL OR SUSPENSION FROM OFFICE OR EMPLOYMENT, DEMOTION, REDUCTION IN SALARY, REPRIMAND, OR A CIVIL PENALTY NOT TO EXCEED $10,000.

CE FORM 8B - EFF. 11/2013
Adopted by reference in Rule 34-7.010(1)(f), F.A.C.

PAGE 2

<u>Item #11 – Reports, Suggestions, Requests</u>

<u>Events, Updates, Congratulations, and Requests</u>
Ms. Shanahan noted upcoming meetings and events.

Commissioner Sargent reviewed upcoming events and events he attended, including the 9/11 and Crime Stoppers events.

Commissioner Persis discussed upcoming events, events she attended, and thanked staff for their work with an issue that occurred.

Commissioner Briley reviewed events he attended.

Commissioner Tolland congratulated Ms. Rebostini and Representative Leek for their service. She discussed events she attended, upcoming events, and provided updates from Ormond Beach MainStreet. She requested an education push on social media regarding code enforcement regulations. She suggested a thin black trim to be used in the city landscaping with mulch to help contain it and prevent runoff into the streets.

Mayor Partington discussed the budget, highlighting the public safety items, and noted the city was the second lowest tax rate in Volusia County. He thanked those who participated in the 9/11 event.

<u>Tomoka State Park</u>
Commissioner Briley inquired if there was any interest by the Commission to write a letter from the Commission as a whole to the State regarding the proposed paving of Tomoka State Park; whereby, Mayor Partington and Commissioner Sargent stated they had no interest in sending a letter.

Commissioner Tolland stated she would support a letter requesting a more permanent permeable product due to flooding concerns.

<u>Item #12 – Adjournment</u>

The meeting was adjourned at 11:02 p.m.

APPROVED:     October 2, 2024


BY:     _____
                Bill Partington, Mayor

ATTEST:


_____
Susan Carroll Dauderis,
City Clerk

EXHIBIT THREE

**AGREEMENT FOR SERVICES BETWEEN**
**Halifax Humane Society, Inc.**
**AND**
**The Impounding agency**

**This Services Agreement** ("Agreement") is hereby entered into by and between the **Halifax Humane Society, Inc.**, a Florida non-profit corporation, with its principal address at 2364 West LPGA Boulevard, Daytona Beach, Florida 32124 ("Humane Society"), and the **Impounding agency**, a municipal corporation, with its primary address at ("Impounding agency address").

**WHEREAS,** in order to enforce the ordinances of the Impounding agency and the laws of the State of Florida with respect to stray animals, the Impounding agency desires to deliver stray animals to the Humane Society for the humane impoundment and humane disposition of said animals; and

**WHEREAS,** the Humane Society is organized for the purpose, among others, of preventing cruelty to animals and is interested in assuring that impounded animals are sheltered in a humane manner and those which must be destroyed, be so destroyed humanely.

**NOW, THEREFORE,** for and in consideration of the mutual covenants, conditions and provisions herein contained, it is expressly agreed and understood as follows:

1.      **TERM**:  This Agreement will take effect on the 1st day of October 2024, and will remain in full force and effect for an initial twelve (12) month period ending on midnight between September 30, 2025. The parties shall have the option to extend the contract or enter into contract negotiations if they so desire. This contract may be renewed by the Impounding agency for up to three (3) twelve (12) month periods, with a 10% increase of fees per renewal.

2.      **ANIMAL SHELTER, RETURN TO FIELD, AND TRAP, NEUTER, AND RETURN**:

   (a)  The Humane Society will maintain and operate an animal shelter ("Shelter") in a manner adequate for the confinement, remedial treatment, and, if necessary, disposal of stray dogs, cats, or other animals, which may be delivered to the Humane Society from all areas within the jurisdiction of the Impounding Agency, and the Humane Society will furnish, at its sole expense, all supervision, labor, animal food, tools, supplies and other things necessary for the satisfactory performance of the services herein agreed to be provided.  Remedial care will be provided for injured animals during operating hours when there is a staff veterinarian available, at the Humane Society's sole expense.  The Shelter will be operated at 2364 West LPGA Blvd., Daytona Beach, Florida.

   (b)  The Humane Society will provide means to accept all stray dogs and other stray or seized domesticated animals delivered to the Shelter by the Impounding agency's law enforcement personnel, Animal Control Officers, or other designated officers appointed by the Impounding agency for this purpose.  The Humane Society will

provide Return to Field (RTF) for unsterilized cats following national animal welfare organization recommendations for the most humane practices with addressing cat overpopulation. The Humane Society will accept wild animals and livestock only if it has the ability and facilities to impound and control these animals, and the decision to accept or reject such animals will be solely within the discretion of the Humane Society. The Humane Society will require all persons who drop off or report injured or stray animals to the Shelter during the Shelter's normal operating hours to give their names, phone number, and current home and post office addresses and identify the place where the animals involved were located or picked up.

(c)   If the Impounding agency delivers an animal to the Shelter for impoundment discovers such animal bears information indicating ownership of the animal, the impounding agency representative shall take reasonable steps to identify the owner of the animal and contact said owner prior to delivering the animal to the Shelter. The impounding representative shall also provide all contact information gathered and documented attempts of contact for the owner/guardian to Halifax.   Regardless of the foregoing, any animal suspected of being infected with rabies or which has bitten or otherwise exposed any person to rabies, shall not be released to its owner until after such animal has been impounded for a period of ten (10) days and the Volusia Health Department, through its authorized representatives, has expressly approved, in writing, any such release.

(d)  When a stray domestic animal is delivered to the Shelter and is not suspected of having rabies or has not bitten or otherwise exposed any person to rabies, the Humane Society will impound the animal at the Impounding agency's expense for a period of not to exceed three (3) calendar days (unless otherwise provided in this Agreement).   If the owner has not retrieved the animal within the designated holding period, the Humane Society will thereafter, at its own expense, provide for the adoption or humane disposal of the animal in accordance with its routine methods and procedures**.**

(e)  When a stray cat is delivered to the Shelter and is not suspected of having rabies or has not bitten or otherwise exposed any person to rabies, the Humane Society will determine the eligibility of the animal for the RTF Program. After consultation with the Impounding agency, Humane Society will decide whether the cat will be referred for impoundment or RTF and notify the impounding agency. The Impounding agency representative will expressly inform the Humane Society if a cat is brought in as part of the Trap, Neuter and Return Program (TNR). The Humane Society will only perform feline sterilization services for cats brought to the Humane Society by an Animal Control Officer (ACO) or other Impounding agency person designated by the Police Department. Cats brought to the Humane Society by any other person will not be eligible for reimbursement by the Impounding agency. Fees for this service are listed in 3.b. under RTF/TNR Cats. The Impounding agency will only be responsible

for services or procedures that are requested and expressly included in this agreement. The Impounding agency will not pay for any other service or procedure. The RTF/TNR Program requires the following:

i.     The Humane Society and the Impounding agency shall mutually agree on the day(s) of the week that the Impounding agency will bring cats to the designated Humane Society facility. Said schedule shall be subject to change by mutual agreement of the parties. The Impounding agency shall at a minimum have one day reserved each week at a designated Humane Society facility to bring in cats for sterilization.

ii.    Surgeries may be completed at either:
       Halifax Humane Society 2364 West LPGA Boulevard Daytona Beach, FL 32124
              -Or-
       HHS Redinger Clinic 600 Mason Ave #150 Daytona Beach, FL 32117

       Hereafter, Humane Society shall refer to both the location on LPGA Blvd. and Mason Ave.

iii.   All regular sterilizations are the same price for neuters and spays (males and females).  Each surgery includes complimentary ear tipping, FVRCP and rabies vaccines, and anesthesia.  Ear tipping must be completed according to Alley Cat Allies recommendations by removing at least 3/8 of an inch from the top of the left ear.

iv.    If the Impounding agency presents a cat for sterilization and the Humane Society finds the cat has already been sterilized, the Humane Society will provide anesthesia, ear tipping, FVRCP and rabies vaccine at the normal sterilization surgery cost.

v.     Upon presentation of a cat, the Humane Society, at its sole discretion, will determine if the cat is healthy enough to survive surgery and whether or not it should be euthanized.  The Humane Society recognizes that the Impounding agency does not have a licensed veterinarian on staff and does not have the ability to determine whether an animal should be euthanized.

vi.    All cats being returned to the Impounding agency staff from the Humane Society will have their ear tipped as described above.  No exceptions.  If a cat is returned to the Impounding agency staff without an ear tip, or with an ear tip of less than 3/8 of an inch from the top of the left ear, the Impounding agency cat will be returned to the Humane Society for the procedure without any additional charge to the Impounding agency.

vii.   No procedures other than those listed in this document will be paid for by the

Impounding agency.  The Impounding agency will only reimburse for procedures that have been documented and provided to the Impounding agency.  The Humane Society must provide at least the following information in order to receive reimbursement for each cat:

- Invoice number
- Visit Date
- Billing Date
- Animal Name and/or Number
- Impounding agency services provided
- Name of Impounding Agency Rep authorizing service(s)
- Cost for each service provided
- Total cost

**viii.** The Humane Society will combine and send all invoices to the Impounding agency monthly.

**ix.** ACO's will notify the Humane Society staff at the LPGA location whether a feline brought there is part of the TNR program, if it is for RTF, is wild, stray, confiscated, or seized.

**x.** The Humane Society will only release RTF cats to the Impounding agency Animal Control Officer unless Impounding agency provided permission for a 3rd party release in writing from the agency's authority.

3.   **BILLING & PAYMENT**:

(a)   The Humane Society shall bill the Impounding agency pursuant to Paragraph 3(b), as applicable, for:

(i) each dog, cat, domesticated animal, injured animal, deceased animal, livestock animal, wild animal, or quarantined/confiscated animal delivered to the Shelter by either the Impounding agency's designated personnel, Police or Animal Control Officers;

(ii) each stray dog, cat, domesticated animal, injured animal, deceased animal, livestock animal or wild animal emanating from within Impounding agency the jurisdictional limits of the impounding agency and delivered to the Shelter by a private citizen who has provided their full name and contact information.  Owner surrendered animals will only be accepted via impounding agency with Supervisor approval from Halifax Humane Society.  Owner requested surrenders in the field should be referred to Halifax Humane Society directly; and

(iii) each dog, cat, domesticated animal, injured animal or deceased animal picked up at the request of the Impounding agency by the Humane Society within

Impounding agency jurisdictional limits of the impounding agency.

(b) In consideration of the agreements and undertakings to be performed by the Humane Society, the Impounding agency agrees to pay the following applicable fee(s) per animal to the Humane Society on a monthly basis, in arrears:

| Type of Animal | Fee |
|---|---|
| **Dog or cat** (if the cat is not eligible for RTF/TNR program) | |
| Impoundment | $156.00 |
| **Other domesticated animal** | $130.00 |
| **Livestock animal** | $195.00 |
| **Wild animal (Euthanasia)** | $ 71.50 |
| **Deceased on arrival (Disposal)** | $32.50 |
| **Quarantined animal (*e.g.*, Rabies)** | $390, $39 per day<br>Quarantine period determined by Florida State Statute |
| **Confiscated animal** | $130 for the 1st day of impoundment plus $45.50 for each additional day of impoundment |
| **Fees for RTF/TNR cats** | |
| **Sterilization Surgery** Complimentary ear tipping, FVRCP, Rabies Vaccines | $58.50 |
| **Anesthesia Fee** No surgery performed, ear tipping, FVRCP vaccine, rabies vaccine | $58.50 |
| **Euthanasia** Veterinarian determined that patient cannot undergo surgery due to illness/disease | $58.50 |
| **Forensic calls and staff assistance upon request** | Staff Support:          $32.50 per hr.<br><br>Veterinarian Support:  $162.50 per hr. |

(c)     Payment must be made to the Humane Society within forty-five (45) days of the date of a proper invoice, as required by the Florida Local Government Prompt Payment Act (Part VII, Chapter 218, Florida Statutes) (the "Prompt Payment Act"). As provided by the Prompt Payment Act, any payment that is not made by the Impounding agency within such time period shall bear interest from thirty (30) days after the due date at a rate of one percent (1%) per month on the unpaid balance until paid in full. If the Impounding agency has a dispute about a charge on its invoice, it must contact the Humane Society's Director of Administrative Services at 386-274-4703, extension 315, within fifteen (15) days of the date of the invoice.

(d)     The Humane Society will submit to the Impounding agency, with its monthly invoice, a list of all pick up addresses of stray animals charged to the Impounding agency account for animals that were not impounded by a an impounding agency's designated personnel, the names and addresses of all persons claiming any stray animals that are dropped off at the Shelter during normal operating hours, and, if known, the names and addresses of all persons claiming stray animals that are dropped off at the Shelter after-hours.

(e)     The Humane Society will make a good faith effort to collect the costs incurred for the care of any animal that is served by the Humane Society and later reclaimed by the animal's owner. Collections received by the Humane Society by an animal owner shall be credited against the fees charged to the Impounding Agency. The animal's owner is financially responsible for any services rendered to the animal by the Humane Society and the Humane Society, without indicating that payment is optional, will seek full payment for said services prior to releasing the animal. The Humane Society may release an animal to its owner without payment in the event the animal's owner completes a financial affidavit indicating that the owner qualifies as indigent. The financial affidavit to be used by Humane Society is attached hereto marked as **Exhibit A**. If the attached financial affidavit is completed by the animal owner, the Humane Society may release the animal to the owner without collecting any fees and the Impounding Agency shall be responsible for the charges associated with the released animal as outlined herein. A copy of the animal owner's financial affidavit shall be included in the corresponding invoice to the Impounding Agency. If the Humane Society does not have the animal owner complete a financial affidavit but releases the animal to the owner, the Impounding Agency shall not be charged for any of the fees associated with the animal released.

4.     **RABIES QUARANTINE**:  The Humane Society will provide space for the confinement, observation and care of any stray animal suspected of rabies, or any stray animal which has bitten or otherwise exposed any person to rabies for a period of the state determined time for quarantine and will accept, care for and dispose of any such animal delivered to the Shelter. The Humane Society will notify the Volusia County Health Department of any rabies specimen

animal that dies during the quarantine period, and will allow the Volusia Impounding agency Health Department the opportunity to take custody of the remains of any such animal that becomes ill or dies while under confinement for such reasons.  The Impounding agency impounding agency shall pay the applicable charges for quarantine service pursuant to Section 3(b) of this Agreement.

5.      **CONFISCATED ANIMALS – 828.073, F.S.**:  The Humane Society will agree to accept confiscated animals as strays or accept said animals as "confiscated" only when the provisions of Section 828.073, Florida Statutes are satisfied (*i.e.*, pursuant to a Court order after petition and hearing).  The Impounding agency shall be responsible for all charges and expenses incurred in confiscating an animal pursuant to § 828.073, Fla. Stat.  Upon request, a copy of the petition must be submitted by the seizing agent to the Humane Society within ten (10) business days of the request.  Failure to comply with this requirement will result in "confiscated" animals being deemed "stray" animals, at which point care of the animal will be charged to the Impounding agency at the default "stray" rates provided in Section 3(b) of this Agreement. The Impounding agency agrees to indemnify the Humane Society for any and all claims that may arise as a result of the Impounding agency decision to submit the animal as a stray, except that the cap on the amount and liability of the Impounding agency for indemnification or damages under this contract, regardless of the number or nature of claims in tort, equity, or contract, shall not exceed the dollar amount expended by the Impounding agency for Humane Society services in the contract year in which the claim arises.

6.      **DANGEROUS DOG LAW**:  Pursuant to Sections 767.12 and 767.13, Florida Statutes, it will be the sole responsibility of the Impounding agency's animal control authority to determine whether a dog is dangerous and to submit to the Humane Society the necessary paperwork as required by the applicable statutes.  If quarantine is necessary, a dog quarantined pursuant to Sections 767.12 and 767.13, Florida Statutes, may be quarantined for ten (10) business days at a bona fide boarding kennel or veterinarian's office of the seizing agent's or owner's choice. Otherwise, the Humane Society will quarantine all dogs that the Impounding agency animal control authority determines to be dangerous for a maximum of ten (10) business days.  The Impounding agency shall pay the applicable charges for such service pursuant to Section 3(b) of this Agreement.  If the owner of the dog is unknown by the end of the quarantine period, the Impounding agency may request that euthanasia be performed by the Humane Society when it is the Impounding agency's belief that the dog poses a threat to public safety. The Impounding agency agrees to indemnify the Humane Society for any and all claims that may arise as a result of the Impounding agency decision to submit the animal under the Dangerous Dog Law, except that the cap on the amount and liability of the Impounding agency for indemnification or damages under this contract, regardless of the number or nature of claims in tort, equity, or contract, shall not exceed the dollar amount expended by the Impounding agency for Humane Society services in the contract year in which the claim arises.

7.      **CONFISCATED ANIMALS - OWNER OF ANIMAL IS IN CUSTODY / DECEASED / HOSPITALIZED**:  All animals whose owners are in police custody, deceased or hospitalized may

be placed in a bona fide boarding kennel or veterinary clinic at the owner's expense.  The Humane Society will accept any such animals that are seized or taken by the Impounding agency. The Impounding agency will pay the applicable charges for such service (*i.e.*, "Confiscated Animal") pursuant to Section 3(b) of this Agreement. The Impounding agency agrees to indemnify the Humane Society for any and all claims that may arise as a result of the Impounding agency's decision to submit the animal as Confiscated/Owner of Animal in Custody/Deceased/Hospitalized, except that the cap on the amount and liability of the Impounding agency for indemnification or damages under this contract, regardless of the number or nature of claims in tort, equity, or contract, shall not exceed the dollar amount expended by the Impounding agency for Humane Society services in the contract year in which the claim arises. The impounding agency agrees to provide next of kin, emergency contact or any other guardian information to Halifax within 3 days of impoundment. Failure to do so by the impounding agency will forfeit any hold on the animal other than the mandatory 3 day holding period for stray animals.

8.      **CONFISCATED ANIMALS DUE TO OWNER EVICTION**:  Animals seized by the Impounding agency as a result of an owner eviction will be held by the Humane Society for 5 days.  The impounding agency agrees to leave notice of impoundment at the eviction location listing the whereabouts and descriptions of animal confiscated.  Impounding agency's representative will provide proof of such notice, agency report or photograph of notice on the dwelling with address or writ of possession displayed.   If not reclaimed by the owner, all charges accruing pursuant to Section 3(b) will be paid by the Impounding agency.

As the impounding agency, if the Impounding agency chooses not to have the Humane Society hold the animal for the entire reclamation period referenced above, the Impounding agency may submit the animal to the Humane Society as a "stray," in which case the animal will be held for three (3) days prior to disposition.  The Impounding agency agrees to indemnify the Humane Society for any and all claims that may arise as a result of the Impounding agency's decision to submit the animal as a "stray", except that the cap on the amount and liability of the Impounding agency for indemnification or damages under this contract, regardless of the number or nature of claims in tort, equity, or contract, shall not exceed the dollar amount expended by the Impounding agency for Humane Society services in the contract year in which the claim arises  The Impounding agency shall pay the applicable charges for such service pursuant to Section 3(b) of this Agreement.

9.      **REMEDY IN THE EVENT OF BREACH**:  In the event that the Impounding agency fails to make timely payment to the Humane Society for services rendered pursuant to this Agreement, the Humane Society, in its sole discretion, may elect to terminate this Agreement and cease providing services to the Impounding agency.  If the Humane Society exercises this option, it will provide the Impounding agency with thirty (30) days written notice of its decision to terminate the Agreement.  The Impounding agency will remain responsible for payment for all services rendered by the Humane Society prior to and during the thirty (30) day notice period.  Upon expiration of the thirty (30) day notice period, the Humane Society will no longer provide

any services to the Impounding agency.

10.    **WAIVER OF BREACH**:  The waiver by the Humane Society or the Impounding agency of any breach or violation of this Agreement will not operate as or be construed to be a waiver of any subsequent breach of this Agreement.

**11.  INSURANCE**: Humane Society shall maintain insurance of sufficient amounts during the life of this Agreement. Humane Society shall provide to the Impounding Agency with a certificate of insurance endorsing the Impounding Agency as an additional named insured, upon request. All insurance coverages of the Humane Society shall be primary and noncontributory. All insurance coverages of the Humane Society shall not seek contribution from any other insurance or self-insurance available to the Impounding Agency.

Policies shall be issued by insurers licensed and/or duly authorized under Florida Law to do business in the State of Florida and all insuring companies are required to have a minimum rating of "A-" in the "Best Key Rating Guide" published by A.M. Best & Company, Inc. Insurer shall provide the Impounding Agency written notice of cancellation, nonrenewal or any other changes in coverage no later than thirty (30) days prior to the effective date of the change and shall provide notice to the Impounding Agency no later than 10 days after non-payment.

Minimum insurance coverages that must remain in place for the life of the Agreement are as follows:

| | |
|---|---|
| Commercial General Liability: | Aggregate $2,000,000.00/ Each Occurrence $1,000,000.00 |
| Automobile Liability: | $1,000,000.00 |
| Umbrella Liability: | $1,000,000.00 |

Should at any time the Humane Society not maintain the insurance coverages required herein, the Impounding Agency may terminate the Agreement or at its sole discretion shall be authorized to purchase such coverages and charge the Humane Society for such coverages purchased. The Impounding Agency shall be under no obligation to purchase such insurance, nor shall it be responsible for the coverages purchased or the insurance company or companies used. The decision of the Impounding Agency to purchase such insurance coverages shall in no way be construed to be a waiver of any of its rights under the Agreement.

11.    **SOVEREIGN IMMUNITY:**  The Impounding agency expressly retains all rights, benefits, and immunities of sovereign immunity in accordance with §768.28, Florida Statutes. Notwithstanding anything set forth in any section of the Agreement to the contrary, nothing in the Agreement shall be deemed as a waiver of immunity of limits of liability of the Impounding agency beyond any statutory limited waiver of immunity or limits of liability which may have been adopted by the Florida Legislature or may be adopted by the Florida Legislature, and the cap on the amount and liability of the Impounding agency for damages, regardless of the number or nature of claims in tort, equity, or contract, shall not exceed the dollar amount set

by the legislature for tort. Nothing in this Agreement shall inure to the benefit of any third party for the purpose of allowing any claim against the Impounding agency, which would otherwise be barred under the Doctrine of Sovereign Immunity or by operation of law.

**12.    PUBLIC RECORDS**:  Pursuant to section 119.0701 (2)(a), Florida Statutes, the Impounding agency is required to provide the Humane Society with this statement and establish the following requirements as contractual obligations pursuant to the Agreement:

**IF THE HUMANE SOCIETY HAS QUESTIONS REGARDING THE APPLICATION OF CHAPTER 119, FLORIDA STATUTES, TO THE HUMANE SOCIETY'S DUTY TO PROVIDE PUBLIC RECORDS RELATING TO THIS AGREEMENT, CONTACT THE CUSTODIAN OF PUBLIC RECORDS AT 386-736-5935, email for Impounding Agency, by mail, Purchasing and Contracts Division, Attn: Public Records Custodian, 123 W. Indiana Ave. RM 302 DeLand, FL 32720.**

By entering into this Agreement, the Humane Society acknowledges and agrees that some records maintained, generated, received, or kept in connection with, or related to the performance of services provided under, this Agreement are public records subject to the public records disclosure requirements of section 119.07(1), Florida Statutes, and Article I, section 24 of the Florida Constitution. Pursuant to section 119.0701, Florida Statutes, any contractor entering into a contract for services with the Impounding agency, including the Humane Society, is required to comply with the following with respect to the applicable public records:

   a)  Keep and maintain public records required by the Impounding agency to perform the services and work provided pursuant to this Agreement.

   b)  Upon request from the Impounding agency's custodian of public records, provide the Impounding agency with a copy of the requested records or allow the records to be inspected or copied within a reasonable time at a cost that does not exceed the cost provided in Chapter 119, Florida Statutes, or as otherwise provided by law.

   c)  Ensure that public records that are exempt or confidential and exempt from public records disclosure requirements are not disclosed except as authorized by law for the duration of the contract term and following completion of the contract if the contractor does not transfer the records to the Impounding agency.

   d)  Upon completion of the contract, transfer, at no cost, to the Impounding agency all public records in the possession of the contractor or keep and maintain public records required by the Impounding agency to perform the service.  If the contractor transfers all public records to the Impounding agency upon completion of the contract, the contractor shall destroy any duplicate public records that are exempt or confidential and exempt from public records disclosure requirements.  If the contractor keeps and maintains public records upon completion of the contract, the contractor shall meet all applicable requirements for retaining public records.  All records stored electronically must be provided to the Impounding agency, upon request from the Impounding

agency's custodian of public records, in a format that is compatible with the information technology systems of the Impounding agency.

e)  Requests to inspect or copy public records relating to the Impounding agency's contract for services must be made directly to the Impounding agency.  If contractor receives any such request, contractor shall instruct the requestor to contact the Impounding agency. If the Impounding agency does not possess the records requested, the Impounding agency shall immediately notify the contractor of such request, and the contractor must provide the records to the Impounding agency or otherwise allow the records to be inspected or copied within a reasonable time.

The Humane Society acknowledges that failure to provide the applicable public records to the Impounding agency within a reasonable time may be subject to penalties under section 119.10, Florida Statutes.  The Humane Society further agrees not to release any records that are statutorily confidential or otherwise exempt from disclosure without first receiving prior written authorization from the Impounding agency.  Humane Society shall indemnify, defend, and hold the Impounding agency harmless for and against any and all claims, damage awards, and causes of action arising from Humane Society's failure to comply with the applicable public records disclosure requirements of section 119.07(1), Florida Statutes, or by Humane Society's failure to maintain any applicable public records that are exempt or confidential and exempt from the public records disclosure requirements, including, but not limited to, any third party claims or awards for attorney's fees and costs arising therefrom.  Humane Society authorizes Impounding agency to seek declaratory, injunctive, or other appropriate relief against Humane Society from a Circuit Court in Volusia Impounding agency on an expedited basis to enforce the requirements of this section.

13.    **E-VERIFY**:  Humane Society shall utilize the U.S. Department of Homeland Security's E-Verify system to verify the employment eligibility of all new employees hired by the Humane Society during the term of this Agreement and shall expressly require any sub-contractors performing services pursuant to this Agreement to likewise utilize the U.S. Department of Homeland Security's E-Verify system to verify the employment eligibility of all new employees hired by the sub-contractor during the term of this Agreement.

13.    **MEDIATION**:  Any dispute arising from this Agreement, including, but not limited to, disputes over fees for services, will be mediated prior to a lawsuit being filed.  Mediation will occur within sixty (60) days of written request by either party to mediate unless agreed to otherwise.  The written request must be delivered in accordance with the provisions of Paragraph 19, below, of this Agreement.  The cost of the mediator's fee will be borne equally by the parties.

14.    **ATTORNEY'S FEES**: Both parties agree to bear the cost of their own attorneys' fees with respect to any disputes, lawsuits, or claims arising under this Agreement, except unless otherwise specifically allowed elsewhere in this Agreement or in the event of an action to recover amounts due under Part VII, Chapter 218, Florida Statutes, in which case, the court

shall award court costs and reasonable attorney's fees, including fees incurred through appeal, to the prevailing party.

15.      **GOVERNING LAW AND VENUE:**  The parties further agree that this Agreement will be governed by the laws of the State of Florida and that venue for any and all suits arising out of or otherwise attributable to this Agreement will lie exclusively in the courts of Volusia Impounding agency, Florida, unless the matter at issue is solely cognizable in federal court, in which case, venue shall be in the Middle District of Florida, Orlando Division.

16.      **SEVERABILITY**:  If any provision of this Agreement or any part of any provision of this Agreement is found to be invalid by a court of competent jurisdiction, such will not affect the validity of any other provision, or part thereof, of this Agreement.

17.      **ENTIRE AGREEMENT**:  This Agreement constitutes the entire and final understanding and agreement with respect to the subject matter hereof and supersedes all prior or contemporaneous negotiations, promises, covenants, agreements, or representations concerning all matters directly or indirectly, collaterally related to the subject matter of this Agreement.

18.      **AMENDMENTS**:  This Agreement cannot be amended or modified except by a writing executed by both of the parties hereto or their respective administrators, trustees, personal representatives and successors.

19.      **NOTICES**:  Any written notice required to be given under this Agreement is to be mailed by registered or certified mail, postage prepaid, to the party's business address or any other address designated for that purpose by written notice and sent to the attention of the Impounding agency Manager with respect to the Impounding agency and to the attention of the CEO with respect to the Humane Society.

IN WITNESS WHEREOF, the Humane Society and the Impounding agency have executed this Agreement for Services between Halifax Humane Society Inc. and the Impounding agency of Volusia, effective on the date and year as set forth above.

**HALIFAX HUMANE SOCIETY, INC.**                **IMPOUNDING AGENCY OF VOLUSIA**

By: _Senn Hawkins_                              By: _____

Name: _Sean Hawkins_        Name:              Title: _____

Title:  Chief Executive Officer                 Date: _____

Date: _Aug. 23, 2024_


ATTEST:                                          ATTEST:

By: _____                     By: _____

Name: Christina Sutherin                         Name: _____

Title:  Chief Operating Officer                  Title: _____

Date: _____                    Date: _____



**COUNTY OF VOLUSIA**
**ANIMAL SERVICES**
**RETURN TO CUSTODY**

**DECLARATION OF NO OR LOW INCOME**

This form should be completed <u>by an adult household member</u> if the household is claiming no or low income within the last 30 days.

_____     _____     _____

**Last Name**                                                    **First Name**                                           **Phone Number**

_____     _____     _____

**Address**                                                       **City**                                                      **Zip**

**1A. I hereby certify that I do not individually receive income from any of the following sources:**

- Wages from employment (including commissions, tips, bonuses, fees, etc.)
- Income from operation of a business
- Rental income from real or personal property
- Interest or dividends from assets
- Social Security, annuities, insurance policies, retirement funds, pensions, or death benefits
- Unemployment or disability payments
- Public assistance payments (AFCD, SSI, TANF)
- Alimony, child support, or gifts received from persons not living in my household
- Sales from self-employed resources (Avon, Mary Kay, etc.)
- Any other source not named above

       **OR**

**1B. I hereby certify that I am low-income, as defined by Florida law, as a family or individual earning 80% or less of the area median income ($63,075)**

2. ☐ I have resources to pay for the daily care of the animal being returned to my custody.

   ☐ I need access to resources to supplement my source of funds to adequately care for the animal being returned to my custody.

**By my signature below, I certify and acknowledge the following:**

- That the forgoing is true, complete, and correct.
- Inquiries may be made to verify statements and a request for documentation to verify low or no-income status maybe requested by Volusia County Animal Services.
- That false statements or omissions are grounds for an at large citation if the animal was impounded and the fees not paid upon return to the owner.

_____     _____

**Signature**                                                                                     **Date**

# EXHIBIT FOUR

# Agreement between City of Ormond Beach
## and Edgewater Animal Shelter, Inc.

**THIS AGREEMENT** (the "Agreement") is made effective this _24_ day of
_July_, 2025, by and between the Edgewater Animal Shelter, Inc., a Florida nonprofit,
hereafter referred to as the "Shelter," and the City of Ormond Beach, a political subdivision of
the County of Volusia and the State of Florida, hereafter referred to as the "City."

**WHEREAS**, the Edgewater Animal Shelter is organized for the purpose, among others,
of preventing cruelty to animals and is interested in ensuring that impounded animals are
sheltered in a humane manner, and

**WHEREAS**, the City needs to be able to house any stray animal that is in need of
services and the City does not have the ability to house animals at the police station, and

**WHEREAS**. the Shelter agrees to accept animals from the City on a case-by-case basis.
The City will notify the Shelter in advance of any animals being brought to the Shelter for
acceptance, and

**WHEARAS**, the Shelter and the City desire to enter into an agreement to establish terms
and conditions under which the Shelter will accept animals from the City on a case-by-case
basis, and

**NOW, THEREFORE**, for and in consideration of the mutual covenants, conditions, and
provisions herein contained, it is expressly agreed and understood as follows:

1. **Term:** This Agreement shall take effect on the first day of the last signature and shall
   remain in full force and effect until terminated by either party.

2. **Animal Acceptance:** The Shelter agrees to accept animals from the City on a case-by-
   case basis. The City will notify the Shelter in advance of any animals being brought to
   the Shelter for acceptance. The Shelter further agrees to contact the City Animal Control
   Officer regarding any animal that is deposited at the shelter by a citizen of Ormond
   Beach, to allow the Animal Control Officer time to ascertain an owner for the animal can
   be located.

3. **Rate:** The City agrees to pay the Shelter a fee of $125 per animal accepted, including
   domestic cats. This fee covers the cost of intake, housing, veterinary care, and other
   associated expenses related to the care of the animal during its stay at the Shelter. The
   Shelter will bill the City one monthly invoice to cover the cost of any animals that are
   received by the Shelter from the City.

4. **Dangerous Dogs, Abused or Neglected Animals, and Police Confiscations:** The City
   agrees to pay the Shelter a fee of $125 per animal accepted by the Shelter as a dangerous
   dog, abused or neglected animal, or police confiscation.

5. **Quarantine Fee:** Any animal placed in the care of the Shelter without an identified owner will be quarantined to assess the potential for rabies exposure. The Shelter will administer a rabies vaccine to the animal during the quarantine period. If an owner is identified during the quarantine, the owner will be responsible for the costs associated with the quarantine, including the rabies vaccination. If the owner is not identified and the animal remains unclaimed, the City agrees to pay $400 for each animal that undergoes quarantine due to rabies exposure concerns.

6. **Notification:** The City will provide the Shelter with relevant information about each animal, including any known medical or behavioral issues, prior to transferring the animal to the Shelter's care.

7. **Health and Care:** The Shelter agrees to provide appropriate care, including shelter, food, water, medical attention, and socialization, to the animals accepted from the City.

8. **Holding Period.** The Shelter agrees to hold any impounded animal without identification or microchip for a period of three days prior to adoption or destruction. Any animal received by the Shelter that has identification or microchip shall be held for a period of seven days. If the owner fails to claim the animal at the expiration of the holding period, the Shelter shall deem the animal abandoned and the animal may be disposed of by the Shelter either through adoption or destruction of the animal. Any impounded animal may be destroyed before the end of the holding period for humane reasons related to relieving needless suffering resulting from injury, sickness, or disease as provided in F.S. § 828.05. The animal control officer may direct that an animal be held by the animal impounding facility for a period in excess of the applicable holding period.

9. **Transfer of Ownership:** The ownership of the animals will transfer to the Shelter until such time as they are adopted or otherwise transferred to new owners.

10. **Adoption:** The Shelter will make reasonable efforts to find suitable homes for the animals through its adoption program. Any adoption fees collected will remain the property of the Shelter.

11. **Reporting:** The Shelter agrees to provide periodic reports to the City detailing the number of animals accepted, their disposition (adoption, transfer, etc.), and any notable incidents.

12. **Termination:** Either party may terminate this agreement with or without cause with thirty (30) days written notice.

13. **Indemnification:** The City and the Shelter agree to indemnify, defend, and hold each other harmless from and against any claims, damages, liabilities, costs, and expenses arising from actions related to the execution of this Contract.

14. **Sovereign Immunity:** The City expressly retains all rights, benefits and immunities of sovereign immunity in accordance with Section 768.28, Florida Statues. Notwithstanding anything set forth in any section of the Contract to the contrary, nothing in the Contract shall be deemed as a waiver of immunity of limits of liability of the City beyond any statutory limited waiver of immunity or limits of liability which may have been or may be adopted by the Florida Legislature and the cap on the amount and liability of the City for damages regardless of the number or nature of claims in tort, equity or contract shall not exceed the dollar amount set by the legislature for tort. Nothing in the Contract shall inure to the benefit of any third party for the purpose of allowing any claim against the City, which would otherwise be barred under the Doctrine of Sovereign Immunity or by operation of law.

15. **Public Records:** The Shelter expressly agrees that it shall comply with the public records law provided in Florida Statutes, Chapter 119, and specifically to:

   (a) Keep and maintain public records required by the City to perform the contracted service.
   (b) Upon request from the City Clerk, provide the City with a copy of the requested records or allow the records to be inspected or copied within a reasonable time at a cost that does not exceed the cost provided in Chapter 119, Florida Statutes, or as otherwise provided by law.
   (c) Ensure that public records that are exempt or confidential and exempt from public records disclosure requirements are not disclosed except as authorized by law for the duration of the contract term and following completion of the contract if the Shelter does not transfer the records to the City.
   (d) Upon completion of the contract, transfer at no cost, to the City all public records in possession of the Shelter or keep and maintain public records required by the City to perform the service. If the Shelter transfers all public records to the City upon completion of the contract, the Shelter shall destroy any duplicate public records that are exempt or confidential and exempt from public records disclosure requirements. If the Shelter keeps and maintains public records upon the completion of the contract, the Shelter shall meet all applicable requirements for retaining public records. All records stored electronically must be provided to the City, upon request from the City Clerk, in a format that is compatible with the information technology systems of the City.
   (e) Failure of the Shelter to comply with Public Records Law as provided by Florida Statutes, Chapter 119, shall subject the Shelter to penalties under Chapter 119.10 and subject this Agreement to termination for cause by the City.


**IF THE SHELTER HAS QUESTIONS REGARDING THE APPLICATION OF CHAPTER 119, FLORIDA STATUTES, TO THE SHELTER'S DUTY TO PROVIDE PUBLIC RECORDS RELATING TO THIS CONTRACT, CONTACT THE CUSTODIAN OF PUBLIC RECORDS AT:**

**CITY CLERK**
**22 SOUTH BEACH STREET**
**ORMOND BEACH, FLORIDA 32175.  (386)677-0311**
CITYCLERK@ORMONDBEACH.ORG

Ref:  Fla. Stat. §119.0701(2016)

16. **Entire Agreement:** This Contract constitutes the entire agreement between the City of
    Ormond Beach and the Edgewater Animal Shelter and supersedes all prior
    understandings, agreements, or representations, whether oral or written.

17. **Amendments:** Both parties will provide each other with at least 30 days advance written
    notice of any proposed changes to this Agreement. Any amendment to the Agreement
    shall be in writing and mutually agreed upon by both parties.

18. **Governing Law:**  This Contract shall be governed by and construed in accordance with
    the laws of the state of Florida.

IN WITNESS WHEREOF, the EDGEWATER ANIMAL SHELTER and the CITY OF ORMOND
BEACH, have executed this Agreement for Services, effective on the date and year set forth
above.

EDGWATER ANIMAL SHELTER, INC             CITY OF ORMOND BEACH

BY: _____              _____
NAME: Kayla Kurtz                        City Manager Joyce Shanahan
TITLE: President
DATE: 7/23/25                            DATE: 7/23/2025


ATTEST:                                          ATTEST:
BY: Roxanne Hicks                        BY: _____
NAME: Director  Roxanne Hicks            NAME: Jessica Otten
TITLE: Director                          TITLE: Executive Assistant
DATE: 7/24/25                            DATE: 7/23/2025

# EXHIBIT FIVE

**Sent:** Thursday, December 11, 2025 1:07 PM
**To:** Marcy LaHart <marcy@floridaanimallawyer.com>
**Subject:** Re: service agreement between Edgewater Animal Shelter and Ormond Beach

Ms. LaHart:

In the interest of avoiding another motion to dismiss and sanctions motion, see Ormond Beach
Ordinance 2-300(c)(2)(e), which authorized the city manager to approve the Edgewater Animal
Shelter contract without the involvement of the city commission

Stephanie M. Boomershine, Esq.
Bogin, Munns & Munns, P.A.
Gateway Center
1000 Legion Place
Suite 1000 (10th Floor)
Orlando, Florida 32801
Tel. 407-578-1334
Fax 407-578-2181
sboomershine@boginmunns.com



EXHIBIT SIX

## Sec. 2-300. Methods of source selection.

(a)   *Competitive sealed bidding.*

   (1)   *Conditions for use.* All contracts of the city involving a purchase in excess of $75,000.00 shall be awarded by competitive sealed bidding, except as otherwise provided in subsections (b) through (g) and (i) of this section.

   (2)   *Invitation for bids.* Following the written approval of a bid request, to include a cost estimate, by the department/division head, the appropriate intermediate manager, if any, and the city manager, an invitation for bids shall be issued, which shall include specifications and all contractual terms and conditions applicable to the procurement.

   (3)   *Public notice.* Adequate public notice of the invitation for bids shall be given a reasonable time, not less than ten calendar days, prior to the date set forth therein for the opening of bids. Such notice may include publication in a newspaper of general circulation a reasonable time prior to bid opening. The public notice shall state the place, date and time of bid opening.

   (4)   *Bid receipt and opening.* No bids shall be accepted unless they are received by the person designated and at or before the time specified in the invitation for bids. Bids shall be opened publicly, by the purchasing agent or their designee in the presence of one or more witnesses at the time and place designated in the invitation for bids. The amount of each bid and such other relevant information as the purchasing agent deems appropriate, together with the name of each bidder, shall be recorded; the record and each bid shall be open to public inspection in accordance with general law.

   (5)   *Bid acceptance and bid evaluation.* Bids shall be unconditionally accepted without alteration or correction, except as authorized in this division. Bids shall be evaluated based on the requirements set forth in the invitation for bids, which may include criteria to determine acceptability such as inspection, testing, quality, workmanship, delivery, and suitability for a particular purpose. Those criteria that will affect the bid price and be considered in evaluation for award shall be objectively measurable, such as discounts, transportation costs, and total or life cycle costs.

   (6)   *Correction or withdrawal of bids; cancellation of awards.* Correction or withdrawal of inadvertently erroneous bids before or after bid opening, or cancellation of awards or contracts based on such bid mistakes, may be permitted where appropriate. Mistakes discovered before bid opening may be modified or withdrawn by written or telegraphic notice received in the office designated in the invitation for bids prior to the time set for bid opening. After bid opening, corrections in bids shall be permitted only to the extent that the bidder can show by clear and convincing evidence that a mistake of a nonjudgmental character was made, the nature of the mistake and the bid price actually intended. After bid opening, no changes in bid prices or other provisions of bids prejudicial to the interest of the city or fair competition shall be permitted. In lieu of bid correction, a low bidder alleging a material mistake of fact may be permitted to withdraw its bid if:

      a.   The mistake is clearly evident on the face of the bid document, but the intended correct bid is not similarly evident; or

      b.   The bidder submits evidence which clearly and convincingly demonstrates that a mistake was made.

      All decisions to permit the correction or withdrawal of bids, or to cancel awards or contracts based on bid mistakes shall be supported by a written determination made by the city attorney.

   (7)   *Award.* The contract shall be awarded with reasonable promptness by appropriate written notice to the lowest responsible and responsive bidder whose bids meets the requirements and criteria set forth in the invitation for bids. In the event the low responsive and responsible bid for a construction project

exceeds the architectural or engineering estimate, the city manager or his designee is authorized, when time or economic considerations preclude resolicitation of work of a reduced scope, to negotiate an adjustment of the bid price with the low responsive and responsible bidder in order to bring the bid within the amount of available funds.

(8) *Multistep sealed bidding.* When it is considered impractical to prepare initially a purchase description to support an award based on price, an invitation for bids may be issued requesting the submission of unpriced offers, to be followed by an invitation for bids limited to those bidders whose offers have been determined to be technically acceptable under the criteria set forth in the first solicitation.

(9) *Use of competitive bids or proposals obtained by other entities.* The city may utilize a competitive bid or proposal solicited by any other municipal, county, state, federal governmental agency, or any combination of such agencies, that the purchasing agent, the finance director or designee deems to be in the best interest of the city. In addition, the purchase of goods may be made through a cooperative purchasing program/alliance if:

    a. The finance director or designee determines that the cooperative program has obtained the bid through a competitively bid selection process that substantially complies with the city's bidding process; and

    b. The finance director or designee determines that the purchase through the program is in the best interest of the city.

(b) *Competitive sealed proposals.*

(1) *Conditions for use.* When the city manager determines in writing that the use of competitive sealed bidding is either not practicable or not advantageous to the city, a contract may be entered into by use of the competitive sealed proposals method.

(2) *Request for proposals.* Proposals shall be solicited through a request for proposals.

(3) *Public notice.* Adequate public notice of the request for proposals shall be given in the same manner as provided in subsection (a)(3) of this section, provided the minimum time shall be 30 calendar days.

(4) *Receipt of proposals.* No proposals shall be handled so as to permit disclosure of the identity of any offeror or the contents of any proposal to competing offerors during the process of negotiation.

(5) *Evaluation factors.* The request of proposals shall state the relative importance of price and other evaluation factors.

(6) *Discussion with responsible offerors and revisions to proposals.* As provided in the request for proposals, discussions may be conducted with responsible offerors who submit proposals determined to be reasonably susceptible of being selected for award for the purpose of clarification to ensure full understanding of and conformance to the solicitation requirements. Offerors shall be accorded fair and equal treatment with respect to any opportunity for discussion and revision of proposals, and such revisions may be permitted after submissions and prior to award for the purpose of obtaining best and final offers. In conducting discussions, there shall be no disclosure of the identity of competing offerors or of any information derived from proposals submitted by competing offerors.

(7) *Award.* Award shall be made to the responsible offeror whose proposal is determined in writing to be the most advantageous to the city, taking into consideration price and the evaluation factors set forth in the request for proposals. No other factors or criteria shall be used in the evaluation.

(c) *Contracting for professional services governed by the Consultants' Competitive Negotiations Act ("the Act").*

(1) Professional services required for any project which is not within the scope of a continuing contract between the city and a service provider, which services are included within the scope of the Act, shall be procured in accordance with the provisions of the Act.

Created: 2025-07-31 13:21:09 [EST]

(Supp. No. 10)

(2) Professional services required for any project which is within the scope of a continuing contract between the city and a service provider, which services are included within the scope of the Act, shall be procured in accordance with the following procedure:

    a.    The department head in charge of the project for which such services are required shall determine which of the service providers then under continuing contract with the city are potentially capable of providing the required services.

    b.    Such department head shall then request each such provider to submit a proposed scope of services and a fee quotation therefor.

    c.    Such department head shall, with such assistance as he deems necessary, review the proposals received; in the event he determines it to be in the overall best interest of the city he may, prior to completing his review, enter into negotiations with any service provider, as aforedescribed, which has submitted a proposal with respect to the proposed scope of services, the proposed fee, or both, in order to have the project completed in the most efficient and economical manner possible; upon the conclusion of any such negotiations, he shall complete his review of the proposals.

    d.    Upon completion of his review of the proposals, such department head shall prepare and submit to the city manager his recommendation as to which of the aforedescribed service providers should, in his professional judgment, receive authorization to perform the work required. In making such determination he shall take into account:

        1.    The factors set forth in F.S. § 287.055(4)(b), with respect to the service providers then under continuing contract with the city; and

        2.    The price for which the services are to be rendered.

    e.    If the proposal is for $75,000.00 or less, the city manager is the approving party and shall make the final decision in accordance with subsection (c)(2)f of this section. If the proposal is for more than $75,000.00, the city manager shall submit his recommendation, together with that of the department head, to the city commission for the final decision thereon.

    f.    The approving party shall, giving due consideration to the recommendation and to the overall general welfare of the citizens of the city, determine whether or not to issue the work authorization and, if so, to which of the aforedescribed service providers. The decision of the approving party shall be final, subject only to certiorari review by the circuit court.

(d)    *Contracting for independent auditing services.*

    (1)    *Authority.* Independent auditing services shall be procured in accordance with the selection procedures specified in this subsection.

    (2)    *Selection procedure.*

        a.    The city commission shall serve as the city's auditor selection committee.

        b.    The committee shall publicly announce, in a uniform and consistent manner, each occasion when auditing services are required to be purchased. Public notice must include a general description of the audit and must indicate how interested certified public accountants can apply for consideration.

        c.    The committee shall encourage firms engaged in the lawful practice of public accounting who desire to provide professional services to submit annually a statement of qualifications and performance data.

d.  Any certified public accountant desiring to provide auditing services must first be qualified pursuant to law. The committee shall make a finding that the firm or individual to be employed is fully qualified to render the required services. Among the factors to be considered in making this finding are the capabilities, adequacy of personnel, past record, and experience of the firm or individual.

e.  The committee shall adopt, by resolution, procedures for the evaluation of professional services, including, but not limited to, capabilities, adequacy of personnel, past record, experience, results of recent external quality-control reviews, proposed fees for the performance of the services desired, and such other factors as may be determined by the committee to be applicable to its particular requirements.

f.  The public must not be excluded from the proceedings under this subsection (d).

g.  The committee shall evaluate current statements of qualifications and performance data on file with the committee, together with those that may be submitted by other firms regarding the proposed audit, and shall conduct discussions with, and may require public presentations by, no fewer than three firms regarding their qualifications, approach to the audit, and ability to furnish the required services.

h.  The committee shall select no fewer than three firms deemed to be the most highly qualified to perform the required services after considering such factors as the ability of professional personnel; past performance; willingness to meet time requirements; location; recent, current and projected workloads of the firms; proposed fees for the performance of the services desired; and the volume of work previously awarded to the firm by the city, with the object of effecting an equitable distribution of contracts among qualified firms, provided such distribution does not violate the principle of selection of the most highly qualified firms. If fewer than three firms desire to perform the services, the committee shall recommend such firms as it determines to be qualified.

i.  If the city commission receives more than one proposal for the same engagement, the city commission may rank, in order of preference, the firms to perform the engagement. The firm ranked first may then negotiate a contract with the city commission giving, among other things, a basis of its proposed fee for that engagement. If the city commission is unable to negotiate a satisfactory contract with that firm, negotiations with that firm shall be formally terminated, and the city commission shall then undertake negotiations with the second-ranked firm. Failing accord with the second-ranked firm, negotiations shall then be terminated with that firm and undertaken with the third-ranked firm. Negotiations with the other ranked firms shall be undertaken in the same manner. The city commission, in negotiating with firms, may reopen formal negotiations with any of the three top-ranked firms, but it may not negotiate with more than one firm at a time. The city commission shall also negotiate on the scope and quality of services. In making such determination, the city commission shall conduct a detailed analysis of the cost of the professional services required in addition to considering their scope and complexity. For contracts over $50,000.00, the city commission shall require the firm receiving the award to execute a truth-in-negotiation certificate stating that the rates of compensation and other factual unit costs supporting the compensation are accurate, complete, and current at the time of contracting. Such certificate shall also contain a description and disclosure of any understanding that places a limit on current or future-years' audit contract fees, including any arrangements, under which fixed limits on fees will not be subject to reconsideration if unexpected accounting or auditing issues are encountered. Such certificate shall also contain a description of any services rendered by the certified public accountant or firm of certified public accountants at rates or terms that are not customary. Any auditing service contract under which such a certificate is required must contain a provision that the original contract price and any

additions thereto shall be adjusted to exclude any significant sums by which the city commission determines the contract price was increased due to inaccurate or incomplete factual unit costs. All such contract adjustments shall be made within one year following the end of the contract.

j.   If the city commission is unable to negotiate a satisfactory contract with any of the selected firms, the committee shall select additional firms, and the city commission shall continue negotiations in accordance with this subsection (d) until an agreement is reached.

(e)   *Contracting for designated professional services.*

(1)   *Authority.* Professional services, other than independent auditing services and those services included within the scope of the Consultants' Competitive Negotiation Act, shall be procured in accordance with the selection procedures specified in this subsection.

(2)   *Selection procedure.*

a.   *Conditions for use.* Except as provided under subsections (e)(5) and (f) of this section, such professional services shall be procured in accordance with this subsection (e).

b.   *Statement of qualifications.* Persons engaged in providing the types of professional services desired may submit statements of qualifications and expressions of interest in providing such professional services. A uniform format for statements of qualifications may be specified by the city. Persons may amend these statements at any time by filing a new statement.

c.   *Public announcement and form of request for proposals.* Adequate notice of the need for such services shall be given by the city through a request for proposals. The request for proposals shall describe the services required, list the types of information and data required of each offeror, and state the relative importance of particular qualifications.

d.   *Quotation of proposed fees.* All those interested persons submitting proposals shall include a quotation of their proposed fees for the performance of their services on behalf of the city. The quotation of proposed fees shall include rates, fees, charges and other detailed cost proposal or cost breakdown information as may be required by the city's request for proposals. The fees quoted shall be considered as one factor in determining the person to render services to the city.

e.   *Discussions.* The department/division head procuring the required professional services or a designee of such officer may conduct discussions with any offeror who has submitted a proposal to determine such offeror's qualifications for further consideration. Discussions shall not disclose any information derived from proposals submitted by other offerors.

f.   *Award.* Award shall be made to the offeror determined in writing by the department/division head procuring the required professional services or a designee of such officer to be best qualified based on the evaluation factors set forth in the request for proposals and negotiation of compensation determined to be fair and reasonable. If compensation cannot be agreed upon with the best qualified offeror, then negotiations will be formally terminated with the selected offeror. If proposals were submitted by one or more other offerors determined to be qualified, negotiations may be conducted with such other offeror or offerors, in the order of their respective qualification ranking, and the contract may be awarded to the offeror then ranked best qualified if the amount of compensation is determined to be fair and reasonable.

(3)   *Current contracts.* No continuing contract between the city and any provider of professional services within the scope of this subsection (e) and in effect at the time of its adoption shall be impaired by its adoption; provided, however, that no expenditure thereunder which is in excess of $75,000.00 shall be made until it has first been approved by the city commission.

(4)   *Contract document.* Every procurement of professional services in accordance herewith, the cost of which shall exceed $75,000.00, shall be evidenced by a written agreement embodying all provisions and conditions of the procurement of such services.

(5)   *Exception.* This subsection (e) shall not be applicable to the provision of health and mental health services or drugs in the examination, diagnosis or treatment of sick or injured city employees or the providing of other benefits as required by the provisions of F.S. ch. 440.

(f)   *Small purchases.*

(1)   *General.*

a.   Any contract or expenditure, except as otherwise provided in this division, exceeding $75,000.00, shall be approved by resolution duly adopted by the city commission.

b.   Any expenditure between $25,000.00 and $75,000.00 shall require procurement through one (1) of the following methods:

i.   Solicitation of quotes through the city's procurement portal for a period of no less than ten (10) days.

ii.   Piggybacking of another municipality upon the approval of the finance director or designee.

iii.   Use of an active continuing contract which was entered into by way of a formal bid or RFP and was awarded with city commission approval.

iv.   Any other means which clearly demonstrates and documents an active attempt to provide competition and obtain the lowest cost with the approval of the finance director or designee.

c.   Any expenditure not exceeding $25,000.00 may be made in accordance with the small purchase procedures. Expenditures shall not be divided to constitute a small purchase.

(2)   *Small purchases over $2,500.00.* Insofar as it is practical for small purchases in excess of $2,500.00, no less than three businesses shall be solicited to submit written quotations. Businesses within the city shall be used to the maximum extent feasible. Award shall be made to the business that meets the city's terms, conditions and specifications and offering the lowest price. The businesses submitting quotations and the date and amount of each quotation shall be recorded and maintained as a public record.

(3)   *Small purchases of $2,500.00 or less.* The purchasing agent or the finance director's designee shall adopt operational procedures for making small purchases of $2,500.00 or less. Such operational procedures shall provide for obtaining adequate and reasonable competition for the supply, services or construction being purchased.

(g)   *Sole source procurement.* A contract may be made without competition when the department head or division manager certifies to the purchasing agent or the finance director's designee in writing that, after conducting a good faith review of available sources, there is only one source for the required item(s) or service(s). The purchasing agent or the finance director's designee shall conduct negotiations as appropriate as to price, delivery and terms. A record of sole procurements shall be maintained as a public record.

(h)   *Emergency procurements.* Notwithstanding any other provisions of this division, the finance director or his designee may make or authorize others to make emergency procurements of supplies, services or construction when there exists a threat to public health, welfare or safety, provided that such emergency procurements shall be made with such competition as is practicable under the circumstances. A written determination of the basis for the emergency and for the selection of the particular contractor shall be submitted to the purchasing agent or the finance director's designee by the department head or division manager and shall be included in the contract file. As soon as practicable, a record of each emergency

procurement that exceeds the small purchase threshold as stated in subsection (e) of this section shall be made and shall set forth the contractor's name, the amount and type of the contract, a listing of the item(s) procured under the contract, and the identification number of the contract file. A copy of such record shall be maintained as a public record.

(i)    *Cancellation of invitations for bids or requests for proposals.* An invitation for bids, a request for proposals or other solicitation may be canceled, or any or all bids or proposals may be rejected in whole or in part as may be specified in the solicitation, when it is for good cause and in the best interests of the city. The reasons therefor shall be made part of the contract file. Each solicitation issued by the city shall state that the solicitation may be canceled and that any bid or proposal may be rejected in whole or in part for good cause when in the best interests of the city. Notice of cancellation shall be sent to all businesses solicited. The notice shall identify the solicitation, explain the reason for cancellation and, where appropriate, explain that an opportunity will be given to compete on any resolicitation or any future procurement of similar items. Reasons for rejection shall be provided upon request by unsuccessful bidders or offerors.

(j)    *Alternative procurement method.* Notwithstanding any other provision of this division to the contrary, any purchase of used vehicles or used equipment may be made through a bid at a public auction, or through competitive negotiations, when such method(s) are recommended by the city manager and determined by city commission resolution to best protect the public welfare.

(Code 1983, § 2-300; Ord. No. 89-77, § 8, 11-7-1989; Ord. No. 91-60, § 1, 1-21-1992; Ord. No. 94-55, §§ 1, 2, 6-21-1994; Ord. No. 94-75, §§ 1—7, 7-19-1994; Ord. No. 97-15, §§ 1, 2, 4-1-1997; Ord. No. 97-37, §§ 1—3, 7-1-1997; Ord. No. 98-56, § 1, 12-22-1998; Ord. No. 2012-45, § 1, 1-8-2013; Ord. No. 2022-23, § 1, 8-3-2022; Ord. No. 2025-16, § 1, 4-15-2025)